F O D   SEP 1 1 2001

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No._____ |
| | ) | (Jointly Administered) |
| GOSS HOLDINGS, INC., et al., | ) | Chapter 11 |
| | ) | Hon. _____ |
| | ) | Hearing Date: September ___, 2001 |
| Debtors. | ) | Hearing Time: _____ |

**EMERGENCY MOTION FOR INTERIM AND FINAL
ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364
(I) AUTHORIZING POST-PETITION FINANCING; (II) GRANTING
LIENS AND SUPER-PRIORITY CLAIMS; (III) AUTHORIZING USE
OF CASH COLLATERAL; (IV) GRANTING ADEQUATE
PROTECTION; AND (IV) SCHEDULING A FINAL HEARING**

Goss Holdings, Inc. and its wholly-owned operating subsidiary, Goss

Graphic Systems, Inc., debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby file this emergency motion (the "Motion"), pursuant

to Sections 105, 361, 362, 363, and 364 of Chapter 11 of Title 11 of the United States

Code, 11 U.S.C. §§ 101, et seq., as amended (the "Bankruptcy Code"), and Rule 4001 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an

order approving Postpetition Financing (as hereinafter defined), granting liens and super

priority claims, authorizing use of cash collateral, granting adequate protection, and

scheduling a final hearing.  In support of this Motion, the Debtors rely on the Affidavit

of Timothy R. Coleman (the "Coleman Affidavit") filed contemporaneously herewith.

In further support of this Motion, the Debtors respectfully represent as follows:

**FILED**
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

SEP 1 0 2001

KENNETH S. GARDNER, CLERK

BY_____
DEPUTY CLERK

5

## BACKGROUND

A.    <u>The Chapter 11 Filings</u>

1.    On September 10, 2001 (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court for reorganization relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

2.    No committee of unsecured creditors has yet been appointed in these cases, and no trustee or examiner has been appointed.

3.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

B.    <u>Business Operations</u>

5.    The Debtors are among the world's leading producers of newspaper and insert printing press systems and are a major producer of commercial printing press systems. The Debtors' products fall into three broad categories:

- newspaper press systems for publishers of national, regional and local news;

2

- commercial press systems for printers of brochures and promotional materials, catalogues, magazines, books, financial publications, and directories; and

- insert press systems for printers of advertising inserts, including Sunday newspaper inserts and direct mail/point-of-purchase inserts.

6.    The Debtors are only one of six major global suppliers of newspaper printing press systems, and are the only U.S.-based producer of newspaper printing presses. The Debtors are headquartered in Westmont, Illinois. Prior to the Petition Date, they conducted their domestic engineering and manufacturing operations at their headquarters and at a large manufacturing facility in Cedar Rapids, Iowa.

7.    Through their foreign subsidiaries and related entities, the Debtors also conduct significant operations in England, France, Japan, and China. During fiscal year 2000, approximately 54% of the Debtors' consolidated revenue was generated from sales by their international operations. Prior to the Petition Date, the Debtors employed approximately 2,700 employees worldwide.

8.    The Debtors' core business, in which they and their predecessors have engaged for over 116 years, is the production of newspaper printing press systems. Over 50% of all daily newspapers worldwide print on the Debtors' presses. The Debtors produce "large newspaper" press systems, which use 50" and wider paper, for use by large national and metropolitan newspapers. The Debtors also produce "small newspaper" press systems, which use 36" wide paper for smaller regional and local newspapers. The Debtors custom design and engineer each press system to meet the specific printing requirements and space limitations of their customers.

3

9.      All of the Debtors' newspaper printing press systems are sold under the "Goss" tradename. The Debtors' principal products for large newspaper printing presses are their Newsliner and Colorliner press systems, whereas their principal products for smaller newspaper printing presses are their Universal and Community press systems. Sales of large printing systems accounted for roughly 47% of the Debtors' sales during fiscal 2000, and sales of smaller printing systems accounted for approximately 25% of the Debtors' sales during fiscal 2000.

10.     As stated above, the Debtors also manufacture insert printing press systems. Sales of such systems, through the Magnum and C700 models, accounted for approximately 10% of the Debtors' sales in fiscal 2000. The Debtors' sales of commercial printing presses, through the M16, G18, and G25 models, represented roughly 1% of sales in fiscal 2000.

11.     Finally, the Debtors provide aftermarket parts and customer service in connection with the presses and related equipment they have sold. Sales of aftermarket parts and equipment comprised approximately 17% of the Debtors' sales in fiscal 2000. Service and technical support include site preparation and inspection, equipment installation, preventive and corrective maintenance, paper width changes, and color capability upgrades. Such support is provided by a staff of approximately 275 field service engineers and other agents around the world.

C.    Corporate Structure and Ownership

12.    Goss Holdings, Inc. ("Holdings") is a holding company that owns all the capital stock of Goss Graphic Systems, Inc. ("Systems"). Stonington Capital Appreciation 1994 Fund, L.P. ("Stonington") owns approximately 65% of the capital stock of Holdings. Another 31% of Holdings' stock is owned by certain debtholders (summarized below). Finally, Rockwell International Corporation owns approximately 3.5% of Holdings' stock.

13.    Systems owns all the capital stock of four foreign subsidiaries: Goss Graphic Systems Limited, a company organized under the laws of England ("Goss UK"); Goss Systemes Graphiques Nantes, S.A., an entity organized under the laws of France ("Goss France"); Goss Graphic Systems Japan Corporation, a corporation organized under the laws of Japan ("Goss Japan"); and Goss Graphic Systems Australasia Pty. Ltd., a company organized under the laws of Australia ("Goss Australia"). Systems also owns a majority interest in Shanghai Goss Graphic Systems Co., Ltd., J.V. ("Goss China"), a joint venture with a large manufacturing facility in the Peoples Republic of China.

14.    None of Goss UK, Goss France, Goss Japan, Goss Australia, or Goss China are debtors in these proceedings. Each of these companies continues to be operated in the ordinary course of business under the laws of its own jurisdiction.

D.    Prior Chapter 11 Filing

15.    On July 30, 1999, Systems and Holdings' predecessor filed voluntary

petitions for relief under Chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the District of Delaware.  The Debtors commenced that case

because of increased competition and cyclical declines that had resulted in severe

operating losses and the Debtors' use of virtually all liquidity.

16.    At the time of that filing, the Debtors owed approximately $200 million

in secured bank debt to a group of lenders led by Bankers Trust Company (the "Original

Credit Agreement"), plus $225 million principal amount of Senior Subordinated Notes

due 2006 (the "Original Notes").  In connection with the cases, certain of the lenders

under the Original Credit Agreement provided $50,000,000 of debtor-in-possession

financing to the Debtors and its subsidiaries (the "1999 DIP Financing"), which financ-

ing was secured by priming liens on the assets of Systems and Holdings' predecessor.

17.    Upon commencement of the case, the Debtors filed a pre-negotiated plan

of reorganization designed to restructure this indebtedness.  The plan of reorganization

cancelled the Debtors' obligations with respect to the Original Notes.  Holders of the

Original Notes received instead $112.5 million principal amount of the Notes described

above, plus 31% of the equity in Holdings.

E.    Prepetition Indebtedness

18.    As part of the plan of reorganization, Systems, Goss UK, Goss France

and Goss Japan entered into that certain $250,000,000 Second Amended and Restated

6

Multicurrency Credit Agreement dated as of November 19, 1999 (as amended, the "Credit Agreement") with Bankers Trust Company ("BTCo") as lender and administrative agent for the lenders party thereto (the "Lenders"). The debt evidenced by the Credit Agreement is comprised of several components, or "tranches," in the total principal amount of approximately $265 million.

19.     The Credit Agreement originally provided for the following commitments: Domestic Tranche A Revolving Loan Commitments in a maximum amount of $50,000,000, available solely to Systems; Domestic Tranche B Revolving Loan Commitments in a maximum amount of $50,000,000, available solely to Systems; UK Tranche B Revolving Loan Commitments in a maximum amount of $50,000,000 (with an initial suballocation of $35,000,000) available solely to Goss UK under the conditions set forth in the Credit Agreement, utilization of which reduced the availability of the Domestic Tranche B Revolving Loan Commitments; Domestic Term Loans in the amount of $131,243,580; and UK Term Loans in the amount of $18,756,420.

20.     On August 30, 2000, the Credit Agreement was amended to add an additional facility (the "Domestic Tranche A Overline") in the amount of $15,000,000, available only to Systems. The Domestic Tranche A Overline was to be repaid by May 31, 2001, which date was extended to September 30, 2001. As of the Petition Date, substantially all of the amounts under the Credit Agreement had been drawn by Systems and Goss UK.

7

21.    The Domestic Tranche A Revolving Loans refinanced the 1999 DIP Financing. The Domestic Tranche A Revolving Loans and the Tranche A Overline Loans are hereinafter referred to collectively as the "Tranche A Loans." The Tranche A Loans are secured pari passu by a first priority lien on substantially all assets of Systems and Holdings (except for 34% of the stock of the Foreign Subsidiaries).

22.    The Domestic Tranche B Revolving Loans and Domestic Term Loans (collectively, the "Tranche B Loans") are secured pari passu by a second priority lien on substantially all the assets of Systems and Holdings (except for 34% of the stock of the Foreign Subsidiaries). The UK Tranche B Revolving Loans and the UK Term Loans are secured pari passu by liens on substantially all the assets of Goss UK and are guaranteed by Systems, which guaranty is secured by a second priority lien on substantially all the assets of Systems and Holdings (except for 34% of the stock of the Foreign Subsidiaries), which lien is pari passu with the liens securing the Tranche B Loans.

23.    Holdings is obligated on roughly $139 million, including interest, of those certain 12.25% Senior Subordinated Notes due 2005 (the "Notes"). The original issue was in the face amount of $112.5 million, however interest has been payable in additional Notes since their issuance and will continue to be so through May 2002. The Notes are unsecured. Payment of the Notes is subordinated to the bank debt under the Credit Agreement.

8

F.    Events Leading to the Chapter 11 Filing

24.    Although the Debtors' prior bankruptcy reduced their unsecured indebt-edness and provided the Debtors with significant new liquidity, the Debtors have been negatively impacted by the downturn in economic conditions that began after the Debtors' emergence from their first bankruptcy. This downturn has affected the newspaper publishing industry in general, resulting in substantial losses in advertising revenue and layoffs nationwide.

25.    Moreover, the Debtors have experienced operational, product quality, and installation issues with respect to certain newspaper presses and related equipment manufactured by their North American operations. These issues have resulted in delays in installations, increased production and substantial re-work costs, and the loss of customer goodwill. These factors have significantly affected the Debtors' operational performance and liquidity, especially in recent months.

G.    The Debtors' Restructuring Plan

26.    Earlier this year, the Debtors retained The Blackstone Group, L.P. ("Blackstone") as investment banking and restructuring advisors, and also retained Skadden, Arps, Slate, Meagher & Flom (Illinois) and its affiliated law practice entities to assist the Debtors in evaluating their strategic alternatives. As part of this process, the Debtors, with the assistance of Blackstone and their other advisors, have developed a business plan for the restructuring of the Debtors' operations and capital structure. The Debtors commenced these cases in order to finalize and implement this plan.

9

27.    The plan contemplates the restructuring of the Debtors' affairs around their international operations, including Goss UK, Goss France, Goss Japan, Goss Australia, and Goss China. However, the Debtors will still conduct substantial operations in the United States. The reorganized enterprise will remain headquartered in the United States; will own the stock of the foreign operations; and will continue the Debtors' parts and services business. There will also be a significant sales force in the United States, and each of the foreign subsidiaries will continue to service and market to significant United States customers.

28.    The Debtors have prepared a Joint Plan of Reorganization of Goss Holdings, Inc. and Goss Graphic Systems, Inc. (the "Plan") designed to implement their operational and financial restructuring. Under the Plan, the Debtors will eliminate $293 million of secured and unsecured debt. This amount is comprised of roughly $153 million in funded bank debt owed to certain of their Lenders under the Credit Agreement, plus the full $139 million owed on the Notes, including accrued interest. The bank debt to be eliminated will be converted into substantially all the stock of the reorganized enterprise, subject to certain amounts to be distributed to holders of general unsecured claims.

29.    The Plan is the result of significant negotiations among the Debtors, the Lenders, and holders of a majority of the Notes. The Plan is supported by the Debtors' Lenders, holders of a majority of the Notes, and holders of a majority of the Debtors' existing equity. The Plan therefore represents a consensual resolution of the Debtors'

10

operational and financial issues. The Plan thus should allow the Debtors to emerge from

Chapter 11 with a more efficient operation and significantly reduced debt, unhindered by

the operational and financial issues that have plagued them in the past.

### RELIEF REQUESTED

30.     By this Motion, the Debtors request entry of interim and final orders:

(a)     authorizing the Debtors to obtain postpetition secured financing
and other financial accommodations (the "Postpetition Financing" or the "DIP
Facility") up to an aggregate principal amount not to exceed $90 million on the
terms set forth in that certain Secured Super-Priority Debtor in Possession
Revolving Credit Facility (the "DIP Credit Agreement")[1] from BTCo, as agent,
(in such capacity, the "Agent") and the DIP Lenders and Issuers party thereto, a
draft of which is attached hereto as Exhibit A;

(b)     authorizing the Debtors to use the proceeds of the DIP Facility to,
among other things, (i) fund working capital and other costs of the Debtors; (ii)
refinance the amounts outstanding under the Pre-petition Credit Agreement with
respect to the Domestic Tranche A Overline Facility and the Domestic Tranche
A Revolver; and (iii) provide loans to the Debtors' foreign subsidiaries, in each
case subject to and in accordance with the budget attached hereto as Exhibit B
(the "Approved Budget");

(c)     authorizing the Debtors, under Section 364(d) of the Bankruptcy
Code, to grant to the Administrative Agent, for the ratable benefit of the DIP
Lenders, and as security for the repayment of the borrowings and all other
obligations arising under the DIP Facility, security interests in and liens upon
substantially all of each Debtor's existing and after-acquired real and personal
property, wherever located (the "Collateral");

(d)     granting superpriority claim status to the DIP Lenders pursuant to
Section 364(c)(1) of the Bankruptcy Code;

(e)     authorizing the Debtors to borrow money and seek other financial
accommodations from the DIP Lenders on an interim basis in an amount not to

---

[1]     Capitalized terms not otherwise defined herein shall have the mean-
ings give to them in the DIP Credit Agreement.

exceed $75 million pursuant to the terms and conditions of the DIP Credit
Agreement on the basis of the security and priority provided for therein and in
the proposed order attached hereto as <u>Exhibit C</u> (the "Interim Order") and the
thirteen-week forecast.

(f)     authorizing the Debtors, pursuant to Section 363(c)(2) of the
Bankruptcy Code, to use cash collateral on an interim and final basis consistent
with the amounts, and for the purposes specified in, the Budget and pursuant to
the terms of the cash collateral and adequate protection stipulation attached
hereto as <u>Exhibit D</u> (the "Adequate Protection Stipulation");

(g)     granting adequate protection to the Debtors' pre-petition Lenders
pursuant to Section 361 of the Bankruptcy Code and the Adequate Protection
Stipulation; and

(h)     setting a final hearing on the Motion pursuant to Rule 4001(c) of
the Bankruptcy Rules.

<u>BASIS FOR RELIEF</u>

31.     The DIP Facility pursuant to the terms of the DIP Credit Agreement is

vital to the Debtors' ability to operate in Chapter 11 and for the Debtors' successful

reorganization.  Without access to the DIP Facility, the Debtors' ability to operate their

businesses, including their ability to obtain goods and services, meet customer obliga-

tions, obtain continued trade credit, and attract new business will be hindered, which will

severely and irreparably damage the enterprise.  In addition, the DIP Facility will

provide the necessary security to the Debtors' customers so that they will continue to do

business with the Debtors, thus minimizing the harm to the Debtors' business as a result

of these Chapter 11 cases.

32.     Prior to the Petition Date, the Debtors were unable to obtain postpetition

financing in the form of unsecured credit allowable as an administrative expense under

Section 503(b)(1) of the Bankruptcy Code or unsecured credit allowable under Sections 364(a) and 364(b) of the Bankruptcy Code. The Debtors therefore determined, in the exercise of their sound business judgment, that the proposal for the DIP Facility provided by the DIP Lenders is the most favorable under the circumstances and addresses the Debtors' working capital needs.

33.     Before determining to enter into the DIP Facility upon the terms of the DIP Credit Agreement, the Debtors and BTCo conducted vigorous and lengthy, arm's-length, and good-faith negotiations.

## TERMS OF THE DIP FACILITY

34.     The terms of the proposed DIP Facility are more specifically set forth in the DIP Credit Agreement.[2] However, the salient terms of the DIP Facility are as follows:

Borrowers:          Goss Graphic Systems, Inc. ("Systems") with respect to the DIP Facility, and each of Goss UK, Goss France, and Goss Japan with respect to the Foreign Facility (described below).

Guarantors:         Goss Holdings, Inc. and the domestic subsidiaries of Systems with respect to the DIP Facility, and Goss Holdings, Inc. and Systems with respect to the Foreign Facility (described below).

The Facility:       A non-amortizing revolving credit facility in a principal amount of up to $90 million, of which up to $75 million shall be available through the entry of a final order (the "Final Order") entered by this Court approving the DIP Facility, subject to availability and the terms of the Budget attached hereto as Exhibit B. The DIP

---

[2]      The parties anticipate that the final DIP Credit Agreement will be substantially in the form of the DIP Credit Agreement attached hereto as Exhibit A.

13

Facility is comprised of five (5) "tranches" or sub-facilities, each of which is described below.

DIP Tranche
1A Facility:

The DIP Tranche 1A Facility is a revolving commitment in the maximum amount of $25 million, $10 million of which shall be available initially, and $15 million more of which may be made available, in two increments of $5 million and $10 million, respectively, upon the discretionary approval by 92% in amount of the maximum commitment of the Tranche 1A Lenders.

DIP Tranche
1B Facility:

The DIP Tranche 1B Facility is a revolving commitment in the maximum amount of $17 million. Of the roughly $50 million principal amount outstanding under the pre-petition Domestic Tranche A Revolver, described above, an amount equal to $17 million is comprised of outstanding letters of credit scheduled to expire by September 30, 2001 (the "Pre-Petition L/C's"). As the Pre-Petition L/C's expire without having been drawn, the DIP Tranche 1B Facility shall become available in amounts equal to the face amount of such expiring L/C's.

DIP Tranche
2 Facility:

The DIP Tranche 2 Facility is a revolving commitment in the maximum amount of $15 million. The proceeds of the DIP Tranche 2 Facility will be used to refinance the Pre-Petition Tranche A Overline Facility in the amount of $15 million.

DIP Tranche
3 Facility:

The DIP Tranche 3 Facility is a revolving commitment in the maximum amount of $50 million. The proceeds of the DIP Tranche 3 Facility will be used to refinance the Pre-Petition Tranche A Revolver Facility in the amount of $50 million, provided, however, that such amount will be reduced, dollar for dollar, as the Pre-Petition L/C's under such Facility expire and are replaced by the DIP Tranche 1B Facility described above. Thus, if the Pre-Petition L/C's expire without being drawn and are fully replaced by the DIP Tranche 1B Facility in the amount of $17 million, the maximum availability under the DIP Tranche 3 Facility would be $33 million. The Tranche 3 Facility includes an additional $6 million of letters of credit which, if they expire without being drawn, will create availability under Tranche 3.

Foreign
Facility:                    Of the maximum amounts available under all of the foregoing
                             Facilities, up to $25 million shall be available for borrowings by
                             Goss UK, Goss France, and Goss Japan.  Borrowings and letter of
                             credit usage under the Foreign Facility therefore shall reduce the
                             maximum amounts available for the Debtors under the DIP Facil-
                             ity.

Summary
of Facilities:               Each of the DIP Facilities, their intended uses (subject in each
                             case to the Budget), and their relation to the indebtedness out-
                             standing under the Pre-Petition Credit Agreement, if any, is
                             summarized in the table below:

| DIP Facility | Maximum Amount | Uses/Pre-Petition Credit Agreement |
|---|---|---|
| 1A | $25 million | Working capital and bankruptcy costs. |
| 1B | $17 million | Working capital and replacement of expiring Pre-Petition L/C's under the Pre-Petition Tranche A Revolver. |
| 2 | $15 million | Working capital and refinance of Pre-Petition Tranche A Overline Facility. |
| 3 | $50 million | Working capital and refinance of Pre-Petition Tranche A Revolver except to the extent that Pre-Petition L/C's under the Tranche A Revolver are replaced by the DIP Tranche 1B Facility. |
| Foreign | $25 million | Working capital sublimit for the benefit of Goss UK, Goss France, and Goss Japan. |

Letters of
Credit:                      Up to $45 million of the DIP Facility, subject to availability, will
                             be available for the issuance of letters of credit (the "Letters of
                             Credit").  An amount equal to 3.50% per annum of the maximum
                             amount available from time to time to be drawn under a Letter of
                             Credit shall be payable to the Administrative Agent for the benefit
                             of any issuer, payable monthly in arrears.

Gap
Lenders:                     To the extent that the Tranche A Lenders have failed to subscribe
                             to the Tranche 1A Facility, there existed a shortfall in Tranche 1A
                             commitments (the "Gap Amount").  Tranche B Lenders (both
                             Revolving and Term) were invited to participate in the DIP Facil-

ity to provide commitments for the Gap Amount, on the terms outlined below. Tranche B Lenders subscribing to provide the Gap Amount are designated as "Gap Lenders". In addition to the fees payable to all DIP Tranche 1A Lenders, the Gap Lenders will receive the following:

     (i)    an additional fee (divided pro rata among the Gap Lenders), payable upon maturity of the DIP Facility, equal the product of (a) 2 times the Gap Amount times (b) 6 months interest at Base Rate plus 2.75% ("Gap Lending Fee"). The Gap Lending Fee will be subordinate in payment priority to repayment of the DIP Facility (including the Back-End Fee discussed below), but will be a DIP obligation senior to all other prepetition debt;

     (ii)    pursuant to an intra-Lender agreement, Gap Lenders will receive payment priority in liquidation with respect to a portion of their Tranche B Loans to Systems equal to 2 times the Gap Amount. For example, if the Gap Amount is $5 million, then $10 million of the Gap Lenders' Tranche B Loans to Systems will receive payment priority in a liquidation of Systems. The payment priority afforded to such portion of the Gap Lenders' Tranche B Loans will be senior to all other Tranche B Loans to Systems, but subordinate to all Tranche A Loans and the DIP Facility. The Tranche B Loans to Goss UK will not be elevated in priority (i.e., the payment priority of existing Tranche B loans to Goss UK will not be affected); and

     (iii)    under the Plan, the Gap Lenders will receive (in addition to the treatment afforded other DIP Lenders) a debt instrument with respect to their Tranche B Loans equal to two times the Gap Amount, in lieu of stock for that portion of the claim. Such debt instrument will be subordinate to the loans refinancing the DIP Facility and the Tranche A Loans not refinanced by the DIP Facility.

| | |
|---|---|
| <u>Term</u>: | The earlier of (i) six (6) months after entry of a Final Order; (ii) the effective date of a plan of reorganization (a "Plan") that is |

confirmed pursuant to a final, non-appealable order entered by this Court or any other court having jurisdiction over these cases (the "Consummation Date"), (iii) the date of termination of the DIP Facility as the result of mandatory or voluntary commitment reductions or the election by the Administrative Agent or the Requisite DIP Lenders during the continuance of an Event of Default, and (iv) the date on which the Obligations become due and payable pursuant to the DIP Credit Agreement (collectively, the "Termination Date"). Item (i) of the preceding sentence may be extended by up to 90 days by 92% in amount of the maximum commitment of the Lenders for all DIP Facilities combined.

<table>
<tr><td>Interest:</td><td>With respect to the DIP Tranche 1A Facility and loans made by Tranche 1A Lenders under the Foreign Facility, the Base Rate plus 3.50% per annum or the reserve adjusted Offshore Rate plus 4.50% per annum, except that after the occurrence of an event of default, the interest rate will be the Base Rate plus 5.50% per annum. With respect to the DIP Tranche 1B Facility, the DIP Tranche 2 Facility, and the DIP Tranche 3 Facility and loans by Tranche 1B Lenders, Tranche 2 Lenders, and Tranche 3 Lenders under the Foreign Facility, at the Debtors' option, at the Base Rate plus 3.00% per annum or the reserve adjusted Offshore Rate plus 4.00% per annum, except that after the occurrence of any event of default, the interest rate will be the Base Rate plus 5.00% per annum.</td></tr>
</table>

__Interest:__

With respect to the DIP Tranche 1A Facility and loans made by Tranche 1A Lenders under the Foreign Facility, the Base Rate plus 3.50% per annum or the reserve adjusted Offshore Rate plus 4.50% per annum, except that after the occurrence of an event of default, the interest rate will be the Base Rate plus 5.50% per annum. With respect to the DIP Tranche 1B Facility, the DIP Tranche 2 Facility, and the DIP Tranche 3 Facility and loans by Tranche 1B Lenders, Tranche 2 Lenders, and Tranche 3 Lenders under the Foreign Facility, at the Debtors' option, at the Base Rate plus 3.00% per annum or the reserve adjusted Offshore Rate plus 4.00% per annum, except that after the occurrence of any event of default, the interest rate will be the Base Rate plus 5.00% per annum.

__Fees:__

Systems agrees to pay to BTCo for distribution to the DIP Lenders non-refundable fees equal to (i) 3.00% of the maximum commitment under the DIP Tranche 1A Facility and (ii) 1.50% of the maximum commitment for the DIP Tranche 1B Facility, DIP Tranche 2 Facility and the DIP Tranche 3 Facility. In addition, Systems agrees to pay the following additional fees: (i) $5 million ("Back-End Fee"), to be divided pro rata among the Tranche 1A Lenders (including the Gap Lenders), payable on maturity of the DIP Facility, subordinate in payment priority to Tranche 1A and Tranche 1B of the DIP Facility, pari passu with the Gap Back-End Fee, and senior to Tranche 2 and 3 of the DIP Facility and the Gap Lending Fee and all prepetition debt; and (ii) $2 million ("Gap Back-End Fee"), to be divided pro rata among the Gap Lenders, payable on maturity of the DIP Facility, pari passu with the Gap Back-End Fee. Also, under the Plan, the Tranche 1A Lenders and

the Tranche 1B Lenders will receive their pro rata share of 10% of the newly issued shares of reorganized Systems. Finally, Systems also agrees to pay the DIP Lenders an unused commitment fee of 0.75% per annum of unutilized commitments under the Credit Agreement.

Mandatory
Prepayments:

Mandatory reductions of the commitments under the DIP Facility shall be required in an amount equal to the net cash sale proceeds received by Systems from certain non-ordinary course asset sales, tax refunds, litigation settlement proceeds, and dividends from Goss China. All mandatory payments received from Systems or Holdings shall be applied first to the repayment in full of the DIP Tranche 1A Facility and the DIP Tranche 1B Facility, pari passu, and second to repayment in full of the DIP Tranche 2 Facility and the DIP Tranche 3 Facility, pari passu. All mandatory payments received from any foreign borrower with respect to the Foreign Facility shall be applied such that loans to such foreign borrower funded by Tranche 1A Lenders and Tranche 1B Lenders shall be repaid first, pari passu, and second, loans funded by Tranche 2 Lenders and Tranche Lenders shall be repaid, pari passu.

Collateral:

All obligations of the Debtors to the DIP Lenders and the Administrative Agent, including, without limitation, all principal and accrued interest, costs, fees, and expenses shall be:

(i)    Secured (subject to the Carve-Out (defined below), pursuant to Section 364(c)(2) of the Bankruptcy Code, by a first priority, fully perfected security interest, in all of the existing and after acquired real and personal, tangible and intangible assets of the Debtors not subject to a perfected, non-avoidable lien or other encumbrance as of the Petition Date, wherever located, but excluding avoidance actions under the Bankruptcy Code;

(ii)    Secured (subject to the Carve-Out), pursuant to Section 364(d)(1) of the Bankruptcy Code, by a fully perfected security interest senior in priority to all liens of the Prepetition Lenders existing as of the Petition Date in all collateral existing as of the Petition Date;

18

(iii)     Secured (subject to the Carve-Out), pursuant to Section 364(c)(3) of the Bankruptcy Code, by a fully perfected security interest in all property other than the collateral (other than that of the Prepetition Lenders) that is subject to valid and non-avoidable liens as of the Petition Date which security interest shall be junior in priority to such valid and non-avoidable liens; and

(iv)     Accorded administrative priority status under Section 364(c)(1) of the Bankruptcy Code, having a superpriority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code ("Superpriority Claims"), subject only to the Carve-Out.

(v)     Loans to a Foreign Subsidiary under the Foreign Facility will be secured by liens on all assets of the Foreign Borrower; provided, however, that BTCo, in its discretion, may waive the requirement for security interests in the assets of Goss France and/or Goss Japan.  Liens of the Prepetition Lenders on Goss UK assets will be subordinated to liens securing loans to Goss UK under the Foreign Facility.

Collateral
Application:                  Proceeds of collateral on which the Pre-Petition Lenders have no lien will be applied to the repayment of the DIP Facility prior to the application of proceeds of collateral on which the Pre-Petition Lenders have liens.  The DIP Tranche 1A Facility and the DIP Tranche 1B Facility shall be pari passu with one another in lien priority, in a first priority position.  The Back-End Fee and Gap Back-End Fee shall be pari passu with one another in lien priority in a second priority position.  The DIP Tranche 2 Facility and the DIP Tranche 3 Facility shall be pari passu with one another in lien priority in a third priority position.

Carve-Out:                   The foregoing liens on the Collateral and the Superpriority Claims shall be subject to a carve-out (the "Carve-Out") for (i) professional fees incurred in the cases in the sum of (a) the aggregate allowed fees and expenses under Sections 330 and 331 of the Bankruptcy Code of professional persons retained pursuant to an order or orders of the Court by the Debtors (collectively, the "Debtors' Professionals") and the Committee's professionals (the "Committee's Professionals"), which fees and expenses prior to

19

the occurrence of an Event of Default (as defined below) and
notice by the Lenders of imposition of the cap specified herein,
(1) have been paid, (2) have been billed (including bills provided
for information purposes only) and copies of any such bills having
been provided to the Lenders, (3) are the subject of a filed interim
or final fee applications, or (4) have been accrued, in each case
subject to the Budget and (b) from and after the occurrence of an
Event of Default and notice by the Lenders of imposition of the
cap specified herein, the aggregate compensation and reimburse-
ment of expenses allowed and payable under Sections 330 and
331 of the Bankruptcy Code to the Debtors' and Committee's
Professionals in an amount not to exceed (A) $1 million for all
professionals other than The Blackstone Group, L.P.
("Blackstone") and (B) monthly fees of Blackstone of not more
than $200,000 per month and, if Blackstone acts as the selling
agent for the sale of all or substantially all of the assets of the
Debtors, the greater of (1) a restructuring fee (as defined in
Blackstone's engagement letter with the Debtors) and (2) a one-
time transaction fee (as defined in the Blackstone engagement
letter) not to exceed 3.5% of the consideration from such sale
available for distribution to creditors, but not less than $1.5 mil-
lion; and (ii) the payment of fees pursuant to 28 U.S.C. § 1930(i).

|                        |                                                                 |
|------------------------|-----------------------------------------------------------------|
| Adequate<br>Protection: | As adequate protection for the priming liens securing the<br>Obligations and for the use of cash collateral of the Prepetition<br>Lenders, the Prepetition Lenders shall receive, in accordance with<br>Section 361 of the Bankruptcy Code, (i) liens on the remaining<br>unencumbered portion of the stock of the Foreign Subsidiaries<br>(subject and subordinate to the liens securing the DIP Facilities);<br>and (ii) replacement liens on all post-petition assets (excluding<br>avoidance actions). Additionally, the last date for challenging the<br>pre-petition liens of the Prepetition Lenders shall be 60-days after<br>the Petition Date, unless otherwise agreed to by the Prepetition<br>Lenders. |
| Conditions<br>Precedent: | The DIP Credit Agreement contains conditions customarily<br>found in BTCo's loan agreements for similar debtor in possession<br>financings and other conditions deemed by BTCo to be appropri-<br>ate to the specific transaction, including, but not limited to, (i) the<br>Interim Order providing that the DIP Lenders may pursue their<br>remedies under the DIP Credit Agreement upon 10 days notice; |

(ii) the Interim Order providing for a waiver of any claims under Section 506(c) of the Bankruptcy Code to surcharge the Lenders' collateral; (iii) the Interim Order providing that the Tranche A Overline Facility and Tranche A Revolver are refinanced with the proceeds of the DIP Tranche 2 Facility and the DIP Tranche 3 Facility, respectively; and (iv) modification of exclusivity after an Event of Default to permit the Lenders to file a plan of reorganization and/or sell assets pursuant to Section 363 of the Bankruptcy Code.

| | |
|---|---|
| Representations and Warranties: | The DIP Credit Agreement contains representations customarily found in BTCo's loan agreements for similar debtor in possession financings and other representations and warranties deemed by BTCo to be appropriate to the specific transaction. |
| Affirmative, Negative and Financial Covenants: | The DIP Credit Agreement contains affirmative, negative, and financial covenants customarily found in BTCo's loan agreements for similar debtor in possession financings and other such matters deemed by BTCo to be appropriate to the specific transaction. |
| Events of Default: | The DIP Credit Agreement contains events of default customarily found in BTCo's loan agreements for similar debtor in possession financings and other events of default deemed by BTCo appropriate to the specific transaction, including, without limitation, failure to make payments when due; noncompliance with covenants; breaches of representations and warranties; failure to satisfy or stay execution of judgments in excess of specified amounts; the existence of certain material environmental liabilities; the occurrence of a Material Adverse Change; impairment of a material portion of the security; dismissal of the cases or conversion to a chapter 7 case; appointment of a chapter 11 trustee; appointment of an examiner with enlarged powers relating to the operation of the business of the Debtors; granting of relief from the automatic stay to permit foreclosure on assets of the Debtors (other than foreclosure on assets in which the Administrative Agent does not have a first priority security interest); entry of an order granting any super-priority claim which is senior or pari passu with the DIP Lenders' claims under the DIP Facility (other than the Carve- |

21

Out or administrative claims granted to the cash management
bank); entry of an order modifying either the Interim Order or the
Final Order without the prior consent of the Requisite DIP Lend-
ers or each of the DIP Lenders (depending on the subject matter of
any such order); non-entry of the Final Order within 45 days of
entry of the Interim Order and payment of or granting adequate
protection with respect to certain pre-petition debt (other than as
approved by the Administrative Agent and the Bankruptcy Court).

Indemnity:                   The Debtors shall indemnify and hold harmless the Administra-
tive Agent, each Lender, and each of their affiliates and each of
their respective officers, directors, employees, agents, advisors,
attorneys, consultants and representatives (the "Indemnified
Parties") from and against any and all claims, damages, losses,
liabilities, obligations, penalties, actions, judgments, suits, costs,
disbursements and expenses of any kind or nature (including
reasonable fees and disbursements of counsel), that may be in-
curred by or asserted or awarded against any Indemnified Party,
arising out of or in connection with any investigation, litigation or
proceeding relating to or arising out of the DIP Credit Agreement,
or any act, event or transaction related or attendant thereto or any
use or intended use of the proceeds of the DIP Facility, except to
the extent the same is found in a final, non-appealable judgment
by a court of competent jurisdiction to have resulted from such
Indemnified Party's gross negligence or willful misconduct.

Requisite
DIP Lenders:                 Except for customary matters requiring unanimous approval, and
those matters designated as requiring 92% approval, DIP Lenders
holding more than 50% of (i) the outstanding commitments and/or
exposure under the DIP Tranche 1A and 1B Facilities with respect
to matters affecting such Facilities and (ii) the combined outstand-
ing commitments and/or exposure under the DIP Tranche 2 Facil-
ity and the DIP Tranche 3 Facility with respect to matters affect-
ing such Facilities.

22

## ADEQUATE PROTECTION STIPULATION

35.    Without providing the pre-petition Lenders adequate protection, the
Debtors cannot grant the liens, security interests, and guaranties contemplated by the
DIP Facility and, accordingly, would be unable to obtain the DIP Financing.  The pre-
petition Lenders have consented to the priming of their existing liens, security interests,
and guaranties only on the terms and conditions set forth in the Adequate Protection
Stipulation attached hereto as Exhibit D.

36.    Pursuant to the terms of the Adequate Protection Stipulation, as adequate
protection of their claims under the Credit Agreement and for the use of the Lenders'
cash collateral by the Debtors, the Lenders will receive, to the extent of any diminution
in value of their existing collateral, (i) liens on the remaining unencumbered portion of
the stock of the Foreign Subsidiaries (subject and subordinate to the liens securing the
DIP Facilities); and (ii) replacement liens on all post-petition assets (excluding avoid-
ance actions).  Additionally, the last date for challenging the pre-petition liens of the
Prepetition Lenders shall be 60-days after the Petition Date, unless otherwise agreed to
by the Prepetition Lenders.

37.    In addition, as further adequate protection of the Lenders' interests, to the
extent of any diminution in the value of the Lenders' collateral, the Lenders will be
granted an administrative expense claim pursuant to Section 507(b) of the Bankruptcy
Code with priority over any and all other administrative expenses of the kind specified

or ordered pursuant to any provision of the Bankruptcy Code, subject and subordinate only to the claims and liens of the Lenders under the DIP Agreement.

38.    Furthermore, the Lenders have entered into a consent, waiver, and forbearance agreement (the "Lender Consent") whereby they have consented to the priority in application of proceeds of the Debtors' assets, a priming lien on the assets of Goss UK, and a forbearance with respect to the exercise of remedies against Goss UK. The Tranche B Lender loans to Goss UK are secured by first priority liens on the assets of Goss UK. The loans to Goss UK under the DIP Facility are to be secured by liens senior to the liens securing the existing loans. Goss UK is not a debtor and this lien subordination can only be obtained through the consent of the Lenders as provided in the Lender Consent. Systems failed to make a monthly interest payment due on its Tranche B loans, including its UK loans, in the week preceding the Petition Date. Accordingly without the forbearance from the UK Tranche B Lenders set forth in the Consent, they could immediately begin pursuing remedies against Goss UK.

## APPLICABLE AUTHORITY

39.    If a debtor is unable to obtain unsecured credit allowable as an adminis-trative expense under Section 503(b)(1) of the Bankruptcy Code, then the Court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt:

(a)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; or

24

      (b)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

      (c)     secured by a junior lien on property of the estate that is subject to a lien.

See 11 U.S.C. § 364(c).

    40.    Moreover, Section 364(d) of the Bankruptcy Code authorizes a debtor to obtain credit secured by a senior lien on property of the estate that is subject to a lien if the debtor is unable to obtain such credit otherwise and so long as there is adequate protection of the interests of the holder of the lien on the property on which the senior lien is proposed to be granted. See 11 U.S.C. § 364(d). Adequate protection may take the form of, among other things, replacement liens. See 11 U.S.C. § 361.

    41.    Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

See Fed. R. Bankr. Pr. 4001(c). Accordingly, the Court is authorized to approve the DIP Facility and liens requested herein.

    42.    Under Section 363(c)(2) of the Bankruptcy Code, the Debtors cannot use the Prepetition Lenders' cash collateral (the "Cash Collateral") without their

consent unless this Court enters an order authorizing such use in accordance with the

Bankruptcy Code, including upon condition that the Prepetition Lenders be granted

adequate protection in consideration for such use.

43.    Cash Collateral may be used on an interim basis solely as is necessary

to avoid immediate and irreparable harm to the Debtors' estates.  See 11 U.S.C.

§ 363(c)(3).  Bankruptcy Rule 4001(b) governs the procedures for obtaining authori-

zation to use Cash Collateral and provides, in relevant part:

> The court may commence a final hearing on a motion for authoriza-
> tion to use cash collateral no earlier than 15 days after service of the
> motion.  If the motion so requests, the court may conduct a hearing
> before such 15 day period expires, but the court may authorize the use
> of only that amount of cash collateral as is necessary to avoid imme-
> diate and irreparable harm to the estate pending a final hearing.

See Fed. R. Bankr. P. 4001(b).  Accordingly, the Court is authorized to approve the

use of Cash Collateral requested herein.

A.    Rationale for Roll-Over of the
      Pre-Petition Bank Debt

44.    The liens securing the Domestic Tranche A Overline Facility and the

Domestic Tranche A Revolver constitute first priority liens on Goss Systems' assets

and are evidenced by that certain Security Agreement dated November 19, 1999,

among Goss Holdings, Goss Systems, BTCo, and the lenders party thereto (collec-

tively with BTCo, the "Tranche A Lenders").  As stated above, the Domestic

26

Tranche A Revolver refinanced the Debtors' obligations under the 1999 DIP Financ-
ing.

45.     The Domestic Tranche B Revolver and the Domestic Tranche B Term
Loan, in the collective outstanding principal amount of approximately $191 million,
are secured by second priority liens on Goss Systems' assets, junior in priority to the
liens securing the Tranche A facilities.  The liens securing the Domestic Tranche B
Revolver and the Domestic Tranche B Term Loan are evidenced by that certain
Second Amended and Restated Security Agreement dated November 19, 1999,
among Goss Holdings, Goss Systems, BTCo, and the lenders party thereto (collec-
tively with BTCo, the "Tranche B Lenders").

46.     The relative priorities as between the Tranche A Lenders and the
Tranche B Lenders is further evidenced by that certain Intercreditor Agreement by
and among the Tranche A Lenders and the Tranche B Lenders.  Pursuant to the terms
of the Intercreditor Agreement, the Tranche B Lenders are subordinated in right of
payment to the Tranche A Lenders with respect to proceeds from any sales of the
Debtors' assets.

47.     In sum, the claims represented by the Tranche A Overline Facility and
the Tranche A Revolver (collectively, the "Tranche A Claims") are separate and
distinct from the claims represented by the Tranche B Revolver and the Domestic
Tranche B Term Loan (collectively, the "Tranche B Claims").  Similarly, the liens

27

securing the Tranche A Claims are separate and distinct from the liens securing the

Tranche B Claims.

48.    As described in the Affidavit of Timothy R. Coleman filed concur-

rently herewith, the Debtors believe that the value of the collateral securing the

Tranche A Claims significantly exceeds the $65 million face amount of such Claims.

Such Claims therefore are entitled to payment in full under the Bankruptcy Code.

The "rollover" of such Claims into the DIP Tranche 2 Facility and the DIP Tranche 3

Facility and payment in full with proceeds of the Exit Facility satisfy this require-

ment.

49.    Indeed, the Plan filed concurrently herewith, which is supported by

the Lenders, a majority of the holders of the Subordinated Notes, and holders of a

majority of the Debtors' equity, specifically contemplates that the Tranche A Claims

will be repaid in full upon the effective date of the Plan with the proceeds of an exit

facility.  The "rollover" of the Tranche A Claims as part of the DIP Facility therefore

simply provides that to which the Tranche A Lenders are entitled under the Bank-

ruptcy Code and that to which major parties in interest have already agreed.

50.    Perhaps more importantly, as further described in Mr. Coleman's

Affidavit, the refinancing of the Tranche A Claims was a heavily-negotiated aspect

of the Debtors' overall restructuring with the Lenders.  Such refinancing, and hence

the rollover of the Claims into the DIP Facility, was a major requirement of the

28

securing the Tranche A Claims are separate and distinct from the liens securing the

Tranche B Claims.

48.    As described in the Affidavit of Timothy R. Coleman filed concur-

rently herewith, the Debtors believe that the value of the collateral securing the

Tranche A Claims significantly exceeds the $65 million face amount of such Claims.

Such Claims therefore are entitled to payment in full under the Bankruptcy Code.

The "rollover" of such Claims into the DIP Tranche 2 Facility and the DIP Tranche 3

Facility and payment in full with proceeds of the Exit Facility satisfy this require-

ment.

49.    Indeed, the Plan filed concurrently herewith, which is supported by

the Lenders, a majority of the holders of the Subordinated Notes, and holders of a

majority of the Debtors' equity, specifically contemplates that the Tranche A Claims

will be repaid in full upon the effective date of the Plan with the proceeds of an exit

facility.  The "rollover" of the Tranche A Claims as part of the DIP Facility therefore

simply provides that to which the Tranche A Lenders are entitled under the Bank-

ruptcy Code and that to which major parties in interest have already agreed.

50.    Perhaps more importantly, as further described in Mr. Coleman's

Affidavit, the refinancing of the Tranche A Claims was a heavily-negotiated aspect

of the Debtors' overall restructuring with the Lenders.  Such refinancing, and hence

the rollover of the Claims into the DIP Facility, was a major requirement of the

28

Rhode Island, Inc., 150 B.R. 296, 299-300 (Bankr. D.R.I. 1993).  Rather, "prejudice

to the interests of unsecured creditors is not a sufficient ground to warrant denial" of

marshaling in favor of a junior secured creditor.  In re Borges, 184 B.R. 874 (Bankr.

D. Conn. 1995).

55.    Finally, the structure of Section 364 of the Code displays the Code's

preference for granting post-petition lenders liens on previously unencumbered

collateral.  Compare 11 U.S.C. 364(c) with 11 U.S.C. 364(d).  Although the DIP

Lenders are granted first priority liens in all of the Debtors' property, this provision

in the DIP Credit Agreement simply accomplishes  a similar result through the

application of proceeds, this furthering the intent of the Code.

C.    The Section 506(c) Waiver
      Should Be Approved

56.    The Court should approve the Debtors' waiver of any right to sur-

charge the DIP Collateral.  Such waivers and provisions are standard and customary

under financings between sophisticated parties such as the Debtors and the DIP

Lenders.  As one court recently noted in discussing the later enforceability of such

waivers, "the Trustee and Debtors-in-Possession in this case had significant interests

in asserting claims under § 506(c) *and have made use of their rights against the*

*Lender under § 506(c) by waiving them in exchange for concessions to the estate*

(including a substantial carve-out for the benefit of administrative creditors)."  In re

31

Molten Metal Technology, Inc., 244 B.R. 515, 527 (Bankr. D. Mass. 2000). See

also, In re Nutri/System of Florida Associates, 178 B.R. 645, 650 (E.D. Pa. 1995)

(noting that debtor had waived § 506(c) rights in obtaining debtor-in-possession

financing). Cf. In re Telesphere Communications, Inc., 179 B.R. 544, 549 (Bank.

N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein

debtor waived certain rights (including 506(c) rights) against the lenders in exchange

for valuable consideration).

        57.    Moreover, the waiver of surcharge rights is particularly appropriate in

these circumstances because it is directly tied to the benefit to be received from the

Carve-Out. Under the DIP Credit Agreement, the Debtors agree to waive any rights

to charge costs and expenses against the DIP Collateral without the prior written

consent of the DIP Lenders, *except* for the Carve-Out. In other words, the Debtors

have waived the uncertainty of surcharge rights in exchange for the valuable and

predictable rights granted to the Debtors and the Creditors' Committee under the

Carve-Out. Cf. In re Lunan Family Restaurants Ltd. Partnership, 192 B.R. 173, 178

(N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment,

who must show by a preponderance of evidence that [(1) the expenditure was

necessary, (2) the amounts were reasonable, and (3) the secured creditor was the

party primarily benefitted by the expenditure]."), citing In re Flagstaff, 739 F.2d 73,

77 (2d Cir. 1984) and New Orleans Public Service Inc. v. Delta Towers, Ltd., 112

32

B.R. 811, 815 (E.D. La. 1990). In light of the magnitude of the Carve-Out–in excess

of $3 million–the value to be received by the Debtors' waiver of surcharge rights

cannot be disputed, and the Court should approve it accordingly.

D.    The DIP Facility and Use of
      Cash Collateral Should be Approved

58.    As described in detail in Mr. Coleman's Affidavit, the terms and

provisions of the DIP Facility have been negotiated at arms' length and in good faith

by the Debtors and BTCo. The terms and provisions of the DIP Facility, though

expensive, are fair and reasonable under the Debtors' unique circumstances - having

filed its second Chapter 11 proceeding in two years - and reflect the most favorable,

and indeed, the only, terms upon which the Debtors could obtain the needed

postpetition financing.

59.    The financing under the DIP Facility will enable the Debtors, among

other things, to (a) maintain the continuity of their operations and (b) maximize the

value of their business and properties. In addition, the availability of credit under the

DIP Facility should instill confidence in vendors and suppliers and encourage them

to continue to extend credit to the Debtors that will lead to a successful reorganiza-

tion as contemplated by Chapter 11 of the Bankruptcy Code.

60.    Accordingly, the Debtors believe that approval of the DIP Facility is

in the best interests of their estates, their creditors and all parties-in-interest, and that

the Court should therefore grant the Motion and authorize the Debtors to enter into

the Postpetition Financing.  Inasmuch as the terms and conditions of the DIP Facility

are fair and reasonable and were negotiated by the parties in good faith and at arms'

length, the DIP Lenders and BTCo should be accorded the benefits of Section 364(e)

of the Bankruptcy Code.

61.     Similarly, the Debtor's proposed use of Cash Collateral should be

approved.  The Prepetition Lenders have consented to such use, and the Debtors

propose to grant adequate protection to the interests of such Lenders by granting

them replacement liens on the Debtors' post-petition collateral (other than avoidance

actions).

E.     The Debtors Should be Permitted
       to Make Interim Borrowings and
       Interim Use of Cash Collateral

62.     Pending a final hearing on this Motion, the Debtors require the ability

to use Cash Collateral and obtain immediate credit under the DIP Facility on an

interim basis, subject to availability, for working capital and general corporate

purposes in an amount, with respect to the DIP Facility not to exceed $75 million.

Such use and such credit are needed to insure the Debtors' ability to continue to

conduct business and maximize the enterprise value of their businesses for the

benefit of their estates and creditors.  The immediate and irreparable harm that could

34

result in the absence of approval of interim financing is inimical to the interests of all concerned.

63.     Therefore, to enable the Debtors to maintain operations and to prevent immediate and irreparable harm to their businesses pending a final hearing on this Motion, the interim use of Cash Collateral and financing requested herein should be authorized by this Court.

## NOTICE

A.     Notice With Respect
        to Interim Order

64.     Notice of this Motion has been given by facsimile or overnight delivery to the following parties or, in lieu thereof, to their counsel: (i) the United States Trustee; (ii) the prepetition Lenders and their counsel; (iii) the DIP Lenders and their counsel; and (iv) those persons filing notices of appearance in this case. The Debtors submit that under the circumstances, no further notice of the hearing on the interim financing is necessary and request that any further notice be dispensed with and waived.

B.     Notice with Respect
        to Final Order

65.     The Debtors respectfully request that they be authorized to serve a copy of the signed order which fixes the time and date for filing objections, if any, by first class mail upon (i) the United States Trustee; (ii) the prepetition lenders and

35

their counsel; (iii) the DIP Lenders and their counsel; (iv) counsel to a committee of

unsecured creditors, once appointed; (v) those persons who have filed notices of

appearance in this case; and (vi) all other parties ordered by the Court. The Debtors

request that the Court consider such notice of the final hearing to be sufficient notice

under Bankruptcy Rule 4001.

WHEREFORE, the Debtors respectfully request that the Court enter

an order substantially in the form of the annexed order and grant such other and

further relief as is just and proper.

Dated: Chicago, Illinois                    GOSS HOLDINGS, INC., et al.,
        September 10, 2001


                                            By: _____
                                            David S. Kurtz (ARDC No. 0312561)
                                            Mark A. McDermott (ARDC No. 06209460)
                                            SKADDEN, ARPS, SLATE, MEAGHER
                                               & FLOM (ILLINOIS)
                                            333 West Wacker Drive, Suite 2100
                                            Chicago, Illinois 60606-1285
                                            Tel: (312) 407-0700

                                            Attorneys for Debtors and Debtors-in-
                                            Possession

36

Lenders as part of their agreement to restructure the Debtors' affairs. The rollover also represents a key component of the compensation that the Lenders required as a condition to providing the DIP Facility. As explained in Mr. Coleman's Affidavit, the DIP Loan, including the requirement of the rollover, is the best that the Debtors could obtain under the circumstances. The rollover of the Tranche A Claims therefore should be approved.

B.     Marshaling of Collateral Provides Adequate
       Protection to the Prepetition Lenders

51.     The DIP Credit Agreement contains an application of proceeds provision, pursuant to which the DIP Lenders have agreed that proceeds received from foreclosure or other realization on DIP Collateral that is also part of the prepetition Collateral shall be applied toward repayment of the obligations under the DIP Credit Agreement only after all available proceeds from foreclosure or other realization on DIP Collateral not part of the prepetition Collateral has been applied thereto.

52.     Essentially, the DIP Lenders, as senior secured parties, are agreeing to marshal the proceeds from the DIP Collateral in favor of the Prepetition Lenders, as junior secured parties, in order to provide further adequate protection. "The prereq-uisites of common law marshaling are (i) the existence of two secured creditors with a common debtor, (ii) the existence of two funds belonging to the debtor, and (iii)

**GOSS GRAPHIC SYSTEMS, INC.**
**GOSS GRAPHIC SYSTEMS LIMITED,**
**GOSS SYSTEMES GRAPHIQUES NANTES S.A.,**
**and**
**GOSS GRAPHIC SYSTEMS JAPAN CORPORATION**

**DEBTOR-IN-POSSESSION**
**MULTICURRENCY CREDIT AGREEMENT**
**WITH FOREIGN BRIDGE FACILITY**

This **DEBTOR-IN-POSSESSION MULTICURRENCY CREDIT AGREEMENT WITH FOREIGN BRIDGE FACILITY** is dated as of September 10, 2001 and entered into by and among **GOSS GRAPHIC SYSTEMS, INC.**, a corporation organized under the laws of the State of Delaware ("**Company**") and whose registered office is at 700 Oakmont Lane, Westmont, Illinois 60559, **GOSS GRAPHIC SYSTEMS LIMITED (Company Number 3212468)**, a company organized under the laws of England ("**Goss UK**") and whose registered office is at Greenbank Street, Preston, Lancashire PR1 7LA, **GOSS SYSTEMES GRAPHIQUES NANTES S.A.**, a *societe anonyme* organized under the laws of the Republic of France ("**Goss France**") and whose registered office is at 20, rue de Koufra, 44300 Nantes, **GOSS GRAPHIC SYSTEMS JAPAN CORPORATION**, a corporation organized under the laws of Japan ("**Goss Japan**") and whose registered office is at Mitsuya Toranomon Building, 22-14 Toranomon 1-Chome, Minato-Ku, Tokyo 105, **THE FINANCIAL INSTITUTIONS ACTING AS LENDERS AND LISTED ON THE SIGNATURE PAGES HEREOF, THE FINANCIAL INSTITUTIONS ACTING AS INDEMNIFYING LENDERS AND LISTED ON THE SIGNATURE PAGES HEREOF**, and **BANKERS TRUST COMPANY ("BTCo")**, as Agent for Lenders (in such capacity, including its successors and assigns, "**Agent**"), and whose registered office is at One Bankers Trust Plaza, 130 Liberty Street, New York, New York 10006.

## R E C I T A L S

**WHEREAS**, the Debtor Entities (such term and other capitalized terms used in these Recitals without definition have the meanings set forth in subsection 1.1 of this Agreement) intend to file on September 10, 2001 voluntary petitions for relief (the actual date of filing, the "**Petition Date**")) under the Bankruptcy Code with the United States Bankruptcy Court for the Northern District of Illinois (the "**Court**") (such proceedings, to be jointly administered, are hereinafter referred to as the "**Chapter 11 Cases**"), and each of the Debtor Entities shall continue to operate its business and manage its properties as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

**WHEREAS**, Borrowers have requested Lenders to provide, subject to the terms and conditions contained herein,

(a)  revolving credit facilities (the "**DIP Facility**") in an initial aggregate principal amount of $90,000,000, for Company (less amounts borrowed under the Foreign Bridge Facility) (including a letter of credit subfacility of up to $45,000,000 in

the aggregate (less amounts with respect to Letters of Credit issued on behalf of the Foreign Borrowers), consisting of

(i) a revolving credit facility (the "**Tranche 1A Facility**") in an initial maximum aggregate principal amount of $25,000,000 ($10,000,000 of which shall be available initially and $15,000,000 of which shall become available as provided in subsection 2.1A(i)(a)(1)(A)), available to the extent the Tranche 1B, Tranche 2 and Tranche 3 Commitments are fully funded or otherwise unavailable for funding,

(ii) a revolving credit facility (the "**Tranche 1B Facility**") in an initial maximum aggregate principal amount of $17,000,000, becoming available if and as Domestic Tranche A Letters of Credit expire without draw thereon prior to September 30, 2001 and for the purposes referenced below to the extent the Tranche 2 and Tranche 3 Commitments are fully funded,

(iii) a revolving credit facility (the "**Tranche 2 Facility**") in an initial maximum aggregate principal amount of $15,000,000, for Company to refinance Tranche A Overline Loans made by the Tranche 2 Lenders and for the purposes referenced below, available to the extent the Tranche 3 Commitments are fully funded, and

(iv) a revolving credit facility (the "**Tranche 3 Facility**") in an initial maximum aggregate principal amount of $50,000,000, reducing dollar for dollar (to a minimum of $33,000,000) as expiring Domestic Tranche A Letters of Credit create availability under the Tranche 1B Facility, for Company to refinance Tranche A Revolving Loans made by the Tranche 3 Lenders and for the purposes referenced below; and

(a) a revolving credit facility (the "**Foreign Bridge Facility**") of up to $25,000,000 in the aggregate (but not exceeding amounts available under the DIP Facility) available to Goss UK, Goss France and Goss Japan (the "**Foreign Borrowers**");

for the purposes defined above and for Company to fund working capital, issue Letters of Credit and make certain other payments during the Chapter 11 Cases, all as set forth herein, and Lenders are willing to extend such postpetition credit to Borrowers in accordance with and on the terms and conditions set forth herein;

**WHEREAS**, Lenders are willing to provide such financing only if all of the DIP Obligations of the Debtor Entities hereunder and under the other Loan Documents (a) constitute allowed administrative expense claims in the Chapter 11 Cases as set forth herein and (b) are secured by a first priority Lien on substantially all of Holdings' and Company's real, personal and mixed property, including a pledge of all of the capital stock of Company, all of Company's equity interests in each of Company's Subsidiaries (including Foreign Subsidiaries);

**WHEREAS**, Company has agreed to guarantee the Obligations of the Foreign Borrowers hereunder and, subject to approval by the Court, desires to secure all of its Obligations thereunder, under this Agreement and under the other Loan Documents by granting

in favor of Agent, on behalf of Lenders, a first priority Lien on substantially all of its real, personal and mixed property, including a pledge of all of its equity interests in each of Company's Subsidiaries (including Foreign Subsidiaries);

WHEREAS, each of the Foreign Borrowers desires to secure all of its Foreign Bridge Obligations by granting in favor of Agent, on behalf of Lenders, first priority Liens on substantially all of its real, personal and mixed property, including a pledge of all of the capital stock of its Subsidiaries, senior to the Liens securing the obligations of Goss UK, Goss France and Goss Japan under the Existing Credit Agreement on the Petition Date;

WHEREAS, Holdings has agreed to guarantee the Obligations hereunder and under the other Loan Documents and, subject to approval by the Court, desires to secure its guarantee by granting to Agent, on behalf of Lenders, a first priority Lien on substantially all of its personal and mixed property, including a pledge of all of the capital stock of Company;

WHEREAS, Prepetition Lenders currently have Liens on substantially all of the assets of Holdings and Company (except that Prepetition Lenders have Liens on only 66 2/3% of the stock of the Foreign Subsidiaries); and

WHEREAS, Prepetition Lenders have agreed to consent to the granting of first priority Liens to secure the Obligations of Holdings and Company hereunder pursuant to the Cash Collateral and Adequate Protection Stipulation and the Consent and Waiver entered into by the parties to the Existing Credit Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, Borrowers, Lenders and Agent agree as follows:

## Section 1.    DEFINITIONS

### 1.1    Certain Defined Terms.

The following terms used in this Agreement shall have the following meanings:

"Acceleration Notice" has the meaning assigned to that term in Section 8.

"Account" means, with respect to any Person, all present and future rights of such Person to payment for goods sold or leased or for services rendered (except those evidenced by instruments or chattel paper), whether now existing or hereafter arising and wherever arising, and whether or not they have been earned by performance.

"Additional Flood Hazard Property" has the meaning assigned to that term in subsection 6.9A(f).

"Additional Mortgage" has the meaning assigned to that term in subsection 6.9A(a).

"Additional Mortgage Policy" has the meaning assigned to that term in subsection 6.9A(d).

"**Adjusted Offshore Rate**" means, for any Interest Rate Determination Date with respect to an Interest Period for an Offshore Rate Loan, the rate per annum equal to the sum of (x) the rate determined by Agent to be the arithmetic mean (rounded upwards, if necessary, to the nearest five decimal places) of the offered quotations for deposits (for delivery on the first day of such Interest Period) in the Applicable Currency with maturities comparable to such Interest Period as of approximately 11:00 A.M. (London time) on such Interest Rate Determination Date as set forth on Telerate Display Screen page number 3740 or 3750 (or such other page(s) as may replace such page(s) from time to time on such Telerate system) (provided that in the event the rate referenced in the preceding clause (x) does not appear on such Telerate page 3740 or 3750 (or otherwise), such rate shall be the offered quotation (rounded upwards, if necessary, to the nearest five decimal places) to first class banks in the London interbank market by Agent for deposits (for delivery on the first day of such Interest Period) in the Applicable Currency of amounts in Same Day Funds comparable to the principal amount of the Offshore Rate Loan of the Agent for which the Adjusted Offshore Rate is then being determined with maturities comparable to such Interest Period as of approximately 11:00 A.M. (London time) on such Interest Rate Determination Date) plus (y) the additional cost (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) to Lenders of complying with (i) the relative reserve asset ratio required by the Bank of England from time to time, if any, expressed as a percentage per annum and calculated in the manner set forth in Schedule 1.1(a), or (ii) any analogous requirement of any central banking or financial regulatory authority imposed in respect of the funding or maintenance of Commitments or Loans of the type contemplated hereby and applicable to the Applicable Currency.

"**Affected Lender**" has the meaning assigned to that term in subsection 2.6C.

"**Affected Loans**" has the meaning assigned to that term in subsection 2.6C.

"**Affiliate**", as applied to any Person, means any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise; provided that no Agent shall be considered to be an "Affiliate" of Holdings or any of its Subsidiaries.

"**Agent**" has the meaning assigned to that term in the introduction to this Agreement, and includes any Affiliates of Agent performing such functions or acting as collateral agent with respect to Offshore Currency Loans, and in each case includes any such successor Agent appointed pursuant to subsection 9.5.

"**Agreement**" means, collectively, this Debtor-in-Possession Multicurrency Credit Agreement with Foreign Bridge Facility dated as of September 10, 2001 by and among Borrowers, Lenders, Indemnifying Lenders and Agent, as it may be amended, supplemented or otherwise modified from time to time.

4

"**Applicable Currency**" means with respect to any particular Loan or Letter of Credit, Dollars or the applicable Offshore Currency in which such Loan or Letter of Credit is denominated or payable.

"**Applied Amount**" has the meaning assigned to that term in subsection 2.4A(iv)(b).

"**Approved Budget**" means the budget approved by the Lenders, attached hereto at Exhibit V, including the initial Forecast included therein, with such changes as may be subsequently approved by Requisite Lenders pursuant to this Agreement.

"**Asset Sale**" means the sale, assignment or other transfer for value by Company or any of its Subsidiaries to any Person other than Company or any of its wholly-owned Subsidiaries of (i) any of the stock of any of Company's Subsidiaries, or (ii) any other assets (whether tangible or intangible) of Company or any of its Subsidiaries (other than (a) inventory sold in the ordinary course of business, (b) the sale of obsolete, surplus or excess equipment and machinery in the ordinary course of business or consistent with past practice, and (c) the sale of equipment and machinery returned by or taken in trade from a customer in the ordinary course of business and consistent with past practice).

"**Assignment Agreement**" means an Assignment Agreement in substantially the form of Exhibit IX annexed hereto.

"**Back-End Fee**" has the meaning assigned to that term in subsection 2.3B.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute, and any similar or comparable law of any applicable Governmental Authority.

"**Bankruptcy Rule**" means a rule promulgated as part of the Federal Rules of Bankruptcy Procedure, as now or hereafter in effect.

"**Base Rate**" means, at any time, the higher of (x) the Prime Rate or (y) the rate which is 1/2 of 1% in excess of the Federal Funds Effective Rate.

"**Base Rate Loans**" means Loans bearing interest at rates determined by reference to the Base Rate as provided in subsection 2.2A.

"**Borrower**" means (i) with respect to DIP Loans, Company, (ii) with respect to UK Bridge Loans, Goss UK, (iii) with respect to French Bridge Loans, Goss France, and (iv) with respect to Japanese Bridge Loans, Goss Japan, and "**Borrowers**" means any combination thereof, collectively.

"**Borrowing Orders**" means the Interim Borrowing Order and the Final Borrowing Order.

"**Business Day**" means (i) for all purposes other than as covered by clauses (ii) and (iii) below, any day excluding Saturday, Sunday and any day which is a legal holiday under

the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close, (ii) with respect to all notices, determinations, fundings and payments in connection with the Adjusted Offshore Rate or any Offshore Rate Loans, any day that is a Business Day described in clause (i) above and that is also a day for trading by and between banks in Dollar deposits in the London interbank market, and (iii) with respect to all notices, determinations, fundings and payments in any Offshore Currency in connection with the Adjusted Offshore Rate or any Offshore Rate Loans, any day that is a Business Day described in clause (i) above and that is also a day on which banks and foreign exchange markets are open for foreign exchange business in London and on which banks and foreign exchange markets are also open for foreign exchange business in the principal financial center of the country of that Offshore Currency.

"**Capital Lease**", as applied to any Person, means any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is accounted for as a capital lease on the balance sheet of that Person.

"**Cash**" means money, currency or a credit balance in a Deposit Account.

"**Cash Collateral and Adequate Protection Stipulation**" means the stipulation entered into by Company and Agent, on behalf of Prepetition Lenders, regarding cash collateral, and providing Prepetition Lenders the adequate protection set forth therein, in form and substance satisfactory to Agent.

"**Cash Equivalents**" means, as at any date of determination, (i) (a) marketable securities (1) issued or directly and unconditionally guaranteed as to interest and principal by the United States Government or (2) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within thirty days after such date; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within thirty days after such date and having, at the time of the acquisition thereof, the highest rating obtainable from either Standard & Poor's Ratings Group ("**S&P**") or Moody's Investors Service, Inc. ("**Moody's**"); (c) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within thirty days after such date and issued or accepted by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (1) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator) and (2) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (e) shares of any money market mutual fund that (1) has at least 95% of its assets invested continuously in the types of investments referred to in clauses (a) and (b) above, (2) has net assets of not less than $500,000,000, and (3) has the highest rating obtainable from either S&P or Moody's, and (ii) with respect to Goss UK, Goss France or Goss Japan, such other European, Japanese or Australian investments which are comparable in term and credit quality to those described in the foregoing clause (i)(a)-(e).

"**Cash Management Lender**" means a Lender providing a Cash Management Arrangement.

"**Cash Management Arrangement**" means a cash management arrangement (including, without limitation, a checking or deposit account arrangement) provided to a Debtor Entity by a Lender.

"**Cash Management Obligation**" means any obligation of a Debtor Entity under a Cash Management Arrangement.

"**Certificate re Non-Bank Status**" means a certificate in form and substance satisfactory to Agent delivered by a Lender to Agent pursuant to subsection 2.7B(iii) (as fully set forth in Annex A) pursuant to which such Lender certifies, under penalty of perjury, that it is not (i) a "bank" as such term is defined in subsection 881(c)(3) of the Internal Revenue Code; (ii) a 10 percent shareholder of Company within the meaning of Section 871(h)(3)(B) or Section 881(c)(3)(B) of the Internal Revenue Code; or (iii) a "controlled" foreign corporation related to Company within the meaning of Section 864(d)(4) of the Internal Revenue Code.

"**Chapter 11 Cases**" means the Chapter 11 Cases as defined in the recital clauses of this Agreement.

"**Closing Date**" means the date on or before September 11, 2001, on which the conditions precedent to the effectiveness of this Agreement set forth in subsection 4.1 are satisfied.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including capital stock) in which Liens are purported to be granted by the Collateral Documents.

"**Collateral Account**" has the meaning assigned to that term in the Collateral Account Agreement.

"**Collateral Account Agreement**" means each Collateral Account Agreement executed and delivered by each Borrower, pursuant to which such Borrower may pledge cash to Agent to secure obligations to reimburse an Issuing Lender for payments made under one or more Letters of Credit as provided in Section 3, substantially in the form of Exhibit X annexed hereto, as such Collateral Account Agreement may hereafter be amended, supplemented or otherwise modified from time to time.

"**Collateral Account Overage**" means any sums disbursed from a Collateral Account Agreement to Agent pursuant to the terms thereof due to the expiration of a Letter of Credit. ("Collateral Account Overage" does not mean, and does not include, sums disbursed due to a draw on a Letter of Credit).

"**Collateral Documents**" means the DIP Collateral Documents and the Foreign Collateral Documents.

"**Commercial Letter of Credit**" means any letter of credit or similar instrument issued for the purpose of providing the primary payment mechanism in connection with the

purchase of any materials, goods or services by a Borrower or any of its Subsidiaries in the ordinary course of business of such Borrower or such Subsidiary.

"**Commitment Termination Date**" means the earliest of (i) the date that is six (6) months after the Interim Borrowing Order Date, as such date may be extended pursuant to Section 2.11, (ii) the effective date of a plan of reorganization in the Chapter 11 Cases, and (iii) the date of termination in whole of the Commitments pursuant to Section 8.

"**Commitment**" means Tranche 1A Loan Commitments, the Tranche 1B Loan Commitments, the Tranche 2 Loan Commitments, the Tranche 3 Loan Commitments, the UK Bridge Loan Commitments, the French Bridge Loan Commitments, or the Japanese Bridge Loan Commitments; and "Commitments" means the Tranche 1A Loan Commitments, the Tranche 1B Loan Commitments, the Tranche 2 Loan Commitments, the Tranche 3 Loan Commitments, the UK Bridge Loan Commitments, the French Bridge Loan Commitments, the Japanese Bridge Loan Commitments or any combination thereof.

"**Committee Member**" means any Lender serving on any committee at the request of Agent.

"**Company**" has the meaning assigned to that term in the introduction to this Agreement.

"**Company Common Stock**" means the common stock of Company, par value $0.01 per share.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit VI annexed hereto delivered to Agent and Lenders by Company pursuant to subsection 6.1(iv).

"**Computation Date**" has the meaning assigned to that term in subsection 2.1F(i).

"**Contingent Obligation**", as applied to any Person, means any direct or indirect liability, contingent or otherwise, of that Person (i) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, (ii) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings, or (iii) under Currency Agreements. Contingent Obligations shall include, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (b) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement, and (c) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (X) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or

otherwise) or (Y) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (X) or (Y) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited.

"**Consent and Waiver**" means the Consent, Waiver and Forbearance Agreement dated as of September 7, 2001, by and among the Borrowers, the Prepetition Lenders and Bankers Trust Company, as Administrative Agent for the Lenders.

"**Contractual Obligation**", as applied to any Person, means any provision of any Security issued by that Person or of any material indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"**Court**" has the meaning assigned to that term in the recitals to this Agreement.

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement.

"**Currency Agreement Obligation**" means an Obligation of a Borrower under a Currency Agreement.

"**Currency Exchanger**" means a Lender party to a Currency Agreement entered into from time to time with a Borrower.

"**Current Forecast**" means the Forecast most recently submitted by Borrowers, in the requisite form, with all requisite certifications.

"**Debtor Entities**" means, collectively, the Holdings and Company and any Subsidiaries of Company that commence a Chapter 11 case that is administratively consolidated with the Chapter 11 Cases.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Deutsche Bank**" means Deutsche Bank AG, a German aktiengesellschaft.

"**DIP Collateral**" means Collateral owned by Debtor Entities or Domestic Subsidiaries, or covered by DIP Collateral Documents.

"**DIP Collateral Documents**" means the Collateral Account Agreements, the Security Agreements and the Mortgages and all other instruments and documents delivered pursuant to this Agreement or any of the other Loan Documents, or an applicable order of the

Court, granting to Agent, on behalf of Lenders, Liens on any real, personal or mixed property of that Debtor Entity as security for the DIP Obligations.

**"DIP Loan Commitment"** means the aggregate commitment of a Lender to make DIP Loans to Company pursuant to its DIP Tranche 1A Loan Commitment, DIP Tranche 1B Loan Commitment, its DIP Tranche 2 Loan Commitment and its Tranche 3 Loan Commitment, and **"DIP Loan Commitments"** means such commitments of all such Lenders in the aggregate.

**"DIP Loan Exposure"** means, with respect to any Lender as of any date of determination (i) prior to the termination of the DIP Loan Commitments, that Lender's DIP Loan Commitment and (ii) after the termination of the DIP Loan Commitments, the sum of (a) the aggregate outstanding principal amount of the DIP Loans of that Lender plus (b) in the event that Lender is an Issuing Lender, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by that Lender for the benefit of Company (in each case net of any participations purchased by other Lenders in such Letters of Credit or any unreimbursed drawings thereunder) plus (c) the aggregate amount of all participations purchased by that Lender in any outstanding Letters of Credit for the benefit of Company or any unreimbursed drawings under any such Letters of Credit.

**"DIP Loans"** means the Tranche 1A Loans, Tranche 1B Loans, Tranche 2 Loans and Tranche 3 Loans, collectively.

**"DIP Obligations"** means, with respect to Company, all obligations of every nature of Company under this Agreement and the other Loan Documents to which it is a party, including, without limitation, any liability of Company on any claim, whether or not the right to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed or contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any bankruptcy, insolvency, reorganization or other similar proceeding. Without limiting the generality of the foregoing, the DIP Obligations of Company include the obligations to (a) pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by Company under this Agreement, Notes and Guaranties executed by the Company or any other Loan Document to which it is a party and (b) reimburse any amount in respect of any of the foregoing that Agent or any Lender, in its sole discretion, may elect to pay or advance on behalf of Company, obligations under Currency Exchange Agreements and the Cash Management Obligations. "DIP Obligations" means, with respect to Holdings, all obligations of every nature of Holdings under this Agreement and the other Loan Documents to which it is a party, including, without limitation, its Guaranty of the DIP Obligations of Company any obligations under Currency Exchange Agreements and the Cash Management Obligations.

**"Dividend Proceeds"** means any Cash payments or proceeds received by any Borrower or any of such Borrower's Subsidiaries with respect to dividends or other similar payments from any Subsidiary or Joint Venture interest.

**"Dollar Equivalents"** means, at any time, (x) as to any amount denominated in Dollars, the amount thereof at such time, and (y) as to any amount denominated in an Offshore

Currency or any other currency other than Dollars, the equivalent amount in Dollars as determined by Agent at such time on the basis of the Exchange Rate for the purchase of Dollars with such Offshore Currency or other currency on the most recent Computation Date provided for in subsection 2.1F(i) or such other time as may be reasonably specified by Agent.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Domestic Subsidiary**" means a direct or indirect Subsidiary of Company that is incorporated or organized under the laws of a state of the United States of America.

"**Domestic Tranche A Letters of Credit**" means Tranche A Letters of Credit (as defined in the Existing Credit Agreement) issued pursuant to the Domestic Tranche A Revolving Loan Commitment (as defined in the Existing Credit Agreement).

"**Domestic Tranche A Revolving Loans**" has the meaning defined in the Existing Credit Agreement.

"**Domestic Tranche B Lenders**" has the meaning defined in the Existing Credit Agreement.

"**Eligible Assignee**" means (A) (i) a commercial bank organized under the laws of the United States or any state thereof; (ii) a savings and loan association or savings bank organized under the laws of the United States or any state thereof; (iii) a commercial bank organized under the laws of any other country or a political subdivision thereof; provided that (x) such bank is acting through a branch or agency located in the United States or (y) such bank is organized under the laws of a country that is a member of the Organization for Economic Cooperation and Development or a political subdivision of such country; and (iv) any other entity which is an "accredited investor" (as defined in Regulation D under the Securities Act) which extends credit or buys loans as one of its businesses including, but not limited to, insurance companies, mutual funds and lease financing companies, in each case (under clauses (i) through (iv) above) that is reasonably acceptable to Agent; and (B) any Lender and any Affiliate of any Lender; provided that no Affiliate of Company shall be an Eligible Assignee.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is, or was at any time, maintained or contributed to by Company or any of its ERISA Affiliates. Any such plan of a former ERISA Affiliate of the Company shall continue to be considered an Employee Benefit Plan within the meaning of this definition solely with respect to the period during which such former ERISA Affiliate was an ERISA Affiliate of the Company and with respect to liabilities existing after such period for which the Company could be liable under the Internal Revenue Code or ERISA.

"**Enforcement Proceeds**" means cash proceeds received in respect of any of the Obligations from (1) the sale, disposition or other liquidation of all or any part of the Collateral, (2) the sale or disposition of any property, business or assets of Holdings or Company, regardless of whether such money, property, securities or other distributions are received directly or indirectly from any such entity during the pendency of or in connection with any case under the Bankruptcy Code commenced by or against Holdings or Company or otherwise, (3) the payment

of any amounts pursuant to the Guaranties or (4) any payment with respect to Obligations received after the Commitment Termination Date or earlier termination of the Commitments pursuant to the terms of this Agreement.

"**Environmental Claim**" means any allegation, investigation, notice, notice of violation, claim, demand, action, suit, proceeding, abatement order or other direction (conditional or otherwise) by any Governmental Authority or any other Person arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law, (ii) in connection with any Hazardous Materials or any actual or alleged Hazardous Materials Activity, or (iii) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"**Environmental Laws**" means any and all current or future statutes, ordinances, orders, rules, regulations, plans, policies or decrees and requirements having the force of law of any Governmental Authority relating to (i) environmental matters, including, without limitation, those relating to any Hazardous Materials Activity, (ii) the generation, use, storage, transportation or disposal of Hazardous Materials, or (iii) occupational safety and health, industrial hygiene, land use or the protection of human, plant or animal health or welfare from environmental hazards, in any manner applicable to Company or any of its Subsidiaries or any of their respective properties, including, without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.) ("CERCLA"), the Hazardous Materials Transportation Act (49 U.S.C. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Federal Water Pollution Control Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §136 et seq.), the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.) and the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001 et seq.), each as amended, and any analogous future or present local, state and federal laws, statutes and regulations promulgated pursuant to any of the foregoing.

"**Equipment**" means, with respect to a Person, all equipment in all of its forms, all parts thereof and all accessions thereto owned or held by such Person, including without limitation all equipment, parts and accessions relating to the manufacture, production, servicing, maintenance or repair of press systems, printing presses and related finished goods and spare parts; provided that "Equipment" shall not include any materials or other items that would otherwise constitute "Inventory".

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute, and any similar or comparable laws in a jurisdiction outside of the U.S. applicable to Company or any of its Subsidiaries.

"**ERISA Affiliate**", as applied to any Person, means (i) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member; (ii) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member; and (iii) except for purposes of Title IV of ERISA, any member of an affiliated service

group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of a Person shall continue to be considered an ERISA Affiliate within the meaning of this definition solely with respect to the period during which such entity was an ERISA Affiliate of the Person and with respect to liabilities arising after such period for which the Person could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (iv) the withdrawal by Company or any of its ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability pursuant to Sections 4063 or 4064 of ERISA; (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (vi) the imposition of liability on Company or any of its ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (vii) the withdrawal by Company or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by Company or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (viii) the occurrence of an act or omission which could reasonably be expected to give rise to the imposition on Company or any of its ERISA Affiliates of material fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409 or 502(c), (i) or (l) or 4071 of ERISA in respect of any Employee Benefit Plan; (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against Company or any of its ERISA Affiliates in connection with any such Employee Benefit Plan; (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan; provided that any event described in the foregoing clauses shall not be an ERISA Event if Company and/or its Subsidiaries are (or would be) liable for any potential liability resulting from such event solely because of their affiliation with an ERISA Affiliate (excluding Company and all Subsidiaries) and (i) such events could not reasonably be

expected to result (individually or in the aggregate) in liability (including joint and several liability) of Company and its Subsidiaries of more than $1,000,000, or (ii) neither Company and its Subsidiary could reasonably be expected to be liable (either individually or on a joint and several basis) for any potential liability resulting from such event; provided further that any event described in the foregoing proviso shall be an ERISA Event if the PBGC or any other governmental authority notifies Company or one of its Subsidiaries that Company or one of its Subsidiaries is liable for any potential liability resulting from such event.

"**EU**" means the European Union.

"**Euro**" has the meaning assigned to that term in subsection 2.1F(ii).

"**Event of Default**" means each of the events set forth in Section 8.

"**Excess Dividend Proceeds**" has the meaning defined in subsection 2.4(A)(iii)(f).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute, and any comparable or similar laws in a jurisdiction outside of the United States applicable to Company or any of its Subsidiaries.

"**Exchange Rate**" means, with respect to any currency other than Dollars, the rate of exchange quoted by the Wall Street Journal on the date of determination as applicable to trading among banks at 4:00 P.M. (New York time) on the immediately preceding Business Day (or at such other time and on such other date specified in the Wall Street Journal) in the New York foreign exchange market for such other currency.

"**Existing Credit Agreement**" means that certain Second Amended and Restated Multicurrency Credit Agreement dated as of November 19, 1999, as amended through the Closing Date, among Borrowers, the Prepetition Lenders, Bankers Trust Company, as Administrative Agent, and Lehman Brothers, as Documentation Agent, as such Existing Credit Agreement may be amended, supplemented or otherwise modified from time to time.

"**Facilities**" means the manufacturing plants, offices, warehouses and all other real property (including, without limitation, all buildings, fixtures or other improvements located thereon) and related facilities now, hereafter or heretofore owned, leased, operated or used by Company or any of its Subsidiaries or any of their respective predecessors or Affiliates.

"**Federal Funds Effective Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Agent from three Federal funds brokers of recognized standing selected by Agent.

"**Fee Property**" means a Real Property Asset consisting of a fee interest in real property.

**"Final Borrowing Order"** means an order of the Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) in form and substance acceptable to Agent and its counsel and Requisite Lenders, as the same may be amended, supplemented or otherwise modified from time to time with the express written consent or joinder of Requisite Lenders and approved by the Court.

**"Final Borrowing Order Date"** means the date of entry of the Final Borrowing Order by the Court.

**"First Day Orders"** means those orders entered by the Court as a result of motions and applications filed by Company with the Court on the Petition Date, in each case in form and substance as approved by Agent pursuant to subsection 4.1F.

**"First Priority"** means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that (i) such Lien has priority over any other Lien (other than those Permitted Encumbrances that as a matter of statutory law have priority over any other Lien irrespective of the prior perfection or filing of such other Lien) on such Collateral and (ii) such Lien is the only Lien (other than Permitted Encumbrances) to which such Collateral is subject.

**"Fiscal Quarter"** means a fiscal quarter of any Fiscal Year.

**"Fiscal Year"** means the fiscal year of Company and its Subsidiaries ending on December 31 of each calendar year.

**"Flood Hazard Property"** means a Mortgaged Property located in an area in the United States designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

**"Forecast"** means the consolidated and consolidating statements of projected receipts, disbursements, income (including dividends from Subsidiaries), expenses and borrowing needs for the thirteen-week period going forward from the date of such Forecast.

**"Foreign Borrowers"** means Goss UK, Goss France and Goss Japan; **"Foreign Borrower"** means any one of Goss UK, Goss France or Goss Japan.

**"Foreign Bridge Facility"** has the meaning assigned to that term in the recitals to this Agreement and is the revolving credit facility provided to Goss UK, Goss France and Goss Japan under this Agreement.

**"Foreign Bridge Facility Availability Date"** means, with respect to each of Goss UK, Goss France and Goss Japan, the date on which such Borrower has satisfied all of the conditions set forth in Section 4 (and specifically subsection 4.4) applicable to such Borrower, in each case as approved by Agent in its sole discretion, and on and after such date such Borrower may request, and the applicable Lenders may make, the applicable Loans to such Borrower under the Foreign Bridge Facility.

the right of the senior creditor to satisfy its claim from both funds, while the other

creditor may resort to only one." In re Borges, 184 B.R. 874, 879 (D. Conn. 1995).

Because the Prepetition Lenders only have liens on a subset of the property constitut-

ing the DIP Collateral, the present situation is akin to the typical marshaling context.

     53.     Bankruptcy courts have recognized that marshaling can provide the

junior secured creditor with adequate protection. See, e.g., In re Robert E. Derecktor

of Rhode Island, Inc., 150 B.R. 296 (Bankr. D.R.I. 1993) (ordering marshaling by

senior secured creditor on motion by junior secured creditor for adequate protection).

Cf. In re Autostyle Plastics, Inc., 216 B.R. 784 (Bankr. W.D. Mich. 1997) (denying

junior secured creditor's motion for adequate protection through marshaling because

there was no second fund).

     54.     Furthermore, courts explicitly recognize that the doctrine of marshal-

ing is not designed to protect unsecured creditors or other creditors to the secured

creditor for whose benefit marshaling is sought.  Marshaling is concerned with

avoiding prejudice only to those with "superior or equal equity" in the collateral at

issue, and is appropriate to protect junior secured creditors even when it would result

in prejudice in unsecured creditors. In re Robert E. Derecktor of Rhode Island, Inc.,

150 B.R. 296 (Bankr. D.R.I. 1993).  Put another way, "[w]hile it is clear that

marshaling . . . will deplete the fund otherwise available to unsecured creditors,

[such a result does not] constitute legal prejudice." In re Robert E. Derecktor of

"**Foreign Bridge Letter of Credit**" means a French Letter of Credit, Japan Letter of Credit or UK Letter of Credit issued under the Foreign Bridge Loan Facility.

"**Foreign Bridge Loan Commitments**" means the UK Bridge Loan Commitments, the French Bridge Loan Commitments, the Japanese Bridge Loan Commitments or any combination thereof.

"**Foreign Bridge Loans**" means the UK Bridge Loans, the French Bridge Loans or the Japanese Bridge Loans or any combination thereof

"**Foreign Bridge Obligations**" means all obligations of every nature of Goss UK, Goss France and Goss Japan under the Foreign Bridge Facility and the Foreign Collateral Documents, including, without limitation, any liability of such Borrower on any claim, whether or not the right to payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed or contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any bankruptcy, insolvency, reorganization or other similar proceeding.  Without limiting the generality of the foregoing, the Foreign Bridge Obligations of Goss UK, Goss France and Goss Japan include the obligations to (a) pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by any Borrower under the Foreign Bridge Facility or any Foreign Collateral Document, (b) reimburse any amount in respect of any of the foregoing that Agent or any Lender, in its sole discretion, may elect to pay or advance on behalf of such Borrower and (c) pay any amount owed under any Currency Agreement to which it is a party.

"**Foreign Collateral**" means Collateral owned by Foreign Subsidiaries or covered by Foreign Collateral Documents.

"**Foreign Collateral Documents**" means the Collateral Account Agreements, Security Agreements, pledge agreements, assignments, mortgages, debentures, financing statements or any other agreement, document, instrument or certificate (including any amendments, supplements or other modifications to any of the foregoing) delivered pursuant to this Agreement or any of the other Loan Documents, or an applicable order of the Court, granting in favor of Agent, on behalf of Lenders, a Lien on any real, personal or mixed property of Goss UK, Goss France and Goss Japan as security for the Foreign Bridge Obligations.

"**Foreign Subsidiary**" means a direct or indirect Subsidiary of Company that is incorporated or organized under the laws of a jurisdiction other than that of the United States of America, including, without limitation, Goss Australia, Goss France, Goss Japan, and Goss UK.

"**Foreign Unfunded Pension Plan**" means a Pension Plan described in Section 4(b)(4) of ERISA that is not required to be funded pursuant to applicable foreign law.

"**Francs**" and the sign "**FF**" mean the lawful money of the Republic of France.

"**French Bridge Indemnifying Lender**" means each financial institution that is designated as a French Bridge Indemnifying Lender on Schedule 2.1 annexed hereto, and each

financial institution which is designated, with the approval of Agent, as a French Bridge Indemnifying Lender in an Assignment Agreement.

"**French Bridge Lender**" and "**French Bridge Lenders**" mean the Lenders that have French Bridge Loan Commitments or that have French Bridge Loans outstanding, together with their successors and permitted assigns pursuant to subsection 10.1.

"**French Bridge Loan Commitment**" means the commitment of a French Bridge Lender (i) to make French Bridge Loans to Goss France pursuant to subsection 2.1A(i)(b) and (ii) to issue and/or purchase participations in Letters of Credit for the account of Goss France pursuant to Section 3, and "**French Bridge Loan Commitments**" means such commitments of all such Lenders in the aggregate.

"**French Bridge Loan Exposure**" means, with respect to any French Bridge Lender as of any date of determination (i) prior to the termination of the French Bridge Loan Commitments, that Lender's French Bridge Loan Commitment and (ii) after the termination of the French Bridge Loan Commitments, the sum of (a) the aggregate outstanding principal amount of the French Bridge Loans of that Lender plus (b) in the event that Lender is an Issuing Lender, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by that Lender for the benefit of Goss France (in each case net of any participations purchased by other Lenders in such Letters of Credit or any unreimbursed drawings thereunder) plus (c) the aggregate amount of all participations purchased by that Lender in any outstanding Letters of Credit for the benefit of Goss France or any unreimbursed drawings under any such Letters of Credit.

"**French Bridge Loans**" means the Loans made by Lenders to Goss France pursuant to subsection 2.1A(i)(b).

"**French Letter of Credit**" means a Letter of Credit issued under the Foreign Bridge Facility for the benefit of Goss France.

"**Funding Date**" means the date of the funding of a Loan, which shall be the Friday after Agent's receipt of the applicable Notice of Borrowing in accordance with subsection 2.1B or, if such Friday is not a Business Day, then the next Business Day.

"**Funding and Payment Office**" means (i) the office or offices of Agent set forth on Schedule 1.1(b) annexed hereto, or (ii) such other office or offices of Agent as may from time to time hereafter be designated as such in a written notice delivered by Agent to Borrowers and Lenders.

"**GAAP**" means, subject to the limitations on the application thereof set forth in subsection 1.2, generally accepted accounting principles set forth in opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession, in each case as the same are applicable to the circumstances as of the date of determination.

17

**"GAP Lender"** means the Domestic Tranche B Lenders that are Tranche 1A Lenders.

**"GAP Lending Fee"** has the meaning assigned to that term in subsection 2.3B.

**"GAP Back-End Fee"** has the meaning assigned to that term in subsection 2.3B.

**"Goss Australia"** means Goss Graphics Systems Australasia Pty. Ltd, a wholly-owned Subsidiary of Company.

**"Goss France"** has the meaning assigned to that term in the introduction to this Agreement and is a wholly-owned Subsidiary of Company.

**"Goss Japan"** has the meaning assigned to that term in the introduction to this Agreement and is a wholly-owned Subsidiary of Company.

**"Goss Realty"** means Goss Realty, L.L.C., a limited liability company organized under the laws of Delaware and a wholly-owned Subsidiary of Company.

**"Goss UK"** has the meaning assigned to that term in the introduction to this Agreement and is a wholly-owned Subsidiary of Company.

**"Governmental Authority"** means any federal, state or local governmental authority, agency or court in the United States, or other comparable or similar governmental authority, agency or court in a jurisdiction outside of the United States, in each case applicable to Company or any of its Subsidiaries.

**"Governmental Authorization"** means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

**"Guarantor"** means, at any time, Holdings, Company or any Domestic Subsidiary that is then a party to any of the Guaranties.

**"Guaranty"** means each of (i) the Debtor in Possession Guaranties executed and delivered by Holdings and (ii) the Debtor in Possession Guaranties executed and delivered by Company, in each case on the Closing Date substantially in the applicable form attached hereto at Exhibit XI, and any other guaranty, document or instrument with a similar or comparable effect executed by any Foreign Subsidiary that is a Borrower, in form and substance satisfactory to Agent in each case as such Guaranty may be amended, supplemented or otherwise modified from time to time, and **"Guaranties"** means all such Guaranties, collectively.

**"Hazardous Materials"** means (i) any chemical, material or substance which, at the time of determination, is defined as or included in the definition of "hazardous substances", "hazardous wastes", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "infectious waste", "toxic substances" or any other formulations intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, toxicity, reproductive toxicity, "TCLP toxicity" or "EP toxicity" or words of similar meaning and regulatory effect under any applicable Environmental Laws; (ii)

any oil, petroleum, petroleum fraction or petroleum derived substance; (iii) any drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal resources; (iv) any flammable substances or explosives; (v) any radioactive materials; (vi) asbestos in any form; (vii) urea formaldehyde foam insulation; (viii) electrical equipment which contains any dielectric fluid containing a mixture of polychlorinated biphenyls ("**PCB**") in excess of fifty parts per million; (ix) pesticides; and (x) any other chemical, material or substance, exposure to which is prohibited, limited, regulated or determined by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of the Facilities.

"**Hazardous Materials Activity**" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Holdings**" means Goss Holdings, Inc., a corporation organized under the laws of the state of Delaware.

"**Holdings Common Stock**" means the voting and nonvoting common stock of Holdings.

"**Holdings Sub Noteholders**" means the holders of the Holdings Subordinated Notes.

"**Holdings Subordinated Note Indenture**" means the subordinated note indenture dated as of November 19, 1999 by and between Holdings and HSBC Bank USA, as Trustee, pursuant to which the Holdings Subordinated Notes are issued, as such indenture may be amended from time to time to the extent permitted under the Existing Credit Agreement.

"**Holdings Subordinated Notes**" means those certain 12.25% subordinated notes due 2005 in an aggregate principal amount of $112,500,000 issued by Holdings to the Holdings Sub Noteholders pursuant to the Holdings Subordinated Note Indenture.

"**Indebtedness**", as applied to any Person, means, without duplication, (i) all indebtedness for borrowed money, (ii) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP, (iii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (iv) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA), which purchase price is (a) due more than six months from the date of incurrence of the obligation in respect thereof or (b) evidenced by a note or similar written instrument, and (v) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person. Obligations under Currency Agreements constitute Contingent Obligations and not Indebtedness.

**"Indemnitee"** means any one of the Indemnitees defined in subsection 10.3; **"Indemnitees"** has the meaning assigned to that term in subsection 10.3.

**"Indemnified Environmental Liabilities"** has the meaning assigned to that term in subsection 10.3.

**"Indemnified Liabilities"** has the meaning assigned to that term in subsection 10.3.

**"Indemnifying Lender"** means each UK Bridge Indemnifying Lender, each French Bridge Indemnifying Lender and each Japanese Bridge Indemnifying Lender, and **"Indemnifying Lenders"** means, collectively, all such financial institutions.

**"Indemnity Amount"** means for each Indemnifying Lender which is a signatory hereto the amount and the percentage that is so designated and set forth opposite such Indemnifying Lender's name on Schedule 2.1 annexed hereto and, for each financial institution which becomes an Indemnifying Lender pursuant to an Assignment Agreement, the amount and the percentage that is so designated in such Assignment Agreement.

**"Indemnity Participation"** shall have the meaning set forth therefor in subsection 2.9A (in Annex C).

**"Interest Payment Date"** means the first Business Day of each calendar month.

**"Interest Period"** has the meaning assigned to that term in subsection 2.2B.

**"Interest Rate Determination Date"** means, (i) with respect to any Interest Period relating to any Loan (other than Loans denominated in Sterling), the second Business Day prior to the first day of such Interest Period, and (ii) with respect to any Interest Period relating to any Loan denominated in Sterling, the first day of such Interest Period.

**"Interim Borrowing Order"** means an order of the Court entered in the Chapter 11 Cases after an interim hearing under Bankruptcy Rule 4001(c)(2) in substantially the form attached hereto as Exhibit XVI with any modifications thereto approved by Requisite Lenders, as the same may be amended, supplemented or otherwise modified from time to time with the express written consent or joinder of Requisite Lenders and approved by the Court.

**"Interim Borrowing Order Date"** means the date of entry of the Interim Borrowing Order by the Court.

**"Internal Revenue Code"** means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute and any similar or comparable laws in a jurisdiction outside of the United States applicable to Company or any of its Subsidiaries.

**"Inventory"** means, with respect to a Person, all goods, merchandise and other personal property which are held by such Person for sale or lease, including those held for display or demonstration or out on lease or consignment or to be furnished under a contract of

service, including without limitation (but without duplication) raw materials, components, works in process, finished goods (including without limitation all completed offset newspaper press systems, insert web offset press systems and commercial web offset printing presses, or accessories thereto, and other related goods and merchandise, in each case constituting finished goods which are held for sale or lease by such Person, including those held for display or demonstration), spare parts (including without limitation all components, goods, merchandise or spare parts relating to press equipment held for sale or lease by such Person in connection with the servicing, maintenance or repair of finished goods sold or leased by such Person), or other materials used or consumed, or to be used or consumed, in the business of such Person; provided that "Inventory" shall not include any materials or other items that would otherwise constitute "Equipment".

"Investment" means (i) any direct or indirect purchase or other acquisition by Company or any of its Subsidiaries of, or of a beneficial interest in, any Securities of any other Person (other than a Person that prior to such purchase or acquisition was a wholly-owned Domestic Subsidiary of Company), (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Subsidiary of Company from any Person other than Company or any of its Subsidiaries, of any equity Securities of such Subsidiary, or (iii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution by Company or any of its Subsidiaries to any other Person other than a wholly-owned Domestic Subsidiary of Company, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto and minus returns of capital thereon, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment. The definition of "Investment" shall not include any Accounts that are current assets and that arose from sales of goods and services in the ordinary course of business of Company and its Subsidiaries.

"Issuing Lender" means, with respect to any Letter of Credit, the Lender which agrees or is otherwise obligated to issue such Letter of Credit, determined as provided in subsection 3.1B(ii), or Deutsche Bank or its Affiliate, if so designated by Agent.

"Japanese Bridge Indemnifying Lender" means each financial institution that is designated as a Japanese Bridge Indemnifying Lender on Schedule 2.1 annexed hereto, and each financial institution which is designated, with the approval of Agent, as a Japanese Bridge Indemnifying Lender in an Assignment Agreement.

"Japanese Bridge Lender" and "Japanese Bridge Lenders" means the Lenders that have Japanese Bridge Loan Commitments or that have Japanese Bridge Loans outstanding, together with their successors and permitted assigns pursuant to subsection 10.1.

"Japanese Bridge Loan Exposure" means, with respect to any Japanese Bridge Lender as of any date of determination (i) prior to the termination of the Japanese Bridge Loan Commitments, that Lender's Japanese Bridge Loan Commitment and (ii) after the termination of the Japanese Bridge Loan Commitments, the sum of (a) the aggregate outstanding principal

amount of the Japanese Bridge Loans of that Lender plus (b) in the event that Lender is an Issuing Lender, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by that Lender for the benefit of Goss Japan (in each case net of any participations purchased by other Lenders in such Letters of Credit or any unreimbursed drawings thereunder) plus (c) the aggregate amount of all participations purchased by that Lender in any outstanding Letters of Credit for the benefit of Goss Japan or any unreimbursed drawings under any such Letters of Credit.

**"Japanese Bridge Loan Commitment"** means the commitment of a Japanese Bridge Lender (i) to make Japanese Bridge Loans to Goss Japan pursuant to subsection 2.1A(i)(b) and (ii) to issue and/or purchase participations in Letters of Credit for the account of Goss Japan pursuant to Section 3, and **"Japanese Bridge Loan Commitments"** means such commitments of all such Lenders in the aggregate.

**"Japanese Bridge Loans"** means the Loans made by Lenders to Goss Japan pursuant to subsection 2.1A(i)(b).

**"Japanese Letter of Credit"** means a Letter of Credit issued under the Foreign Bridge Facility for the benefit of Goss Japan.

**"Joint Venture"** means a joint venture, partnership, limited liability company or other similar arrangement, whether in corporate, partnership, limited liability company or other legal form; provided that in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

**"Junior Lenders"** means Tranche 2 Lenders and Tranche 3 Lenders.

**"Junior Obligations"** means all sums payable to Junior Lenders under this Agreement or any Loan Document, including, without limitation, all Tranche 2 Loans, all Tranche 3 Loans, all Foreign Bridge Loans funded by Junior Lenders, any unreimbursed drawings under any Letter of Credit issued by any Junior Lender, any reimbursement paid by any Junior Lender with respect to any drawing of any Letter of Credit and all other Obligations owed to Junior Lenders, and any obligation of a Borrower to deposit funds pursuant to a Collateral Account Agreement for the purpose of collateralizing Letters of Credit in which Junior Lenders are participants pursuant to subsection 3.1 of this Agreement.

**"Lender"** and **"Lenders"** mean the Lenders listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to subsection 10.1; provided that the term "Lenders", when used in the context of a particular Commitment, shall mean Lenders having that Commitment.

**"Lending Office"** means, with respect to any Lender, the office or offices of such Lender specified as its "Lending Office" or "Domestic Lending Office" or "Offshore Lending Office", as the case may be, on the signature pages hereof, or such other office or offices as such Lender may from time to time notify Borrowers and Agent.

**"Letter of Credit"** or **"Letters of Credit"** means Commercial Letters of Credit and Standby Letters of Credit issued or to be issued by Issuing Lenders for the account of a Borrower pursuant to subsection 3.1.

**"Letter of Credit Usage"** means, as at any date of determination, for any Borrower the Dollar Equivalent of the sum of (i) the maximum aggregate amount which is or at any time thereafter may become available for drawing under all Letters of Credit then outstanding issued for the account of such Borrower plus (ii) the aggregate amount of all drawings under such Letters of Credit honored by Issuing Lenders not theretofore reimbursed.

**"Letters of Credit Sublimit"** means the aggregate limit on Letter of Credit Usage for all Borrowers, equal to the lesser of (x) $45,000,000 and (y) the Maximum Commitments then effect.

**"Lien"** means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof and any agreement to give any security interest) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

**"Loan"** or **"Loans"** means one or more of the Tranche 1A Loans, the Tranche 1B Loans, the Tranche 2 Loans, the Tranche 3 Loans, the UK Bridge Loans, the French Bridge Loans or the Japanese Bridge Loans or any combination thereof.

**"Loan Documents"** means this Agreement, the Notes, the Letters of Credit (and any applications for, or reimbursement agreements or other documents or certificates executed by a Borrower in favor of an Issuing Lender relating to, the Letters of Credit), the Guaranties and the Collateral Documents and, solely for purposes of the use of the term "Loan Documents" in the definition of the term "Obligations", the Currency Agreements to which a Loan Party and any Lender or any of such Lender's Affiliates is a party.

**"Loan Exposure"** means the Tranche 1A Loan Exposure, Tranche 1B Loan Exposure, Tranche 2 Loan Exposure, Tranche 3 Loan Exposure, the UK Bridge Loan Exposure, French Bridge Loan Exposure, or the Japanese Bridge Loan Exposure or any combination thereof.

**"Loan Parties"** means each of the Borrowers, the Guarantors or any of Company's Subsidiaries executing any other Loan Document.

**"Local Time"** means (i) with respect to Base Rate Loans, New York time and (ii) with respect to Offshore Rate Loans, London time.

**"Margin Stock"** has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

**"Material Adverse Effect"** means (i) a material adverse effect upon the business, operations, properties, assets, condition (financial or otherwise) or prospects (other than the filing of the Chapter 11 Cases) of (a) Company and its Domestic Subsidiaries, taken as a whole, (b) Goss UK and its Subsidiaries, taken as a whole, (c) Goss France and its Subsidiaries, taken as

a whole, (d) Goss Japan and its Subsidiaries, taken as a whole, or (e) Company and its Subsidiaries, taken as a whole; provided that in the event of the occurrence of a material adverse effect as described in the foregoing clauses (a), (b), (c) or (d), such Borrower shall have five days after receipt of notice from Agent to cure such material adverse effect (without causing a material adverse effect for any other Borrower) before it shall become a "Material Adverse Effect" as defined in this clause (i); (ii) the impairment in any material respect of the ability of any Loan Party to perform, or of Agent or any Lender to enforce, the Obligations; or (iii) a material adverse effect on the value of the Collateral or the amount which Agent or any Lender would be likely to receive (after giving consideration to delays in payment and costs of enforcement) in the liquidation of the Collateral.

"**Material Contract**" means any contract or other arrangement to which any Borrower or any of its Subsidiaries is a party (other than the Loan Documents) for which breach, nonperformance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect.

"**Material Leasehold**" means a Real Property Asset consisting of a leasehold interest in an Operating Lease or a Capital Lease which is reasonably determined by Agent to be of material value as collateral for the Obligations.

"**Material Subsidiary**" means any Subsidiary of Holdings that (i) owns 5% or more of the assets of Holdings and its Subsidiaries, measured on a consolidated basis, or (ii) accounts for 5% or more of the net income of Company and its Subsidiaries on a consolidated basis.

"**Material Variance**" means (a) any variance in a Borrower's receipts from that projected in the Approved Budget or applicable Forecasts, whether actual or projected by such Borrower, which would result in a cumulative 15% decrease in receipts from that projected in the Approved Budget or applicable Forecasts, (b) any variance in disbursements from that projected in the Approved Budget or applicable Forecasts, whether actual or projected by such Borrower, which would result in a cumulative 15% increase in disbursements from that projected in the Approved Budget or applicable Forecasts, (c) any variance in disbursements within any single line item of the Approved Budget or applicable Forecasts, whether actual or projected by such Borrower, which would result in a cumulative 15% increase in disbursements within such line item of the Approved Budget or applicable Forecasts, or (d) any variance in net revenues or from that projected in the Approved Budget or applicable Forecasts, whether actual or projected by such Borrower, which would result in any additional borrowing needs, or excess of disbursements over receipts, greater than that projected in the Approved Budget.

"**Maximum Commitments**" means, as of any date of determination, the Dollar Equivalent of $90,000,000 less the aggregate amount of all reductions made to all Commitments pursuant to subsection 2.4A.

"**Minimum Amount**" means (i) in the case of Base Rate Loans denominated in Dollars, $100,000 and integral multiples of $100,000 in excess of that amount, (ii) in the case of Offshore Rate Loans denominated in Dollars and having a particular Interest Period, $1,000,000 and integral multiples of $100,000 in excess of that amount, (iii) in the case of Offshore Rate

Loans denominated in Sterling and having a particular Interest Period, £1,000,000 and integral multiples of £100,000 in excess of that amount, (iv) in the case of Offshore Rate Loans denominated in Francs and having a particular Interest Period, FF6,000,000 and integral multiples of FF600,000 in excess of that amount, and (v) in the case of Offshore Rate Loans denominated in Yen and having a particular Interest Period, ¥150,000,000 and integral multiples of ¥15,000,000 in excess of that amount.

"**Mortgage**" means an instrument (whether designated as a deed of trust, a trust deed or a mortgage or by any similar title) executed and delivered by any Borrower or any of its Subsidiaries encumbering a Fee Property, as such instrument may be amended, supplemented or otherwise modified from time to time, and "**Mortgages**" means all such instruments, including the Mortgages set forth on Schedule 5.5 and any Additional Mortgages (as defined in subsection 6.9) collectively.

"**Mortgaged Property**" means any property so identified on Schedule 5.5 or any Covered Real Property Asset covered by an Additional Mortgage (as those terms are defined in subsection 6.9).

"**Multiemployer Plan**" means a "multiemployer plan", as defined in Section 3(37) of ERISA, to which Company or any of its ERISA Affiliates is contributing, or ever has contributed, or to which Company or any of its ERISA Affiliates has, or ever has had, an obligation to contribute.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received from such Asset Sale, net of any bona fide direct costs incurred in connection with such Asset Sale (including without limitation, (i) income taxes reasonably estimated to be actually payable as a result of such Asset Sale within two years of the date of such Asset Sale and (ii) payment of any Indebtedness secured by a Lien on the assets in question required to be paid which has been disclosed on Schedule 7.2) and approved by the Court, if such approval is necessary pursuant to the Bankruptcy Code.

"**Net Insurance/Condemnation Proceeds**" means any Cash payments or proceeds received by Agent or by any Borrower or any of such Borrower's Subsidiaries (i) under any business interruption or casualty insurance policy in respect of a covered loss thereunder or (ii) as a result of the taking of any assets of any Borrower or any of its respective Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, in each case net of any actual and reasonable documented costs incurred by such Borrower or any of its respective Subsidiaries in connection with the adjustment or settlement of any claims of such Borrower or such Subsidiary in respect thereof.

"**Net Settlement Proceeds**" means any Cash payments or proceeds received by any Borrower or any of such Borrower's Subsidiaries as a result of or in connection with any settlement, or litigation to judgment, of any claim, action or proceeding, before any court, arbitrator or other governmental body involving such Borrower or such Subsidiary (including

any trade action existing as of the Closing Date), net of legal fees relating to such settlement and income taxes reasonably estimated to be actually payable as a result of such settlement within two years of the date of such settlement.

"**Non-French Lender**" has the meaning assigned to that term in subsection 2.7B(iii).

"**Non-Japanese Lender**" has the meaning assigned to that term in subsection 2.7B(iii).

"**Non-US Lender**" has the meaning assigned to that term in subsection 2.7B(iii).

"**Note**" means one or more of (i) the promissory notes of Borrowers issued pursuant to subsection 2.1E on the Closing Date, and (ii) any promissory notes issued by Borrowers pursuant to the last sentence of subsection 10.1B(i) in connection with assignments of Commitments and Loans of any Lender, in each case substantially in the form of Exhibit IV annexed hereto, as they may be amended, supplemented or otherwise modified from time to time.

"**Notice of Borrowing**" means a notice substantially in the form of Exhibit I annexed hereto delivered by a Borrower to Agent pursuant to subsection 2.1B(ii) with respect to a proposed borrowing.

"**Notice of Conversion/Continuation**" means a notice substantially in the form of Exhibit II annexed hereto delivered by a Borrower to Agent pursuant to subsection 2.2D with respect to a proposed conversion or continuation of the applicable basis for determining the interest rate with respect to the Loans specified therein.

"**Obligations**" means collectively the DIP Obligations and Foreign Bridge Obligations.

"**Officers' Certificate**" means, as applied to any corporation, a certificate executed on behalf of such corporation by its chairman of the board (if an officer) or its president or one of its vice presidents (or comparable officer in the case of Goss UK, Goss France or Goss Japan) and by its chief financial officer or its treasurer; provided that any Officers' Certificate required to be delivered by any Loan Party on the Closing Date may be executed on behalf of such Loan Party by any one of the foregoing officers; provided further that every Officers' Certificate with respect to the compliance with a condition precedent to the making of any Loans hereunder shall include (i) a statement that the officer or officers making or giving such Officers' Certificate have read such condition and any definitions or other provisions contained in this Agreement relating thereto, (ii) a statement that, in the opinion of the signers, they have made or have caused to be made such examination or investigation as is necessary to enable them to express an informed opinion as to whether or not such condition has been complied with, and (iii) a statement as to whether, in the opinion of the signers, such condition has been complied with.

"**Offshore Currency**" means Sterling, Francs or Yen.

"**Offshore Currency Loans**" means any Loans denominated in an Offshore Currency.

"**Offshore Rate Loans**" means Loans bearing interest at rates determined by reference to the Adjusted Offshore Rate as provided in subsection 2.2A.

"**Operating Lease**" means, as applied to any Person, any lease (including, without limitation, leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

"**PBGC**" means the Pension Benefit Guaranty Corporation (or any successor thereto), or any similar or comparable governmental agency or authority in a jurisdiction outside of the United States applicable to Company or any of its Subsidiaries.

"**Pension Plan**" means any Employee Benefit Plan, other than a Multiemployer Plan, which is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"**Permitted Encumbrances**" means the following types of Liens (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA):

(i)    Liens for taxes, assessments or governmental charges or claims the payment of which is not, at the time, required by subsection 6.3 (other than any Lien relating to or imposed in connection with any Environmental Claim);

(ii)    statutory Liens of landlords and Liens of carriers, warehousemen, mechanics and materialmen and other Liens imposed by law incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(iii)    Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money); provided, however, that "Permitted Encumbrances" shall not include Liens for the benefit of any customer of Company or any of its Subsidiaries or for any advances, deposits, progress payments or other similar payments made to Company or any of its Subsidiaries by a customer;

(iv)    any attachment or judgment Lien not constituting an Event of Default under subsection 8.10 (other than any Lien relating to or imposed in connection with any Environmental Claim);

(v)    leases or subleases granted to others not interfering in any material respect with the ordinary conduct of the business of Company or any of its Subsidiaries;

(vi)   easements, rights-of-way, restrictions, covenants, declarations, encroachments, minor defects or irregularities in title, and other similar charges or encumbrances not interfering in any material respect with the ordinary conduct of the business of Company or any of its Subsidiaries;

(vii)   any (a) restriction or encumbrance that the interest or title of a lessor or sublessor may be subject to, or (b) subordination of the interest of the lessee or sublessee under a lease to any restriction or encumbrance referred to in the preceding clause (a);

(viii)   Liens arising from filing UCC financing statements relating solely to leases permitted by this Agreement;

(ix)   Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(x)   licenses of patents, trademarks and other intellectual property rights granted by Company or any of its Subsidiaries in the ordinary course of business and not interfering in any material respect with the ordinary conduct of the business of Company or such Subsidiary; and

(xi)   the title exceptions approved by Agent and shown on Schedule B of the Mortgages set forth on <u>Schedule 5.5</u> of the Existing Credit Agreement.

**"Person"** means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments and agencies and political subdivisions thereof.

**"Petition Date"** means the Petition Date as defined in the recitals to this Agreement.

**"Plan of Reorganization"** means the Plan of Reorganization attached hereto as Exhibit XV.

**"Potential Event of Default"** means a condition or event that, after notice or passage of time or both, would constitute an Event of Default.

**"Prepetition Debt"** means Indebtedness or other liability of any Loan Party or claim against any Loan Party (within the meaning of Bankruptcy Code section 101(5)) outstanding on the Petition Date, including Prepetition Lenders' Claims.

**"Prepetition Lenders"** means the parties identified as lenders and indemnifying lenders under the Existing Credit Agreement in their capacities as lenders under the Existing Credit Agreement as of the Petition Date, together with their successors and permitted assigns.

**"Prepetition Lenders' Claims"** means the claims of Prepetition Lenders against Debtor Entities for amounts owing under the Existing Credit Agreement as of the Petition Date

(including Contingent Obligations arising as the result of outstanding letters of credit) plus interest, fees and charges accruing after such date.

"**Prepetition Liens**" means the Liens securing the Prepetition Lenders' Claims as of the Petition Date and any replacement Liens or additional Liens granted to the Prepetition Lenders pursuant to the Cash Collateral and Adequate Protection Stipulation.

"**Prepetition Lender Lock Up Agreement**" means the Forbearance, Lock-Up and Voting Agreement dated as of September 7, 2001, by and among Company, Holdings, the Prepetition Lenders and others.

"**Prime Rate**" means the rate that BTCo announces from time to time as its prime lending rate as in effect from time to time. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Agent or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Pro Rata Share**" means, on any date of determination, with respect to all matters relating to a Type of DIP Loan Commitment of any Lender or any Letters of Credit of such Type issued under the DIP Facilities, or participations in such Loans or Letters of Credit purchased by any Lender, the percentage obtained by <u>dividing</u> (x) the Commitments of such Type of that Lender <u>by</u> (y) the aggregate Commitments of such Type of all Lenders, as such percentage may be adjusted by assignments permitted pursuant to subsection 10.1. The initial Pro Rata Share of each Lender with respect to each Type of DIP Loan Commitment is set forth opposite the name of that Lender in <u>Schedule 2.1</u> annexed hereto. With respect to Foreign Bridge Loan Commitments, the term "Pro Rata Share" shall mean, with respect to all matters relating to a Type of Foreign Bridge Loan Commitment of any Lender or any Letters of Credit of such Type issued under the Foreign Bridge Facilities, or participations in such Loans or Letters of Credit purchased by any Lender, the percentage of a Foreign Bridge Loan that the Lender would be committed to fund pursuant to subsection 2.1A(i)(b) at the time in question. For example, if a Foreign Bridge Loan is to be funded and, pursuant to subsection 2.1A(i)(b), such Foreign Bridge Loan is to be funded by Tranche 3 Lenders, a Lender's Pro Rata Share thereof would equal such Lender's Pro Rata Share of Tranche 3 Loan Commitments, as determined pursuant to the first sentence of this paragraph. If a Foreign Bridge Letter of Credit is to be issued, a Lender's Pro Rata Share thereof, for purposes of determining its participation in such Letter of Credit pursuant to subsection 3.1C, would be determined in the same manner as the preceding sentence, by positing a hypothetical Foreign Bridge Loan.

"**Real Property Assets**" means all real property from time to time owned in fee by any Loan Party and all rights, title and interest in and to any and all leases of real property as to which any Loan Party has a leasehold or license interest, including without limitation any such fee or leasehold or license interests acquired by any Loan Party after the date hereof.

"**Register**" has the meaning assigned to that term in subsection 2.1D.

"**Regulation D**" means Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time, and any similar or comparable laws in the UK, France or Japan.

"**Reimbursement Date**" has the meaning assigned to that term in subsection 3.3B.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials into the environment (including, without limitation, the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials), or into or out of any Facility, including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Request for Issuance of Letter of Credit**" means a notice substantially in the form of Exhibit III annexed hereto delivered by a Borrower to Agent pursuant to subsection 3.1B(i) with respect to the proposed issuance of a Letter of Credit.

"**Requisite Enforcement Decision-makers**" means (i) Requisite Senior Lenders until all of the Senior Obligations have been indefeasibly paid in full in cash, the Tranche 1A Commitments and Tranche 1B Commitments have been terminated, and there are no outstanding Letters of Credit that are Tranche 1A Letters of Credit, Tranche 1B Letters of Credit or Foreign Bridge Letters of Credit in which Senior Lenders participate pursuant to Section 3, and thereafter (ii) Requisite Junior Lenders.

"**Requisite Junior Lenders**" means Lenders having or holding a majority of the aggregate Loan Exposure under the Tranche 2 Facility and the Tranche 3 Facility.

"**Requisite Senior Lenders**" means Lenders having or holding a majority of the aggregate Loan Exposure under the Tranche 1A Facility and the Tranche 1B Facility.

"**Requisite Lenders**" means Lenders having or holding a majority of the aggregate Loan Exposure of all Types of all Lenders.

"**Same Day Funds**" means (i) with respect to disbursements and payments in Dollars, immediately available funds, and (ii) with respect to disbursements and payments in an Offshore Currency, same day or other funds as may be determined by Agent to be customary in the place of disbursement or payment for the settlement of international banking transactions in the relevant Offshore Currency.

"**Second Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that (i) such Lien has priority over any other Lien (other than First Priority Liens permitted under this Agreement and the other Loan Documents and those Permitted Encumbrances that as a matter of statutory law have priority over any other Lien irrespective of the prior perfection or filing of such other Lien) on such Collateral and (ii) such Lien is the only Lien (other than First Priority Liens permitted under this Agreement and the other Loan Documents and Permitted Encumbrances) to which such Collateral is subject.

"**Securities**" means any stock, shares, partnership interests, equity interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, whether certificated or uncertificated, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute, and any comparable or similar laws in a jurisdiction outside of the United States applicable to Company or any of its Subsidiaries.

"**Security Agreement**" means each Security Agreement executed and delivered by Holdings and each Borrower on the Closing Date, substantially in the forms provided at Exhibit XII annexed hereto, as each such Security Agreement may be amended or supplemented or otherwise modified from time to time, and "**Security Agreements**" means all such Security Agreements, collectively.

"**Senior Lenders**" means Tranche 1A Lenders and Tranche 1B Lenders.

"**Senior Obligations**" means all sums payable to Senior Lenders under this Agreement or any Loan Document, including, without limitation, all Tranche 1A Loans, all Tranche 1B Loans, all Foreign Bridge Loans funded by Senior Lenders, any unreimbursed drawings under any Letter of Credit issued by any Senior Lender, any reimbursement paid by any Senior Lender with respect to any drawing of any Letter of Credit and all other Obligations owed to Senior Lenders, and any obligation of a Borrower to deposit funds pursuant to a Collateral Account Agreement for the purpose of collateralizing Letters of Credit in which Senior Lenders are participants pursuant to subsection 3.1 of this Agreement.

"**Standby Letter of Credit**" means any standby letter of credit or similar instrument issued for the purpose of supporting (i) Indebtedness of Company or any of its Subsidiaries in respect of industrial revenue or development bonds or financings; (ii) workers' compensation liabilities of Company or any of its Subsidiaries; (iii) the obligations of third party insurers of Company or any of its Subsidiaries arising by virtue of the laws of any jurisdiction requiring third party insurers; (iv) obligations with respect to Capital Leases or Operating Leases of Company or any of its Subsidiaries; (v) performance, payment, deposit or surety obligations of Company or any of its Subsidiaries, in any case if required by law or governmental rule or regulation or in accordance with custom and practice in the industry; and (vi) Currency Agreements with respect to customer contracts for the sale of finished goods entered into in the ordinary course of business and consistent with past practices; provided that Standby Letters of Credit may not be issued for the purpose of supporting (a) trade payables or (b) any Indebtedness constituting "antecedent debt" (as that term is used in the Bankruptcy Code).

"**Sterling**" and the sign "**£**" mean the lawful money of the UK.

"**Stonington**" means Stonington Partners, Inc., a corporation organized under the laws of Delaware.

**"Subdebt Lock Up Agreement"** means the Forbearance, Lock-Up and Voting Agreement dated as of September ___, 2001, by and among Company, Holdings and Holdings Sub Noteholders.

**"Subsidiary"** means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

**"Subsidiary Guarantors"** means any Subsidiary that is party to a Subsidiary Guaranty.

**"Subsidiary Guaranty"** means each of the Subsidiary Guaranty to be executed and delivered by Subsidiaries from time to time thereafter in accordance with subsections 4.4A and 6.8A, in the form provided at Exhibit XVIII (with applicable insertions provided therein), or any other guaranty, document or instrument with a similar or comparable effect executed by any Foreign Subsidiary other than a Borrower, in form and substance satisfactory to Agent, as such Subsidiary Guaranty may be amended, supplemented or otherwise modified from time to time, and **"Subsidiary Guaranties"** means all such Subsidiary Guaranties collectively.

**"Supermajority"** means, with respect to a Type of Loans, Lenders having or holding not less than 92% of the aggregate Loan Exposure of such Type of Loans.

**"Tax"** or **"Taxes"** means any present or future tax, levy, impost, duty, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed; provided that **"Tax on the overall net income"** of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person's principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person is deemed to be doing business on all or part of the net income, profits or gains of that Person (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise).

**"Tax Refund Proceeds"** means any tax refunds or other similar or comparable payments, prepayments or proceeds received by any Borrower or any of such Borrower's Subsidiaries from any Tax or other Governmental Authority.

**"Total Utilization"** means, as at any date of determination, for any Borrower and with respect to any Type of Commitment hereunder, the Dollar Equivalent of the sum of (i) the aggregate outstanding principal amount of all Loans made to such Borrower under such Commitment (other than Loans made for the purpose of reimbursing the applicable Issuing Lender for any amount drawn under any Letter of Credit but not yet so applied in the case of all Borrowers) plus (ii) the Letter of Credit Usage with respect to all Letters of Credit issued for the

account of such Borrower under such Commitment. **"Total Utilization of Commitments"** means the Total Utilization for all Commitments.

**"Tranche A Revolving Lenders"** means the holders of Domestic Tranche A Revolving Loans made under the Existing Credit Agreement.

**"Tranche A Over-Line Lenders"** has the meaning defined in the Existing Credit Agreement.

**"Tranche A Over-Line Loans"** has the meaning defined in the Existing Credit Agreement.

**"Tranche 1A Facility"** has the meaning assigned to that term in the recitals to this Agreement.

**"Tranche 1A Lenders"** means the Lenders under the Tranche 1A Facility, together with their successors and permitted assigns pursuant to subsection 10.1.

**"Tranche 1A Letter of Credit"** means a Letter of Credit issued under the Tranche 1A Facility.

**"Tranche 1A Loan Commitment"** means the commitment of a Tranche 1A Lender (i) to make Tranche 1A Loans to Company pursuant to subsection 2.1A(i)(a)(1)(A), and (ii) to issue and/or purchase participations in Letters of Credit issued under the Tranche 1A Facility for the account of Company pursuant to Section 3, and **"Tranche 1A Loan Commitments"** means such commitments of all such Tranche 1A Lenders in the aggregate.

**"Tranche 1A Loan Exposure"** means, with respect to any Tranche 1A Lender as of any date of determination (i) prior to the termination of the DIP Loan Commitments, that Lender's Tranche 1A Loan Commitment and (ii) after the termination of the DIP Loan Commitments, the sum of (a) the aggregate outstanding principal amount of the Tranche 1A Loans of that Lender plus (b) in the event that Lender is an Issuing Lender, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by that Lender under the Tranche 1A Facility for the benefit of Company pursuant to Section 3 (in each case net of any participations purchased by other Lenders in such Letters of Credit or any unreimbursed drawings thereunder) plus (c) the aggregate amount of all participations purchased by that Lender in any outstanding Letters of Credit issued under the Tranche 1A Facility pursuant to subsection 3 for the benefit of Company or any unreimbursed drawings under any such Letters of Credit.

**"Tranche 1A Loans"** means the Loans made by Tranche 1A Lenders to Company under the Tranche 1A Facility, pursuant to subsection 2.1A(i)(a)(1)(A).

**"Tranche 1B Facility"** has the meaning assigned to that term in the recitals to this Agreement.

**"Tranche 1B Lenders"** means the Lenders under the Tranche 1B Facility, together with their successors and permitted assigns pursuant to subsection 10.1.

**"Tranche 1B Letter of Credit"** means a Letter of Credit issued under the Tranche 1B Facility.

**"Tranche 1B Loan Commitment"** means the commitment of a Tranche 1B Lender (i) to make Tranche 1B Loans to Company pursuant to subsection 2.1A(i)(a)(1)(B), and (ii) to issue and/or purchase participations in Letters of Credit issued under the Tranche 1B Facility for the account of Company pursuant to Section 3, and **"Tranche 1B Loan Commitments"** means such commitments of all such Tranche 1B Lenders in the aggregate.

**"Tranche 1B Loan Exposure"** means, with respect to any Tranche 1B Lender as of any date of determination (i) prior to the termination of the DIP Loan Commitments, that Lender's Tranche 1B Loan Commitment and (ii) after the termination of the DIP Loan Commitments, the sum of (a) the aggregate outstanding principal amount of the Tranche 1B Loans of that Lender plus (b) in the event that Lender is an Issuing Lender, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by that Lender under the Tranche 1B Facility for the benefit of Company pursuant to Section 3 (in each case net of any participations purchased by other Lenders in such Letters of Credit or any unreimbursed drawings thereunder) plus (c) the aggregate amount of all participations purchased by that Lender in any outstanding Letters of Credit issued under the Tranche 1B Facility pursuant to subsection 3 for the benefit of Company or any unreimbursed drawings under any such Letters of Credit.

**"Tranche 1B Loans"** means the Loans made by Tranche 1B Lenders to Company under the Tranche 1B Facility, pursuant to subsection 2.1A(i)(a)(1)(B).

**"Tranche 2 Facility"** has the meaning assigned to that term in the recitals to this Agreement.

**"Tranche 2 Lenders"** means the Lenders under the Tranche 2 Facility, together with their successors and permitted assigns pursuant to subsection 10.1.

**"Tranche 2 Letter of Credit"** means a Letter of Credit issued under the Tranche 2 Facility.

**"Tranche 2 Loan Commitment"** means the commitment of a Tranche 2 Lender (i) to make Tranche 2 Loans to Company pursuant to subsection 2.1A(i)(a)(2), and (ii) to issue and/or purchase participations in Letters of Credit issued under the Tranche 2 Facility for the account of Company pursuant to Section 3, and **"Tranche 2 Loan Commitments"** means such commitments of all such Tranche 2 Lenders in the aggregate.

**"Tranche 2 Loan Exposure"** means, with respect to any Tranche 2 Lender as of any date of determination (i) prior to the termination of the DIP Loan Commitments, that Lender's Tranche 2 Loan Commitment and (ii) after the termination of the DIP Loan Commitments, the sum of (a) the aggregate outstanding principal amount of the Tranche 2 Loans of that Lender plus (b) in the event that Lender is an Issuing Lender, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by that Lender under the Tranche 2 Facility for the benefit of Company pursuant to Section 3 (in each case net of any participations purchased by other Lenders in such Letters of Credit or any unreimbursed drawings thereunder) plus (c) the aggregate amount of all participations purchased by that Lender in any outstanding

Letters of Credit issued under the Tranche 2 Facility pursuant to subsection 3 for the benefit of Company or any unreimbursed drawings under any such Letters of Credit.

"**Tranche 2 Loans**" means the Loans made by Tranche 2 Lenders to Company under the Tranche 2 Facility, pursuant to subsection 2.1A(i)(a)(2).

"**Tranche 3 Facility**" has the meaning assigned to that term in the recitals to this Agreement.

"**Tranche 3 Lenders**" means the Lenders under the Tranche 3 Facility, together with their successors and permitted assigns pursuant to subsection 10.1.

"**Tranche 3 Letter of Credit**" means a Letter of Credit issued under the Tranche 3 Facility.

"**Tranche 3 Loan Commitment**" means the commitment of a Tranche 3 Lender (i) to make Tranche 3 Loans to Company pursuant to subsection 2.1A(i)(a)(3), and (ii) to issue and/or purchase participations in Letters of Credit issued under the Tranche 3 Facility for the account of Company pursuant to Section 3, and "**Tranche 3 Loan Commitments**" means such commitments of all such Tranche 3 Lenders in the aggregate.

"**Tranche 3 Loan Exposure**" means, with respect to any Tranche 3 Lender as of any date of determination (i) prior to the termination of the DIP Loan Commitments, that Lender's Tranche 3 Loan Commitment and (ii) after the termination of the DIP Loan Commitments, the sum of (a) the aggregate outstanding principal amount of the Tranche 3 Loans of that Lender plus (b) in the event that Lender is an Issuing Lender, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by that Lender under the Tranche 3 Facility for the benefit of Company pursuant to Section 3 (in each case net of any participations purchased by other Lenders in such Letters of Credit or any unreimbursed drawings thereunder) plus (c) the aggregate amount of all participations purchased by that Lender in any outstanding Letters of Credit issued under the Tranche 3 Facility pursuant to subsection 3 for the benefit of Company or any unreimbursed drawings under any such Letters of Credit.

"**Tranche 3 Loans**" means the Loans made by Tranche 3 Lenders to Company under the Tranche 3 Facility, pursuant to subsection 2.1A(i)(a)(3).

"**Triggering Event**" means (i) the occurrence and continuation of any Event of Default under subsection 8.1, 8.6, 8.7 or 8.8 or (ii) the acceleration of the maturity of the Obligations as a result of any Event of Default, which acceleration has not been rescinded in accordance with the provisions of Section 8.

"**Type**" means (i) with respect to a Commitment, Tranche 1A Loan Commitment, Tranche 1B Loan Commitment, a Tranche 2 Loan Commitment, a Tranche 3 Loan Commitment, a UK Bridge Loan Commitment, a French Bridge Loan Commitment or a Japanese Bridge Loan Commitment, (ii) with respect to a Letter of Credit, a Tranche 1A Letter of Credit, a Tranche 1B Letter of Credit, a Tranche 2 Letter of Credit, a Tranche 3 Letter of Credit, a UK Letter of Credit, a French Letter of Credit, or a Japanese Letter of Credit (iii) with respect to a Loan, Tranche 1A

LA3:979117.9

Loan, Tranche 1B Loan, a Tranche 2 Loan, a Tranche 3 Loan, a UK Bridge Loan, a French Bridge Loan or a Japanese Bridge Loan.

"**UK**" means the United Kingdom of Great Britain and Northern Ireland.

"**UK Bridge Indemnifying Lender**" means each financial institution that is designated as a UK Bridge Indemnifying Lender on <u>Schedule 2.1</u> annexed hereto, and each financial institution which is designated, with the approval of the Agent, as a UK Bridge Indemnifying Lender in an Assignment Agreement.

"**UK Bridge Lender**" and "**UK Bridge Lenders**" mean the Lenders that have UK Bridge Loan Commitments or that have UK Bridge Loans outstanding, together with their successors and permitted assigns pursuant to subsection 10.1.

"**UK Bridge Loan Exposure**" means, with respect to any UK Bridge Lender as of any date of determination (i) prior to the termination of the UK Bridge Loan Commitments, that Lender's UK Bridge Loan Commitment and (ii) after the termination of the UK Bridge Loan Commitments, the sum of (a) the aggregate outstanding principal amount of the UK Bridge Loans of that Lender <u>plus</u> (b) in the event that Lender is an Issuing Lender, the aggregate Letter of Credit Usage in respect of all Letters of Credit issued by that Lender for the benefit of Goss UK (in each case net of any participations purchased by other Lenders in such Letters of Credit or any unreimbursed drawings thereunder) <u>plus</u> (c) the aggregate amount of all participations purchased by that Lender in any outstanding Letters of Credit for the benefit of Goss UK or any unreimbursed drawings under any such Letters of Credit.

"**UK Bridge Loan Commitment**" means the commitment of a UK Bridge Lender (i) to make UK Bridge Loans to Goss UK pursuant to subsection 2.1A(i)(b) and (ii) to issue and/or purchase participations in Letters of Credit for the account of Goss UK pursuant Section 3, and "**UK Bridge Loan Commitments**" means such commitments of all such Lenders in the aggregate.

"**UK Bridge Loans**" means the Loans made by the Lenders to Goss UK pursuant to subsection 2.1A(i)(b).

"**UK Double Tax Treaty Lender**" means a Person resident in a jurisdiction with a double tax treaty with the UK under which payments of interest by Goss UK to such Person may be made without withholding or deduction for or on account of Tax.

"**UK Letter of Credit**" means a Letter of Credit issued under the Foreign Bridge Facility for the benefit of Goss UK.

"**UK Qualifying Lender**" means a Person entitled to receive payments of interest in respect of each UK Bridge Loan under this Agreement free of withholding or deduction for or on account of UK income tax under Section 349(3)(a) of the Income and Corporation Taxes Act 1988 of the UK.

"**Weekly Report**" means a report to be delivered by Borrowers to Agent pursuant to subsection 6.1(xix).

"**Yen**" and the sign "**¥**" mean the lawful money of Japan.

## 1.2   Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement.

Except as otherwise expressly provided in this Agreement, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP. Financial statements and other information required to be delivered by Company to Lenders pursuant to clauses (i), (ii), (iii) and (xix) of subsection 6.1 shall be prepared in accordance with GAAP (to the extent GAAP is applicable thereto) as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in subsection 6.1(v)). Calculations in connection with the definitions, covenants and other provisions of this Agreement shall utilize accounting principles and policies in conformity with those used to prepare the financial statements referred to in subsection 5.3.

## 1.3   Other Definitional Provisions.

References to "Sections" and "subsections" shall be to Sections and subsections, respectively, of this Agreement unless otherwise specifically provided. Any of the terms defined in subsection 1.1 may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. An Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in accordance with subsection 10.6 hereof.

## Section 2.   AMOUNTS AND TERMS OF COMMITMENTS AND LOANS

## 2.1   Commitments; Making of Loans; the Register; Notes.

**A.   Commitments.** Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of Borrowers set forth herein, Lenders hereby severally agree to make the Loans described herein:

(i)   Loans.

(a)   DIP Loan Commitments and DIP Loans.

(1)(A) Tranche 1A Loan Commitments and Tranche 1A Loans. Each Tranche 1A Lender severally agrees, subject to the limitations set forth in subsection 2.1A(i)(c), to lend to Company from time to time during the period from the Closing Date to but excluding the Commitment Termination Date an aggregate amount in Dollars not exceeding its Pro Rata Share of the aggregate amount of the applicable Tranche 1A Loan Commitments as in effect from time to time to be used for the purposes identified in subsection 2.5A, provided, however, that the Lenders may not make, and Company may not borrow, Tranche 1A Loans, on the Closing Date or at any other time, so long as an amount equal to or greater than the applicable Minimum Amount with respect to the Tranche 1B Loan Commitments, the Tranche 2 Loan Commitments or the Tranche 3 Loan Commitments remains available for borrowing at such time (it being understood that if such Commitments are available only for issuance of Letters of Credit then the

foregoing shall not prohibit funding of Loans). The original amount of each Lender's applicable Tranche 1A Loan Commitment is set forth opposite its name on Schedule 2.1 annexed hereto and the Dollar Equivalent of the aggregate original amount of all Tranche 1A Loan Commitments, plus the aggregate share of Tranche 1A Lenders of the Foreign Bridge Loan Commitments is $25,000,000, provided that the amount of such commitments available as of the Closing Date shall be limited to $10,000,000, and the remaining $15,000,000 of the Tranche 1A Commitments shall become available upon request of Company, subject to approval of such increased availability by Supermajority Tranche 1A Lenders, in their discretion. Increases in availability of the Tranche 1A Commitments shall be made, if at all, in two increments of $5,000,000 and $10,000,000, respectively.

(1)(B) Tranche 1B Loan Commitments and Tranche 1B Loans. Each Tranche 1B Lender severally agrees, subject to the limitations set forth in subsection 2.1A(i)(c), to lend to Company from time to time during the period from the Closing Date to but excluding the Commitment Termination Date an aggregate amount in Dollars not exceeding its Pro Rata Share of the aggregate amount of the applicable Tranche 1B Loan Commitments as in effect from time to time to be used for the purposes identified in subsection 2.5A, provided, however, that the Lenders may not make, and Company may not borrow, Tranche 1B Loans, on the Closing Date or at any other time, so long as an amount equal to or greater than the applicable Minimum Amount with respect to the Tranche 2 Loan Commitments or the Tranche 3 Loan Commitments remains available for borrowing at such time. The aggregate original amount of all Tranche 1B Commitments plus the aggregate share of Tranche 1B Lenders of the Foreign Bridge Loan Commitments shall equal, at any time, the Dollar Equivalent of the face amount of all Domestic Tranche A Letters of Credit that have expired without draw thereon prior to September 30, 2001, up to a maximum aggregate amount of $17,000,000. The original amount of each Lender's applicable Tranche 1B Loan Commitment is set forth opposite its name on Schedule 2.1 annexed hereto, provided that the Tranche 1B Loan Commitments shall be adjusted to give effect to any adjustments to Tranche 1B Loan Commitments pursuant to the foregoing formula.

(2) Tranche 2 Loan Commitments and Tranche 2 Loans. Each Tranche 2 Lender severally agrees, subject to the limitations set forth in subsection 2.1A(i)(c), to lend to Company from time to time during the period from the Closing Date to but excluding the Commitment Termination Date an aggregate amount in Dollars not exceeding its Pro Rata Share of the aggregate amount of the applicable Tranche 2 Loan Commitments as in effect from time to time to be used for the purposes identified in subsection 2.5A, provided, however, that the Lenders may not make, and Company may not borrow, Tranche 2 Loans for the purposes described in subsection 2.5A(iii), on the Closing Date or at any other time, so long as an amount equal to or greater than the applicable Minimum Amount with respect to the Tranche 1B Loan Commitments or the Tranche 3 Loan Commitments remains available for borrowing at such time. The original amount of each Lender's applicable Tranche 2 Loan Commitment is set forth opposite its name on Schedule 2.1 annexed hereto and the Dollar Equivalent of the aggregate original amount of all Tranche 2 Loan Commitments plus the aggregate share of Tranche 2 Lenders of the Foreign Bridge Loan Commitments is $15,000,000.

(3)   Tranche 3 Loan Commitments and Tranche 3 Loans.   Each Tranche 3 Lender severally agrees, subject to the limitations set forth in subsection 2.1A(i)(c), to lend to Company from time to time during the period from the Closing Date to but excluding the Commitment Termination Date an aggregate amount in Dollars not exceeding its Pro Rata Share of the aggregate amount of the applicable Tranche 3 Loan Commitments as in effect from time to time to be used for the purposes identified in subsection 2.5A. The aggregate original amount of all Tranche 3 Loan Commitments plus the aggregate share of Tranche 3 Lenders of the Foreign Bridge Loan Commitments at any time is $50,000,000 less the aggregate amount of Tranche 1B Loan Commitments in effect at the time. The original amount of each Lender's applicable Tranche 1B Loan Commitment is set forth opposite its name on Schedule 2.1 annexed hereto, provided that the Tranche 3 Loan Commitments shall be adjusted to give effect to any adjustments to Tranche 3 Loan Commitments pursuant to the foregoing formula.

The applicable Commitments of Lenders shall be adjusted to give effect to any assignments of the DIP Loan Commitments pursuant to subsection 10.1B. The amount of the DIP Loan Commitments shall be reduced from time to time by the amount of any reductions thereto made pursuant to subsections 2.4A(ii) and 2.4A(iii). DIP Loans may be made only in Dollars. Each Lender's applicable DIP Loan Commitment shall expire on the Commitment Termination Date and all Loans and all other amounts owed hereunder with respect to the Loans and the DIP Loan Commitments shall be paid in full no later than that date. Amounts borrowed under this subsection 2.1A(i)(a) may be repaid and reborrowed to but excluding the Commitment Termination Date, subject to the terms of this Agreement.

(b)   Foreign Bridge Loan Commitments and Foreign Bridge Loans.

Each UK Bridge Lender, French Bridge Lender and Japanese Bridge Lender severally agrees, subject to the limitations set forth in subsection 2.1A(i)(c), to lend to Goss UK, Goss France and Goss Japan, respectively, from time to time during the period from the applicable Foreign Bridge Facility Availability Date to but excluding the Commitment Termination Date an aggregate amount in the Applicable Currency, when valued in Dollar Equivalents, not exceeding its Pro Rata Share of the aggregate amount of the applicable Foreign Bridge Loan Commitments as in effect from time to time to be used for the purposes identified in subsection 2.5A, provided, however, that the Lenders shall not make, and are not obligated to make, Foreign Bridge Loans at any time in excess of the portion of the DIP Loan Commitments available for borrowing at the time; provided further that Tranche 1A Lenders shall not make, and are not obligated to make, Foreign Bridge Loans at any time that an amount equal to or greater than the applicable Minimum Amount with respect to the Tranche 1B Loan Commitments, the Tranche 2 Loan Commitments or the Tranche 3 Loan Commitments remains available for borrowing, provided further that the Tranche 1B Lenders shall not make, and are not obligated to make, Foreign Bridge Loans at any time that an amount equal to or greater than the applicable Minimum Amount with respect to the Tranche 2 Loan Commitments or the Tranche 3 Loan Commitments remains available for borrowing, provided further that the Tranche 2 Lenders shall not make, and are not obligated to make, Foreign Bridge Loans at any time that an amount equal to or greater than the applicable Minimum

Amount with respect to the Tranche 1B Loan Commitments or the Tranche 3 Loan Commitments remains available for borrowing, provided further, that the Dollar Equivalent of the aggregate original amount of all Foreign Bridge Loan Commitments is, at any time, the lesser of $25,000,000 and the DIP Loan Commitments then in effect; provided further that the applicable Foreign Bridge Loan Commitments of Lenders shall be adjusted to give effect to any assignments of the Foreign Bridge Loan Commitments pursuant to subsection 10.1B; provided further that the amount of the Foreign Bridge Loan Commitments shall be reduced from time to time by the amount of any reductions thereto made pursuant to subsections 2.4A(ii) and 2.4A(iii); and provided further that (x) UK Bridge Loans may be made only in Sterling or Dollars, (y) French Bridge Loans may be made only in Francs or Dollars, and (z) Japanese Bridge Loans may be made only in Yen or Dollars. Each Lender's applicable Foreign Bridge Loan Commitment shall expire on the Commitment Termination Date and all Foreign Bridge Loans and all other amounts owed hereunder with respect to the Foreign Bridge Loans and the Foreign Bridge Loan Commitments shall be paid in full no later than that date. Amounts borrowed under this subsection 2.1A(i)(b) may be repaid and reborrowed to but excluding the Commitment Termination Date.

(c)     Limitation on Loans.    Anything contained in this Agreement to the contrary notwithstanding:

(I)     no Borrower shall request any Loans be made or Letters of Credit be issued (and no Lender shall make any Loans to, or issue any Letters of Credit on behalf of, any Borrower) in amounts or for purposes other than those provided for in the Approved Budget or if, after giving effect to such Loans and/or any such issuances of any Letters of Credit, the Total Utilization of Commitments of all Borrowers would exceed the amounts of Loans and/or Letters of Credit set forth in the Approved Budget; and

(II)     the Loans and the Commitments shall be subject to the additional limitations that:

(1)     in no event shall the Total Utilization of Commitments then in effect exceed the Maximum Commitments then in effect;

(2)     in no event shall the Total Utilization of any Commitment exceed the maximum amount of such Commitment then in effect;

(3)     in no event shall the Total Utilization of Commitments for Company then in effect exceed the Maximum Commitments then in effect less the Total Utilization of Commitments for Foreign Borrowers then in effect;

(4)     in no event shall the aggregate Letter of Credit Usage for all Borrowers exceed the Sublimit for Letters of Credit;

(5)     in no event shall the Total Utilization of Foreign Bridge Loan Commitments exceed the maximum amount of Foreign Bridge Loan Commitments in effect;

(6)     in no event shall the Total Utilization of Commitments for all Borrowers then in effect exceed the amount permitted to be outstanding hereunder pursuant to the Interim Borrowing Order or Final Borrowing Order, as applicable.

(e)     <u>Adjustments to Commitments</u>.  Any request under subsection 2.1A(i)(a)(1) for increased availability of the Tranche 1A Commitments shall be submitted by Company to Agent (which shall forward copies to Lenders), specify the proposed effective date and amount of such increase and be accompanied by an Officer's Certificate stating that no Event of Default or Potential Event of Default exists or will occur as a result of such increase.  Notwithstanding anything to the contrary in the foregoing, increased availability pursuant to subsection 2.1A(i)(a)(1) shall not cause the Tranche 1A Loan Commitments to exceed $25,000,000, and no such increase shall take effect if any Event of Default or Potential Event of Default shall have occurred and be continuing.  Borrowers shall, and shall cause their Subsidiaries to, execute and deliver such documents and instruments and take such other actions as may be reasonably requested by Agent in connection with such increases.

(ii)     [Intentionally Omitted.]

**B.     Borrowing Mechanics.**

(i)     <u>Minimum Amounts</u>.  Loans made on any Funding Date (other than Loans made for the purpose of reimbursing any Issuing Lender for the amount of a drawing under a Letter of Credit issued by it) as Base Rate Loans or as Offshore Rate Loans shall be in an aggregate minimum amount equal to the applicable Minimum Amount.

(ii)     <u>Notice of Borrowing</u>.  Whenever a Borrower desires that Lenders make Loans it shall deliver to Agent a Notice of Borrowing on the Wednesday prior to the proposed Funding Date.  The Notice of Borrowing shall be accompanied by the Weekly Report and specify (i) the Borrower, (ii) the proposed Funding Date (which shall be a Business Day), (iii) the amount and Type of Loans requested, (iv) whether such Loans shall be Base Rate Loans or Offshore Rate Loans (Tranche 1A Loans or Foreign Bridge Loans funded by Tranche 1A Lenders shall be specified as Base Rate Loans), (v) in the case of any Loans to be made as Offshore Rate Loans, the initial Interest Period requested therefor, and (vi) the Applicable Currency the Loan is to be made in.

(iii)     <u>Continuation/Conversion</u>.  Loans may be continued as or converted into Base Rate Loans and Offshore Rate Loans (except that Tranche 1A Loans and Foreign Bridge Loans funded by Tranche 1A Lenders shall remain Base Rate Loans), in each case in the manner provided in subsection 2.2D.

(iv)     [Intentionally Omitted.]

(v)   Certification of Certain Items.   The applicable Borrower shall notify Agent prior to the funding of any Loans in the event that any of the matters to which such Borrower is required to certify in the applicable Notice of Borrowing is no longer true and correct as of the applicable Funding Date, and the acceptance by such Borrower of the proceeds of any Loans shall constitute a re-certification by such Borrower, as of the applicable Funding Date, as to the matters to which such Borrower is required to certify in the applicable Notice of Borrowing.

(vi)   Offshore Rate Loans.   Except as otherwise provided in subsections 2.6B, 2.6C and 2.6G, a Notice of Borrowing for an Offshore Rate Loan (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and the Borrower giving such notice shall be bound to make a borrowing in accordance therewith.

(v)   Alternative to Foreign Loan Funding.   Requisite Lenders may elect, in lieu of funding a requested Foreign Bridge Loan, to instead fund a DIP Loan in the Dollar Equivalent amount to Company.   Such election by Requisite Lenders may be made by telephonic notice to Agent (Agent may require confirmation in writing, but is not obligated to do so), and must be made no less than 24 hours prior to the Funding Date (provided Agent may waive such deadline in its discretion).   If Requisite Lenders so elect, and such DIP Loan is made to Company, Company shall be permitted, notwithstanding any contrary provision of this Agreement, to loan the Dollar Equivalent amount of such DIP Loan to the Foreign Borrower that requested the subject Foreign Bridge Loan, for the same purposes proposed for such Foreign Bridge Loan.

**C.   Disbursement of Funds.**

(i)   Subject to this subsection 2.1C and subsection 2.1D, (a) all DIP Loans under this Agreement shall be made by Lenders simultaneously and proportionately to their respective Pro Rata Shares of each of the DIP Loan Commitments and (b) all Foreign Bridge Loans under this Agreement shall be made by Lenders simultaneously and proportionately to their respective Pro Rata Shares of the Foreign Bridge Loan Commitments, in each case it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligation to make a Loan requested hereunder nor shall the Commitment of any Lender be increased or decreased as a result of a default by any other Lender in that other Lender's obligation to make a Loan requested hereunder.

(ii)   Promptly after receipt by Agent of a Notice of Borrowing pursuant to subsection 2.1B (or telephonic notice in lieu thereof), Agent shall notify each applicable Lender of the proposed borrowing.   Each such Lender shall make the amount of its Loan available to Agent, at the Funding and Payment Office, not later than 12:00 Noon (Local Time) on the applicable Funding Date, in Same Day Funds in the Applicable Currency, at the Funding and Payment Office.   Except as provided in subsection 3.3B with respect to Loans used to reimburse any Issuing Lender for the amount of a drawing under a Letter of Credit issued by it, upon satisfaction or waiver of the conditions precedent specified in subsection 4.1 (in the case of Loans made on the Closing Date) and, subject to the provisions set forth in the immediately preceding paragraph, subsection 4.2 (in the case of all Loans), Agent shall make the proceeds of such Loans available to the applicable Borrower on the applicable Funding Date by causing an amount of Same Day Funds in the Applicable Currency equal to the proceeds of all such Loans

received by Agent from Lenders, to be credited to the account of such Borrower at the Funding and Payment Office.

Unless Agent shall have been notified by any Lender prior to the Funding Date for any Loans that such Lender does not intend to make available to Agent the amount of such Lender's Loan requested on such Funding Date, Agent may assume that such Lender has made such amount available to Agent on such Funding Date and Agent may, in its sole discretion, but shall not be obligated to, make available to Borrower a corresponding amount on such Funding Date. If such corresponding amount is not in fact made available to Agent by such Lender, Agent shall be entitled to recover such corresponding amount on demand from such Lender together with interest thereon, for each day from such Funding Date until the date such amount is paid to Agent at the customary rate set by Agent for the correction of errors among banks for three Business Days and thereafter at the Base Rate. If such Lender does not pay such corresponding amount forthwith upon Agent's demand therefor, Agent shall promptly notify Borrower and Borrower shall immediately pay such corresponding amount in the Applicable Currency to Agent together with interest thereon, for each day from such Funding Date until the date such amount is paid to Agent at the rate payable under this Agreement for Base Rate Loans. Nothing in this subsection 2.1C shall be deemed to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Borrower may have against any Lender as a result of any default by such Lender hereunder.

### D.     The Register.

(i)     Agent shall maintain, at its address referred to in subsection 10.8, a register for the recordation of the names and addresses of Lenders and the Commitments and Loans of each Lender from time to time (the **"Register"**). The Register shall be available for inspection by any Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(ii)     Agent shall record in the Register the Commitments and Loans from time to time of each Lender, and each repayment or prepayment in respect of the principal amount of the Loans of each Lender. Any such recordation shall be conclusive and binding on each Borrower and each Lender, absent manifest error; provided that failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitment or any Borrower's Obligations in respect of the applicable Loans.

(iii)     Each Lender shall record on its internal records (including, without limitation, the Notes held by such Lender) the amount of each Loan made by it and each payment in respect thereof. Any such recordation shall be conclusive and binding on each Borrower, absent manifest error; provided that failure to make any such recordation, or any error in such recordation, shall not affect Lender's Commitment or any Borrower's Obligations in respect of the applicable Loans; and provided further that in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(iv)     Borrowers, Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or

Loan shall be effective, in each case unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been accepted by Agent and recorded in the Register as provided in subsection 10.1B(ii). Prior to such recordation, all amounts owed with respect to the applicable Commitment or Loan shall be owed to the Lender listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.

(v)     Each Borrower hereby designates BTCo to serve as such Borrower's agent solely for purposes of maintaining the Register as provided in this subsection 2.1D, and each Borrower hereby agrees that, to the extent BTCo serves in such capacity, BTCo and its officers, directors, employees, agents and affiliates shall constitute Indemnitees for all purposes under subsection 10.3.

E.     **Notes.** Company shall execute and deliver on the Closing Date to each applicable Lender (or to Agent for that Lender) a Note, substantially in the form of Exhibit IV annexed hereto, to evidence that Lender's Loans, in the principal amount of that Lender's applicable Loans and with other appropriate insertions. Each of Goss UK, Goss France and Goss Japan shall execute and deliver on its applicable Foreign Bridge Facility Availability Date (a) to each applicable UK Bridge Lender, French Bridge Lender and Japanese Bridge Lender, as the case may be (or to Agent for such Lender) a Note, substantially in the form of Exhibit IV annexed hereto, to evidence such Lender's Loans, in the principal amount of such Lender's applicable Loans and with other appropriate insertions.

Agent may deem and treat the payee of any Note as the owner thereof for all purposes hereof unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been accepted by Agent as provided in subsection 10.1B(ii). Any request, authorization or consent of any person or entity who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding on any subsequent holder, assignee or transferee of that Note or of any Note or Notes issued in exchange therefor.

F.     **Special Provisions Governing Offshore Currency Loans and Offshore Currency Letters of Credit.** Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to Offshore Currency Loans and to Letters of Credit denominated in a currency other than Dollars, in each case as to the matters covered:

(i)     Calculation of Dollar Equivalent Amount of Offshore Currency Loans and Foreign Currency Letters of Credit. For purposes of determining (1) whether the Total Utilization of Commitments exceeds the Maximum Commitments then in effect or (2) the Letter of Credit Usage, Agent shall determine the Dollar Equivalent amounts with respect to any Loans that are Offshore Currency Loans and with respect to any Letters of Credit denominated in a currency other than Dollars (a) on the first Business Day of each month of each calendar year, and (b) at such other dates as Agent may reasonably require (each such date, a **"Computation Date"**). Agent shall determine the Dollar Equivalent amount

for a particular Loan at the time a Notice of Borrowing or a Notice of Conversion/Continuation is given with respect to such Loan and for a particular Letter of Credit at the time a Request for Issuance of Letter of Credit is given with respect to such Letter of Credit.

      (ii)    <u>European Union</u>. The EU has introduced a single currency (the **"Euro"**) and has initiated the process of substituting the Euro for the national currencies of the member states participating in the EU. On the date on which any Offshore Currency is replaced by the Euro, it is hereby acknowledged and agreed that "Sterling" and "Francs," each as defined herein, shall include the Euro and that conversion of any outstanding Loans denominated in such Offshore Currency into the Euro shall take effect; <u>provided</u> that the original Offshore Currency shall be retained for so long as legally permissible; <u>provided further</u> that any such conversion shall be based on the rate of conversion officially fixed by the EU on the date the Euro replaces the applicable Offshore Currency. Notwithstanding anything contained herein to the contrary, none of the introduction of the Euro, the substitution of such currency for any Offshore Currency, the fixing of such official rate of conversion nor any economic consequences that arise from any of the aforementioned events or otherwise in connection with the EU shall give rise to any right to terminate prematurely, contest, cancel, rescind, modify or renegotiate this Agreement or any of its provisions or to raise any other objections and/or exceptions or to assert any claims for compensation.

## 2.2    Interest on the Loans.

      **A.**    **Rate of Interest.** Subject to the provisions of subsections 2.6 and 2.7, each Loan shall bear interest on the unpaid principal amount thereof from the date made through maturity (whether by acceleration or otherwise) at a rate determined by reference to the Base Rate or to the Adjusted Offshore Rate. Tranche 1A Loans and Foreign Bridge Loans funded by Tranche 1A Lenders and denominated in Dollars shall be Base Rate Loans. Subject to the preceding sentence, the applicable basis for determining the rate of interest with respect to any Loan shall be selected by the Borrower initially at the time a Notice of Borrowing is given with respect to such Loan pursuant to subsection 2.1B, and the basis for determining the interest rate with respect to any Loan may be changed from time to time pursuant to subsection 2.2D. If on any day a Loan denominated in Dollars is outstanding with respect to which notice has not been delivered to Agent in accordance with the terms of this Agreement specifying the applicable basis for determining the rate of interest, then for that day that Loan shall bear interest determined by reference to the Base Rate. If on any day a Loan denominated in an Offshore Currency is outstanding with respect to which notice has not been delivered to Agent in accordance with the terms of this Agreement specifying the applicable basis for determining the rate of interest, then such Loan shall bear interest determined by reference to the Offshore Rate with an Interest Period of, and the applicable Interest Period shall be deemed to be, one month.

      Subject to the provisions of subsections 2.2E and 2.7, the Loans shall bear interest through maturity as follows:

      (i)    with respect to Tranche 1A Loans and Foreign Bridge Loans funded by Tranche 1A Lenders

(a)    if denominated in Dollars, the sum of the Base Rate plus 3.50%; or

(b)    if denominated in Offshore Currency, the sum of the Adjusted Offshore Rate plus 4.5%; and

(ii)    with respect to all other Loans,

(a)    if a Base Rate Loan, then at the sum of the Base Rate plus 3.00%; or

(b)    if an Offshore Rate Loan, then at the sum of the Adjusted Offshore Rate plus 4.00%.

**B.    Interest Periods.**  In connection with each Offshore Rate Loan, a Borrower may, pursuant to the applicable Notice of Borrowing or Notice of Conversion/Continuation, as the case may be, select an interest period (each an "**Interest Period**") to be applicable to such Loan, which Interest Period shall be a one month period; provided that:

(i)    the initial Interest Period for any such Loan shall commence on the Funding Date in respect of such Loan, in the case of a Loan initially made as an Offshore Rate Loan or on the date specified in the applicable Notice of Conversion/Continuation, in the case of a Loan converted to an Offshore Rate Loan;

(ii)    in the case of immediately successive Interest Periods applicable to an Offshore Rate Loan continued as such pursuant to a Notice of Conversion/Continuation, each successive Interest Period shall commence on the day on which the next preceding Interest Period expires;

(iii)    if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that, if any Interest Period would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(iv)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (v) of this subsection 2.2B, end on the last Business Day of a calendar month;

(v)    no Interest Period with respect to any portion of the Loans shall extend beyond the Commitment Termination Date;

(vi)    there shall be no more than five (5) Interest Periods for any Borrower outstanding at any time; and

(vii)    in the event a Borrower fails to specify an Interest Period for any Offshore Rate Loan in the applicable Notice of Borrowing or Notice of Conversion/Continuation, such Borrower shall be deemed to have selected an Interest Period of one month.

**C.    Interest Payments.**  Subject to the provisions of subsection 2.2E, interest on each Loan shall be payable in arrears on and to each Interest Payment Date applicable to that Loan, upon any prepayment of that Loan (to the extent accrued on the amount being prepaid) and at maturity (including final maturity); provided that in the event any Loans that are Base Rate Loans are prepaid pursuant to subsection 2.4A(i), interest accrued on such Loans through the date of such prepayment shall be payable on the next succeeding Interest Payment Date applicable to Base Rate Loans (or, if earlier, at final maturity).

**D.    Conversion or Continuation.**  Subject to the provisions of subsection 2.6, a Borrower shall have the option (i) to convert at any time all or any part of its outstanding Loans denominated in Dollars equal to the Minimum Amount from Loans bearing interest at a rate determined by reference to one basis to Loans bearing interest at a rate determined by reference to an alternative basis, or (ii) upon the expiration of any Interest Period applicable to any Offshore Rate Loan to continue all or any portion of such Loan equal to the Minimum Amount as an Offshore Rate Loan; provided, however, that any Offshore Rate Loan denominated in Dollars may only be converted into a Base Rate Loan on the expiration date of an Interest Period applicable thereto; provided further that Loans denominated in an Offshore Currency may not be converted into Base Rate Loans and that Loans denominated in one currency may not be converted into Loans denominated in another currency.

A Borrower shall deliver a Notice of Conversion/Continuation to Agent no later than 12:00 Noon (Local Time) at least one Business Day in advance of the proposed conversion date (in the case of a conversion of an Offshore Rate Loan denominated in Dollars to a Base Rate Loan) and at least three Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, an Offshore Rate Loan).  A Notice of Conversion/Continuation shall specify (i) the proposed conversion/continuation date (which shall be a Business Day), (ii) the amount and Type of the Loan to be converted/continued, (iii) the nature of the proposed conversion/continuation, (iv) in the case of a conversion to, or a continuation of, an Offshore Rate Loan, the requested Interest Period, and (v) in the case of a conversion to, or a continuation of, an Offshore Rate Loan, that no Potential Event of Default or Event of Default has occurred and is continuing.  In lieu of delivering the above-described Notice of Conversion/Continuation, a Borrower may give Agent telephonic notice by the required time of any proposed conversion/continuation under this subsection 2.2D; provided that such notice shall be promptly confirmed in writing by delivery of a Notice of Conversion/Continuation to Agent on or before the proposed conversion/continuation date.

Upon receipt of written or telephonic notice of any proposed conversion/continuation under this subsection 2.2D, Agent shall promptly transmit said notice by telefacsimile or telephone to each applicable Lender.

Neither Agent nor any Lender shall incur any liability to any Borrower in acting upon any telephonic notice referred to above that Agent believes in good faith to have been given by a duly authorized officer or other person authorized to act on behalf of such Borrower or for

otherwise acting in good faith under this subsection 2.2D, and upon conversion or continuation of the applicable basis for determining the interest rate with respect to any Loans in accordance with this Agreement pursuant to any such telephonic notice any Borrower shall have effected a conversion or continuation, as the case may be, hereunder.

Except as otherwise provided in subsections 2.6B, 2.6C and 2.6G, a Notice of Conversion/Continuation for conversion to, or continuation of, an Offshore Rate Loan (or telephonic notice in lieu thereof) shall be irrevocable on and after the related Interest Rate Determination Date, and Borrower shall be bound to effect a conversion or continuation in accordance therewith.

**E.    Default Rate.**  Upon the occurrence and during the continuation of any Event of Default, the outstanding principal amount of all Loans and, to the extent permitted by applicable law, any interest payments thereon not paid when due and any fees and other amounts then due and payable hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code) payable upon demand at a rate that is 2.00% per annum in excess of the interest rate otherwise payable under this Agreement with respect to Base Rate Loans.   Payment or acceptance of the increased rates of interest provided for in this subsection 2.2E is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Agent or any Lender.

**F.    Computation of Interest.**  Interest on the Loans (other than Loans denominated in Sterling) shall be computed on the basis of a 360-day year and interest on Loans denominated in Sterling shall be computed on the basis of a 365-day year, in each case for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, (i) the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from an Offshore Rate Loan, the date of conversion of such Offshore Rate Loan to such Base Rate Loan shall be included, and (ii) the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to an Offshore Rate Loan, the date of conversion of such Base Rate Loan to such Offshore Rate Loan shall be excluded; provided that if a Loan is repaid on the same day on which it is made, no interest shall be paid on that Loan.

[**G.    Effective Global Rate**.  For the purposes of Articles L 313-1 to L 313-6 of the French *Code de la Consummation*, the parties acknowledge that the *taux effectif global* for Offshore Rate Loans denominated in Francs may only be determined during the course of the Offshore Rate Loans denominated in Francs.]

**2.3    Fees.**

**A.    Commitment Fees.**

(i)    Company agrees to pay to Agent in Dollars, for distribution to each Lender in proportion to that Lender's Pro Rata Share of the Commitments, commitment fees for the period from and including the Interim Borrowing Order Date to and excluding the

Commitment Termination Date in an amount equal to (x) 0.750% multiplied by (y) the average of the daily excess of all Commitments over the sum of (i) the Dollar Equivalent of the aggregate principal amount of outstanding Loans of all Borrowers plus (ii) the Dollar Equivalent of the Letter of Credit Usage of all Borrowers.

(ii)     Calculation.  Such commitment fees shall be calculated on the basis of a 360-day year and the actual number of days elapsed and be payable monthly in arrears on each date that is three (3) Business Days after the last Business Days of each month of each year, commencing on the first such date to occur after the Closing Date, and on the Commitment Termination Date.  For purposes of calculating commitment fees under this subsection 2.3A, the Dollar Equivalent amount of the aggregate principal amount of any outstanding Offshore Currency Loans shall be determined based upon the Exchange Rate as of the last Business Day of each month of each year with respect to such Offshore Currency Loan.  Agent shall provide to Borrowers on each first Business Day after the last Business Day of each month of each year a report specifying the commitment fees payable by each Borrower and including the calculations of such commitment fees and the Exchange Rate used, and Borrowers shall pay such commitment fees no later than two (2) Business Days after delivery of such report.

**B.     Facility Fees.**

(i)     Fees to Tranche 1A Lenders.  Borrowers shall pay to Agent in Dollars, on or before the Closing Date, for distribution to each Tranche 1A Lender (including each Gap Lender) in proportion to that Lender's Pro Rata Share of the Tranche 1A Loan Commitments, facility fees in an amount equal to 3.00% of the portion of the Tranche 1A Loan Commitments available for borrowing.  Borrowers shall pay to Agent in Dollars, as a condition to the effectiveness of any increase in borrowing availability of Tranche 1A Loan Commitments pursuant to subsection 2.1A(i)(a)(1)(A), for distribution to each Tranche 1A Lender in proportion to that Lender's Pro Rata Share of the Tranche 1A Loan Commitments, an additional facility fee in an amount equal to 3.00% of the amount of the increase in availability of the Tranche 1A Loan Commitments.

(ii)     Fees to Tranche 1B Lenders, Tranche 2 Lenders and Tranche 3 Lenders. Borrowers shall pay to Agent in Dollars, on or before the Closing Date, for distribution to each Tranche 1B Lender, Tranche 2 Lender and Tranche 3 Lender in proportion to that Lender's combined Pro Rata Share of the Tranche 1B Loan Commitments, Tranche 2 Loan Commitments and Tranche 3 Loan Commitments, respectively, facility fees in an amount equal to 1.50% of the aggregate Tranche 1B Loan Commitments, Tranche 2 Loan Commitments and Tranche 3 Loan Commitments.

(iii)     Back-End Fee.  Borrowers shall pay to Agent in Dollars, on or before the Commitment Termination Date, for distribution to each Tranche 1A Lender (including each Gap Lender) in proportion to that Lender's Pro Rata Share of the Tranche 1A Loan Commitments, an additional fee (the **"Back-End Fee"**) in an amount equal to the product of $5,000,000 times the percentage of the Tranche 1A Loan Commitments made available for borrowing by the Tranche 1A Lenders pursuant to 2.1A(i)(a)(1)(A).

(iv)    Gap Lending Fee.  Borrowers shall pay to Agent in Dollars, on or before the Commitment Termination Date, for distribution to the Gap Lenders only in proportion to their respective Tranche 1A Loan Commitments, an additional fee (the **"Gap Lending Fee"**) in an amount equal to the product of $_____ times the percentage of the Tranche 1A Loan Commitments made available for borrowing by the Tranche 1A Lenders pursuant to 2.1A(i)(a)(1)(A).  [Amount to be inserted in the blank is the product of (a) 2 times the Gap Amount times (b) 6 months interest at Base Rate plus 2.75%.]

(iv)    Gap Back-End Fee.  Borrowers shall pay to Agent in Dollars, on or before the Commitment Termination Date, for distribution to the Gap Lenders only in proportion to their respective Tranche 1A Loan Commitments, an additional fee (the **"Gap Back-End Fee"**) in an amount equal to the product of $2,000,000 times the percentage of the Tranche 1A Loan Commitments made available for borrowing by the Tranche 1A Lenders pursuant to 2.1A(i)(a)(1)(A).

**C.    Administrative Fee.**  On or before the Closing Date, Company shall pay to Agent an administrative fee of $100,000.

**D.    Other Fees.**  Each Borrower agrees to pay to Agent such other fees in the amounts and at the times separately agreed upon between such Borrower and Agent.

## 2.4    Repayments, Prepayments and Voluntary Reductions in Commitments; General Provisions Regarding Payments.

**A.    Prepayments and Reductions in Commitments.**

(i)    Voluntary Prepayments.  Each Borrower may, upon not less than one Business Day's prior written or telephonic notice, in the case of Base Rate Loans, and three Business Days' prior written or telephonic notice, in the case of Offshore Rate Loans, in each case given to Agent by 12:00 Noon (Local Time) on the date required and, if given by telephone, promptly confirmed in writing to Agent (which original written or telephonic notice Agent will promptly transmit by telefacsimile or telephone to each Lender), at any time and from time to time prepay any Loans on any Business Day in whole or in part in an aggregate minimum amount equal to the applicable Minimum Amount; provided, however, that an Offshore Rate Loan may not be prepaid prior to the expiration of the Interest Period applicable thereto unless such Borrower pays to each Lender all such amounts as are payable pursuant to subsection 2.6D. Notice of prepayment having been given as aforesaid, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein. Any such voluntary prepayment shall be applied as specified in subsection 2.4A(iv).

(ii)    Voluntary Reductions of Commitments.  Company may, upon not less than three Business Days' prior written or telephonic notice confirmed in writing to Agent (which original written or telephonic notice such Agent will promptly transmit by telefacsimile or telephone to each Lender), at any time and from time to time terminate in whole or permanently reduce in part, without premium or penalty, the Commitments in an amount up to the amount by which the Commitments exceed the Total Utilization of Commitments with respect to all Borrowers; provided that any such partial reduction of the Commitments shall be in

an aggregate minimum amount equal to the applicable Minimum Amount. Company's notice to Agent shall designate the date (which shall be a Business Day) of such termination or reduction and the amount of any partial reduction, and such termination or reduction of such Commitments shall be effective on the date specified in such notice and shall reduce such Commitment of each Lender proportionately to its Pro Rata Share.

(iii)    Mandatory Prepayments of Loans. The Maximum Commitments shall be reduced, and Loans shall be prepaid, in the amounts and under the circumstances set forth below, all such prepayments to be applied as set forth below or as more specifically provided in subsection 2.4A(iv):

(a)    Prepayments from Net Asset Sale Proceeds. No later than the first Business Day following the date of receipt by any Borrower or any of its Subsidiaries of any Net Asset Sale Proceeds in respect of any Asset Sale, (1) such Borrower shall prepay its Loans in an aggregate amount equal to 100% of such Net Asset Sale Proceeds, and (2) to the extent that any such Net Asset Sale Proceeds remain after the applications required pursuant to the foregoing clause (1), such Borrower shall cause the excess of such Net Asset Sale Proceeds to be applied to prepay the remaining outstanding Loans of all other Borrowers on a pro rata basis (in accordance with the respective outstanding amount of Loans).

(b)    Prepayments from Net Insurance/Condemnation Proceeds. No later than the first Business Day following the date of receipt by Agent or by any Borrower or any of its Subsidiaries of any Net Insurance/Condemnation Proceeds that are required to be applied to prepay the Loans pursuant to the provisions of subsection 6.4C, (1) such Borrower shall prepay its Loans in an aggregate amount equal to 100% of such Net Insurance/Condemnation Proceeds, and (2) to the extent that any such Net Insurance/Condemnation Proceeds remain after the applications required pursuant to the foregoing clause (1), such Borrower shall cause the excess of such Net Insurance/Condemnation Proceeds to be applied to prepay the remaining outstanding Loans of all other Borrowers on a pro rata basis (in accordance with the respective outstanding amount of Loans).

(c)    Prepayments Due to Reversion of Surplus Assets of Pension Plans. On the date of return to any Borrower or any of its Subsidiaries of any surplus assets of any pension plan of such Borrower or any of its Subsidiaries, (1) such Borrower shall prepay its Loans in an aggregate amount (such amount being the **"Net Reversion Amount"**) equal to 100% of such returned surplus assets, net of transaction costs and expenses incurred in obtaining such return, including incremental taxes payable as a result thereof, and (2) to the extent that any such Net Reversion Amount remains after the applications required pursuant to the foregoing clause (1), such Borrower shall cause the excess of such Net Reversion Amount to be applied to prepay the remaining outstanding Loans of all other Borrowers on a pro rata basis (in accordance with the respective outstanding amount of Loans).

(d)    Prepayments from Tax Refund Proceeds. No later than the first Business Day following the date of receipt by Agent or by any Borrower or any of its

Subsidiaries of any Tax Refund Proceeds, (1) such Borrower shall prepay its Loans in an aggregate amount equal to 100% of such Tax Refund Proceeds, and (2) to the extent that any such Tax Refund Proceeds remain after the applications required pursuant to the foregoing clause (1), such Borrower shall cause the excess of such Tax Refund Proceeds to be applied to prepay the remaining outstanding Loans of all other Borrowers on a pro rata basis (in accordance with the respective outstanding amount of Loans).

(e)     Prepayments from Net Settlement Proceeds.  No later than the first Business Day following the date of receipt by Agent or by any Borrower or any of its Subsidiaries of any Net Settlement Proceeds, (1) such Borrower shall prepay its Loans in an aggregate amount equal to 100% of such Net Settlement Proceeds, and (2) to the extent that any such Net Settlement Proceeds remain after the applications required pursuant to the foregoing clause (1), such Borrower shall cause the excess of such Net Settlement Proceeds to be applied to prepay the remaining outstanding Loans of all other Borrowers on a pro rata basis (in accordance with the respective outstanding amount of Loans).

(f)     Prepayments from Excess Dividend Proceeds.  No later than the first Business Day following the date of receipt by Agent or by any Borrower or any of its Subsidiaries of any Dividend Proceeds in excess of those forecasted in the Approved Budget (**"Excess Dividend Proceeds"**), (1) such Borrower shall prepay its Loans in an aggregate amount equal to 100% of such Excess Dividend Proceeds, and (2) to the extent that any such Excess Dividend Proceeds remain after the applications required pursuant to the foregoing clause (1), such Borrower shall cause the excess of such Excess Dividend Proceeds to be applied to prepay the remaining outstanding Loans of all other Borrowers on a pro rata basis (in accordance with the respective outstanding amount of Loans).

(g)     Calculations of Net Proceeds Amounts; Additional Prepayments and Reductions Based on Subsequent Calculations.  Concurrently with any prepayment of the Loans and/or reduction of the Commitments pursuant to subsections 2.4A(iii)(a)-(f), the applicable Borrower shall deliver to Agent an Officers' Certificate demonstrating the calculation of the amount (the **"Net Proceeds Amount"**) of the applicable Net Asset Sale Proceeds, Net Insurance/Condemnation Proceeds, Tax Refund Proceeds, Net Settlement Proceeds or Excess Dividend Proceeds or the applicable Net Reversion Amount (as such term is defined in subsection 2.4A(iii)(c)), as the case may be, that gave rise to such prepayment.  In the event that such Borrower or Agent shall subsequently determine that the actual Net Proceeds Amount was greater than the amount set forth in such Officers' Certificate, such Borrower shall promptly make an additional prepayment of its Loans in an amount equal to the amount of such excess, and such Borrower shall concurrently therewith deliver to Agent an Officers' Certificate demonstrating the derivation of the additional Net Proceeds Amount resulting in such excess.

(h)     Prepayments Due to Restrictions of Commitments.  If

(I)     the Total Utilization of Commitments for all Borrowers exceeds the Maximum Commitments then in effect;

(II)   the Total Utilization of Commitments for all Borrowers exceeds the amount permitted to be outstanding hereunder pursuant to the Interim Borrowing Order or Final Borrowing Order, as applicable;

(III)   the Total Utilization of any Commitment exceeds the maximum amount of such Commitment then in effect; or

(IV)   the aggregate Letter of Credit Usage for all Borrowers exceeds the Letter of Credit Sublimit then in effect;

then Agent shall give notice to the applicable Borrower(s) that a prepayment is required under this subsection 2.4A(iii)(h), and such Borrower shall promptly (x) prepay its Loans and/or (y) cash collateralize its outstanding Letters of Credit, in each case to the extent necessary so that the Total Utilization of any Commitment shall not exceed the maximum amount of such Commitment then in effect.

(i)   Prepayments Due to Currency Fluctuations.  If on any Computation Date Agent shall have determined that the Total Utilization of any Commitment exceeds the maximum amount of such Commitment because of a change in applicable rates of exchange between Dollars and Offshore Currencies, then Agent shall give notice to the applicable Borrower(s) that a prepayment is required under this subsection 2.4A(iii)(i), and such Borrower shall promptly (x) prepay its Loans and/or (y) cash collateralize its outstanding Letters of Credit, in each case to the extent necessary so that the Total Utilization of any Commitment shall not exceed the maximum amount of such Commitment then in effect.

(j)   Reductions of Revolving Loan Commitments Not Limited to Amount of Loans Outstanding.  The amount of any required reduction of the Commitments pursuant to any provision of this subsection 2.4A(iii) shall not be affected by the fact that the outstanding principal amount of Loans at the time of such reduction is less than the amount of such reduction.

(iv)   <u>Application of Prepayments</u>.

(a)   <u>Application of Voluntary Prepayments</u>.   Any voluntary prepayments pursuant to subsection 2.4A(i) shall be applied

(1) in the case of voluntary prepayments by Company, to expenses incurred by Agent and reimbursable by Company under this Agreement, and then

<u>first</u>, for the benefit of Tranche 1A Lenders and Tranche 1B Lenders, as follows

(I) to repay Company's outstanding Tranche 1A Loans and Tranche 1B Loans in full, on a *pari passu* basis, in proportion to outstanding balances of such Loans, and then

(II) to fully collateralize outstanding Tranche 1A Letters of Credit and Tranche 1B Letters of Credit, on a *pari passu* basis, in proportion to the face amounts thereof, and then

(III) to repay Foreign Bridge Loans made by Tranche 1A Lenders and Tranche 1B Lenders in full, on a *pari passu* basis, in proportion to outstanding balances of such Loans, and then

(IV) to fully collateralize outstanding Foreign Bridge Letters of Credit in which Tranche 1A Lenders and Tranche 1B Lenders are participants pursuant to Section 3.1C, on a *pari passu* basis, in proportion to the face amounts thereof; and

<u>second</u>, for the benefit of Tranche 2 Lenders, as follows

(I) to repay Company's outstanding Tranche 2 Loans in full, and then

(II) to collateralize outstanding Tranche 2 Letters of Credit, and then

(III) to repay Foreign Bridge Loans made by Tranche 2 Lenders in full, and then

(IV) to fully collateralize outstanding Foreign Bridge Letters of Credit in which Tranche 2 Lenders are participants pursuant to Section 3.1C; and

<u>third</u>, for the benefit of Tranche 3 Lenders, as follows

(I) to repay Company's outstanding Tranche 3 Loans in full, and then

(II) to fully collateralize outstanding Tranche 3 Letters of Credit , and then

(III) to repay Foreign Bridge Loans made by Tranche 3 Lenders in full, and then

(IV) to fully collateralize outstanding Foreign Bridge Letters of Credit in which Tranche 3 Lenders are participants pursuant to Section 3.1C; and

(2) in case of voluntary prepayments by any Borrower other than Company, to expenses incurred by Agent and reimbursable by Company under this Agreement, and then to repay such Borrower's Foreign Bridge Loans to the full extent thereof and collateralize outstanding Foreign Bridge Letters of Credit. Payments received with respect to Foreign Bridge Loans shall be applied

first, for the benefit of Tranche 1A Lenders and Tranche 1B Lenders, as follows

(I) to repay such Borrower's Foreign Bridge Loans made by Tranche 1A Lenders and Tranche 1B Lenders in full, on a *pari passu* basis, in proportion to outstanding balances of such Loans, and then

(II) to fully collateralize outstanding Foreign Bridge Letters of Credit in which Tranche 1A Lenders and Tranche 1B Lenders are participants pursuant to Section 3.1C, on a *pari passu* basis, in proportion to the face amounts thereof, and

second, for the benefit of Tranche 2 Lenders, as follows:

(I) to repay such Borrower's Foreign Bridge Loans made by Tranche 2 Lenders in full, and then

(II) to fully collateralize outstanding Foreign Bridge Letters of Credit in which Tranche 2 Lenders are participants pursuant to Section 3.1C, and

third, for the benefit of Tranche 3 Lenders, as follows:

(I) to repay such Borrower's Foreign Bridge Loans made by Tranche 3 Lenders, and then

(II) to collateralize outstanding Foreign Bridge Letters of Credit in which Tranche 3 Lenders are participants pursuant to Section 3.1C.

(b)    Application of Mandatory Prepayments, Enforcement Proceeds and Collateral Account Overage.  Any amount (the **"Applied Amount"**) required to be applied as a mandatory prepayment of the Loans pursuant to subsections 2.4A(iii)(a)-(f), any Enforcement Proceeds, and Collateral Account Overage disbursed to Agent shall be applied as follows:

(1) Any such payments by Company or Holdings, any Enforcement Proceeds derived from DIP Collateral, any Collateral Account Overage in respect of funds originally deposited in a Collateral Account pursuant to this subsection 2.4A(iv)(b)(1), any payment by a Foreign Subsidiary in respect of its obligations under a Subsidiary Guaranty, and any Enforcement Proceeds derived from Foreign Collateral in respect of a Foreign Subsidiary's obligations under a Subsidiary Guaranty shall be applied to expenses incurred by Agent and reimbursable by Company under this Agreement, and then

first, to repay all Cash Management Obligations owing to Cash Management Lenders, an then for the benefit of Tranche 1A Lenders and Tranche 1B Lenders, as follows

(I) to repay Company's outstanding Tranche 1A Loans and Tranche 1B Loans in full, on a *pari passu* basis, in proportion to outstanding balances of such Loans, and then

(II) to fully collateralize outstanding Tranche 1A Letters of Credit and Tranche 1B Letters of Credit, on a *pari passu* basis, in proportion to the face amounts thereof, and then

(III) to repay Foreign Bridge Loans made by Tranche 1A Lenders and Tranche 1B Lenders in full, on a *pari passu* basis, in proportion to outstanding balances of such Loans, and then

(IV) to fully collateralize outstanding Foreign Bridge Letters of Credit in which Tranche 1A Lenders and Tranche 1B Lenders are participants pursuant to Section 3.1C, on a *pari passu* basis, in proportion to the face amounts thereof; and

second, to pay the Back-End Fee and the Gap Back-End Fee in full, on a *pari passu* basis, in proportion to the amounts thereof, and

third, for the benefit of Tranche 2 Lenders, Tranche 3 Lenders and Currency Exchangers, as follows

(I) to repay Company's outstanding Tranche 2 Loans, Tranche 3 Loans and Currency Agreement Obligations, in full, on a *pari passu* basis, in proportion to outstanding balances, and then

(II) to fully collateralize outstanding Tranche 2 Letters of Credit and Tranche 3 Letters of Credit, on a *pari passu* basis, in proportion to the face amounts thereof, and then

(III) to repay Foreign Bridge Loans made by Tranche 2 Lenders and Tranche 3 Lenders and Foreign Borrowers' Currency Agreement Obligations, in full, on a *pari passu* basis, in proportion to outstanding balances, and then

(IV) to fully collateralize outstanding Foreign Bridge Letters of Credit in which Tranche 2 Lenders and Tranche 3 Lenders are participants pursuant to Section 3.1C, on a *pari passu* basis, in proportion to the face amounts thereof; and

fourth, to pay the Gap Lending Fee in full.

(2) Any such payments by a Foreign Borrower in respect of a Foreign Bridge Loan or Foreign Bridge Letter of Credit, any Enforcement Proceeds derived from Foreign Collateral in respect of a Foreign Bridge Loan or Foreign Bridge Letter of Credit, and any Collateral Account Overage disbursed from a Foreign Borrower's Collateral Account in respect of funds originally deposited in a Collateral Account pursuant to this subsection 2.4A(iv)(b)(2) shall be applied to expenses incurred by Agent and reimbursable by Company under this Agreement, and then

first, for the benefit of Tranche 1A Lenders and Tranche 1B Lenders, as follows

(I) to repay such Borrower's Foreign Bridge Loans made by Tranche 1A Lenders and Tranche 1B Lenders in full, on a *pari passu* basis, in proportion to outstanding balances of such Loans, and then

(II) to fully collateralize outstanding Foreign Bridge Letters of Credit in which Tranche 1A Lenders and Tranche 1B Lenders are participants pursuant to Section 3.1C, on a *pari passu* basis, in proportion to the face amounts thereof, and

second, to pay the Back-End Fee and the Gap Back-End Fee in full, on a *pari passu* basis, in proportion to the amounts thereof, and then

third, for the benefit of Tranche 2 Lenders, Tranche 3 Lenders and Currency Exchangers, as follows

(I) to repay such Borrower's Foreign Bridge Loans made by Tranche 2 Lenders and Tranche 3 Lenders and such Borrower's Currency Agreement Obligations, in full, on a *pari passu* basis, in proportion to outstanding balances, and then

(II) to fully collateralize outstanding Foreign Bridge Letters of Credit in which Tranche 2 Lenders and Tranche 3 Lenders are participants pursuant to Section 3.1C, on a *pari passu* basis, in proportion to the face amounts thereof

fourth, to pay the Gap Lending Fee in full.

(c)     Collateralization of Letters of Credit.  Where either clause (a) or (b) above calls for a portion of prepayment proceeds to be applied to collateralize Letters of Credit, such proceeds shall be deposited by Agent into the applicable Collateral Account pursuant to the terms of the applicable Collateral Account Agreement.

(d)     Application of Prepayments of Loans to Base Rate Loans and Offshore Rate Loans.  Any prepayment of the Loans shall, to the extent consistent with subsection 2.4A(iv)(a) and (b), be applied first to Base Rate Loans to the full extent thereof before application to Offshore Rate Loans, in each case in a manner which minimizes the amount of any payments required to be made by Borrowers pursuant to subsection 2.6D.

(e)     Application of Prepayments from Realization on Collateral. Proceeds received by Lenders from realization on Collateral which is encumbered by Prepetition Liens shall be deemed applied toward repayment of the Loans only after all proceeds from realization on Collateral which is not subject to such Prepetition Liens has been applied to the Loans.

**B.     General Provisions Regarding Payments**.

(i)     Manner and Time of Payment.  Borrowers shall make all payments in respect of any Loan denominated in an Applicable Currency in the same Applicable Currency. All payments by a Borrower of (x) principal and interest in respect of Loans hereunder and under any Notes shall be made in the same Applicable Currency as incurred, and (y) except as may be otherwise provided elsewhere in this Agreement, all fees and all other Obligations hereunder and under any Notes shall be made in Dollars (amounts denominated in a currency other than Dollars shall be converted into Dollars by reference to the applicable Exchange Rate), in each case in Same Day Funds and without defense, setoff, counterclaim or other deduction, free of any restriction or condition, and delivered to Agent not later than 12:00 Noon (Local Time) on the date due to the applicable Funding and Payment Office.  Funds received by Agent after the times specified above on the due dates specified above shall be deemed to have been paid by Borrowers on the next succeeding Business Day.  Each Borrower hereby authorizes Agent to charge its accounts with Agent in order to cause timely payment to be made to Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

(ii)     Application of Payments to Principal and Interest.  Except as provided in subsection 2.2C, all payments in respect of the principal amount of any Loan shall include payment of accrued interest on the principal amount being repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due

and payable with respect to such Loan) shall be applied to the payment of interest before application to principal.

(iii)    Apportionment of Payments.  Aggregate principal and interest payments in respect of Loans shall be apportioned among all outstanding Loans to which such payments relate, in each case proportionately to such Lenders' respective funding of such Loans.  Agent shall promptly distribute to the applicable Lender, at its primary address set forth below, its name on the appropriate signature page hereof or at such other address as such Lender may request, its share of all such payments (as determined in the preceding sentence) received by Agent and the commitment fees of such Lender when received by Agent pursuant to subsection 2.3. Notwithstanding the foregoing provisions of this subsection 2.4B(iii), if, pursuant to the provisions of subsection 2.6C, any Notice of Conversion/Continuation is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Offshore Rate Loans, Agent shall give effect thereto in apportioning payments received thereafter.

(iv)    Payments on Business Days.   Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder, as the case may be.

(v)    Notation of Payment.  Each Lender agrees that before disposing of any Note held by it, or any part thereof (other than by granting participations therein), that Lender will make a notation thereon of all Loans evidenced by that Note and all principal payments previously made thereon and of the date to which interest thereon has been paid; provided that the failure to make (or any error in the making of) a notation of any Loan made under such Note shall not limit or otherwise affect the obligations of any Borrower hereunder or under such Note with respect to any Loan or any payments of principal or interest on such Note.

**2.5**    **Use of Proceeds.**

**A.**    **Loans.**

(i)    Tranche 2 Loan Proceeds.  The initial advance of proceeds of the Tranche 2 Loans shall be used solely to refinance the Tranche A Over-Line Loans funded by the Tranche 2 Lenders pursuant to the Existing Credit Agreement, and subsequent advances shall be used for the purposes identified in subsection 2.5A(iii).

(ii)    Tranche 3 Loan Proceeds.  The initial advance of proceeds of the Tranche 3 Loans shall be used solely to refinance the Domestic Tranche A Revolving Loans funded by the Tranche 3 Lenders pursuant to the Existing Credit Agreement, and subsequent advances shall be used for the purposes identified in subsection 2.5A(iii).

(iii)    Other Loan Proceeds.  All other proceeds of the Loans shall be used for working capital and general corporate purposes relating to Borrowers' post-petition operations, and shall be used only in accordance with the terms and conditions set forth in the Approved Budget; provided that no proceeds or any other portion of the Loans shall be used, directly or

indirectly, to (i) finance or make any payments prohibited under subsection 7.5; (ii) finance in any way any adversary action, suit, arbitration, proceeding or other litigation of any type relating to or in connection with this Agreement or the Existing Credit Agreement or any of the Loan Documents or instruments entered into in connection therewith, including, without limitation, any challenges to the Prepetition Lenders' Claims or the validity, perfection, priority or enforceability of any of the Liens securing such claims or any payment made thereunder; provided that, during the period prior to the date that is 60 days after the Petition Date, proceeds of the Loans may be used by an official committee of creditors, if any, appointed in the Chapter 11 Cases to analyze the Prepetition Lenders' Claims and any Liens securing such claims (subject to the requirements for payment of fees in the Bankruptcy Code and the rights of Lenders to object thereto); (iii) make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body; or (iv) make intercompany loans by Company to Goss UK, Goss France and Goss Japan.

(iv)    Notwithstanding anything to the contrary in the foregoing, the Tranche 1B Commitments, the Tranche 2 Commitments and the Tranche 3 Commitments (and the respective shares of the Tranche 1B Lenders, the Tranche 2 Lenders and the Tranche 3 Lenders of the Foreign Bridge Loan Commitments) shall be available only for the purposes defined in subsections 2.5A (i) and (ii), as applicable, and for issuance of Letters of Credit pursuant to Section 3 unless and until the availability of Tranche 1A Commitments is increased beyond the initial $10,000,000 limit.

**B.    Margin Regulations**.  No portion of the proceeds of any borrowing under this Agreement shall be used by any Borrower or any of its Subsidiaries in any manner that might cause the borrowing or the application of such proceeds to violate Regulation U, Regulation T or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of such Board or to violate the Exchange Act, or to violate any other similar or comparable laws of the UK, France or Japan in each case as in effect on the date or dates of such borrowing and such use of proceeds.

**2.6    Special Provisions Governing Offshore Rate Loans.**

Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to Offshore Rate Loans as to the matters covered:

**A.    Determination of Applicable Interest Rate**.  As soon as practicable after 11:00 A.M. (London time) on each Interest Rate Determination Date, Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Offshore Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to each Borrower and each applicable Lender.

**B.    Inability to Determine Applicable Interest Rate**.  In the event that Agent shall have determined (which determination shall be final and conclusive and binding upon all parties hereto) on any Interest Rate Determination Date with respect to any Offshore Rate Loans that by reason of circumstances affecting the interbank Eurodollar market adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis

provided for in the definition of Adjusted Offshore Rate, Agent shall on such date give notice (by telefacsimile or by telephone confirmed in writing) to the applicable Borrower and each applicable Lender, of such determination, whereupon (i) no Loans may be made as, or converted to, Offshore Rate Loans until such time as Agent notifies such Borrower and such Lenders that the circumstances giving rise to such notice no longer exist and (ii) any Notice of Borrowing or Notice of Conversion/Continuation given by a Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by such Borrower.

C.    **Illegality or Impracticability of Offshore Rate Loans.** In the event that on any date any Lender shall have determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with the Borrower and Agent) that the making, maintaining or continuation of its Offshore Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful) or (ii) has become impracticable, or would cause such Lender material hardship, as a result of contingencies occurring after the date of this Agreement which materially and adversely affect the interbank Eurodollar market or the position of such Lender in that market, then, and in any such event, such Lender shall be an **"Affected Lender"** and it shall on that day give notice (by telefacsimile or by telephone confirmed in writing) to the Borrower and Agent of such determination (which notice Agent shall promptly transmit to each other applicable Lender). Thereafter (a) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Offshore Rate Loans shall be suspended until such notice shall be withdrawn by the Affected Lender, (b) to the extent such determination by the Affected Lender relates to an Offshore Rate Loan then being requested by a Borrower pursuant to a Notice of Borrowing or a Notice of Conversion/Continuation, the Affected Lender shall make such Loan as (or convert such Loan to, as the case may be) a Base Rate Loan, (c) the Affected Lender's obligation to maintain its outstanding Offshore Rate Loans (the **"Affected Loans"**), shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (d) the Affected Loans shall automatically convert into applicable Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to an Offshore Rate Loan then being requested by a Borrower pursuant to a Notice of Borrowing or a Notice of Conversion/Continuation, such Borrower shall have the option, subject to the provisions of subsection 2.6D, to rescind such Notice of Borrowing or Notice of Conversion/Continuation as to all Lenders by giving notice (by telefacsimile or by telephone confirmed in writing) to Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission Agent shall promptly transmit to each other applicable Lender). Except as provided in the immediately preceding sentence, nothing in this subsection 2.6C shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Offshore Rate Loans in accordance with the terms of this Agreement.

D.    **Compensation For Breakage or Non-Commencement of Interest Periods.** A Borrower shall compensate each Lender, upon written request by that Lender (which request shall set forth in reasonable detail the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including, without limitation, any interest paid by that

Lender to lenders of funds borrowed by it to make or carry its Offshore Rate Loans, and any loss, expense or liability sustained by that Lender in connection with the liquidation or re-employment of such funds) which that Lender may sustain: (i) if for any reason (other than a default by that Lender) a borrowing of any Offshore Rate Loan does not occur on a date specified therefor in a Notice of Borrowing or a telephonic request for borrowing, or a conversion to or continuation of any Offshore Rate Loan does not occur on a date specified therefor in a Notice of Conversion/Continuation or a telephonic request for conversion or continuation, (ii) if any prepayment or other principal payment or any conversion of any of its Offshore Rate Loans occurs on a date prior to the last day of an Interest Period applicable to that Loan, (iii) if any prepayment of any of its Offshore Rate Loans is not made on any date specified in a notice of prepayment given by the Borrower, or (iv) as a consequence of any other default by the Borrower in the repayment of its Offshore Rate Loans when required by the terms of this Agreement.

      **E.**    **Booking of Offshore Rate Loans.**  Any Lender may make, carry or transfer Offshore Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of that Lender.

      **F.**    **Assumptions Concerning Funding of Offshore Rate Loans.** Calculation of all amounts payable to a Lender under this subsection 2.6 and under subsection 2.7A (as fully set forth in Annex A) shall be made as though that Lender had actually funded each of its relevant Offshore Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to clause (i) of the definition of Adjusted Offshore Rate in an amount equal to the amount of such Offshore Rate Loan and having a maturity comparable to the relevant Interest Period and through the transfer of such Eurodollar deposit from an offshore office of that Lender to a domestic office of that Lender; provided, however, that each Lender may fund each of its Offshore Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this subsection 2.6 and under subsection 2.7A.

      **G.**    **Offshore Rate Loans After Default.** After the occurrence of and during the continuation of a Potential Event of Default or an Event of Default, (i) all Offshore Rate Loans shall be converted to Base Rate Loans, at Agent's election and at the applicable Borrower's expense and (ii) subject to the provisions of subsection 2.6D, any Notice of Borrowing or Notice of Conversion/Continuation given by any Borrower with respect to a requested borrowing or conversion/continuation that has not yet occurred shall be deemed to be rescinded by such Borrower.

**2.7**   **Increased Costs; Taxes; Capital Adequacy.**

      Provisions regarding increased costs, taxes, and capital adequacy are set forth in Annex A attached hereto and such Annex A is incorporated herein by this reference.

**2.8**   **Obligations of Lenders and Issuing Lenders to Mitigate; Replacement of Lenders.**

      Provisions regarding obligations of Lenders and Issuing Lenders to mitigate are set forth in Annex B attached hereto and such Annex B is incorporated herein by this reference.

**2.9   Indemnifying Lenders.**

Provisions regarding Indemnifying Lenders are set forth in Annex C attached hereto and such Annex C is incorporated herein by this reference.

**2.10   Superpriority Nature of DIP Obligations; Foreign Security.**

**A.   Superpriority Nature of DIP Obligations.** All DIP Obligations of Company (x) shall be secured by first priority Liens in and security interests in the assets of Company pursuant to this Agreement and the DIP Collateral Documents and the Borrowing Orders. All DIP Obligations of Holdings shall be secured by first priority Liens in and security interests in the assets of Holdings pursuant to this Agreement and the DIP Collateral Documents and the Borrowing Orders. All DIP Obligations shall constitute allowed administrative expense claims in the Chapter 11 Cases with priority under Section 364(c)(1) of the Bankruptcy Code over any and all other administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a) and 507(b) of the Bankruptcy Code; provided that upon the approval of the Court of the waiver of claims to surcharges pursuant to Section 6.14, the priority status of the DIP Obligations and the Liens securing the same shall be subject to (i) fees payable to the clerk of the Court or the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) and (ii) professional fees incurred in the Chapter 11 Cases in the sum of the aggregate allowed fees and expenses under Sections 330 and 331 of the Bankruptcy Code of professional persons retained pursuant to an order or orders of the Court by the Debtors and by the official creditor's committee appointed in the Chapter 11 Case of Company, (A) which fees and expenses prior to the occurrence of an Event of Default (I) do not exceed the amount for such fees and expenses provided for in the Approved Budget prior to the date of the occurrence of such Event of Default and (II) (a) have been paid, (b) have been billed (including bills provided for information purposes only) if copies of any such bills have been provided to the DIP Lenders, (c) are the subject of a filed interim or final fee application, or (d) have been accrued, (B) which fees and expenses from and after the occurrence of an Event of Default do not exceed $1,000,000 for all such professionals other than fees of the Blackstone Group approved by the Court and (C) which Court-approved fees and expenses for the Blackstone Group may include but shall not exceed (x) monthly fees not more than $200,000 per month for a period not to exceed three months and (y) if the Blackstone Group acts as the selling agent for the sale of all or substantially all of the assets of the Debtors, a one-time transaction fee in an amount not to exceed 3.5% of the net proceeds from such sale available for distribution to creditors but not less than $1,250,000.

**B.   Foreign Security Interests.** The Obligations of each Foreign Borrower under its Foreign Bridge Loans shall, within thirty (30) days following the Closing Date, be secured by first priority Liens in and security interests in the assets of such Foreign Borrower pursuant to this Agreement and the Foreign Collateral Documents.

**C.   Lien Priority.** The relative lien priority of each Lender shall be, with respect to all Liens granted hereunder, as follows (all as set forth in greater detail in the appropriate DIP Collateral Documents): Liens securing the Tranche 1A Facility and the Tranche 1B Facility shall be *pari passu* with one another in lien priority, and shall be senior in lien priority to Liens securing the Tranche 2 Facility and the Tranche 3 Facility; and Liens securing

the Tranche 2 Facility and the Tranche 3 Facility shall be *pari passu* with one another in lien priority.

**2.11   Extension of Commitments.**   Borrower may at any time, provided there exists no Event of Default or Potential Event of Default, request an extension of the Commitment Termination Date of up to 90 days.  Such extension shall require approval of Supermajority Lenders (for all Commitments combined).

## Section 3.   LETTERS OF CREDIT

**3.1   Issuance of Letters of Credit and Lenders' Purchase of Participations Therein.**

     **A.   Letters of Credit.**  In addition to Borrowers requesting that Lenders make Loans pursuant to subsection 2.1A(i)(a), Borrowers may request, in accordance with the provisions of this subsection 3.1, from time to time during the period from the Closing Date to but excluding the date which is (x) the fifth Business Day prior to the Commitment Termination Date (in the case of Standby Letters of Credit) and (y) the thirtieth Business Day prior to the Commitment Termination Date (in the case of Commercial Letters of Credit), that one or more Lenders issue Letters of Credit payable on a sight basis for the account of such Borrower for the purposes specified in the definitions of Commercial Letters of Credit and Standby Letters of Credit.  Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of Borrowers set forth herein, any one or more Lenders may, but (except as provided in subsection 3.1B(ii)) shall not be obligated to, issue such Letters of Credit in accordance with the provisions of this subsection 3.1; provided further that Borrowers shall not request that any Lenders issue (and no Lender shall issue):

     (i)     any Letter of Credit if, after giving effect to such issuance, the Total Utilization of Commitments for all Borrowers would exceed the Maximum Commitments for all Borrowers then in effect;

     (ii)     any Letter of Credit if, after giving effect to such issuance, the aggregate Letter of Credit Usage of all Borrowers would exceed the Letters of Credit Sublimit;

     (iii)     any Letter of Credit if, after giving effect to such issuance, the Total Utilization of Commitments would exceed the Maximum Commitments;

     (iv)     any Letter of Credit to a Foreign Borrower if, after giving effect to such issuance, the Total Utilization of Foreign Bridge Loan Commitments would exceed the maximum amount of Foreign Bridge Loan Commitments in effect;

     (v)     any Standby Letter of Credit having an expiration date later than the earlier of (a) the date which is five Business Days prior to the Commitment Termination Date and (b) the date which is one year from the date of issuance of such Standby Letter of Credit; provided that the immediately preceding clause (b) shall not prevent any Issuing Lender from agreeing that a Standby Letter of Credit will automatically be extended for one or more successive periods not to exceed one year each unless such Issuing Lender elects not to extend for any such additional period; and provided further that such Issuing Lender shall elect not to extend such Standby Letter of Credit if it has

knowledge that an Event of Default has occurred and is continuing (and has not been waived in accordance with subsection 10.6) at the time such Issuing Lender must elect whether or not to allow such extension; or

(vi)   any Commercial Letter of Credit having an expiration date (a) later than the earlier of (X) the date which is thirty Business Days prior to the Commitment Termination Date and (Y) the date which is 180 days from the date of issuance of such Commercial Letter of Credit or (b) that is otherwise unacceptable to the applicable Issuing Lender in its reasonable discretion.

Notwithstanding anything in to the contrary in the foregoing: Lenders may not issue, and Company may not request issuance of, Tranche 1A Letters of Credit, on the Closing Date or at any other time, so long as an amount equal to or greater than the applicable Minimum Amount with respect to the Tranche 1B Loan Commitments, the Tranche 2 Loan Commitments or the Tranche 3 Loan Commitments remains available for issuance of Letters of Credit at such time (it being understood that if such Commitments are available only for issuance of Letters of Credit then the foregoing shall not prohibit funding of Letters of Credit); Lenders may not issue, and Company may not request issuance of, Tranche 1B Letters of Credit, on the Closing Date or at any other time, so long as an amount equal to or greater than the applicable Minimum Amount with respect to the Tranche 2 Loan Commitments or the Tranche 3 Loan Commitments remains available for issuance of Letters of Credit at such time; and Lenders may not issue, and Company may not request issuance of, Tranche 2 Letters of Credit for the purposes described in subsection 2.5A(iii), on the Closing Date or at any other time, so long as an amount equal to or greater than the applicable Minimum Amount with respect to the Tranche 1B Loan Commitments or the Tranche 3 Loan Commitments remains available for issuance of Letters of Credit at such time.

**B.     Mechanics of Issuance.**

(i)     Request for Issuance.  Whenever any Borrower desires the issuance of a Letter of Credit, it shall deliver to Agent a Request for Issuance of Letter of Credit substantially in the form of Exhibit III annexed hereto no later than 12:00 Noon (New York time) at least two (2) Business Days, or such shorter period as may be agreed to by the Issuing Lender in any particular instance, in advance of the proposed date of issuance. The Request for Issuance of Letter of Credit shall specify (a) the proposed date of issuance (which shall be a Business Day), (b) the face amount of the Letter of Credit, (c) the currency the Letter of Credit is requested to be denominated in, (d) the expiration date of the Letter of Credit, (e) the name and address of the beneficiary, (f) the Type of such Letter of Credit, and (g) either the verbatim text of the proposed Letter of Credit or the proposed terms and conditions thereof, including a precise description of any documents to be presented by the beneficiary which, if presented by the beneficiary prior to the expiration date of the Letter of Credit, would require the Issuing Lender to make payment under the Letter of Credit; provided that the Issuing Lender, in its reasonable discretion, may require changes in the text of the proposed Letter of Credit or any such documents.

Such Borrower shall notify the applicable Issuing Lender (and Agent, if Agent is not such Issuing Lender) prior to the issuance of any Letter of Credit in the event that any of the matters to which it is required to certify in the applicable Request

for Issuance of Letter of Credit is no longer true and correct as of the proposed date of issuance of such Letter of Credit, and upon the issuance of any Letter of Credit such Borrower shall be deemed to have re-certified, as of the date of such issuance, as to the matters to which it is required to certify in the applicable Request for Issuance of Letter of Credit.

(ii)     Determination of Issuing Lender.  Upon receipt by Agent of a Request for Issuance of Letter of Credit pursuant to subsection 3.1B(i) requesting the issuance of a Letter of Credit, in the event Agent elects to issue such Letter of Credit, Agent shall promptly so notify Borrower, and Agent shall be the Issuing Lender with respect thereto. In the event that Agent, in its sole discretion, elects not to issue such Letter of Credit, Agent shall promptly notify Borrower, whereupon Borrower may request any other Lender to issue such Letter of Credit by delivering to such Lender a copy of the applicable Request for Issuance of Letter of Credit.  Any Lender so requested to issue such Letter of Credit shall promptly notify Borrower and Agent whether or not, in its sole discretion, it has elected to issue such Letter of Credit, and any such Lender which so elects to issue such Letter of Credit shall be the Issuing Lender with respect thereto.  In the event that all other Lenders shall have declined to issue such Letter of Credit, notwithstanding the prior election of Agent not to issue such Letter of Credit, Agent shall be obligated to issue such Letter of Credit and shall be the Issuing Lender with respect thereto, notwithstanding the fact that the Letter of Credit Usage with respect to such Letter of Credit and with respect to all other Letters of Credit issued by the Agent, when aggregated with Agent's outstanding Loans, may exceed Agent's Commitments for such Borrower then in effect.  Notwithstanding anything to the contrary herein, Agent may designate Deutsche Bank or its Affiliate to act as Issuing Lender in Agent's place.

(iii)     Issuance of Letter of Credit.  Upon satisfaction or waiver (in accordance with subsection 10.6) of the conditions set forth in subsection 4.3, the Issuing Lender shall issue the requested Letter of Credit in accordance with the Issuing Lender's standard operating procedures.

(iv)     Notification to Lenders.  Upon the issuance of or amendment to any Letter of Credit the applicable Issuing Lender shall promptly notify Agent of such issuance or amendment and which notice shall be accompanied by a copy of such Letter of Credit or amendment.  Promptly after receipt of such notice (or, if Agent is the Issuing Lender, together with such notice), Agent shall notify each applicable Lender, of such issuance or modification and the amount of such Lender's respective participation in such Letter of Credit or amendment, as determined in accordance with subsection 3.1C.  Upon request of any applicable Lender, Agent will furnish such Lender with copies of any such issuance or amendment.

(v)     Reports to Lenders.  In the event that the Issuing Lender is other than Agent, such Issuing Lender will send by facsimile transmission to Agent, promptly on the first Business Day of each week, its daily maximum amount available to be drawn under the Letters of Credit issued by such Issuing Lender for the previous week.  Agent shall deliver to each Lender upon each calendar month end, and upon each Letter of Credit fee

payment, a report setting forth the daily maximum amount available to be drawn for all Issuing Lenders during such period.

    (vi)   <u>Issuance of Multiple Letters of Credit to Avoid</u> Participation across Tranches. If the face amount of any Letter of Credit requested pursuant to this subsection 3.1A would require participation by more than one tranche of Lenders pursuant to subsection 3.1C, Agent may cause the Issuing Lender to issue, in response to a single Request for Issuance of Letter of Credit, multiple Letters of Credit, each sized appropriately to allow participation in each such Letter of Credit to be limited to a single tranche of Lenders.

**C.**    **Lenders' Purchase of Participations in Letters of Credit.**

    (i)   <u>Pro Rata Participation</u>.  Immediately upon the issuance of each Letter of Credit for the benefit of Company, Goss UK, Goss France or Goss Japan, as the case may be, each applicable Lender shall be deemed to, and hereby agrees to, have irrevocably purchased from the Issuing Lender a participation in such Letter of Credit and drawings thereunder in an amount equal to such Lender's Pro Rata Share (equal to its Pro Rata Share of the Commitment for the Type of Letter of Credit) of the maximum amount which is or at any time may become available to be drawn thereunder.

    (ii)   <u>Outstanding Domestic Tranche A Letters of Credit</u>.  Upon satisfaction of the conditions set forth in subsection 4.1, the Domestic Tranche A Letters of Credit shall, effective as of the Closing Date, become Tranche 3 Letters of Credit under this Agreement to the same extent as if initially issued hereunder and each Tranche 3 Lender shall be deemed to have irrevocably purchased from the Issuing Lender(s) of such existing Domestic Tranche A Letters of Credit a participation in such applicable Tranche 3 Letters of Credit and drawings thereunder in an amount equal to such Lender's Pro Rata Share of the maximum amount which is or at any time may become available to be drawn thereunder.  All such Domestic Tranche A Letters of Credit which become Tranche 3 Letters of Credit under this Agreement, shall be fully secured by the Collateral commencing on the Closing Date to the same extent as if initially issued hereunder on such date.

**3.2**    **Letter of Credit Fees.**

    Each Borrower agrees to pay the following amounts with respect to Letters of Credit issued hereunder for such Borrower's account:

    (i)   with respect to each Standby Letter of Credit, (a) a fronting fee, payable in Dollars directly to the applicable Issuing Lender for its own account, equal to the greater of (X) $500 per annum and (Y) 0.25% per annum of the Dollar Equivalent of the daily maximum amount available to be drawn under such Standby Letter of Credit, and (b) a letter of credit fee, payable in Dollars to Agent for the account of Lenders, equal to (x) the Dollar Equivalent of the daily maximum amount available to be drawn under such Standby Letter of Credit <u>multiplied by</u> (y) 3.50%, in each case payable in arrears on and to (but excluding) the date that is three (3) Business Days after the last Business Day of

each month of each year and computed on the basis of a 360-day year for the actual number of days elapsed;

(ii)    with respect to each Commercial Letter of Credit, (a) a fronting fee, payable in Dollars directly to the applicable Issuing Lender for its own account, equal to the greater of (X) $500 per annum and (Y) 0.25% per annum of the Dollar Equivalent of the daily maximum amount available to be drawn under such Commercial Letter of Credit, and (b) a letter of credit fee, payable in Dollars to Agent for the account of Lenders, equal to (x) the Dollar Equivalent of the daily maximum amount available to be drawn under such Commercial Letter of Credit multiplied by (y) 3.50%, in each case payable in arrears on and to (but excluding) the date that is three (3) Business Days after the last Business Day of each month of each year and computed on the basis of a 360-day year for the actual number of days elapsed; and

(iii)    with respect to the issuance, amendment or transfer of each Letter of Credit and each payment of a drawing made thereunder (without duplication of the fees payable under clauses (i) and (ii) above), documentary and processing charges payable directly to the applicable Issuing Lender for its own account in accordance with such Issuing Lender's standard schedule for such charges in effect at the time of such issuance, amendment, transfer or payment, as the case may be.

For purposes of calculating any fees payable under clauses (i) or (ii) of this subsection 3.2, (1) the Dollar Equivalent of the daily amount available to be drawn under any Letter of Credit shall be determined as of the close of business on any date of determination, (2) any amount which is denominated in a currency other than Dollars shall be determined based on the applicable Exchange Rate for such currency as of each first Business Day after the last Business Day of each month of each year, and (3) Agent shall provide to Borrowers on each first Business Day after the last Business Day of each month of each year a report specifying the Letter of Credit fees payable by each Borrower and including the calculations of such fees and the Exchange Rate used, and Borrowers shall pay such fees no later than two (2) Business Days after delivery of such report. Promptly upon receipt by Agent of any amount described in clause (i)(b) and (ii)(b) of this subsection 3.2, Agent shall distribute to each other applicable Lender its Pro Rata Share of such amount.

**3.3    Drawings and Reimbursement of Amounts Drawn Under Letters of Credit.**

A.    **Responsibility of Issuing Lender With Respect to Drawings.**    In determining whether to honor any drawing under any Letter of Credit by the beneficiary thereof, the Issuing Lender shall be responsible only to exercise reasonable care to determine that the documents required to be delivered under such Letter of Credit have been delivered and that they substantially comply on their face with the requirements of such Letter of Credit.

B.    **Reimbursement by Borrowers of Amounts Drawn Under Letters of Credit.**    In the event an Issuing Lender has determined to honor a drawing under a Letter of Credit issued by it, (i) such Issuing Lender shall immediately notify the applicable Borrower and Agent and (ii) such Borrower shall reimburse such Issuing Lender on or before the Business Day immediately following the date on which such drawing is honored (the **"Reimbursement Date"**)

in an amount in same day funds in Dollars (which amount, in the case of a drawing under a Letter of Credit which is denominated in a currency other than Dollars, shall be calculated by reference to the applicable Exchange Rate) equal to the amount of such drawing; provided that, anything contained in this Agreement to the contrary notwithstanding, (i) unless such Borrower shall have notified Agent and such Issuing Lender prior to 12:00 Noon (New York time) on the date such drawing is honored that such Borrower intends to reimburse such Issuing Lender for the amount of such drawing with funds other than the proceeds of Loans, such Borrower shall be deemed to have given a timely Notice of Borrowing to Agent requesting Lenders to make Loans that are (x) Base Rate Loans (in the case of Company) or (y) Offshore Rate Loans with an Interest Period of one week (in the case of Goss UK, Goss France or Goss Japan) on the Reimbursement Date in an amount in Dollars (which amount, in the case of a drawing under a Letter of Credit which is denominated in a currency other than Dollars, shall be calculated by reference to the applicable Exchange Rate) equal to the amount of such drawing and (ii) Lenders shall, on the Reimbursement Date, make Loans denominated in Dollars that are (x) Base Rate Loans (in the case of Company) or (y) Offshore Rate Loans with an Interest Period of one week (in the case of Goss UK, Goss France or Goss Japan) in the amount of such drawing, the proceeds of which shall be applied directly by Agent to reimburse such Issuing Lender for the amount of such drawing; and provided further that if for any reason proceeds of Loans are not received by such Issuing Lender on the Reimbursement Date in an amount equal to the amount of such drawing, such Borrower shall reimburse such Issuing Lender, on demand, in an amount in same day funds equal to the excess of the amount of such drawing over the aggregate amount of such Loans, if any, which are so received. Nothing in this subsection 3.3B shall be deemed to relieve any Lender from its obligation to make Loans on the terms and conditions set forth in this Agreement, and such Borrower shall retain any and all rights it may have against any Lender resulting from the failure of such Lender to make such Loans under this subsection 3.3B.

### C.    Payment by Lenders of Unreimbursed Drawings Under Letters of Credit.

(i)    Payment by Lenders.  In the event that a Borrower shall fail for any reason to reimburse any Issuing Lender as provided in subsection 3.3B in an amount (calculated in the case of a drawing under a Letter of Credit denominated in an Offshore Currency, by reference to the applicable Exchange Rate) equal to the amount of any drawing honored by such Issuing Lender under a Letter of Credit issued by it, such Issuing Lender shall promptly notify each other Lender having a Commitment of the same Type, of the unreimbursed amount of such drawing, of such other Lender's respective participation therein based on such Lender's participation in such Letter of Credit pursuant to subsection 3.1C(i). Each such Lender shall make available to such Issuing Lender an amount equal to its respective participation in same day funds in Dollars, at the office of such Issuing Lender specified in such notice, not later than 12:00 Noon (New York time) on the first business day (under the laws of the jurisdiction in which such office of such Issuing Lender is located) after the date notified by such Issuing Lender. In the event that any such Lender fails to make available to such Issuing Lender on such business day the amount of such Lender's participation in such Letter of Credit or the amount of the unreimbursed drawing regarding such Letter of Credit as provided in this subsection 3.3C, such Issuing Lender shall be entitled to recover such amount on demand from such Lender together with interest thereon at the rate customarily used by such Issuing Lender for the correction of errors among banks for three Business Days and thereafter at the

Base Rate. Nothing in this subsection 3.3C shall be deemed to prejudice the right of any such Lender to recover from any Issuing Lender any amounts made available by such Lender to such Issuing Lender pursuant to this subsection 3.3C in the event that it is determined by the final judgment of a court of competent jurisdiction that the payment with respect to a Letter of Credit by such Issuing Lender in respect of which payment was made by such Lender constituted gross negligence or willful misconduct on the part of such Issuing Lender.

(ii)     Distribution to Lenders of Reimbursements Received From Borrowers. In the event any Issuing Lender shall have been reimbursed by other Lenders pursuant to subsection 3.3C(i) for all or any portion of any drawing honored by such Issuing Lender under a Letter of Credit issued by it, and subsequently receives payment from a Borrower in reimbursement of such drawing, such Issuing Lender shall distribute to each other Lender which has paid all amounts payable by it under subsection 3.3C(i) with respect to such drawing a percentage of such payments received equal to the percentage of such drawing reimbursed by such Lender. Any such distribution shall be made to a Lender at its primary address set forth below its name on the appropriate signature page hereof or at such other address as such Lender may request.

**D.      Interest on Amounts Drawn Under Letters of Credit**.

(i)     Payment of Interest by Borrowers. Each Borrower agrees to pay to Issuing Lender, with respect to drawings made under any Letters of Credit issued by such Issuing Lender at such Borrower's request, interest on the amount paid by such Issuing Lender in respect of each such drawing from the date of such drawing to but excluding the date such amount is reimbursed by the Borrower (including any such reimbursement out of the proceeds of Loans pursuant to subsection 3.3B) at a rate equal to, (a) for the period from the date of such drawing to but excluding the Reimbursement Date, the rate then in effect under this Agreement with respect to Loans that are Base Rate Loans and (b) thereafter, a rate which is 2.00% per annum in excess of the rate of interest otherwise payable under this Agreement with respect to Loans that are Base Rate Loans. Interest payable pursuant to this subsection 3.3D(i) shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues and shall be payable on demand or, if no demand is made, on the date on which the related drawing under a Letter of Credit is reimbursed in full.

(ii)     Distribution of Interest Payments by Issuing Lender. Promptly upon receipt by any Issuing Lender of any payment of interest pursuant to subsection 3.3D(i) with respect to a drawing under a Letter of Credit issued by it, (a) such Issuing Lender shall distribute to each other applicable Lender, out of the interest received by such Issuing Lender in respect of the period from the date of such drawing to but excluding the date on which such Issuing Lender is reimbursed for the amount of such drawing (including any such reimbursement out of the proceeds of Loans pursuant to subsection 3.3B), the amount that such other Lender would have been entitled to receive in respect of the letter of credit fee that would have been payable in respect of such Letter of Credit for such period pursuant to subsection 3.2 if no drawing had been made under such Letter of Credit, and (b) in the event such Issuing Lender shall have been reimbursed by other

Lenders pursuant to subsection 3.3C(i) for all or any portion of such drawing, such Issuing Lender shall distribute to each other Lender which has paid all amounts payable by it under subsection 3.3C(i) with respect to such drawing such other Lender's Pro Rata Share of any interest received by such Issuing Lender in respect of that portion of such drawing so reimbursed by such other Lender for the period from the date on which such Issuing Lender was so reimbursed by such other Lender to but excluding the date on which such portion of such drawing is reimbursed by the Borrower.  Any such distribution shall be made to a Lender at its primary address set forth below its name on the appropriate signature page hereof or at such other address as such Lender may request.

**3.4    Obligations Absolute.**

The obligation of a Borrower to reimburse an Issuing Lender for drawings made under the Letters of Credit issued by such Issuing Lender for such Borrower's account and to repay any Loans made by Lenders pursuant to subsection 3.3B and the obligations of Lenders under subsection 3.3C(i) shall be deemed DIP Obligations subject to Section 2.10 and shall be unconditional and irrevocable, and any such payments shall be made strictly in accordance with the terms of this Agreement under all circumstances including, without limitation, the following circumstances:

(i)     any lack of validity or enforceability of any Letter of Credit;

(ii)    the existence of any claim, set-off, defense or other right which any Borrower or any Lender may have at any time against a beneficiary or any transferee of any Letter of Credit (or any Persons for whom any such transferee may be acting), any Issuing Lender or other Lender or any other Person or, in the case of a Lender, against any Borrower, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between Borrower or one of its Subsidiaries and the beneficiary for which any Letter of Credit was procured);

(iii)   any draft or document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)    payment by the applicable Issuing Lender under any Letter of Credit against presentation of a draft or document which does not substantially comply with the terms of such Letter of Credit;

(v)     any adverse change in the business, operations, properties, assets, condition (financial or otherwise) or prospects of Borrower or any of its Subsidiaries;

(vi)    any breach of this Agreement or any other Loan Document by any party thereto;

(vii)   any other circumstance or happening whatsoever, whether or not similar to any of the foregoing; or

(viii)   the fact that an Event of Default or a Potential Event of Default shall have occurred and be continuing;

provided, in each case, that payment by the applicable Issuing Lender under the applicable Letter of Credit shall not have constituted gross negligence or willful misconduct of such Issuing Lender under the circumstances in question (as determined by a final judgment of a court of competent jurisdiction).

**3.5     Indemnification; Nature of Issuing Lenders' Duties.**

    **A.     Indemnification.**   In addition to amounts payable as provided in subsection 3.6, each Borrower hereby agrees to protect, indemnify, pay and save harmless each Issuing Lender from and against any and all claims, demands, liabilities, damages, losses, costs, charges and expenses (including reasonable fees, expenses and disbursements of counsel and reasonable allocated costs of internal counsel) which such Issuing Lender may incur or be subject to as a consequence, direct or indirect, of (i) the issuance of any Letter of Credit by such Issuing Lender for the account of such Borrower, other than as a result of (a) the gross negligence or willful misconduct of such Issuing Lender as determined by a final judgment of a court of competent jurisdiction or (b) subject to the following clause (ii), the wrongful dishonor by such Issuing Lender of a proper demand for payment made under any Letter of Credit issued by it or (ii) the failure of such Issuing Lender to honor a drawing under any such Letter of Credit as a result of any act or omission, whether rightful or wrongful, of any Governmental Authority (all such acts or omissions herein called **"Governmental Acts"**).

    **B.     Nature of Issuing Lenders' Duties.**   As between any Borrower on the one hand and any Issuing Lender on the other hand, such Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit issued by such Issuing Lender by, the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the foregoing, such Issuing Lender shall not be responsible (absent a determination of a court of competent jurisdiction of gross negligence or willful misconduct by Issuing Lender) for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for and issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) failure of the beneficiary of any such Letter of Credit to comply fully with any conditions required in order to draw upon such Letter of Credit; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of such Issuing Lender, including without limitation any Governmental Acts, and none of the above shall affect or impair, or prevent the vesting of, any of such Issuing Lender's rights or powers hereunder.

In furtherance and extension and not in limitation of the specific provisions set forth in the first paragraph of this subsection 3.5B, any action taken or omitted by any Issuing Lender under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith, shall not put such Issuing Lender under any resulting liability to any Borrower.

Notwithstanding anything to the contrary contained in this subsection 3.5, each Borrower shall retain any and all rights it may have against any Issuing Lender for any liability arising solely out of the gross negligence or willful misconduct of such Issuing Lender, as determined by a final judgment of a court of competent jurisdiction or out of a wrongful dishonor by Issuing Lender of a proper demand for payment made under any Letter of Credit.

## 3.6    Increased Costs and Taxes Relating to Letters of Credit.

In the event that any Issuing Lender or Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or governmental authority, in each case that becomes effective after the date hereof, or compliance by any Issuing Lender or Lender with any guideline, request or directive issued or made after the date hereof by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law):

(i)    subjects such Issuing Lender or Lender (or its applicable lending or letter of credit office) to any additional Tax (other than any Tax on the overall net income of such Issuing Lender or Lender) with respect to the issuing or maintaining of any Letters of Credit or the purchasing or maintaining of any participations therein or any other obligations under this Section 3, whether directly or by such being imposed on or suffered by any particular Issuing Lender;

(ii)    imposes, modifies or holds applicable any reserve (including without limitation any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement in respect of any Letters of Credit issued by any Issuing Lender or participations therein purchased by any Lender; or

(iii)    imposes any other condition (other than with respect to a Tax matter) on or affecting such Issuing Lender or Lender (or its applicable lending or letter of credit office) regarding this Section 3 or any Letter of Credit or any participation therein;

and the result of any of the foregoing is to increase the cost to such Issuing Lender or Lender of agreeing to issue, issuing or maintaining any Letter of Credit or agreeing to purchase, purchasing or maintaining any participation therein or to reduce any amount received or receivable by such Issuing Lender or Lender (or its applicable lending or letter of credit office) with respect thereto in an amount deemed by such Issuing Lender or Lender (in its sole discretion) to be material; then, in any case, such Borrower shall promptly pay to such Issuing Lender or Lender, upon

receipt of the statement referred to in the next sentence, such additional amount or amounts as may be necessary to compensate such Issuing Lender or Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Issuing Lender or Lender shall deliver to the Borrower a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Issuing Lender or Lender under this subsection 3.6, which statement shall be conclusive and binding upon all parties hereto absent manifest error.

**Section 4.**     **CONDITIONS TO LOANS AND LETTERS OF CREDIT**

The obligations of Lenders to make Loans and the issuance of Letters of Credit hereunder to each Borrower are subject to the satisfaction of the following conditions by such Borrower.

**4.1**     **Conditions to Initial Effectiveness.**

The obligations of Lenders to purchase or make any Loans on the Closing Date are, in addition to the conditions precedent specified in subsection 4.2, subject to prior or concurrent satisfaction of the following conditions:

**A.**     **Borrower Documents.**   On or before the Closing Date, each Borrower shall deliver or cause to be delivered to Lenders (or to Agent for Lenders with sufficient originally executed copies, where appropriate, for each Lender and its counsel) the following, each, unless otherwise noted, dated the Closing Date:

(i)     Certified copies of its Certificate or Articles of Incorporation, together with a good standing certificate from the Secretary of State of its jurisdiction of incorporation and each other state in which it is qualified as a foreign corporation to do business and, to the extent generally available a certificate or other evidence of good standing as to payment of any applicable franchise or similar taxes from the appropriate taxing authority of each of such jurisdictions, and in the case of Goss UK, Goss France and Goss Japan, the comparable or equivalent documentation under the laws of the applicable Governmental Authority, each dated a recent date prior to the Closing Date;

(ii)     Copies of its Bylaws, certified as of the Closing Date by its corporate secretary or an assistant secretary, and in the case of Goss UK, Goss France and Goss Japan, the comparable or equivalent documentation, certified as of the Closing Date by a duly authorized officer;

(iii)     Resolutions of its Board of Directors approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party, certified as of the Closing Date by its corporate secretary, an assistant secretary or other duly authorized officer as being in full force and effect without modification or amendment;

(iv)     Signature and incumbency certificates of its officers executing this Agreement and the other Loan Documents to which it is a party;

(v)     Executed and acknowledged (where applicable) originals of this Agreement, the Notes (duly executed in accordance with subsection 2.1E, drawn to the order of each applicable Lender and with appropriate insertions) and the other Loan Documents to which it is a party and which are required to be delivered on the Closing Date, which Loan Documents shall include the instruments listed on Schedule 4.1A(v);

(vi)    An Officers' Certificate from each Borrower as to authorized signatories of that Borrower for Notices of Borrowing, Notices of Conversion/Continuation, Requests of Issuance of Letters of Credit and Notices of Allocation; and

(vii)   Such other documents as Agent may reasonably request.

**B.      Holdings and Subsidiary Documents**.  On or before the Closing Date, Company shall cause Holdings and each Borrower shall cause each of its Subsidiaries to deliver to Lenders (or to Agent for Lenders with sufficient originally executed copies, where appropriate, for each Lender and its counsel) the following, each, unless otherwise noted, dated the Closing Date:

(i)     Certified copies of the Certificate or Articles of Incorporation of such Person, together with a good standing certificate from the Secretary of State of the State of its jurisdiction of incorporation and each other state in which such Person is qualified as a foreign corporation to do business (except that no such certificate is required for Goss Realty, which has been administratively dissolved) and, to the extent generally available, and a certificate or other evidence of good standing as to payment of any applicable franchise or similar taxes from the appropriate taxing authority of each of such jurisdictions, and in the case of any Foreign Subsidiary, to the extent generally available the comparable or equivalent documentation under the laws of the applicable Governmental Authority, each dated a recent date prior to the Closing Date;

(ii)    Copies of the Bylaws of such Person, certified as of the Closing Date by such Person's corporate secretary or an assistant secretary, and in the case of any Foreign Subsidiary, the comparable or equivalent documentation, certified as of the Closing Date by a duly authorized officer;

(iii)   Resolutions of the Board of Directors of such Person approving and authorizing the execution, delivery and performance of the Loan Documents to which it is a party, certified as of the Closing Date by the corporate secretary, an assistant secretary or other duly authorized officer of such Person as being in full force and effect without modification or amendment;

(iv)    Signature and incumbency certificates of the officers of such Person executing the Loan Documents to which it is a party;

(v)     Executed originals of the Loan Documents to which such Person is a party, which Loan Documents shall include the instruments listed on Schedule 4.1A(v) (except Foreign Collateral Documents); and

(vi)    Such other documents as Agent may reasonably request.

     **C.**    **Necessary Consents.**  Company and its Subsidiaries shall have obtained all Governmental Authorizations and all consents of other Persons, in each case that are necessary or advisable in connection with the execution of this Agreement and the continued operation of the business to be conducted by Company and its Subsidiaries in substantially the same manner as conducted prior to the execution of this Agreement, and each of the foregoing shall be in full force and effect, in each case other than those the failure to obtain, which either individually or in the aggregate, would not be reasonably likely to have a Material Adverse Effect.  All applicable waiting periods shall have expired without any action being taken or threatened by any competent authority which would restrain, prevent or otherwise impose adverse conditions on the Loans or this Agreement.  No action, request for stay, petition for review or rehearing, reconsideration or appeal with respect to any of the foregoing shall be pending, and the time for any applicable agency to take action to set aside its consent on its own motion shall have expired.  Agent shall have received an Officer's Certificate of Company to the effect set forth in this subsection 4.1C.

     **D.**    **Closing Date Mortgages; Closing Date Mortgage Policies; Etc.**  To the extent requested by Agent, Agent shall have received from Company:

     (i)    Closing Date Mortgages.  Fully executed and notarized Mortgages (each a **"Closing Date Mortgage"** and, collectively, the **"Closing Date Mortgages"**), in proper form for recording in all appropriate places in all applicable jurisdictions, encumbering each Real Property Asset consisting of fee property of the Company listed in Schedule 5.5 annexed hereto (each a **"Closing Date Mortgaged Property"** and, collectively, the **"Closing Date Mortgaged Properties"**), with respect to any Mortgages existing as of the Closing Date and listed on Schedule 5.5 annexed hereto;

     (ii)    Opinions of Local Counsel.  An opinion of counsel (which counsel shall be reasonably satisfactory to Agent) in each state in which a Closing Date Mortgaged Property is located with respect to the enforceability of the form(s) of Closing Date Mortgages to be recorded in such state and such other matters as Agent may reasonably request, in each case in form and substance reasonably satisfactory to Agent;

     (iii)    Title Insurance.  (a) ALTA mortgagee title insurance policies (or (1) if an ALTA title insurance policy is not available in the applicable jurisdiction, such other form of mortgage title policy as may be customarily provided in such jurisdiction, or (2) such other form as shall be approved by Agent in its discretion) or unconditional commitments therefor (the **"Closing Date Mortgage Policies"**) issued by the Title Company with respect to the Closing Date Mortgaged Properties listed in Part A of Schedule 5.5 annexed hereto, in amounts not less than the respective amounts designated therein with respect to any particular Closing Date Mortgaged Properties, insuring fee simple title to, or a valid leasehold interest in, each such Closing Date Mortgaged Property vested in such Loan Party and assuring Agent that the applicable Closing Date Mortgages create valid and enforceable mortgage Liens on the respective Closing Date Mortgaged Properties encumbered thereby, subject only to Permitted Encumbrances, which Closing Date Mortgage Policies (1) shall include an endorsement for mechanics' liens, for future advances under this Agreement and for any other matters reasonably requested by Agent and (2) shall provide for affirmative insurance and such reinsurance

as Agent may reasonably request, all of the foregoing in form and substance reasonably satisfactory to Agent; and (b) evidence reasonably satisfactory to Agent that such Loan Party has (i) delivered to the Title Company all certificates and affidavits required by the Title Company in connection with the issuance of the Closing Date Mortgage Policies and (ii) paid to the Title Company or to the appropriate governmental authorities all expenses and premiums of the Title Company in connection with the issuance of the Closing Date Mortgage Policies and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Closing Date Mortgages in the appropriate real estate records (it being understood that Agent may waive any of the requirements of this subsection 4.1D(iii) in its discretion);

(iv)    Environmental Indemnity.    If requested by Agent, an environmental indemnity agreement, satisfactory in form and substance to Agent and its counsel, with respect to the indemnification of Agent and Lenders for any liabilities that may be imposed on or incurred by any of them as a result of any Hazardous Materials Activity.

**E.    Security Interests in Personal and Mixed Property.** To the extent not otherwise satisfied pursuant to subsection 4.1D, Agent shall have received evidence satisfactory to it that Holdings and Company shall have taken or caused to be taken all such actions, executed and delivered or caused to be executed and delivered all such agreements, documents and instruments, and made or caused to be made all such filings and recordings (other than the filing or recording of items described in clauses (iii), (iv) and (v) below) that may be necessary or, in the opinion of Agent, desirable in order to (x) create in favor of Agent, for the benefit of Tranche 1A Lenders, Tranche 1B Lenders and Cash Management Lenders, *pari passu* valid and (upon such filing and recording) perfected First Priority security interests in the entire personal and mixed property Collateral of such Persons, and (y) create and/or continue in favor of Agent, for the benefit of Tranche 2 Lenders, Tranche 3 Lenders and Currency Exchangers, *pari passu* valid and (upon such filing and recording) perfected Second Priority security interests in the entire personal and mixed property Collateral. Such actions shall include the following:

(i)    Schedules to Collateral Documents.    Delivery to Agent of fully executed DIP Collateral Documents with accurate and complete schedules attached;

(ii)    Stock Certificates and Instruments.    Delivery to Agent of (a) certificates (which certificates shall be accompanied by irrevocable undated stock powers, duly endorsed in blank and otherwise satisfactory in form and substance to Agent) representing all capital stock pledged pursuant to the Security Agreements and (b) all promissory notes or other instruments (duly endorsed, where appropriate, in a manner satisfactory to Agent) evidencing any Collateral;

(iii)    Lien Searches and UCC Termination Statements.    Delivery to Agent of (a) the results of a recent search, by a Person satisfactory to Agent, of all effective UCC financing statements and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of the Company and Holdings, together with copies of all such filings disclosed by such search, and (b) UCC termination statements duly executed by all applicable Persons for filing in all applicable jurisdictions as may be necessary to terminate any effective UCC financing statements or fixture

filings disclosed in such search (other than any such financing statements or fixture filings in respect of Liens permitted to remain outstanding pursuant to the terms of this Agreement);

(iii)   UCC Financing Statements, Fixture Filings.   Delivery to Agent of UCC financing statements and, where appropriate, fixture filings, in each case duly executed by each of the Company and Holdings with respect to all personal and mixed property Collateral of such Loan Party, for filing in all jurisdictions as may be necessary or, in the opinion of Agent, desirable to perfect or maintain the perfection of the security interests created in such Collateral pursuant to the Collateral Documents;

(iv)   PTO Cover Sheets, Etc.   Delivery to Agent of all cover sheets or other documents or instruments required to be filed with the United States Patent and Trademark Office in order to create and/or continue or perfect and/or maintain perfected Liens in respect of any intellectual property Collateral of the Company and Holdings; and

F.   **Orders; Related Consents.**

(i)   The Interim Borrowing Order shall have been entered by the Court and shall be unstayed by the Court, and such Interim Borrowing Order shall provide, among other things, that Agent may pursue its remedies upon the occurrence of an Event of Default under Section 8 of this Agreement.

(ii)   An order of the Court shall have been entered by the Court approving the Cash Collateral and Adequate Protection Stipulation after an interim hearing pursuant to Bankruptcy Rule 4001(c)(2) and such order shall be unstayed.

(iii)   All First Day Orders entered by the Court shall be in form and substance satisfactory to Agent.   Modifications to the First Day Orders require the approval of Requisite Lenders.

G.   **Pleadings.**   No pleading or application shall have been filed in the Court by any party in interest which is not withdrawn, dismissed or denied within 15 days after filing seeking (i) to dismiss or convert any of the Chapter 11 Cases to a Chapter 7 Case, (ii) the appointment of a Chapter 11 trustee in any of the Chapter 11 Cases, (iii) the appointment of an examiner having enlarged powers relating to the operation of the business of Borrowers (beyond those set forth under Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, (iv) the granting of a super-priority claim or a Lien *pari passu* or senior to that of Agent granted pursuant to the DIP Collateral Documents, the Interim Borrowing Order and the Final Borrowing Order, (v) to stay, reverse, vacate, or otherwise modify the Interim Borrowing Order or the Final Borrowing Order without the prior written consent of Agent and Lenders, or (vi) relief from the automatic stay (or any other injunction having similar effect) so as to allow a third party to proceed against any material property or assets of Borrowers.

H.   **Evidence of Insurance.**   Agent shall have received a certificate from Company's insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to subsection 6.4 is in full force and effect and that Agent, on behalf of

Lenders, has been named as additional insured and/or loss payee thereunder to the extent required under subsection 6.4.

**I.     Lock Up and Plan of Reorganization.** The Prepetition Lender Lock Up Agreement shall be fully executed and effective and the Plan of Reorganization shall have been filed with the Court. The Subdebt Lock Up Agreement shall be executed by Holdings Sub Noteholders in sufficient number and representing a sufficient percentage of the Holdings Subordinated Notes to confirm the Plan of Reorganization. The Consent and Waiver shall be executed by Prepetition Lenders in sufficient number to effectuate the terms thereof.

**J.     [Intentionally Omitted.]**

**K.     [Intentionally Omitted.]**

**L.     Opinions of Borrowers' Counsel.** Lenders shall have received originally executed copies of one or more favorable opinions of Skadden, Arps, Slate, Meagher & Flom (Illinois), counsel to Borrowers, in form and substance satisfactory to Agent and its counsel, dated as of the Closing Date and setting forth substantially the matters in the opinions designated in Exhibit VIII annexed hereto and such other matters as Agent, acting on behalf of Lenders, may reasonably request.

**M.     Expenses and Fees.** Company shall have paid to Agent, for distribution (as appropriate) to Agent and Lenders, the reasonable fees payable on the Closing Date referred to in subsection 2.3. Company shall have paid to Agent all of the Agent's reasonable costs and expenses incurred in connection with the consummation of the transactions contemplated hereby, including, without limitation, all reasonable travel-related costs, collateral review and monitoring costs, all of the reasonable fees, costs and expenses of all of Agent's experts, consultants, auditors, appraisers, counsel and other advisors, including without limitation the reasonable fees and expenses of O'Melveny & Myers LLP, Kaye Scholer LLP and of local and foreign counsel to Agent.

**N.     Representations and Warranties; Performance of Agreements.** Each Borrower shall have delivered to Agent an Officers' Certificate, in form and substance satisfactory to Agent, to the effect that the representations and warranties in Section 5 hereof are true, correct and complete in all material respects on and as of the Closing Date to the same extent as though made on and as of that date (or, to the extent such representations and warranties specifically relate to an earlier date, that such representations and warranties were true, correct and complete in all material respects on and as of such earlier date) and that such Borrower shall have performed in all material respects all agreements and satisfied all conditions which this Agreement provides shall be performed or satisfied by it on or before the Closing Date except as otherwise disclosed to and agreed to in writing by Agent with the approval of Requisite Lenders.

**O.     Completion of Proceedings.** All corporate and other proceedings taken or to be taken in connection with the transactions contemplated hereby and all documents incidental thereto not previously found acceptable by Agent, acting on behalf of Lenders, and its counsel shall be satisfactory in form and substance to Agent and such counsel, and Agent and

such counsel shall have received all such counterpart originals or certified copies of such documents as Agent may reasonably request.

       **P.**    **Lender Approval and Consent**. Each Lender hereby agrees that by its execution and delivery of its signature pages thereto and by the funding of its loans to be made on the Closing Date, such Lender approves of and consents to each of the matters set forth in this subsection 4.1 which must be approved by, or which must be satisfactory to, all or Requisite Lenders; provided that in the case of any agreement or document which must be approved by, or which must be satisfactory to, all or Requisite Lenders, Agent or Company shall have delivered a copy of such agreement or document in substantially the form in which executed or delivered to such Lender on or prior to the Closing Date.

**4.2**    **Conditions to All Loans.**

       The obligations of Lenders to make Loans on each Funding Date are subject to the following further conditions precedent:

       **A.**    [Initial funding mechanics to be discussed.]  Agent shall have received before the Wednesday immediately preceding that Funding Date, (i) in accordance with the provisions of subsection 2.1B, an originally executed Notice of Borrowing and Weekly Report, in each case signed by the chief financial officer or chief executive officer of Company, and (ii) a certificate executed by the chief financial officer or chief executive officer of Company certifying to Agent that, neither such person is aware of any information contained in the Notice of Borrowing, Approved Budget, Current Forecast or Weekly Report which is false or misleading in any material respect or of any omission of information which causes any of such documents to be false or misleading in any material respect and that the proceeds of the Loans requested on such Funding Date shall be applied in a manner consistent with, and for the purposes identified in, the Approved Budget and Current Forecast.

       **B.**    As of that Funding Date:

       (i)    The representations and warranties contained herein and in the other Loan Documents shall be true, correct and complete in all material respects on and as of that Funding Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true, correct and complete in all material respects on and as of such earlier date;

       (ii)    No event shall have occurred and be continuing or would result from the consummation of the borrowing contemplated by such Notice of Borrowing that would constitute an Event of Default or a Potential Event of Default;

       (iii)    Borrower shall have performed in all material respects all agreements and satisfied all conditions which this Agreement provides shall be performed or satisfied by it on or before that Funding Date, including, without limitation, its obligation to make information available at the Lenders' request pursuant to subsection 6.1(xx);

(iv)    No order, judgment or decree of any court (including, without limitation, the Court), arbitrator or governmental authority shall purport to enjoin or restrain any Lender from making the Loans to be made by it on that Funding Date;

(v)    The Interim Borrowing Order and/or the Final Borrowing Order, as applicable, shall be unstayed;

(vi)    The making of the Loans requested on such Funding Date shall not violate any law including, without limitation, Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other comparable or similar law of any Governmental Authority; and

(vii)    There shall not be pending or, to the knowledge of Borrower, threatened, any action, suit, proceeding, governmental investigation or arbitration against or affecting Company or any of its Subsidiaries or any property of Company or any of its Subsidiaries that has not been disclosed by any Borrower in writing pursuant to subsection 5.6 or 6.1(x) prior to the making of the last preceding Loans (or, in the case of the initial Loans, prior to the execution of this Agreement), and there shall have occurred no development not so disclosed in any such action, suit, proceeding, governmental investigation or arbitration so disclosed, that, in either event, in the opinion of Agent or of Requisite Lenders, would be expected to have a Material Adverse Effect; and no injunction or other restraining order shall have been issued and no hearing to cause an injunction or other restraining order to be issued shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by this Agreement or the making of Loans hereunder.

**4.3    Conditions to Letters of Credit.**

The issuance of any Letter of Credit hereunder (whether or not the Issuing Lender is obligated to issue such Letter of Credit) is subject to the following conditions precedent:

**A.**    On or before the date of issuance of the initial Letter of Credit pursuant to this Agreement, the initial Loans shall have been made.

**B.**    On or before the date of issuance of such Letter of Credit, Agent shall have received, (i) in accordance with the provisions of subsection 3.1B(i), an originally executed Request for Issuance of Letter of Credit, in each case signed by the chief financial officer or chief executive officer of Company, together with all other information specified in subsection 3.1B(i) and such other documents or information as the Issuing Lender may reasonably require in connection with the issuance of such Letter of Credit, (ii) a certificate executed by the chief financial officer or chief executive officer of Company certifying to Agent that, such officer is not aware of any information contained in the Approved Budget, Current Forecast or most recent Weekly Report which is false or misleading in any material respect or of any omission of information which causes such Approved Budget to be false or misleading in any material respect and that the Letters of Credit requested on such issuance date shall be used in a manner consistent with, and for the purposes identified in, the Approved Budget and Current Forecast.

**C.** On the date of issuance of such Letter of Credit, (x) with respect to Company, all conditions precedent described in subsection 4.2B shall be satisfied to the same extent as if the issuance of such Letter of Credit were the making of a Loan and the date of issuance of such Letter of Credit were a Funding Date, and (y) with respect to Goss UK, Goss France and Goss Japan, as the case may be, all conditions precedent described in subsections 4.2B and 4.4 shall be satisfied to the same extent as if the issuance of such Letter of Credit were the making of a Loan and the date of issuance of such Letter of Credit were a Funding Date.

**4.4    Conditions to Foreign Bridge Loans.**

The obligations of Lenders to purchase or make any Foreign Bridge Loans under the Foreign Bridge Facility on the applicable Foreign Bridge Facility Availability Date are, in addition to the conditions precedent specified in subsections 4.1 and 4.2, subject to prior or concurrent satisfaction of the following conditions:

**A.    Borrower Documents.** On or before the applicable Foreign Bridge Facility Availability Date, each of Goss UK, Goss France and Goss Japan shall deliver or cause to be delivered to Lenders (or to Agent for Lenders with sufficient originally executed copies, where appropriate, for each Lender and its counsel) the following, each, unless otherwise noted, dated the applicable Foreign Bridge Facility Availability Date:

(i) Certified copies of its Certificate or Articles of Incorporation, together with a good standing certificate from the appropriate Governmental Authority jurisdiction of incorporation and each other jurisdiction in which it is qualified as a foreign corporation to do business and, to the extent generally available, a certificate or other evidence of good standing as to payment of any applicable franchise or similar taxes from the appropriate taxing authority of each of such jurisdictions, or in each case the comparable or equivalent documentation under the laws of the applicable Governmental Authority, each dated a recent date prior to the applicable Foreign Bridge Facility Availability Date;

(ii) Copies of its Bylaws or the comparable or equivalent documentation, certified as of the applicable Foreign Bridge Facility Availability Date by a duly authorized officer;

(iii) Resolutions of its Board of Directors (or comparable body) approving and authorizing the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party, certified as of the applicable Foreign Bridge Facility Availability Date by its corporate secretary, an assistant secretary or other duly authorized officer as being in full force and effect without modification or amendment;

(iv) Signature and incumbency certificates of its officers executing this Agreement and the other Loan Documents to which it is a party;

(v) An Officers' Certificate from each Borrower as to authorized signatories of that Borrower for Notices of Borrowing, Notices of Conversion/Continuation, Requests of Issuance of Letters of Credit and Notices of Allocation;

(vi)    Executed and acknowledged (where applicable) originals of the Notes (duly executed by Goss UK, Goss France and Goss Japan, as the case may be, in accordance with subsection 2.1E, drawn to the order of each applicable Lender and with appropriate insertions), the Subsidiary Guaranties (duly executed by Goss France and Goss Japan, as the case may be, with appropriate insertions, but excluding Goss UK, it being understood and agreed that Goss UK will not execute a Subsidiary Guaranty) and the other Loan Documents to which Goss UK, Goss France or Goss Japan is a party, which Loan Documents shall include any Foreign Collateral Documents required to be delivered on or before the applicable Foreign Bridge Facility Availability Date pursuant to subsection 4.4B; and

(vii)   Such other documents as Agent may reasonably request.

To the extent that the undertaking by a Foreign Subsidiary to guaranty the obligations of other Borrowers pursuant to item (vi), above, such Foreign Subsidiary shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all obligations under such Guaranty.

**B.    Foreign Security Documents.**  No later than thirty (30) days after the Closing Date, Agent shall have received evidence satisfactory to it that Goss UK, Goss France and Goss Japan, as the case may be, shall have (i) taken or caused to be taken such actions, (ii) executed and delivered or caused to be executed and delivered all such agreements, amendments, documents and instruments and, if requested by Agent, legal opinions (in each case, in form and substance satisfactory to Agent and its counsel), and (iii) made or caused to be made all such filings and recordings, in each case of clauses (i), (ii) and (iii) that may be necessary or, in the opinion of Agent, desirable to, maintain and continue in favor of Agent, for the benefit of Lenders, a valid and perfected first priority security interest as of such date in the entire real, personal and mixed property Collateral of Goss UK, Goss France and Goss Japan, as the case may be, and Agent shall have received executed copies of all such agreements, amendments, documents and instruments and, if requested by Agent, legal opinions, and such other documents and instruments as may be requested by Agent.  Without limiting the foregoing, the instruments to be delivered pursuant to this subsection 4.4B are listed on Schedule 4.4B hereto.  (The Lenders hereby grant Agent the specific discretion to waive any of the foregoing requirements of this Section 4.2B.)

## Section 5.    BORROWERS' REPRESENTATIONS AND WARRANTIES

In order to induce Lenders to enter into this Agreement and to make the Loans, to induce Issuing Lenders to issue Letters of Credit and to induce other Lenders to purchase participations therein, each Borrower represents and warrants, (in the case of Foreign Borrower, with respect only to itself,) to each Lender, on the date of this Agreement, on each Funding Date and on the date of issuance of each Letter of Credit, that the following statements are true, correct and complete:

**5.1    Organization, Powers, Qualification, Good Standing, Business and Subsidiaries.**

      **A.    Organization and Powers**.  Each Loan Party is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation.  Subject to compliance with any applicable provisions of the Bankruptcy Code, each Loan Party has all requisite corporate power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby and, to issue and pay the Notes.  Each Borrower is in compliance with its organizational, formation and governing documents and all applicable orders of the Court.

      **B.    Qualification and Good Standing**.  Each Loan Party is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, except in jurisdictions, individually or in the aggregate for all such jurisdictions, where the failure to be so qualified or in good standing has not had and will not have a Material Adverse Effect.

      **C.    Conduct of Business**.  Company and its Subsidiaries are engaged only in the businesses permitted to be engaged in pursuant to subsection 7.12.

      **D.    Subsidiaries**.  All of the Subsidiaries of Holdings are identified in Schedule 5.1 annexed hereto.  The capital stock of each of the Subsidiaries of Holdings identified in Schedule 5.1 annexed hereto is duly authorized, validly issued, fully paid and nonassessable and none of such capital stock constitutes Margin Stock.  Each of the Subsidiaries of Holdings identified in Schedule 5.1 annexed hereto is a corporation duly organized, validly existing and in good standing under the laws of its respective jurisdiction of incorporation set forth therein, has all requisite corporate power and authority to own and operate its properties and to carry on its business as now conducted and as proposed to be conducted, and is qualified to do business and in good standing in every jurisdiction where its assets are located and wherever necessary to carry out its business and operations, in each case except where failure to be so qualified or in good standing or a lack of such corporate power and authority, individually or in the aggregate, has not had and will not have a Material Adverse Effect.  Schedule 5.1 annexed hereto correctly sets forth the ownership interest of Holdings and each of its Subsidiaries in each of the Subsidiaries of Holdings identified therein.

**5.2    Authorization of Borrowing, etc.**

      **A.    Authorization of Borrowing**.  The execution, delivery and performance of the Loan Documents and the issuance, delivery and payment of the Notes (i) have been duly authorized by all necessary corporate action on the part of each Loan Party that is a party thereto and (ii) have been or by the Closing Date will be duly authorized by the Court.

      **B.    No Conflict**.  The execution, delivery and performance by any Loan Party of the Loan Documents to which it is a party and the consummation of the transactions contemplated by the Loan Documents, and the issuance, delivery and payment of the Notes, do not and will not (i) subject to Court approval, violate any provision of any law or any governmental rule or regulation applicable to any Loan Party, the Certificate or Articles of

Incorporation or Bylaws, or other organizational, formation or governing documents, of any Loan Party or any order, judgment or decree of any court or other Governmental Authority (including, without limitation, the Court) binding on any Loan Party, (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under (x) any Contractual Obligation of any Loan Party (performance or enforceability of which has not been excused by the Bankruptcy Code or an applicable order of the Court), except for such breaches, conflicts and defaults which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (y) any applicable order of the Court, (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Loan Party (other than any Liens created under any of the Loan Documents in favor of Agent on behalf of Lenders), or (iv) require any approval of stockholders or any approval or consent of any Person under any Contractual Obligation of any Loan Party (performance or enforceability of which has not been waived or excused by the Bankruptcy Code or an applicable order of the Court), except for (a) such approvals or consents or any applicable order of the Court which will be obtained on or before the Closing Date and disclosed on Schedule 5.2 annexed hereto or (b) such approvals or consents, the failure to obtain which, could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

C.     **Governmental Consents**.  Except as set forth on Schedule 5.2 annexed hereto, the execution, delivery and performance by any Loan Party of the Loan Documents and the consummation of the transactions contemplated by the Loan Documents do not and will not require any registration with, consent or approval of, or notice to, or other action to, with or by, any federal, state or other governmental authority or regulatory body, except for filings that may be made in connection with the perfection of security interests granted pursuant to the Loan Documents, and such other registrations, consents, approvals, notices or other actions which have been or will be made, obtained, given or taken on or before the Closing Date or which the failure to obtain or take could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

D.     **Binding Obligation**.  Upon Court approval, each of the Loan Documents will be duly executed and delivered by each Loan Party that is a party thereto and will be the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

E.     **Valid Issuance of Common Stock.**  The issued and outstanding shares of Company Common Stock and Holdings Common Stock are validly issued.  No stockholder of Company nor any stockholder of Holdings has any preemptive rights to subscribe to additional Securities issued by Company or Holdings.  Any issuance and sale of such Company Common Stock or Holdings Common Stock upon such issuance and sale, will either (a) have been registered or qualified under applicable federal and state securities laws or (b) be exempt therefrom.

F.     **Restrictions on Transfer**.  There are no restrictions on any Borrower or any of its Subsidiaries which prohibit or otherwise restrict the transfer of cash or other assets from one to another, other than prohibitions or restrictions existing under or by reason of (i) this

Agreement and the other Loan Documents, (ii) applicable law (including the Bankruptcy Code and any applicable orders of the Court), (iii) customary non-assignment provisions entered into in the ordinary course of business and consistent with past practices, and (iv) any documents or instruments governing the terms of any Indebtedness or other obligations secured by Liens permitted by subsection 7.2 (each of which document or instrument is set forth on, and each of which document and instrument is described on, Schedule 5.2 annexed hereto); provided that (x) such prohibitions or restrictions apply only to the assets subject to such Liens, and (y) the prohibitions or restrictions set forth in clauses (iii) or (iv) only apply to the extent enforceable under the Bankruptcy Code and the applicable orders of the Court.

> **G.    Prepetition Debt.**  Prepetition Debt (and all amounts owing in respect thereof) of Debtor Entities as of the Petition Date is set forth on the Debtors' Schedule of Assets and Liabilities filed with the Court, as they may be amended in accordance with the Bankruptcy Rules.

> **H.    Chapter 11 Cases.**  The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof and of the hearing for the approval of the Final Borrowing Order has been given as identified in the Certificate of Service filed with the Court.

## 5.3    Financial Condition.

All financial statements (other than projected financial statements) heretofore delivered to Lenders were prepared in conformity with GAAP and fairly present the financial position (on a consolidated and, where applicable, consolidating basis) of the entities described in such financial statements as at the respective dates thereof and the results of operations and cash flows (on a consolidated and, where applicable, consolidating basis) of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments. None of the Loan Parties has any Contingent Obligation, contingent liability or liability for taxes, long-term lease or unusual forward or long-term commitment that is not reflected in the foregoing financial statements or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of Company and its Subsidiaries, taken as a whole.

## 5.4    No Material Adverse Change; No Restricted Junior Payments.

Since June 30, 2001, no event or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, other than the commencement of the Chapter 11 Cases and the occurrence of the events described in Schedule 5.4 annexed hereto.  Neither Holdings nor any Borrower, nor any of their respective Subsidiaries has directly or indirectly declared, ordered, paid or made, or set apart any sum or property for, any payment prohibited under subsection 7.5 of the Existing Credit Agreement, any Restricted Junior Payment (as that term is defined in the Existing Credit Agreement), or any other payment, disbursement, dividend or distribution prohibited by the Existing Credit Agreement.

## 5.5   Title to Properties; Liens.

**A.   Title to Properties; Liens.** Holdings, Company and their respective Subsidiaries have (i) good and marketable title to the Fee Properties set forth on Schedule 5.5 hereto, and (ii) valid leasehold interests in the leases set forth on Schedule 5.5 in each case free and clear of Liens other than Permitted Encumbrances, Holdings, Company and their respective Subsidiaries have, or (iii) good title to (in the case of all other personal property), all of their respective properties and assets reflected in the financial statements referred to in subsection 5.3 or in the most recent financial statements delivered pursuant to subsection 6.1, in each case except for assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under subsection 7.2. Except as permitted by this Agreement, all such properties and assets are free and clear of Liens.

**B.   Real Property.** As of the Closing Date, Schedule 5.5 annexed hereto contains a true, accurate and complete list of (i) all Fee Properties and (ii) all leases and subleases (together with all amendments, modifications, supplements, renewals or extensions of any thereof) affecting each Real Property Asset of any Loan Party, regardless of whether such Loan Party is the landlord or tenant (whether directly or as an assignee or successor in interest) under such lease or sublease. Except as specified in Schedule 5.5 annexed hereto, each agreement listed in clause (ii) of the immediately preceding sentence is in full force and effect and Company does not have knowledge of any default that has occurred and is continuing thereunder, and each such agreement constitutes the legally valid and binding obligation of each applicable Loan Party, enforceable against such Loan Party in accordance with its terms, except as enforcement may be limited in connection with the Chapter 11 cases.

## 5.6   Litigation; Adverse Facts.

Except as set forth in Schedule 5.6 annexed hereto or, with respect to Environmental Claims, as set forth on Schedule 5.13 annexed hereto, there are no actions, suits, proceedings, arbitrations or governmental investigations (whether or not purportedly on behalf of Holdings, Company or any of their respective Subsidiaries) at law or in equity or before or by any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, pending or, to the knowledge of any Borrower, threatened against or affecting Holdings, Company or any of their respective Subsidiaries or any property of Holdings, Company or any of their respective Subsidiaries that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. Neither Holdings nor Company nor any of their respective Subsidiaries is (i) in violation of any applicable laws (excluding Environmental Laws which are covered in subsection 5.13) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect or (ii) subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**5.7    Payment of Taxes.**

Except to the extent permitted by subsection 6.3 and to the extent payment has been excused by the Bankruptcy Code or an applicable order of the Court, all material Tax returns and reports of Holdings, Company and their respective Subsidiaries required to be filed by any of them have been timely filed or extensions with respect to filing have been properly obtained, and all material taxes, assessments, fees and other governmental charges upon Holdings, Company and their respective Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable.   None of the Borrowers knows of any material proposed Tax assessment against Holdings, Company or any of their respective Subsidiaries which is not being actively contested by Holdings, Company or such Subsidiary in good faith and by appropriate proceedings; provided that such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

**5.8    Performance of Agreements; No Materially Adverse Agreements.**

**A.**    Except as excused by the Bankruptcy Code or applicable order of the Court, neither Holdings nor Company nor any of their respective Subsidiaries is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations, and no condition exists that, with the giving of notice or the lapse of time or both, would constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**B.**    Neither Holdings nor Company nor any of their respective Subsidiaries is a party to or is otherwise subject to any agreements or instruments or any charter or other internal restrictions which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**C.**    The Contractual Obligations of each of Holdings and Company and their respective Subsidiaries are in full force and effect and no defaults, except as excused by the Bankruptcy Code or applicable order of the Court, that could reasonably be expected to result in a Material Adverse Effect currently exist thereunder.

**5.9    Governmental Regulation.**

Neither Holdings nor Company nor any of their respective Subsidiaries is subject to regulation under the Public Utility Holding Company Act of 1935, the Federal Power Act, the Interstate Commerce Act or the Investment Company Act of 1940 or under any other federal or state statute or regulation (other than the Bankruptcy Code) or under any other comparable or similar laws of any Governmental Authority which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.

## 5.10    Securities Activities.

Neither Holdings nor Company nor any of their respective Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

## 5.11    Employee Benefit Plans.

**A.**    Holdings and Company and each of their respective Subsidiaries are in compliance in all material respects with all applicable provisions and requirements of ERISA and the regulations and published interpretations thereunder and the terms of each Employee Benefit Plan, and have performed all their material obligations under each Employee Benefit Plan.

**B.**    No ERISA Event has occurred or is reasonably expected to occur that could reasonably be expected to result in an aggregate liability to the Company or any of its Subsidiaries of more than $1,000,000.

**C.**    In accordance with the most recent actuarial valuation for any Pension Plan, the excess of the aggregated accumulated benefit obligations, as defined in Statement of Financial Accounting Standards No. 87, over the aggregate total fair market value for all such Pension Plans (excluding for purposes of such computation (1) any Pension Plans with respect to which the fair market value of the assets exceeds such accumulated benefit obligations and (2) any Foreign Unfunded Pension Plan), does not exceed $12,000,000.

## 5.12    Certain Fees.

No broker's or finder's fee or commission will be payable with respect to this Agreement or any of the transactions contemplated hereby, and each Borrower hereby indemnifies Lenders against, and agrees that it will hold Lenders harmless from, any claim, demand or liability for any such broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any expenses (including reasonable fees, expenses and disbursements of counsel) arising in connection with any such claim, demand or liability.

## 5.13    Environmental Protection.

Except as set forth in Schedule 5.13 annexed hereto:

(i)    the operations of Company and each of its Subsidiaries (including, without limitation, all operations and conditions at or in the Facilities) comply in all material respects with all Environmental Laws;

(ii)    Company and each of its Subsidiaries have obtained all Governmental Authorizations under Environmental Laws necessary to their respective operations, and all such Governmental Authorizations are being maintained in good standing, and Company and each of its Subsidiaries are in compliance in all material respects with such Governmental Authorizations;

(iii)   neither Company nor any of its Subsidiaries has received (a) any notice or claim to the effect that it is or may be liable to any Person as a result of or in connection with any Hazardous Materials or (b) any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or comparable state laws, and, to the best of the Borrowers' knowledge, none of the operations of Company or any of its Subsidiaries is the subject of any federal or state investigation relating to or in connection with any Hazardous Materials at any Facility or at any other location except for such of the foregoing which would not reasonably be expected to have a Material Adverse Effect;

(iv)   none of the operations of Company or any of its Subsidiaries is subject to any judicial or administrative proceeding alleging the violation of or liability under any Environmental Laws which if adversely determined could reasonably be expected to have a Material Adverse Effect;

(v)   neither Company nor any of its Subsidiaries nor any of their respective Facilities or operations are subject to any outstanding written order, consent, decree or settlement agreement with any Person relating to (a) any Environmental Laws, (b) any Environmental Claims or (c) any Hazardous Materials Activity, except for such of the foregoing which would not reasonably be expected to have a Material Adverse Effect;

(vi)   neither Company nor any of its Subsidiaries has any contingent liability in connection with any Release by Company or any of its Subsidiaries except for such of the foregoing which would not reasonably be expected to have a Material Adverse Effect;

(vii)   neither Company nor any of its Subsidiaries nor, to the best knowledge of the Borrowers, any predecessor of Company or any of its Subsidiaries has filed any notice under any Environmental Laws indicating past or present treatment of Hazardous Materials at any Facility and none of Company's or any of its subsidiaries operations involves the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Parts 260-270 or any state equivalent;

(viii)   there are and, to Company's knowledge, have been no conditions, occurrences or Hazardous Materials Activities which could reasonably be expected to form the basis of an Environmental Claim against Company or any of its Subsidiaries that individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect;

(ix)   neither Company nor any of its Subsidiaries nor, to the best knowledge of Company, any of their respective predecessors has disposed of any Hazardous Materials in a manner that would reasonably be expected to give rise to an Environmental Claim having a Material Adverse Effect;

(x)   to the best knowledge of Company, no underground storage tanks or surface impoundments are on or at any Facility;

(xi)    no Lien in favor of any Person relating to or in connection with any Environmental Claim has been filed or has been attached to any Facility except for any such Lien which would not reasonably be expected to have a Material Adverse Effect.

Notwithstanding anything in this subsection 5.13 to the contrary, no event or condition has occurred or is occurring with respect to Company or any of its Subsidiaries relating to any Environmental Law, any Release of any Hazardous Materials at any Facility or any other location, or any Hazardous Materials Activity including without limitation any matter disclosed in Schedule 5.13 annexed hereto which, individually or in the aggregate, has had or could reasonably be expected to have, a Material Adverse Effect.

## 5.14    Employee Matters.

There is no strike or work stoppage in existence or threatened involving Company or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect.

## 5.15    Solvency.

With respect to Goss France: (a) Goss France has not ceased or suspended or threatened or announced an intention to cease or suspend payment of its debts whether pursuant to Article 3 of law No. 85-98 dated 25 January, 1985 or otherwise; (b) Goss France has not become insolvent or had any moratorium declared in respect of any of its indebtedness; (c) Goss France has not applied for the appointment of a conciliator pursuant to law No. 84-148 dated 1 March, 1984; (d) Goss France has not applied for the appointment of a *mandataire* ad hoc; (e) Goss France is not the object of a judgment declaring its *redressement* or *liquidation judiciaire* pursuant to law No. 85-98 dated 25 January 1985 or subject to a plan for the transfer of the whole or part of its business; and (f) no administrator, receiver, liquidator or similar officer has been appointed with respect to Goss France or its assets nor so far as is aware is any petition or proceeding for any such appointment pending nor has any resolution for any such appointment been passed.

## 5.16    Matters Relating to Collateral.

A.    **Creation, Continuation, Perfection and Priority of Liens.**    The execution and delivery of the Collateral Documents by Loan Parties, together with (i) the actions taken on or prior to the date hereof pursuant to subsections 4.1D, 4.1E, 6.8 and 6.9 and (ii) the delivery to Agent of any Pledged Collateral not delivered to Agent at the time of execution and delivery of the applicable Collateral Document (all of which Pledged Collateral has been so delivered) are effective to create and/or continue in favor of Agent for the benefit of Lenders, as security for the respective Secured Obligations (as defined in the applicable Collateral Document in respect of any Collateral), valid and perfected First Priority Liens and Second Priority Liens (as appropriate) on all of the Collateral, and all filings and other actions necessary or desirable to perfect and maintain the perfection and first senior status of such Liens, have been duly made or taken and remain in full force and effect, other than the filing of any UCC financing statements delivered to Agent for filing (but not yet filed) and the periodic filing of UCC continuation statements in respect of UCC financing statements filed by or on behalf of Agent.

**B.     Governmental Authorizations.**   Other than Court approval, no authorization, approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for either (i) the pledge or grant by any Loan Party of the Liens purported to be created in favor of Agent pursuant to any of the Collateral Documents or (ii) the exercise by Agent of any rights or remedies in respect of any Collateral (whether specifically granted or created pursuant to any of the Collateral Documents or created or provided for by applicable law), except for filings or recordings contemplated by subsection 5.16A and except as may be required, in connection with the disposition of any Pledged Collateral, by laws generally affecting the offering and sale of securities.

**C.     Absence of Third-Party Filings.**   Except (i) such as may have been filed in favor of Agent as contemplated by subsection 5.16A, (ii) filings in favor of the Prepetition Lenders or (iii) as otherwise permitted under this Agreement and the other Loan Documents, (i) no effective UCC financing statement, fixture filing or other instrument similar in effect covering all or any part of the Collateral is on file in any filing or recording office and (ii) no effective filing covering all or any part of the intellectual property Collateral is on file in the United States Patent and Trademark Officer.

**D.     Margin Regulations.**   The pledge of the Pledged Collateral pursuant to the Collateral Documents does not violate Regulation T, U or X of the Board of Governors of the Federal Reserve System.

**E.     Information Regarding Collateral**.   All information supplied to Agent by or on behalf of any Loan Party with respect to any of the Collateral (in each case taken as a whole with respect to any particular Collateral) is accurate and complete in all material respects.

## 5.17   Disclosure.

No representation or warranty of Company or any of its Subsidiaries contained in any Loan Document or in any other document, certificate or written statement furnished to Lenders by or on behalf of Company or any of its Subsidiaries for use in connection with the transactions contemplated by this Agreement contains any untrue statement of a material fact or omits to state a material fact (known to any Borrower, in the case of any document not furnished by it) necessary in order to make the statements contained herein or therein not misleading in any material respect in light of the circumstances in which the same were made.  Any projections and pro forma financial information contained in such materials are based upon good faith estimates and assumptions believed by the Borrowers to be reasonable at the time made, it being recognized by Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results.  There are no facts known (or which should upon the reasonable exercise of diligence be known) to the Borrowers (other than matters of a general economic nature) that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to Lenders for use in connection with the transactions contemplated hereby.

## 5.18   Inventory and Accounts.

Except as disclosed to Agent in writing, with respect to all Inventory and Accounts:

(i)   Agent may rely upon all statements, warranties, or representations made in any written report regarding Inventory and Accounts delivered hereunder by Borrowers;

(ii)   No Inventory or Account is subject to any Lien whatsoever, except for Liens of Lenders under the Collateral Documents and other Liens permitted hereunder;

(iii)   No such Inventory has been consigned to any Person;

(iv)   All Inventory located in the United States of America has been produced in accordance with all applicable requirements of the Federal Fair Labor Standards Act of 1938, as amended and all rules, regulations and orders related thereto;

(v)   All Inventory has been and shall be used in Borrowers' business and not for personal, family, household or farming use;

(vi)   Each Account represents a valid and legally enforceable indebtedness based upon an actual and bona fide sale and delivery of goods or rendition of services in the ordinary course of Borrowers' business which has been finally accepted by the account debtor and for which the account debtor is unconditionally liable to make payment of the amount stated in each invoice, document or instrument evidencing the Account in accordance with the terms thereof, without offset, defense or counterclaim and will be paid in full at maturity;

(vii)   All statements made and all unpaid balances appearing in the invoices, documents and instruments evidencing each Account are true and correct in all material respects and are in all material respects what they purport to be and, to the best of Borrowers' knowledge, all signatures and endorsements that appear thereon are genuine and all signatories and endorsers have full capacity to contract and each account debtor is solvent and financially able to pay in full the Account when it matures;

(viii)   None of the transactions underlying or giving rise to any Account violate any state or federal laws or regulations, and all documents relating to the Accounts are legally sufficient under such laws or regulations and are legally enforceable in accordance with their terms and all recording, filing and other requirements of giving public notice under any applicable law have been duly complied with; and

(ix)   All sales, excise and similar taxes relating to Accounts of Borrowers have been paid when due.

## 5.19   Orders.

On the date of the making of the initial Loans hereunder, the Interim Borrowing Order (or, if there is no Interim Borrowing Order, the Final Borrowing Order) will have been

entered and shall be unstayed. On the date of the making of any Loan, the Interim Borrowing Order or the Final Borrowing Order, as the case may be, shall be unstayed. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations of the Borrowers hereunder and under the other Loan Documents, Lenders shall be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Court subject to the notice procedures set forth in the second to the last paragraph of Section 8.

**5.20    Goss Realty.** Goss Realty is not engaged in business activities of any kind, has no employees, owns no assets, and has no Investments, Indebtedness, Contractual Obligations, or Contingent Obligations.

## Section 6.    LOAN PARTIES' AFFIRMATIVE COVENANTS

Each Loan Party covenants and agrees, with respect to itself, that, so long as any of the Commitments hereunder shall remain in effect and until payment in full of all of the Loans and other Obligations and the cancellation or expiration of all Letters of Credit, unless Requisite Lenders shall otherwise give prior written consent, such Loan Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

**6.1    Financial Statements and Other Reports.**

Each Loan Party will maintain, and cause each of its Subsidiaries to maintain, a system of accounting established and administered in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP. Company will deliver to Agent and Lenders:

(i)    Monthly Financials: as soon as available and in any event within 30 days after the end of each month ending after the Closing Date, (a) the consolidated and consolidating (by geographic region, which regions shall consist of the United States, Europe and Asia, each, a **"Region"**) balance sheets of each Loan Party and its Subsidiaries as at the end of such month and the related consolidated and consolidating (by Region) statements of income, stockholders' equity and cash flows of such Loan Party and its Subsidiaries for such month and for the period from the beginning of the then current Fiscal Year to the end of such month and setting forth in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Forecast most recently covering such month, all in reasonable detail and certified by the chief financial officer or chief executive officer of Company that they fairly present, in all material respects, the financial condition of such Loan Party and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments, and (b) a report describing the operations of such Loan Party and its Subsidiaries in the form prepared for presentation to senior management for such month and for the period from the beginning of the then current Fiscal Year to the end of such month, and (c) a report comparing the achievements of Company with respect to contract margin improvement, collection of Accounts and disposition of stale

Inventory against the corresponding figures from the Forecast most recently covering such month;

(ii)    Quarterly Financials: as soon as available and in any event within 45 days after the end of each Fiscal Quarter, (a) the consolidated and consolidating (by Region) balance sheets of each Loan Party and its Subsidiaries as at the end of such Fiscal Quarter and the related consolidated and consolidating (by Region) statements of income, stockholders' equity and cash flows of such Loan Party and its Subsidiaries for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year and the corresponding figures from the Forecast most recently covering such Quarter, all in reasonable detail and certified by the chief financial officer or chief executive officer of Company that they fairly present, in all material respects, the financial condition of such Loan Party and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments, and (b) a narrative report describing the operations of such Loan Party and its Subsidiaries in the form prepared for presentation to senior management for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter;

(iii)    Year-End Financials: as soon as available and in any event within 100 days after the end of each Fiscal Year, (a) the consolidated and consolidating (by Region) balance sheets of such Loan Party and its Subsidiaries as at the end of such Fiscal Year and the related consolidated and consolidating (by Region) statements of income, stockholders' equity and cash flows of such Loan Party and its Subsidiaries for such Fiscal Year, setting forth in each case in comparative form the corresponding figures for the previous Fiscal Year and the corresponding figures from the Forecast most recently covering the Fiscal Year covered by such financial statements, all in reasonable detail and certified by the chief financial officer or chief executive officer of Company that they fairly present, in all material respects, the financial condition of such Loan Party and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, (b) a narrative report describing the operations of such Loan Party and its Subsidiaries in the form prepared for presentation to senior management for such Fiscal Year, and (c) in the case of such consolidated financial statements with respect to Company and its Subsidiaries, a report thereon of Arthur Andersen LLP or other independent certified public accountants of recognized national standing selected by Company and satisfactory to Agent, which report shall be unqualified as to scope of audit, shall express no doubts about the ability of Company and its Subsidiaries to continue as a going concern, and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Company and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the examination by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards;

(iv)   Officers' and Compliance Certificates:  (a) together with each delivery of financial statements of each Loan Party and its Subsidiaries pursuant to subdivisions (i), (ii), (iii) and (xix) of this Section 6.1, an Officers' Certificate of Company stating that the signers have reviewed the terms of this Agreement and have made, or caused to be made under their supervision, a review in reasonable detail of the transactions and condition of each Loan Party and its Subsidiaries during the accounting period covered by such financial statements and that such review has not disclosed the existence during or at the end of such accounting period, and that the signers do not have knowledge of the existence as at the date of such Officers' Certificate, of any condition or event that constitutes an Event of Default or Potential Event of Default, or, if any such condition or event existed or exists, specifying the nature and period of existence thereof and what action Loan Parties have taken, are taking and propose to take with respect thereto; and (b) together with each delivery of financial statements pursuant to subdivision (ii) and (iii) above, a Compliance Certificate demonstrating in reasonable detail compliance during and at the end of the applicable accounting periods with the restrictions contained in Section 7;

(v)   Reconciliation Statements:  if, as a result of any change in accounting principles and policies from those used in the preparation of the audited financial statements referred to in subsection 5.3, the consolidated financial statements of Company and its Subsidiaries delivered pursuant to subdivisions (i), (ii), (iii) or (xix) of this subsection 6.1 will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then (a) together with the first delivery of financial statements pursuant to subdivision (i), (ii), (iii) or (xix) of this subsection 6.1 following such change, consolidated financial statements of Company and its Subsidiaries for (y) the current Fiscal Year to the effective date of such change and (z) the full Fiscal Year immediately preceding the Fiscal Year in which such change is made, in each case prepared on a pro forma basis as if such change had been in effect during such periods, and (b) together with each delivery of financial statements pursuant to subdivision (i), (ii), (iii) or (xix) of this subsection 6.1 following such change, a written statement of the chief financial officer or chief executive officer of Company setting forth the differences which would have resulted if such financial statements had been prepared without giving effect to such change;

(vi)   Accountants' Certification:  together with each delivery of consolidated financial statements of Company and its Subsidiaries pursuant to subdivision (iii) above, a written statement by the independent certified public accountants giving the report thereon (a) stating that their audit examination has included a review of the terms of this Agreement and the other Loan Documents as they relate to accounting matters, (b) stating whether, in connection with their audit examination, any condition or event that constitutes an Event of Default or Potential Event of Default has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof; provided that such accountants shall not be liable by reason of any failure to obtain knowledge of any such Event of Default or Potential Event of Default that would not be disclosed in the course of their audit examination, and (c) stating that based on their audit examination nothing has come to their attention that

causes them to believe either or both that the information contained in the certificates delivered therewith pursuant to subdivision (iv) above is not correct or that the matters set forth in the Compliance Certificates delivered therewith pursuant to subdivision (iv) above for the applicable Fiscal Year are not stated in accordance with the terms of this Agreement;

(vii)   Accountants' Reports:  promptly upon receipt thereof (unless restricted by applicable professional standards), copies of all reports submitted to any Loan Party by independent certified public accountants in connection with each annual, interim or special audit of the financial statements of any Loan Party and its Subsidiaries made by such accountants, including, without limitation, any comment letter submitted by such accountants to management in connection with their annual audit;

(viii)   SEC Filings and Press Releases:  promptly upon their becoming available, copies of (a) all financial statements, reports, notices and proxy statements sent or made available generally by any Loan Party to its security holders or by any Subsidiary of any Loan Party to its security holders other than any Loan Party or another Subsidiary of a Loan Party, (b) all regular and periodic reports and all registration statements (other than on Form S-8 or a similar form) and prospectuses, if any, filed by a Loan Party or any of its Subsidiaries with any securities exchange or with the Securities and Exchange Commission or any governmental or private regulatory authority, and (c) all press releases and other statements made available generally by a Loan Party or any of its Subsidiaries to the public concerning material developments in the business of such Loan Party or any of its Subsidiaries;

(ix)   Events of Default, etc.:  promptly upon any officer of any Loan Party obtaining knowledge (a) of any condition or event that constitutes an Event of Default or Potential Event of Default, or becoming aware that any Lender has given any notice (other than to Agent) or taken any other action with respect to a claimed Event of Default or Potential Event of Default, (b) that any Person has given any notice to a Loan Party or any of its Subsidiaries or taken any other action with respect to a claimed default or event or condition of the type referred to in subsection 8.2, (c) of any condition or event that would be required to be disclosed in a current report filed by a Loan Party with the Securities and Exchange Commission on Form 8-K (Items 1, 2, 4, 5 and 6 of such Form as in effect on the date hereof) if such Loan Party were required to file such reports under the Exchange Act, or (d) of the occurrence of any event or change that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect, an Officers' Certificate specifying the nature and period of existence of such condition, event or change, or specifying the notice given or action taken by any such Person and the nature of such claimed Event of Default, Potential Event of Default, default, event or condition, and what action Loan Parties have taken, are taking and propose to take with respect thereto;

(x)   Litigation or Other Proceedings:  (a) promptly upon any officer of any Loan Party obtaining knowledge of (X) the institution of, or non-frivolous threat of, any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration against or affecting such Loan Party or any of its Subsidiaries

or any property of such Loan Party or any of its Subsidiaries (collectively, **"Proceedings"**) not previously disclosed in writing by Company or any of its Subsidiaries to Lenders or (Y) any material development in any Proceeding that, in any case:

> (1)    could reasonably be expected to result in a Material Adverse Effect; or

> (2)    seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby;

written notice thereof together with such other information as may be reasonably available to such Loan Party to enable Lenders and their counsel to evaluate such matters; and (b) within twenty days after the end of each Fiscal Quarter, a schedule of all Proceedings involving an alleged liability of, or claims against or affecting, any Loan Party or any of its Subsidiaries equal to or greater than $500,000, and promptly after request by Agent such other information as may be reasonably requested by Agent to enable Agent and its counsel to evaluate any of such Proceedings;

(xi)    ERISA Events:  promptly upon becoming aware of the occurrence of or forthcoming occurrence of any ERISA Event, a written notice specifying the nature thereof, what action Company or any of its ERISA Affiliates has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto;

(xii)    ERISA Notices:  with reasonable promptness, copies of (a) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by Company or any of its ERISA Affiliates with the Internal Revenue Service with respect to each Pension Plan; (b) all notices received by Company or any of its ERISA Affiliates from a Multiemployer Plan sponsor concerning an ERISA Event; and (c) such other documents or governmental reports or filings relating to any Employee Benefit Plan as Agent shall reasonably request;

(xiii)    [intentionally omitted];

(xiv)    Insurance:  as soon as practicable and in any event by the last day of each Fiscal Year, a report in form and substance satisfactory to Agent outlining all material insurance coverage maintained as of the date of such report by Company and its Subsidiaries and all material insurance coverage planned to be maintained by Company and its Subsidiaries in the immediately succeeding Fiscal Year and confirming the status of Agent as loss payee under all such insurance to the extent required by subsection 6.4;

(xv)    Board of Directors:  with reasonable promptness, written notice of any change in the Board of Directors of any Loan Party;

(xvi)    New Subsidiaries:  promptly upon any Person becoming a Subsidiary of Company, a written notice setting forth with respect to such Person (a) the date on which

such Person became a Subsidiary of Company and (b) all of the data required to be set forth in Schedule 5.1 annexed hereto with respect to all Subsidiaries of Company (it being understood that such written notice shall be deemed to supplement Schedule 5.1 annexed hereto for all purposes of this Agreement);

(xvii) Bankruptcy Information: promptly after the same is available, Company shall furnish or cause to be furnished to counsel for Agent all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Holdings and Company with the Court or the United States Trustee in the Chapter 11 Cases or distributed by or on behalf of Holdings and Company to any official committee appointed in the Chapter 11 Cases and, without limiting the generality of the foregoing, Loan Parties shall promptly deliver to, and discuss with, Agent and its counsel any and all information and developments in connection with any proposed Asset Sale, including, without limitation, any letters of intent, commitment letters or engagement letters received by any Loan Party, and any other event or condition which is reasonably likely to have a material effect on Holdings, Company or any of the other Loan Parties or the Chapter 11 Cases, including, without limitation, the progress of any disclosure statement or any proposed Chapter 11 plan of reorganization;

(xviii) UCC Search Report: as promptly as practicable after the date of delivery to Agent of any UCC financing statement executed by any Loan Party pursuant to subsection 4.1E or 6.8A, copies of completed UCC searches evidencing the proper filing, recording and indexing of all such UCC financing statements and listing all other effective financing statements in that jurisdiction that name such Loan Party as debtor, together with copies of all such financing statements not previously delivered to Agent by or on behalf of any Loan Party or such Loan Party;

(xix) Weekly Reports: as soon as available, and in any event no later than the Wednesday following the applicable one week period, a Weekly Report for such week, including the following, in form and substance satisfactory to Agent, and certified as being true and correct to the knowledge of, after diligent inquiry by, the chief financial officer or chief executive officer of Company:

(A) a detailed statement of actual Cash receipts and disbursements on a line item basis for the preceding week;

(B) a report reflecting the percentage variance of receipts and disbursements for the preceding week from the Approved Budget and the Forecast most recently covering such one-week period and containing a narrative analysis of Loan Parties' performance for the preceding one week period against the Approved Budget and such Forecast;

(C) a report reflecting the percentage variance of receipts and disbursements since the Closing Date from the Approved Budget and the Forecast most recently covering such period and containing a narrative analysis of Loan Parties' performance for such period against the Approved Budget and such Forecast;

(D)   an updated Forecast, extending forward thirteen weeks from the date of such Forecast; and

(E)   a statement of any variance in income or expenses, actual or projected, which will or may be reasonably expected to result in a Material Variance.

(xx)   Other Information:  with reasonable promptness, such other information and data with respect to any Loan Party or any of its Subsidiaries as from time to time may be reasonably requested by Agent on its own behalf or on behalf of any Lender.

## 6.2   Corporate Existence, etc.

Except as permitted under subsection 7.7, each Loan Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its corporate existence and all rights and franchises material to its business.

## 6.3   Payment of Taxes and Claims; Tax Consolidation.

A.   Except as allowed by this Agreement or excused by the Bankruptcy Code or an applicable order of the Court, each Loan Party will, and will cause each of its Subsidiaries to, pay all Taxes, assessments and other governmental charges imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any material penalty accrues thereon, and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a material Lien upon any of its properties or assets, prior to the time when any material penalty or fine shall be incurred with respect thereto; provided that no such charge or claim need be paid if being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and if such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP (or comparable accounting principles in foreign jurisdictions) shall have been made therefor.

B.   None of the Loan Parties will nor will any such Loan Party permit any of its Subsidiaries to, file or consent to the filing of any consolidated income Tax return with any Person (other than Holdings or any of its Subsidiaries).

## 6.4   Maintenance of Properties; Insurance; Application of Net Insurance/Condemnation Proceeds.

A.   Maintenance of Properties.  Each Loan Party will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all of their respective material properties used or useful in the business of such Loan Party and its Subsidiaries (including, without limitation, all patents, trademarks, tradenames, copyrights, registered names, service marks, technology, know-how and processes used in or necessary for the conduct of the business of Company and its Subsidiaries as currently conducted that are material to the condition (financial or otherwise), business or operations of Company and its Subsidiaries) and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof such that the

properties will remain in substantially the same condition and working order, ordinary wear and tear excepted, that exists as of the Closing Date.

**B.     Insurance**. Each Loan Party will maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to its properties and business and the properties and businesses of its Subsidiaries against loss or damage of the kinds customarily carried or maintained under similar circumstances by corporations of established reputation engaged in similar businesses. Without limiting the generality of the foregoing, each Loan Party will maintain or cause to be maintained (i) flood insurance with respect to each Flood Hazard Property to the extent that such Flood Hazard Property is located in a community that participates in the National Flood Insurance Program and (ii) public liability insurance, third party property damage insurance and replacement value insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts and covering such risks as are at all times satisfactory to Agent in its commercially reasonable judgment. Each such policy of insurance that insures against loss or damage with respect to any Collateral or against losses due to business interruption shall name Agent for the benefit of Lenders as the loss payee thereunder for any covered loss in excess of $500,000 and shall provide for at least 30 days (15 days in the event of non-payment of premium) prior written notice to Agent of any modification or cancellation of such policy.

**C.     Application of Net Insurance/Condemnation Proceeds**. Upon receipt by Agent of any Net Insurance/Condemnation Proceeds as loss payee (i) in respect of any such business interruption insurance constituting Net Insurance/Condemnation Proceeds, Agent shall, and Loan Parties hereby authorize Agent to, apply such Net Insurance/Condemnation Proceeds to prepay the Loans as provided in subsection 2.4A(iii)(b), and (ii) in respect of any such insurance against loss or damage with respect to any Collateral, (a) to the extent that any Loan Party or any of its Subsidiaries intends to use any such insurance proceeds to repair, restore or replace the assets of such Loan Party or Subsidiary in respect of which such Net Insurance/Condemnation Proceeds were received, Agent shall, so long as no Event of Default shall have occurred and be continuing, hold such proceeds in a cash collateral account and so long as any Loan Party or any of its Subsidiaries proceeds to repair, restore or replace the assets of such Loan Party or such Subsidiary in respect of which such Net Insurance/Condemnation Proceeds were received, Agent shall from time to time disburse to such Loan Party or such Subsidiary amounts necessary to pay the cost of such repair, restoration or replacement after the receipt by Agent of invoices or other documentation reasonably satisfactory to Agent describing the amount of costs so incurred; provided, however, that if in the reasonable good faith belief of Agent, such Loan Party or such Subsidiary is not proceeding diligently with the repair, restoration or replacement, Agent shall, and Loan Parties hereby authorize Agent to, apply such insurance proceeds to prepay the Loans as provided in subsection 2.4A(iii)(b), and (b) if an Event of Default shall have occurred and be continuing or to the extent that neither the applicable Loan Party nor any of its Subsidiaries intends to use any such Net Insurance/Condemnation Proceeds to repair, restore or replace assets of such Loan Party or any of its Subsidiaries as described above, Agent shall, and Loan Parties hereby authorize Agent to, apply such Net Insurance/Condemnation Proceeds to prepay the Loans as provided in subsection 2.4A(iii)(b).

**6.5    Inspection; Records; Audits and Appraisals.**

A.    **Inspection Rights; Records.** Each Loan Party shall, and shall cause each of its Subsidiaries to, permit any authorized representatives designated by Agent (which may include representatives of any Lender at such Lender's expense) to visit and inspect any of the properties of such Loan Party or any of its Subsidiaries, including its and their financial and accounting records, and to make copies and take extracts therefrom, and to discuss its and their affairs, finances and accounts with its and their officers and independent public accountants (provided that such Loan Party may, if it so chooses, be present at or participate in any such discussion). Each Loan Party shall, and shall cause each of its Subsidiaries to, maintain all of their financial and accounting records in accordance with GAAP (or the equivalent of GAAP in jurisdictions outside of the United States).

B.    **Audits and Appraisals.** Upon the request of Agent, each Loan Party shall, and shall cause each of its Subsidiaries to, permit any authorized representatives designated by Agent to conduct one or more audits of all Real Property Assets, Equipment, Accounts and Inventory of Loan Parties, all upon reasonable notice and at such reasonable times during normal business hours and as often as may be reasonably requested.

C.    **Lender Meeting.** Without in any way limiting the foregoing, each Loan Party from time to time, upon request of Agent after reasonable advance notice, will participate in a meeting of Agent and Lenders to be held at Company's or Agent's corporate offices (or such other location as may be agreed to by such Loan Party and Agent) at such time as may be agreed to by such Loan Party and Agent.

**6.6    Compliance with Laws, etc.**

Each Loan Party shall, and shall cause each of its Subsidiaries to, comply with the requirements of all applicable laws, rules, regulations and orders of any governmental authority (including without limitation all Environmental Laws), noncompliance with which could reasonably be expected to cause, individually or in the aggregate at any time, a Material Adverse Effect.

**6.7    Environmental Disclosure and Inspection.**

A.    **Compliance with Environmental Laws.** Each Loan Party shall, and shall cause each of its Subsidiaries to, exercise all due diligence in order to comply in all material respects and cause (i) all tenants under any leases or occupancy agreements affecting any portion of the Facilities and (ii) all other Persons on or occupying such property, to comply in all material respects with all Environmental Laws.

B.    **Environmental Reports; Environmental Review and Inspection.**

(i)    Upon request by Agent from time to time, Loan Parties shall deliver as soon as practicable to Agent reports and other information, in form, scope and substance satisfactory to Agent, regarding environmental matters relating to the Facilities, which reports shall include (i) a Phase I environmental assessment for each of the Facilities currently owned, leased, operated or used by Company or any of its Domestic

Subsidiaries (collectively, the **"Phase I Report"**) which (a) conforms to the ASTM Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process, E 1527, (b) was conducted by one or more environmental consulting firms reasonably satisfactory to Agent, and (c) includes an estimate of the reasonable worst-case cost of investigating and remediating any Hazardous Materials Activity identified in the Phase I Report as giving rise to an actual or potential material violation of any Environmental Law or as presenting a material risk of giving rise to a material Environmental Claim, and (ii) a current compliance audit setting forth an assessment of Company's, its Domestic Subsidiaries' and such Facilities' current and past compliance with Environmental Laws and an estimate of the cost of rectifying any non-compliance with current Environmental Laws identified therein and the cost of compliance with reasonably anticipated future Environmental Laws identified therein.

(ii)    Each Loan Party agrees that Agent may, from time to time and in its reasonable discretion, (a) retain, at such Loan Party's expense, an independent professional consultant to review any environmental audits, investigations, analyses and reports relating to Hazardous Materials prepared by or for such Loan Party and (b) conduct its own investigation of any Facility; provided that, in the case of any Facility no longer owned, leased, operated or used by such Loan Party or any of its Subsidiaries, such Loan Party shall only be obligated to use its best efforts to obtain permission for Agent's professional consultant to conduct an investigation of such Facility.   For purposes of conducting such a review and/or investigation, each Loan Party hereby grants to Agent and its agents, employees, consultants and contractors the right to enter into or onto any Facilities currently owned, leased, operated or used by such Loan Party or any of its Subsidiaries and to perform such tests on such property (including taking samples of soil, groundwater and suspected asbestos-containing materials) as are reasonably necessary in connection therewith.   Any such investigation of any Facility shall be conducted, unless otherwise agreed to by Loan Party and Agent, during normal business hours and, to the extent reasonably practicable, shall be conducted so as not to interfere with the ongoing operations at such Facility or to cause any damage or loss to any property at such Facility.   Each Loan Party and Agent hereby acknowledges and agrees that any report of any investigation conducted at the request of Agent pursuant to this subsection 6.7B will be obtained and shall be used by Agent and Lenders for the purposes of Lenders' internal credit decisions, to monitor and police the Loans and to protect Lenders' security interests, created by the Loan Documents.   Agent agrees to deliver a copy of any such report to Company with the understanding that each Loan Party acknowledges and agrees that (x) it will indemnify and hold harmless Agent and each Lender from any costs, losses or liabilities relating to such Loan Party's use of or reliance on such report, (y) neither Agent nor any Lender makes any representation or warranty with respect to such report, and (z) by delivering such report to such Loan Party, neither Agent nor any Lender is requiring or recommending the implementation of any suggestions or recommendations contained in such report.

C.    **Environmental Disclosure**.  Each Loan Party and its Subsidiaries will deliver to Agent and Lenders:

(i)     Environmental Audits and Reports.  As soon as practicable following receipt thereof, copies of all environmental audits, investigations, analyses and reports of any kind or character, whether prepared by personnel of any Loan Party or any of its Subsidiaries or by independent consultants, governmental authorities or any other Persons, with respect to significant environmental matters at any Facility which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect or with respect to any Environmental Claims which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(ii)     Notice of Certain Releases, Remedial Actions, Etc.  Each Loan Party shall promptly upon the occurrence thereof advise Agent and Lenders in writing and in reasonable detail of (i) any Release required to be reported to any Governmental Authority under any applicable Environmental Laws, (ii) any Environmental Claims made to or on such Loan Party or any of its Subsidiaries or Affiliates that could reasonably be expected to give rise to a Material Adverse Effect or with respect to any Release required to be reported to any Governmental Authority, (iii) any remedial action taken by such Loan Party or any other Person in response to (x) any Hazardous Materials Activities the existence of which could reasonably be expected to give rise to an Environmental Claim having a Material Adverse Effect, or (y) any Environmental Claim made to or on such Loan Party or any of its Subsidiaries or Affiliates that could have a Material Adverse Effect, (iv) such Loan Party's discovery of any occurrence or condition on any real property adjoining or in the vicinity of any Facility that could cause such Facility or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws, and (v) any request for information from any Governmental Authority that suggests such agency is investigating whether such Loan Party or any of its Subsidiaries may be potentially responsible for a Release, except for in each case those matters set forth on Schedule 5.13.

(iii)     Written Communications Regarding Environmental Claims, Releases, Etc. As soon as practicable following the sending or receipt thereof by any Loan Party or any of its Subsidiaries, a copy of any and all written communications with respect to (a) any Environmental Claims that, individually or in the aggregate, have a reasonable possibility of giving rise to a Material Adverse Effect, (b) any Release required to be reported to any federal, state or local governmental or regulatory agency, and (c) any request for information from any governmental agency that suggests such agency is investigating whether such Loan Party or any of its Subsidiaries may be potentially responsible for any Hazardous Materials Activity.

(iv)     Notice of Certain Proposed Actions Having Environmental Impact. Prompt written notice describing in reasonable detail (a) any proposed acquisition of stock, assets, or property by any Loan Party or any of its Subsidiaries that could reasonably be expected to (1) expose such Loan Party or any of its Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (2) affect the ability of such Loan Party or any of its Subsidiaries to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations and (b) any proposed action to be taken by such Loan Party or any of its Subsidiaries to

commence new manufacturing or other industrial operations or to modify current operations in a manner that could reasonably be expected to subject such Loan Party or any of its Subsidiaries to any material additional obligations or requirements under any Environmental Laws that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(v)   Other Information.   Each Loan Party shall, at its own expense, provide copies of such documents or information as Agent may reasonably request in relation to any matters disclosed pursuant to this subsection 6.7.

### D.   Loan Party's Remedial Action Regarding Hazardous Materials.

(i)   Remedial Actions Relating to Hazardous Materials Activities.   Each Loan Party shall promptly undertake, and shall cause each of its Subsidiaries promptly to undertake, any and all investigations, studies, sampling, testing, abatement, cleanup, removal, remediation or other response actions necessary to remove, remediate, clean up or abate any Hazardous Materials Activity on, under or about any Facility that is in violation of any Environmental Laws or that presents a material risk of giving rise to an Environmental Claim.   In the event any Loan Party or any of its Subsidiaries undertakes any such action with respect to any Hazardous Materials, such Loan Party or such Subsidiary shall conduct and complete such action in compliance with all applicable Environmental Laws and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, such Loan Party's or such Subsidiary's liability with respect to such Hazardous Materials Activity is being contested in good faith by such Loan Party or such Subsidiary.

(ii)   Actions with Respect to Environmental Claims and Violations of Environmental Laws.   Each Loan Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Loan Party or its Subsidiaries that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (ii) make an appropriate response to any Environmental Claim made to or on such Loan Party or any of its Subsidiaries and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

### 6.8   Execution of Future Guaranties and Collateral Documents.

A.   **Execution of Future Subsidiary Guaranty and Collateral Documents**. In the event that any Person becomes a Subsidiary of Company after the date hereof, Company will promptly notify Agent of that fact, will execute a pledge amendment to the Security Agreement executed and delivered by Company pledging 100% of the capital stock of such Subsidiary owned by Company and cause such Subsidiary to execute and deliver to Agent a counterpart of the Subsidiary Guaranty, a counterpart of the Security Agreement, and, if applicable, Additional Mortgages (as defined in subsection 6.9) and to take all such further action and execute all such further documents and instruments as may be reasonably required to (x) grant and perfect in favor of Agent, for the benefit of Tranche 1A Lenders, Tranche 1B

Lenders and Cash Management Lenders *pari passu*, First Priority security interests in all of the Real Property Assets and all of the personal property assets of such Subsidiary described in the applicable Collateral Documents, and (y) grant and perfect in favor of Agent, for the benefit of Tranche 2 Lenders, Tranche 3 Lenders and Currency Exchangers, *pari passu*, Second Priority security interests in all of the Real Property Assets and all of the personal property assets of such Subsidiary described in the applicable Collateral Documents.

> **B.      Intentionally Omitted.**

> **C.      Subsidiary Charter Documents, Legal Opinions, Etc**. With respect to any such new Subsidiary, Company shall deliver to Agent, together with the applicable Guaranty and such Collateral Documents if, and to the extent, requested by Agent:

>> (i)      certified copies of such Subsidiary's Articles or Certificate of Incorporation, together with a good standing certificate from the Secretary of State (or comparable official) of the jurisdiction of its incorporation, each to be dated a recent date prior to their delivery to Agent;

>> (ii)      a copy of such Subsidiary's Bylaws (or comparable or equivalent documentation), certified by its corporate secretary or an assistant corporate secretary or other appropriate officer as of a recent date prior to their delivery to Agent;

>> (iii)      a certificate executed by the secretary or an assistant secretary or other appropriate officer of such Subsidiary as to (a) the incumbency and signatures of the officers of such Subsidiary executing such Guaranty and the Collateral Documents to which such Subsidiary is a party and (b) the fact that the attached resolutions of the Board of Directors of such Subsidiary authorizing the execution, delivery and performance of such Guaranty and such Collateral Documents are in full force and effect and have not been modified or rescinded; and

>> (iv)      a favorable opinion of counsel to such Subsidiary, in form and substance satisfactory to Agent and its counsel, as to (a) the due organization and good standing of such Subsidiary, (b) the due authorization, execution and delivery by such Subsidiary of such Guaranty and such Collateral Documents, (c) the enforceability of such Guaranty and such Collateral Documents against such Subsidiary, and (d) such other matters as Agent may reasonably request, all of the foregoing to be satisfactory in form and substance to Agent and its counsel.

Nothing in this Section 6.8 waives the prohibition against Investments under Section 7.3.

**6.9      Additional Real Property Collateral.**

> **A.      Additional Mortgages, Etc**. From and after the Effective Date, in the event that (i) any Loan Party or any of its Subsidiaries acquires any Fee Property or any Material Leasehold (other than any Fee Property or Material Leasehold which Agent in its sole discretion affirmatively waives the requirements set forth in this subsection 6.9 with respect to such Fee Property or Material Leasehold) (each a "**Covered Real Property Asset**") or (ii) at the time any Person becomes a Subsidiary of any Loan Party, such Person owns or holds any Covered Real

Property Asset, such Loan Party or such Subsidiary shall, as soon as practicable after the acquisition of such Covered Real Property Asset or such Person's becoming a Subsidiary of any Loan Party, as the case may be, deliver to Agent the following:

(a)    Additional Mortgage. Fully executed and acknowledged counterparts of Mortgages (each an "**Additional Mortgage**" and collectively, the "**Additional Mortgages**") in recordable form encumbering such Covered Real Property Asset, which Mortgages shall create a valid and enforceable First Priority Lien (or such other priority lien as may be specified in the applicable Additional Mortgage), subject to Permitted Encumbrances, on such Covered Real Property Asset in favor of Agent (or such other trustee as may be required or desired under local law) for the benefit of the Senior Lenders and Junior Lenders, as appropriate;

(b)    Opinion of Counsel. If required by Agent, an opinion of local counsel (which counsel shall be reasonably satisfactory to Agent) in the jurisdiction in which such Covered Real Property Asset is located with respect to the enforceability of Additional Mortgage recorded in such jurisdiction and such other matters as Agent may reasonably request, in form and substance reasonably satisfactory to Agent;

(c)    Landlord Consent and Estoppel; Recorded Leasehold Interest. In the case of a Covered Real Property Asset consisting of a Material Leasehold, to the extent that the landlord is obligated to deliver an estoppel certificate pursuant to the terms of the applicable lease, such estoppel letters from the landlord on such Material Leasehold as may be reasonably requested by Agent, in form and substance reasonably satisfactory to Agent. In the event the landlord is not obligated to deliver an estoppel certificate pursuant to the terms of the applicable lease, the Company shall use good faith efforts (which shall not include the expenditure of any money) to obtain an estoppel certificate from the landlord in the form reasonable requested by Agent;

(d)    Title Insurance. (1) If required by Agent, in the case of each such Covered Real Property Asset consisting of a Fee Property located in the United States of America, an ALTA mortgagee title insurance policy (or (A) if an ALTA title insurance policy is not available in the applicable jurisdiction, such other form of mortgagee title policy as may be customarily provided in such jurisdiction or (B) such other form as shall be approved by Agent in its discretion) issued by the Title Company (or such other title insurer reasonably satisfactory to Agent) (an "Additional Mortgage Policy"), in an amount reasonably satisfactory to Agent (but in any event no more than the fair market value of such property), insuring the applicable Additional Mortgage to be valid and enforceable first lien on the Covered Real Property Asset encumbered thereby, subject only to Permitted Encumbrances, which Closing Date Mortgage Policies (i) shall include an endorsement for mechanics' liens, for future advances under this Agreement and for any other matters reasonably requested by Agent and (ii) shall provide for affirmative insurance and such reinsurance as Agent may reasonably request, all of the foregoing in form and substance reasonably satisfactory to Agent; and (2) evidence reasonably satisfactory to Agent that such Loan Party has (i) delivered to the Title Company all certificates and affidavits required by the Title Company in connection with the issuance of the Additional Mortgage Policy and (ii) paid to the Title Company or to the

appropriate governmental authorities all expenses and premiums of the Title Company in connection with the issuance of the Additional Mortgage Policy and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Additional Mortgage in the appropriate real estate records;

(e)     Title Report.  If no Additional Mortgage Policy is required with respect to such Covered Real Property Asset, a title report obtained by Loan Party in respect of any such Covered Real Property Asset, dated not more than 30 days prior to the date such Additional Mortgage is to be recorded and satisfactory in form and substance to Agent;

(f)     Matters Relating to Flood Hazard Properties.  (i) Evidence, which may be in the form of a letter from an insurance broker or a municipal engineer, as to whether (1) such Covered Real Property Asset (an **"Additional Flood Hazard Property"**) is Flood Hazard Property and (2) the community in which such Covered Real Property Asset (if it is an Additional Flood Hazard Property) is located is participating in the National Flood Insurance Program; (ii) if such Covered Real Property Asset is an Additional Flood Hazard Property, Loan Party's written acknowledgement of receipt of written notification from Agent (1) as to the existence of such Additional Flood Hazard Property and (2) as to whether the community in which such Flood Hazard Property is located is participating in the National Flood Insurance Program; and (iii) in the event such Covered Real Property Asset is an Additional Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, evidence that Loan Party has obtained flood insurance in respect of such Flood Hazard Property to the extent required under the applicable regulations of the Board of Governors of the Federal Reserve System; and

(g)     Environmental Audit.  If required by Agent, in the case of each such Covered Real Property Asset consisting of a Fee Property, environmental audits, reports and other information prepared by professional consultants mutually acceptable to Loan Party and Agent, in form, scope and substance satisfactory to Agent in its reasonable discretion, concerning any environmental hazards or liabilities to which Loan Party or any of its Subsidiaries may be subject with respect to such Covered Real Property Asset.

**B.     Real Estate Appraisals.**  Each Loan Party shall, and shall cause each of its Subsidiaries to, permit any authorized representatives designated by Agent, upon reasonable notice, to visit and inspect any Covered Real Property Asset for the purpose of obtaining an appraisal of value, conducted by consultants retained by Agent in compliance with all applicable banking regulations, with respect to such Covered Real Property Asset.

**6.10    Assignability and Recording of Lease Agreements.**

From and after the Effective Date, in the event that any Loan Party or any of its Subsidiaries enters into any lease that is a Material Leasehold (other than any Material Leasehold as to which Agent in its sole discretion affirmatively waives the requirements set forth in this subsection 6.10), such Loan Party shall, or shall cause such Subsidiary to, (i) obtain lease terms permitting (or not expressly prohibiting) the encumbrancing of such Material Leasehold pursuant to an Additional Mortgage and the assignment of such Material Leasehold interest to the

successful bidder at a foreclosure or similar sale (and to a subsequent third party assignee by Agent or any Lender to the extent Agent or such Lender is the successful bidder at such sale) in the event of a foreclosure or similar action pursuant to such Additional Mortgage and (ii) cause such lease, or a memorandum of lease with respect thereto, or other evidence of such lease in form and substance reasonably satisfactory to Agent, to be recorded in all places to the extent necessary or desirable, in the reasonable judgment of Agent, so as to enable an Additional Mortgage encumbering such Material Leasehold to effectively create a valid and enforceable Lien (subject to Permitted Encumbrances) on such Material Leasehold in favor of Agent (or such other Person as may be required or desired under local law) for the benefit of Lenders. Agent may waive the requirements of this Section 6.10 in its discretion.

**6.11    Cash Maintenance.**

Company shall, and shall cause each of its Domestic Subsidiaries to, (x) deposit, transfer and otherwise maintain all Cash in Deposit Accounts established and maintained with Lenders and (y) maintain all Cash Equivalents with Lenders. Any Cash of Company or any of its Domestic Subsidiaries not on deposit or otherwise maintained in a Deposit Account established and maintained with a Lender and any Cash Equivalents not maintained with a Lender, in each case as of the Closing Date, shall be transferred by Company or such Subsidiary to a Deposit Account established and maintained with a Lender or to a Lender, as the case may be, no later than thirty (30) days after the Closing Date. In the event that a Lender is replaced pursuant to subsection 2.8 or a financial institution is no longer a Lender under this Agreement, then all Cash and Cash Equivalents maintained with such former Lender shall be transferred to a Lender no later than thirty (30) days after such former Lender is replaced or is no longer a Lender, as the case may be.

**6.12    Inventory Reports; Accounts.**

(i)      [Intentionally Omitted.]

(ii)      Inventory Reports.

(a)      Loan Parties shall at all times hereafter maintain a perpetual inventory, keeping correct and accurate records itemizing and describing the kind, type, quality and quantity of Inventory, Loan Parties' cost therefor and daily withdrawals therefrom and additions thereto, all of which records shall be available during Loan Party's usual business hours upon reasonable prior request of Agent.

(b)      [intentionally omitted]

(c)      Upon Agent's request, at any time and from time to time, Loan Parties shall, at Loan Parties' sole cost and expense, execute and deliver to Agent written reports or appraisals of the Inventory listing all items and categories thereof, describing the condition of same and setting forth the value thereof (the lower of cost or market value of the Inventory), in such form as is reasonably satisfactory to Agent. Agent, in its reasonable discretion, and at Loan Parties' expense, may review or have an outside consultant selected by them review, upon reasonable notice and at reasonable times, the quality and amount of inventory.

(iii)    Accounts

(a)    Loan Parties shall immediately upon obtaining knowledge thereof report to Agent all reclaimed, repossessed or returned goods, account debtor claims and any other matter affecting the value, enforceability or collectibility of Accounts.

(b)    At Agent's request, any goods reclaimed or repossessed by or returned to Loan Parties will be set aside, marked with Agent's name and held by Loan Party for Agent's account and subject to Agent's security interest.

(c)    Loan Parties shall pay all sales, excise or similar taxes relating to Accounts when due.

**6.13    Further Assurances.**

**A.    Assurances.**  Without expense or cost to Agent or Lenders, each Loan Party shall from time to time hereafter execute, acknowledge, file, record, do and deliver all and any further acts, deeds, conveyances, mortgages, deeds of trust, deeds to secure debt, security agreements, hypothecations, pledges, charges, assignments, financing statements and continuations thereof, notices of assignment, transfers, certificates, assurances and other instruments as such Agent may from time to time reasonably request and that do not involve a material expansion of Loan Parties' obligations or liabilities hereunder in order to carry out more effectively the purposes of this Agreement, the other Loan Documents, the Interim Borrowing Order or the Final Borrowing Order, including to subject any Collateral, intended to now or hereafter be covered, to the Liens created by the Collateral Documents, to perfect and maintain such Liens, and to assure, convey, assign, transfer and confirm unto Agent the property and rights thereby conveyed and assigned or intended to now or hereafter be conveyed or assigned or that any Loan Party may be or may hereafter become bound to convey or to assign to Agent or for carrying out the intention of or facilitating the performance of the terms of this Agreement, any other Loan Documents, the Interim Borrowing Order or the Final Borrowing Order, registering or recording this Agreement or any other Loan Document.  Without limiting the generality of the foregoing, (i) Loan Parties and Holdings shall take all actions necessary to grant to Agent a Lien on any real, personal or mixed property now owned or hereafter acquired by any Loan Party or Holdings and (ii) Loan Parties shall deliver to Agent, promptly upon receipt thereof, all instruments received by Loan Parties after the Closing Date and take all actions and execute all documents necessary or reasonably requested by Agent to perfect Agent's Liens in any such instrument or any other Investment acquired by any Loan Party.

**B.    Filing and Recording Obligations.**  Except as excused by the Bankruptcy Code or applicable orders of the Court, each Loan Party shall jointly and severally pay all filing, registration and recording fees and all expenses incident to the execution and acknowledgement of any Mortgage or other Loan Document, including any instrument of further assurance described in subsection 6.13A, and shall pay all mortgage recording taxes, transfer taxes, general intangibles taxes and governmental stamp and other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution, delivery, filing, recording or registration of any Mortgage or other Loan Document, including any instrument of further assurance described in subsection 6.13A, or by reason of its interest in, or measured by amounts

payable under, the Notes, the Mortgages or any other Loan Document, including any instrument of further assurance described in subsection 6.13A, (excluding income, franchise and doing business taxes), and shall pay all stamp taxes and other taxes required to be paid on the Notes or any other Loan Document; provided, however, that such Loan Party may contest in good faith and through appropriate proceedings, any such taxes, duties, imposts, assessments and charges; provided further, however, that such Loan Party shall pay all such taxes, duties, imposts and charges when due to the appropriate taxing authority during the pendency of any such proceedings if required to do so to stay enforcement thereof. If any Loan Party fails to make any of the payments described in the preceding sentence within ten (10) days after notice thereof from Agent (or such shorter period as is necessary to protect the loss of or diminution in value of any Collateral by reason of tax foreclosure or otherwise, as determined by Agent) accompanied by documentation verifying the nature and amount of such payments, Agent may (but shall not be obligated to) pay the amount due and Loan Parties shall jointly and severally reimburse all amounts in accordance with the terms hereof.

**C.     Costs of Defending and Upholding the Lien.**  Agent may, upon at least five (5) days' prior notice to Loan Parties, (i) appear in and defend any action or proceeding, in the name and on behalf of Agent, Lenders or any Loan Party, in which Agent or any Lender is named or which Agent in its sole discretion determines is reasonably likely to materially adversely affect any Mortgaged Property, any other Collateral, any Mortgage, the Lien thereof or any other Loan Document and (ii) institute any action or proceeding which Agent reasonably determines should be instituted to protect the interest or rights of Agent and Lenders in any Mortgaged Property or other Collateral or under this Agreement or any other Loan Document. Loan Parties, jointly and severally, agree that all reasonable costs and expenses expended or otherwise incurred pursuant to this subsection (including reasonable attorneys' fees and disbursements) by Agent shall be paid pursuant to subsection 10.2 hereof.

**6.14     Waiver of Claims to Surcharge.**

        In accordance with the Borrowing Orders, each Loan Party hereby waives, and shall cause each of its Subsidiaries to waive, any and all claims to any surcharge of the security interests of Agent in the Collateral under section 506(c) of the Bankruptcy Code.

**6.15     [Intentionally Omitted].**

**6.16     Delivery of Additional Documents by Foreign Borrowers.**

        No later than thirty (30) days after the **Closing Date**, each Foreign Borrower shall (i) execute and deliver to Agent executed and acknowledged (where applicable) originals of any and all Security Agreements and Mortgages, (ii) deliver to Lenders originally executed copies of one or more favorable written opinions of local counsel for such Foreign Borrower, in form and substance reasonably satisfactory to Agent and its counsel, and (iii) take any and all other actions, including, without limitation, the recording, filing and/or registration of any and all applicable Security Agreements and Mortgages, necessary or desirable, in the opinion of Agent, to continue and maintain in favor of Agent, on behalf of the applicable Lenders, a perfected Lien in the real, personal and mixed property Collateral of such Foreign Borrower. (The Lenders

hereby grant Agent the specific discretion to waive any of the foregoing requirements of this Section 6.16.)

## Section 7.    LOAN PARTIES' NEGATIVE COVENANTS

Each Holdings and each Loan Party covenants and agrees, (in the case of a Foreign Borrower, as to itself, only), that, so long as any of the Commitments hereunder shall remain in effect and until payment in full of all of the Loans and other Obligations and the cancellation or expiration of all Letters of Credit, unless Requisite Lenders shall otherwise give prior written consent, such Loan Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 7.

### 7.1    Indebtedness.

Each Loan Party shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

(i)    Each Loan Party may become and remain liable with respect to the Obligations for which it is liable under the Loan Documents;

(ii)    Company and its Subsidiaries may remain liable with respect to Contingent Obligations permitted by subsection 7.4 and, upon any matured obligations actually arising pursuant thereto, the Indebtedness corresponding to the Contingent Obligations so extinguished;

(iii)    (x) Debtor Entities may remain liable with respect to Prepetition Debt, in each case as set forth on the Schedule of Assets and Liabilities as filed with the Court (as the same may be amended in accordance with the Bankruptcy Rules), and (y) Goss UK, Goss France and Goss Japan may remain liable with respect to Indebtedness described on Schedule 7.1 annexed hereto, in each case without giving effect to any extensions, renewals, refinancings, supplemental borrowings or other incurrences thereof;

(iv)    Debtor Entities may become and remain liable with respect to Indebtedness incurred in connection with the rejection of unexpired leases and executory contracts in the Chapter 11 Cases; provided that the obligations of Company or any of its Subsidiaries in respect of such Indebtedness shall be determined by the Court order entered at the time of such rejection, to be a general, unsecured, non-priority claim;

(v)    Company and its Subsidiaries may become and remain liable with respect to Capital Leases, Contingent Obligations and other Indebtedness only to the extent set forth in Section 7.4 or otherwise permitted under the Approved Budget; and

(vi)    Company may remain liable with respect to the intercompany Indebtedness reflected on Schedule 7.1 to Goss UK, Goss France and Goss Japan in an aggregate principal amount not exceeding $_____ in the aggregate.

(vii)    Borrowers may make and incur intercompany loans and intercompany Indebtedness provided that (i) any intercompany loan made by Company to a Foreign Subsidiary shall be formally established as a legal payment obligation of such Foreign Subsidiary, in a manner reasonably satisfactory to Agent, and (ii) on or before any Funding Date following the making of such intercompany loan, Requisite Lenders may require that such intercompany loan hall be repaid in full, and the capital requirements it served will be addressed through a Request for Borrowing under this Agreement.

(viii)    Intercompany loans permitted by subsection 2.1B(5).

## 7.2    Liens and Related Matters.

A.    **Prohibition on Liens.**  None of Holdings nor any Loan Party shall, nor shall any Holdings or Loan Party permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of Holdings, such Loan Party or any of their respective Subsidiaries, whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any Lien with respect to any such property, asset, income or profits under the Uniform Commercial Code of any State or under any similar recording or notice statute, or apply to the Court for the authority to do any of the foregoing, except:

(i)    Permitted Encumbrances;

(ii)    Liens created in favor of Agent (for the benefit of Lenders) (a) pursuant to the applicable Collateral Documents or (b) authorized by the Interim Borrowing Order or the Final Borrowing Order;

(iii)    Liens granted in favor of Prepetition Lenders pursuant to the Existing Credit Agreement and the collateral documents entered into in connection therewith and Liens granted pursuant to the order approving the Cash Collateral and Adequate Protection Stipulation (all of which shall be subordinated to the Liens granted to secure the Loans hereunder); and

(iv)    Liens existing as of the Petition Date described in Schedule 7.2 annexed hereto.

B.    **Equitable Lien in Favor of Lenders.**  If Holdings, any Loan Party or any of their respective Subsidiaries shall create or assume any Lien upon any of its properties or assets, whether now owned or hereafter acquired, other than Liens excepted by the provisions of subsection 7.2A, it shall make or cause to be made effective a provision whereby the Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness secured thereby as long as any such Indebtedness shall be so secured; provided that, notwithstanding the foregoing, this covenant shall not be construed as a consent by Requisite Lenders to the creation or assumption of any such Lien not permitted by the provisions of subsection 7.2A.

C.    **No Further Negative Pledges.**  Except with respect to specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to an Asset Sale, none of Holdings, the Loan Parties or any of their respective Subsidiaries shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

D.    **No Restrictions on Subsidiary Distributions to Loan Parties or Other Subsidiaries.**  Except as provided herein, none of Holdings or any Loan Party will, nor will any Holdings or Loan Party permit any of their respective Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any such Subsidiary to (i) pay dividends or make any other distributions on any of such Subsidiary's capital stock owned by such Holdings or Loan Party or any other Subsidiary of Holdings or such Loan Party, (ii) repay or prepay any Indebtedness owed by such Subsidiary to Holdings or such Loan Party or any other Subsidiary of Holdings or such Loan Party, (iii) make loans or advances to Holdings or such Loan Party or any other Subsidiary of Holdings or such Loan Party, or (iv) transfer any of its property or assets to Holdings or such Loan Party or any other Subsidiary of Holdings or such Loan Party.

**7.3    Investments; Joint Ventures.**

None of Holdings or any Loan Party shall, nor shall Holdings or any Loan Party permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including any Joint Venture, except:

(i)    Company and its Subsidiaries may make and own Investments in Cash Equivalents;

(ii)    Company and its Subsidiaries may continue to own the Investments owned by them and described in Schedule 7.3 annexed hereto;

(iii)    Company and its Subsidiaries may make and maintain investments received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers, in each case arising in the ordinary course of business;

(iv)    Company and its Subsidiaries may form Subsidiaries only to the extent expressly provided by the Plan of Reorganization and approved by the Court; and

(v)    Investments permitted pursuant to Section 7.1(vi), (vii) and (viii).

**7.4    Contingent Obligations.**

None of Holdings or any Loan Party shall, nor shall Holdings or any Loan Party permit any of its Subsidiaries to, directly or indirectly, create or become or remain liable with respect to any Contingent Obligation, except:

(i)    Holdings and its Subsidiaries may become and remain liable with respect to Contingent Obligations arising under their respective Guaranties;

(ii)     Company and its Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of Letters of Credit;

(iii)     Company and its Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of customary indemnification and purchase price adjustment obligations incurred in connection with Asset Sales or other sales of Assets;

(iv)     Company and its Subsidiaries, as applicable, may become and remain liable with respect to Contingent Obligations in existence on the Petition Date as described on Schedule 7.4 annexed hereto;

(viii)     Company and its Subsidiaries may become and remain liable with respect to Contingent Obligations under Currency Agreements entered into in the ordinary course of business; and

(ix)     Company may, if approved by Requisite Lenders, become and remain liable with respect to Contingent Obligations in respect of performance guarantees entered into in favor of a customer of Goss UK, Goss France or Goss Japan, in the ordinary course of business and consistent with past practice, whereby Company guarantees the performance obligations of Goss UK, Goss France or Goss Japan in connection with the manufacture and delivery of any printing press and/or other machinery or equipment, including without limitation the repayment of any down payment or other customer advance amount; and

(x)     Company may, if approved by Requisite Lenders, become and remain liable with respect to Contingent Obligations in respect of performance bonds in favor of a customer (or designee of such customer) of Goss UK, Goss France or Goss Japan, in the ordinary course of business and consistent with past practice, in an aggregate amount not to exceed [$10,000,000].

**7.5     Payments Contrary to Budget.**

Loan Parties shall not, and shall not permit any of their Subsidiaries to, (i) directly or indirectly pay any Prepetition Debt except to the extent provided in the Approved Budget and approved by the Court pursuant to a motion not objected to by Agent, or (ii) afford any Prepetition Debt status as an administrative expense claim in the Chapter 11 Cases except to the extent approved by the Court pursuant to a motion not objected to by Agent. Without limiting the foregoing, no Loan Party shall seek the authorization of the Court to make any payment or afford administrative expense claim status to any Prepetition Debt without the prior approval of Agent.

**7.6**   **Goss Realty.** Without limiting any other provision of this Section 7, Goss Realty shall not engage in business activities of any kind, shall not hire employees, shall not acquire any assets, and shall have no Investments, no Indebtedness, no Contractual Obligations, and no Contingent Obligations.

**7.7**   **Restrictions on Fundamental Changes; Asset Sales and Acquisitions.**

No Loan Party shall nor shall any Loan Party permit any of its Subsidiaries to (except as expressly provided by the Plan of Reorganization):

(i)    alter the corporate, capital or legal structure of such Loan Party or any of its Subsidiaries, or enter into any transaction of merger or consolidation, or liquidate, wind-up or dissolve itself (or suffer any liquidation or dissolution); or

(ii)    make any Asset Sales or otherwise convey, sell, lease or sub-lease (as lessor or sub-lessor), transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, property or fixed assets (including without limitation any Accounts or other accounts receivables), whether now owned or hereafter acquired (it being understood that the foregoing prohibition applies to transactions with Affiliates as well as third parties); or

(iii)    acquire by purchase or otherwise all or substantially all the business, property or fixed assets of, or stock or other evidence of beneficial ownership of, any Person or any division or line of business of any Person; or

(iv)    acquire by purchase or otherwise any Inventory (other than as required by executed contracts or as required by Company's replacement parts operations);

provided that Company and its Subsidiaries may make Asset Sales of assets having a fair market value of less than $100,000, whether in any single transaction or related series of transactions or in the aggregate; provided, however, that:

(a)    any Asset Sale to be made by Company or any of its Subsidiaries in excess of such $100,000 amount in any single transaction or related series of transactions, shall require the prior written approval of Requisite Lenders;

(b)    the consideration received for all such assets shall be in Cash in an amount at least equal to the fair market value thereof; and

(c)    the Net Asset Sale Proceeds of any Asset Sales, whether in any single transaction or related series of transactions, shall be applied as mandatory prepayments as required by subsection 2.4A(iii)(a) in an amount equal to such Net Asset Sale Proceeds.

**7.8**   **[Intentionally Omitted].**

**7.9**   **Sales and Lease-Backs.**

No Loan Party shall nor shall any Loan Party permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease, whether an Operating Lease or a Capital Lease, of any property (whether real, personal or mixed), whether now owned or hereafter acquired, (i) which such Loan Party or any of its Subsidiaries has sold or transferred or is to sell or transfer to any other Person (other than such Loan Party or any of its Subsidiaries) or (ii) which such Loan Party or any of its Subsidiaries intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Loan Party or any of its Subsidiaries to any Person (other than such Loan Party or any of its Subsidiaries) in connection with such lease.

**7.10    Transactions with Shareholders and Affiliates.**

No Loan Party shall nor shall any Loan Party permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of 5% or more of any class of equity Securities of Holdings or Company or with any Affiliate of Holdings or Company or of any such holder, on terms that are less favorable to Holdings or Company or that Subsidiary, as the case may be, than those that might be obtained at the time from Persons who are not such a holder or Affiliate; provided that the foregoing restriction shall not apply to (i) any transaction between Company and any of its wholly-owned Subsidiaries or between any of its wholly-owned Subsidiaries, and (ii) reasonable and customary fees paid to members of the Boards of Directors of Company and its Subsidiaries in accordance with the Approved Budget.

**7.11    Disposal of Subsidiary Stock.**

Except pursuant to the Collateral Documents, no Loan Party shall:

(i)      directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any shares of capital stock or other equity Securities of any of its Subsidiaries, except to qualify directors if required by applicable law; or

(ii)      permit any of its Subsidiaries directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any shares of capital stock or other equity Securities of any of its Subsidiaries (including such Subsidiary), except to Company, another Subsidiary of Company, or to qualified directors if required by applicable law.

**7.12    Conduct of Business.**

From and after the Closing Date, no Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, engage in any business other than (i) the businesses engaged in by such Loan Party and its Subsidiaries on the Closing Date and similar or related businesses and (ii) such other lines of business as may be consented to by Requisite Lenders.

**7.13    [Intentionally Omitted].**

**7.14    Fiscal Year.**

None of Company nor any of its Subsidiaries shall change its Fiscal Year-end from December 31 without giving 60 days notice to Agent and Lenders of such change.

**7.15    Foreign Unfunded Pension Plans.**

No Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, adopt or amend any Foreign Unfunded Pension Plan if such adoption or amendment could reasonably be expected to result in a Material Adverse Effect.

**7.16    Chapter 11 Claims.**

Without limiting the provisions of subsection 7.2 hereof, no Loan Party shall, nor shall any Loan Party permit any of its Subsidiaries to, (i) incur, create, assume, suffer or permit any claim or Lien or encumbrance against it or any of its property or assets in any Chapter 11 Case (other than the claims specifically referred to in subsection 2.10 and the Borrowing Orders, but only to the extent therein described) to be *pari passu* with or senior to the claims of Agent and Lenders against any Loan Party in respect of the DIP Obligations hereunder, or apply to the Court for authority to do so, except to the extent permitted herein, or (ii) incur or permit any other administrative expense claim (other than those specifically referred to in subsection 2.10) having any priority over, or being *pari passu* with, the administrative expense priority of the DIP Obligations in respect of any of the Chapter 11 Cases.

**7.17    Agreements.**

Loan Parties shall not, and shall not permit any of their Subsidiaries to, assume, reject, cancel, terminate, breach or modify (whether pursuant to Section 365 of the Bankruptcy Code, or any other applicable law) any Material Contract, except pursuant to a motion approved by the Court without objection by Agent.

**7.18    Remedies of Agent.**

Loan Parties shall not, and shall not permit any of their Subsidiaries to, seek to obtain any stay on the exercise of the remedies available to Agent under this Agreement.

**7.19    Use of Proceeds.**

Loan Parties shall not, and shall not permit any of their Subsidiaries to, use the proceeds of any Loans and/or Letters of Credit in any manner other than pursuant to, and in accordance with, the Approved Budget and Current Forecast.

**Section 8.    EVENTS OF DEFAULT**

Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Court, the occurrence of any one or more of

the following conditions or events, regardless of the reason therefore, shall constitute an "**Event of Default**" hereunder:

## 8.1   Failure to Make Payments When Due.

Failure by any Loan Party to pay any installment of principal of any Loan when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; failure by any Loan Party to pay when due any amount payable to an Issuing Lender in reimbursement of any drawing under a Letter of Credit; or failure by any Loan Party within five (5) days after the date due to pay interest on any Loan or any fee or any other amount due under this Agreement; or

## 8.2   Default in Other Agreements.

Holdings or any Loan Party shall default in the performance of or compliance with any term contained in other Loan Documents (other than this Agreement) other than those referred to in subsections 8.1, 8.3 or 8.4 and such default shall not have been remedied or waived within thirty (30) days after receipt by Holdings or such Loan Party, as the case may be, of notice from Agent of any such default; or

## 8.3   Breach of Covenants.

Failure of any Loan Party to perform or comply with any covenant, term or condition contained in this Agreement, provided, however, that with respect to all such covenant other than those contained in subsection 2.5, 6.1, 6.2, 6.3, 6.8, 6.9, 6.11, 6.13, 6.16 or Section 7 of this Agreement, no Event of Default shall be deemed to exist unless the failure continues for more than thirty (30) days after receipt by such Loan Party of notice from Agent of any such failure; or

## 8.4   Breach of Warranty.

Any representation, warranty, certification or other statement made by any Loan Party or any of its Subsidiaries in any Loan Document or in any statement or certificate at any time given by any Loan Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect on the date as of which made; or

## 8.5   Material Variance.  Any Material Variance shall exist; or

## 8.6   Involuntary Bankruptcy; Appointment of Receiver, etc.

(i) A court having jurisdiction in the premises shall enter a decree or order for relief in respect of any Loan Party (other than Company and Holdings) or any of its Material Subsidiaries in an involuntary case under the Bankruptcy Code which decree or order is not stayed; or (ii) an involuntary case shall be commenced against any Loan Party (other than Company and Holdings) or any of its Material Subsidiaries under the Bankruptcy Code; or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer

having similar powers over any Loan Party (other than Company and Holdings) or any of its Material Subsidiaries, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of any Loan Party (other than Company and Holdings) or any of its Material Subsidiaries for all or a substantial part of its property; or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of any Loan Party (other than Company and Holdings) or any of its Material Subsidiaries, and any such event described in this clause (ii) shall continue for 60 days unless dismissed, bonded or discharged; or (iii) with respect to Goss France: (a) Goss France ceases or threatens or announces an intention to cease or suspend payment of its debts whether pursuant to Article 3 of law No. 85-89 dated 25 January 1985 or otherwise, (b) Goss France becomes insolvent or has any moratorium declared in respect of any of its indebtedness, (c) Goss France applies for the appointment of a *conciliator* pursuant to law No. 84-148 dated 1 March 1984, (d) Goss France applies for the appointment of a *mandataire* ad hoc, (e) Goss France becomes the object of a judgment declaring its *redressment judiciare* (after notice to terminate addressed to the *administrateur* remaining without response for one month or upon the *administrateur* electing to terminate) or *liquidation judiciaire* pursuant to law No. 85-998 of January 25, 1985 or subject to a plan for the transfer of the whole or part of its business, or (f) an administrator, receiver, liquidator or similar officer is appointed with respect to Goss France or its assets or any petition or proceedings for any such appointment is brought or a resolution for such appointment is passed; or

**8.7    Voluntary Bankruptcy; Appointment of Receiver, etc.**

(i)    Any Loan Party (other than Company and Holdings) or any of its Material Subsidiaries shall have an order for relief entered with respect to it or commence a voluntary case under the Bankruptcy Code, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or any Loan Party (other than Company and Holdings) or any of its Material Subsidiaries shall make any assignment for the benefit of creditors; or (ii) any Loan Party (other than Company and Holdings) or any of its Material Subsidiaries shall be unable, or shall fail generally, or shall admit in writing, its inability to pay its debts as such debts become due; or the Board of Directors of any Loan Party (other than Company and Holdings) or any of its Material Subsidiaries (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to in clause (i) above or this clause (ii); or

**8.8    Bankruptcy Proceeding Events.**

With respect to the Chapter 11 Cases, (i) the entry of an order, which has not been withdrawn, dismissed or reversed:

(a)    authorizing any Debtor Entity in any of the Chapter 11 Cases to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code, or authorizing

any Person to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or (except as provided in the Interim Borrowing Order or the Final Borrowing Order) authorizing the use of Cash collateral without Requisite Lenders' prior written consent under Section 363(c) of the Bankruptcy Code; or

(b)     appointing an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of an examiner in any of the Chapter 11 Cases; or

(c)     without the prior written consent of Lenders, dismissing of any of the Chapter 11 Cases, or converting of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; or

(d)     the entry of an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code with respect to assets having a value in excess of $1,000,000 in the aggregate (x) to allow any creditor to execute upon or enforce a Lien on any Collateral or on any other property or assets of Holdings or Company or (y) with respect to any Lien of, or the granting of any Lien on any Collateral or any other property or assets of any Loan Party to, any State or local environmental or regulatory agency or authority; or

(e)     amending, supplementing, staying, reversing, vacating or otherwise modifying any of the Interim Borrowing Order, the Final Borrowing Order or this Agreement or any other Loan Document or any of Agent's or Lenders' rights, benefits, privileges or remedies under the Interim Borrowing Order, the Final Borrowing Order, this Agreement or any other Loan Document without the written consent of Requisite Lenders; or

(f)     [intentionally omitted]; or

(g)     consolidating or combining Holdings or Company with any other Person (other than Holdings or Company), except pursuant to the Plan of Reorganization with; or

(h)     approving, or there shall arise, any other administrative expense claim (other than those specifically referred to in subsection 2.10) having any priority over, or being *pari passu* with the administrative expense priority of the Obligations in respect of any of the Chapter 11 Cases; or

(ii) the filing by any Loan Party of a motion, application or other petition to effect or consent to any order referred to in the foregoing clause (i); or

**8.9     [Intentionally Omitted];**

**8.10     Judgments and Attachments.**

(i) Any money judgment, writ, warrant of attachment or order or similar process as to post-Petition Date liability or Indebtedness involving (a) in any individual case an amount in excess of $500,000 or (b) in the aggregate at any time an amount in excess of $1,000,000 (in

either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against Holdings, any Loan Party or any of its Subsidiaries or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 60 days (or in any event later than five days prior to the date of any proposed sale thereunder); or (ii) any non-monetary judgement or order with respect to a post-Petition Date event shall be rendered against Holdings, any Loan Party or any of its Subsidiaries which could reasonably be expected to result in a Material Adverse Effect and there shall be a period of 60 consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

**8.11    Dissolution.**

Any order, judgment or decree shall be entered against Holdings, any Loan Party or any of its Subsidiaries decreeing the dissolution or split up of Holdings, any Loan Party or that Subsidiary and such order shall remain undischarged or unstayed for a period in excess of 60 days; or

**8.12    Employee Benefit Plans.**

There shall occur one or more ERISA Events which individually or in the aggregate results in or might reasonably be expected to result in liability of any Loan Party or any of its Subsidiaries in excess of $1,000,000 during the term of this Agreement; or there shall exist an excess of aggregated accumulated benefit obligations, as defined in Statement of Financial Accounting Standards No. 87, over the aggregate total fair market value for all Pension Plans (excluding for purposes of such computation (1) each Pension Plan with respect to which the fair market value of the assets exceed such accumulated benefit obligations and (2) each Foreign Unfunded Pension Plan), which exceeds $12,000,000.

**8.13    Change in Control; Management.**

(i)    A change shall occur in the Board of Directors of Holdings so that a majority of the Board of Directors of Holdings ceases to consist of the individuals who constituted the Board of Directors of Holdings on the Petition Date (or individuals whose election or nomination for election was approved by a vote of at least 75% of the directors then in office who either were directors of Holdings on the Petition Date or whose election or nomination for election previously was so approved); or

(ii)    any Person or Group (within the meaning of Rule 13d-3 of the Securities and Exchange Commission), other than Stonington Partners and its Affiliates, shall become or be the owner, directly or indirectly, beneficially or of record, of shares representing more than 30% of the aggregate ordinary voting power represented by the issued and outstanding capital stock of Holdings on a fully diluted basis, unless Stonington and its Affiliates shall own and continue to so own capital stock representing not less than a majority of such aggregate ordinary voting power; or

(iii)    Holdings shall cease to beneficially own and control, directly or indirectly, 100% of the issued and outstanding shares of capital stock of Company or shall cease to have the ability to elect all of the Board of Directors of Company; or

(iv)    Company shall cease to beneficially own and control, directly or indirectly, 100% of the issued and outstanding shares of capital stock of each of the other Borrowers (other than directors' qualifying shares) or Company shall cease to have the ability to elect all of the Board of Directors of each of the other Loan Parties; or

**8.14    Invalidity of Loan Documents.**

Any Guaranty for any reason, other than the satisfaction in full of all Obligations, ceases to be in full force and effect (other than in accordance with its terms) or is declared to be null and void; or any Loan Party denies that it has any further liability, including without limitation with respect to future advances by Lenders, under any Loan Document to which it is a party, or gives notice to such effect; or the validity of any Loan Document shall be contested by any Governmental Authority (whether by a general suspension of payments or a moratorium on the payment of any class of indebtedness or otherwise); or any treaty, law, regulation, communique, decree, ordinance or policy of any Governmental Authority shall purport to render any provision of any Loan Document invalid or unenforceable or shall purport to prevent or materially delay the performance or observance by any Loan Party of its obligations under any Loan Documents; or

**8.15    Failure of Security.**

Any Collateral Document shall, at any time, cease to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms thereof) or shall be declared null and void, or the validity or enforceability thereof shall be contested by any Loan Party, or Agent shall not have or shall cease to have a valid and perfected first priority security interest in the Collateral; or

**8.16    Amendment of Certain Documents of Holdings.**

Holdings shall agree to any material amendment to, or waive any of its material rights under, or otherwise change any material terms of, the Holdings Subordinated Note Indenture, in each case as in effect on the Closing Date, in a manner adverse to Holdings or any of its Subsidiaries or to Lenders without the prior written consent of Agent and Requisite Lenders; or

**8.17    Conduct of Business Relating to Holdings.**

Holdings shall engage in any business other than owning 100% of the capital stock of Company and entering into and performing its obligations under and in accordance with the Loan Documents to which it is a party, or shall own any assets other than the capital stock of Company or shall incur or permit to exist any Indebtedness other than its Obligations and obligations arising pursuant to the Existing Credit Agreement; or

**8.18   Failure of Lock Up.**  Any party to the Prepetition Lender Lock Up Agreement or the Subdebt Lock Up Agreement shall elect to terminate its obligations thereunder in accordance with the terms thereof; or

**8.19   Failure to Accomplish Certain Milestones.**

The Debtor Entities shall have failed to accomplish any of the following reorganization milestones within the times set forth below:

(i)     The Court shall have entered the Interim Borrowing Order within fifteen (15) days after the Petition Date, and shall have entered the Final Borrowing Order within thirty (30) days after the Petition Date;

(ii)    Company and Holdings, within sixty (60) days after the Petition Date, shall have obtained the support of all creditor committees for the Plan of Reorganization, collectively sufficient to confirm the Plan of Reorganization; and

(iii)   The Court shall have issued an order approving the disclosure statements of Company and Holdings within sixty (60) days after the Petition Date.

provided that each of the above-described actions and/or documents shall be in form and substance satisfactory to Agent:

**THEN** upon the occurrence and during the continuation of any Event of Default, Agent, upon the written request or with the written consent of Requisite Lenders, shall (notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Court), by written notice to each Loan Party, declare all or any portion of (a) the unpaid principal amount of and accrued interest on the Loans, (b) an amount equal to the maximum amount that may at any time be drawn under all Letters of Credit then outstanding (whether or not any beneficiary under any such Letter of Credit shall have presented, or shall be entitled at such time to present, the drafts or other documents or certificates required to draw under such Letter of Credit), and (c) all other Obligations to be, and the same shall forthwith become, immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Loan Party (**"Acceleration Notice"**), and the obligation of each Lender to make any Loan, the obligation or right of any Issuing Lender to issue any Letter of Credit hereunder shall thereupon terminate; provided that the foregoing shall not affect in any way the obligations of Lenders under subsection 3.3C(i).

Any amounts described in clause (b) above, when received by Agent, shall be held by Agent pursuant to the terms of the Collateral Account Agreement and shall be applied as therein provided.

Notwithstanding anything contained in the second preceding paragraph, if at any time within 60 days after an acceleration of the Loans pursuant to such paragraph each Loan Party shall pay all arrears of interest and all payments on account of principal which shall have become due otherwise than as a result of such acceleration (with interest on principal and, to the extent permitted by law, on overdue interest, at the rates specified in this Agreement) and all

Events of Default and Potential Events of Default (other than non-payment of the principal of and accrued interest on the Loans, in each case which is due and payable solely by virtue of acceleration) shall be remedied or waived pursuant to subsection 10.6, then Requisite Lenders, by written notice to each Loan Party, may at their option rescind and annul such acceleration and its consequences; but such action shall not affect any subsequent Event of Default or Potential Event of Default or impair any right consequent thereon. The provisions of this paragraph are intended merely to bind Lenders to a decision which may be made at the election of Requisite Lenders and are not intended to benefit any Loan Party and do not grant any Loan Party the right to require Lenders to rescind or annul any acceleration hereunder, even if the conditions set forth herein are met.

Further upon the occurrence and during the continuance of any Event of Default, Agent may (i) exercise all rights and remedies of Agent set forth in any of the Collateral Documents, in addition to all rights and remedies allowed by, the United States and of any state thereof, including but not limited to the UCC, and (ii) revoke Loan Parties' rights to use cash collateral in which Agent has an interest. Neither Agent nor Lenders shall have any obligation of any kind to make a motion or application to the Court to exercise their rights and remedies set forth or referred to in this Agreement or in the other Loan Documents. The enumeration of the foregoing rights and remedies is not intended to be exhaustive and the exercise of any right or remedy shall not preclude the exercise of any other rights or remedies, all of which shall be cumulative and not alternative.

Agent shall have the authority to sell any portion of the Collateral or other assets of the Debtor Entities, subject to approval of the sale by the Court, pursuant to Section 363 of the Bankruptcy Code. The Debtor Entities' exclusive period to file and solicit votes for a plan of reorganization under Section 1121 of the Bankruptcy Code shall be deemed modified to permit the Agent on behalf of the Lenders to file a plan of reorganization and solicit votes therefor.

Each Loan Party hereby waives (i) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties or other property at any time held by Agent or Lenders on which Loan Parties may in any way be liable and hereby ratify and confirm whatever Agent and Lenders may lawfully do in this regard, (ii) all rights to notice and hearing prior to Agent's taking possession or control of, or to Agent or Lenders reply, attachment or levy upon, the Collateral, or any bond or security which might be required by any court prior to allowing Agent or Lenders to exercise any of their remedies, and (iii) the benefit of all valuation, appraisal and exemption laws. Each Loan Party acknowledges that it has been advised by counsel of its choice with respect to the effect of the foregoing waivers and this Agreement, the other Loan Documents and the transactions evidenced by this Agreement and the other Loan Documents.

## Section 9.   AGENT

### 9.1   Appointment.

BTCo and its applicable Affiliates are hereby appointed by each Lender as the Agent so appointed hereunder and under the other Loan Documents, and each such Lender hereby authorizes Agent to act as its agent in accordance with the terms of this Agreement and the other Loan Documents. Agent agrees to act upon the express conditions contained in this Agreement and the other Loan Documents, as applicable. The provisions of this Section 9 are solely for the benefit of Agent and Lenders and Loan Parties shall have no rights as a third party beneficiary of any of the provisions thereof. In performing its functions and duties under this Agreement, Agent shall act solely as an agent of Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Loan Party or any of its Subsidiaries.

### 9.2   Powers and Duties; General Immunity.

**A.   Powers; Duties Specified**. Each Lender irrevocably authorizes Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Loan Documents as are specifically delegated or granted to Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. Agent shall have only those duties and responsibilities that are expressly specified in this Agreement and the other Loan Documents. Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. Agent shall not have, by reason of this Agreement or any of the other Loan Documents, a fiduciary relationship in respect of any Lender; and nothing in this Agreement or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon Agent any obligations in respect of this Agreement or any of the other Loan Documents except as expressly set forth herein or therein.

**B.   No Responsibility for Certain Matters**. Agent shall not be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency of this Agreement or any other Loan Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by Agent to Lenders or by or on behalf of any Loan Party to Agent or any Lender in connection with the Loan Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Loan Party or any other Person liable for the payment of any Obligations, nor shall Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Loan Documents or as to the use of the proceeds of the Loans or the use of the Letters of Credit or as to the existence or possible existence of any Event of Default or Potential Event of Default. Anything contained in this Agreement to the contrary notwithstanding, Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the Letter of Credit Usage or the component amounts thereof.

     **C.**    **Exculpatory Provisions**. Neither Agent nor any of its officers, directors, employees or agents shall be liable to Lenders for any action taken or omitted by Agent under or in connection with any of the Loan Documents except to the extent caused by such party's gross negligence or willful misconduct. If Agent shall request instructions from Lenders with respect to any act or action (including the failure to take an action) in connection with this Agreement or any of the other Loan Documents, Agent shall be entitled to refrain from such act or taking such action unless and until Agent shall have received instructions from Requisite Lenders (or Requisite Enforcement Decision-makers, as applicable). Without prejudice to the generality of the foregoing, (i) Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper person or persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for Loan Parties and their Subsidiaries), accountants, experts and other professional advisors selected by it; and (ii) no Lender shall have any right of action whatsoever against Agent or any of its officers, directors, employees or agents as a result of Agent acting or (where so instructed) refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of Requisite Lenders (or Requisite Enforcement Decision-makers, as applicable). Agent shall be entitled to refrain from exercising any power, discretion or authority vested in it under this Agreement or any of the other Loan Documents unless and until it has obtained the instructions of Requisite Lenders (or Requisite Enforcement Decision-makers, as applicable). Agent shall not be required to take any action that is, in its opinion, contrary to law or to the terms of this Agreement, or any of the Loan Documents or which would in its opinion subject it or any of its officers, employees or directors to liability, and the Agent shall not be required to take any action under this Agreement or any of the Loan Documents.

     **D.**    **Agent Entitled to Act as Lender**. The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, Agent in its individual capacity as a Lender hereunder. With respect to their participation in the Loans and the Letters of Credit, Agent shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not performing the duties and functions delegated to it hereunder, and the term "Lender" or "Lenders" or any similar term shall, unless the context clearly otherwise indicates, includes Agent, in each case in its individual capacity. Agent and each of its respective Affiliates may accept deposits from, lend money to and generally engage in any kind of banking, trust, financial advisory or other business with any Loan Party or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from any Loan Party for services in connection with this Agreement and otherwise without having to account for the same to Lenders.

     **E.**    **Powers Coupled with an Interest**. All powers, authorizations and agencies granted to Agent under this Agreement are coupled with an interest and are irrevocable until the Obligations are paid in full and the Commitments are terminated.

**9.3**    **Representations and Warranties; No Responsibility for Appraisal of Creditworthiness.**

     Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of each Loan Party and its Subsidiaries in

connection with the making of the Loans and the issuance of Letters of Credit hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of each Loan Party and its Subsidiaries. Agent shall not have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and Agent shall not have any responsibility with respect to the accuracy of or the completeness of any information provided to Lenders.

**9.4     Right to Indemnity.**

Each Lender, in proportion to its Pro Rata Share of the DIP Loan Commitments, severally agrees to indemnify each of Agent and any Committee Member, and its respective officers, directors, employees or agents to the extent that Agent, such Lender and such officers, directors, employees or agents shall not have been reimbursed by Loan Parties, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits and reasonable costs and expenses (including, without limitation, reasonable counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against Agent or Committee Member and such officers, directors, employees or agents in exercising its or their powers, rights and remedies or performing its or their duties hereunder or under the other Loan Documents or otherwise in its or their capacity as Agent or Committee Member or as an officer, director, employee or agent of Agent or such Lender in any way relating to or arising out of this Agreement or the other Loan Documents; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's, such Committee Member's or such officer's, director's, employee's or agent's gross negligence or willful misconduct. If any indemnity furnished to Agent, such Committee Member or any such officer, director, employee or agent for any purpose shall, in the opinion of Agent, such Committee Member or such officer, director, employee or agent be insufficient or become impaired, Agent, such Committee Member or such officer, director, employee or agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished.

**9.5     Successor Agent.**

Agent may resign at any time by giving 30 days' prior written notice thereof to Lenders and each Loan Party, and either Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to each Loan Party and Agent, as the case may be, and signed by Requisite Lenders. Upon any such notice of resignation or any such removal, Requisite Lenders shall have the right, upon five Business Days' notice to each Loan Party, to appoint a successor Agent. Upon the acceptance of any appointment as Agent hereunder by a successor Agent that successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Agent and the retiring or removed Agent shall be discharged from its duties and obligations under this Agreement. After any retiring or removed Agent's resignation or removal hereunder as Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

**9.6** **Collateral Documents and Guaranties.**

Each Lender hereby further authorizes Agent to enter into each Collateral Document as secured party on behalf of and for the benefit of Lenders and agrees to be bound by the terms of each Collateral Document; provided that, subject to any provision of subsection 10.6 requiring the consent of any additional Lenders, Agent shall not enter into or consent to any amendment, modification, termination or waiver of any provision contained in any Collateral Document or any Guaranty without the prior consent of Requisite Lenders, but Agent may (i) release any Lien covering any items of Collateral that are the subject of a sale or other disposition of assets permitted by this Agreement or to which Requisite Lenders have consented and (ii) release any Guarantor (other than any Loan Party or Holdings) from its Guaranty if all of the capital stock of such Guarantor is sold to a Person that is not an Affiliate of Company pursuant to a sale or other disposition permitted hereunder or to which Requisite Lenders have consented.

[Each Lender hereby further authorizes Agent to execute and deliver on behalf of and for the benefit of Lenders, if Agent determines to be necessary or desirable, a *"Reiteration et Reservation Hypothecaire"* to be executed before a *"notaire"* (notary) in France. Anything contained in any of the Loan Documents to the contrary notwithstanding, each Lender agrees that no Lender shall have any right individually to realize upon any of the Collateral under any Collateral Document or to enforce any of the Guaranties, it being understood and agreed that all rights and remedies under the Collateral Documents and the Guaranties may be exercised solely by Agent for the benefit of Lenders in accordance with the terms thereof.]

[It is herein specified that the obligations of Goss France under this Agreement shall be in addition to its obligations resulting from the Existing Credit Agreement, and that Agent hereby reserves, as provided under Article 1278 of the French Civil Code, as security for the obligations of Goss France under this Agreement, the benefit of the security interest created by the *"Reiteration Delegation et Affectation Hypothecaire"* (mortgage agreement) dated October 15, 1996 (registered with the Mortgage Registry of Nantes on November 25, 1996, Volume 1996 V, n° 5627) between Agent and Goss France (formerly named Rockwell Systemes Graphiques Nantes, S.A.) and by the *"Reiteration de Contrat Decredit Modifier et Reserve de Garantie Hypothecaire"* (mortgage amendment) dated March 2, 1998 (registered with the Mortgage Registry of Nantes on _____, 1998, Volume _____, n° ____) between Agent and Goss France.]

[It is herein specified that obligations of Company under this Agreement shall be in addition to its obligations resulting from the Existing Credit Agreement, and that therefore Agent hereby reserves, as provided under Article 1278 of the French Civil Code, as security for the obligations of Company under this Agreement, the benefit of the security interest created by the Share Pledge Agreement dated October 15, 1996 among Company and Agent relating to the pledge of Goss France's shares by Company, and the Amendment Agreement dated January 29, 1998 among Company and Agent relating to the Share Pledge Agreement dated October 15, 1996.]

**Section 10.    MISCELLANEOUS**

**10.1    Assignments and Participations in Loans and Letters of Credit.**

    **A.    General.** Subject to subsection 10.1B, each Lender shall have the right at any time to (i) sell, assign or transfer to any Eligible Assignee, or (ii) sell participations to any Person in, all or any part of its Commitments or any Loan or Loans made by it or its Letters of Credit or participations therein or any other interest herein or in any other Obligations owed to it; provided that any assignment of any Type of DIP Loan Commitment shall constitute an assignment of the corresponding Foreign Bridge Loan Commitment, and no assignment of a Foreign Bridge Loan Commitment may be made except as a result of an assignment of a DIP Loan Commitment; provided further that any assignment of a Lender's Tranche 3 Commitment shall include an assignment of an equal percentage of its Tranche 1B Commitment, and vice versa; provided further that no such sale, assignment, transfer or participation shall, without the consent of Company, require Company to file a registration statement with the Securities and Exchange Commission or apply to qualify such sale, assignment, transfer or participation under the securities laws of any state; provided further that no such sale, assignment or transfer described in clause (i) above shall be effective unless and until an Assignment Agreement effecting such sale, assignment or transfer shall have been accepted by Agent and recorded in the Register as provided in subsection 10.1B(ii); and provided further that no such sale, assignment, transfer or participation of any Letter of Credit or any participation therein may be made separately from a sale, assignment, transfer or participation of a corresponding interest in the Commitment and the Loans of the Lender effecting such sale, assignment, transfer or participation. Except as otherwise provided in this subsection 10.1, no Lender shall, as between Loan Parties and such Lender, be relieved of any of its obligations hereunder as a result of any sale, assignment or transfer of, or any granting of participations in, all or any part of its Commitments or the Loans, the Letters of Credit or participations therein, or the other Obligations owed to such Lender.

    **B.    Assignments.**

        (i)    Amounts and Terms of Assignments. Each Commitment, Loan, Letter of Credit or participation therein, or other Obligation may (a) be assigned in any amount to another Lender, or to an Affiliate of the assigning Lender or another Lender, with the giving of notice to Company and Agent or (b) be assigned in an aggregate amount of not less than $5,000,000 (or such lesser amount as shall constitute the aggregate amount of the Commitments, Loans, Letters of Credit and participations therein, and other Obligations of the assigning Lender) to any other Eligible Assignee with the consent of Agent and, in the case of an assignment of an Indemnity Amount or an Indemnity Participation, the consent of Agent (which consent of Agent shall not be unreasonably withheld); provided that any such assignment by a Lender in accordance with either clause (a) or (b) above shall effect a pro rata assignment of each Type of Commitment and each Type of Loan of the assigning Lender, and in the event that any such assigning Lender is an Indemnifying Lender, shall also effect a pro rata assignment of any Indemnity Participation and Indemnity Amount; provided further that notwithstanding the foregoing, in the event that an Indemnifying Lender is making an assignment to any other Lender or Eligible Assignee, which Lender or Eligible Assignee desires to become

a UK Bridge Lender, a French Bridge Lender or a Japanese Bridge Lender hereunder, as the case may be, Agent shall be entitled to assign to such other Lender or Eligible Assignee, without making a pro rata assignment of any other Type of Commitment or Type of Loan of Agent, that portion of its UK Bridge Loan Commitment, its French Bridge Loan Commitment or its Japanese Bridge Loan Commitment, as the case may be, which represents the portion of the Indemnity Participation and Indemnity Amount being assigned to such other Lender or Eligible Assignee by such Indemnifying Lender, and upon such assignment by Agent, such other Lender or Eligible Assignee shall become a UK Bridge Lender, a French Bridge Lender or a Japanese Bridge Lender hereunder, as the case may be.  To the extent of any such assignment in accordance with either clause (a) or (b) above, the assigning Lender shall be relieved of its obligations with respect to its Commitments, Loans, Letters of Credit or participations therein, or other Obligations or the portion thereof so assigned.  The parties to each such assignment shall execute and deliver to Agent, for its acceptance and recording in the Register, an Assignment Agreement, together with a processing and recordation fee of $3,500, and with such forms, certificates or other evidence, if any, with respect to any withholding tax matters as the assignee under such Assignment Agreement may be required to deliver to Agent or the appropriate persons, as the case may be, pursuant to subsection 2.7B(iii)(a) (as fully set forth in Annex A).  Upon such execution, delivery, acceptance and recordation, from and after the effective date specified in such Assignment Agreement, (y) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement, shall have the rights and obligations of a Lender hereunder and (z) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment Agreement, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto; provided that, anything contained in any of the Loan Documents to the contrary notwithstanding, if such Lender is the Issuing Lender with respect to any outstanding Letters of Credit such Lender shall continue to have all rights and obligations of an Issuing Lender with respect to such Letters of Credit until the cancellation or expiration of such Letters of Credit and the reimbursement of any amounts drawn thereunder).  The Commitments hereunder shall be modified to reflect the Commitment of such assignee and any remaining Commitment of such assigning Lender and, if any such assignment occurs after the issuance of the Notes hereunder, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to Agent for cancellation, and thereupon new Notes shall be issued to the assignee and/or to the assigning Lender, substantially in the form of Exhibit IV annexed hereto, as the case may be, with appropriate insertions, to reflect the new Commitments and/or outstanding Loans, as the case may be, of the assignee and/or the assigning Lender.

      (ii)     Acceptance by Agent; Recordation in Register.  Upon its receipt of an Assignment Agreement executed by an assigning Lender and an assignee representing that it is an Eligible Assignee, together with the processing and recordation fee referred to in subsection 10.1B(i) and any forms, certificates or other evidence with respect to any withholding tax matters that such assignee may be required to deliver to Agent or the

appropriate persons, as the case may be, pursuant to subsection 2.7B(iii) (as fully set forth in Annex A), Agent shall, if Agent and Company have consented to the assignment evidenced thereby (in each case to the extent such consent is required pursuant to subsection 10.1B(i)), (a) accept such Assignment Agreement by executing a counterpart thereof as provided therein (which acceptance shall evidence any required consent of Agent to such assignment), (b) record the information contained therein in the Register, and (c) give prompt notice thereof to Company.  Agent shall maintain a copy of each Assignment Agreement delivered to and accepted by it as provided in this subsection 10.1B(ii).  Each Eligible Assignee shall be solely responsible for all fees, costs and expenses (including reasonable attorney fees, costs and expenses incurred by Agent) relating to the registering and recording the security interests of such Eligible Assignee with respect to any Mortgages in Japan.

      **C.**     **Participations.**  The holder of any participation (other than any holder of any Indemnity Participation), other than an Affiliate of the Lender granting such participation, shall not be entitled to require such Lender to take or omit to take any action hereunder except action directly affecting (i) the extension of the scheduled final maturity date of any Loan allocated to such participation or (ii) a reduction of the principal amount of or the rate of interest payable on any Loan allocated to such participation, and all amounts payable by Loan Parties hereunder (including without limitation amounts payable to such Lender pursuant to subsections 2.6D, 2.7 and 3.6) shall be determined as if such Lender had not sold such participation.  Each Loan Party and each Lender hereby acknowledges and agrees that, solely for purposes of subsections 10.4 and 10.5, (a) any participation will give rise to a direct obligation of such Loan Party to the participant and (b) the participant shall be considered to be a "Lender".

      **D.**     **Assignments to Federal Reserve Banks.**  In addition to the assignments and participations permitted under the foregoing provisions of this subsection 10.1, any Lender may assign and pledge all or any portion of its Loans, the other Obligations owed to such Lender, and its Notes to any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any operating circular issued by such Federal Reserve Bank; provided that (i) no Lender shall, as between any Loan Party and such Lender, be relieved of any of its obligations hereunder as a result of any such assignment and pledge and (ii) in no event shall such Federal Reserve Bank be considered to be a "Lender" or be entitled to require the assigning Lender to take or omit to take any action hereunder.

      **E.**     **Information.**  Each Lender may furnish any information concerning Company and its Subsidiaries in the possession of that Lender from time to time to assignees and participants (including prospective assignees and participants), subject to subsection 10.19.

## 10.2   Expenses.

Whether or not the transactions contemplated hereby shall be consummated, each Loan Party agrees to pay promptly (i) all the actual and reasonable costs and expenses of preparation of the Loan Documents and any consents, amendments, waivers or other modifications thereto; (ii) all the actual and reasonable costs of furnishing all opinions by counsel for any Loan Party (including without limitation any opinions requested by Lenders as to any legal matters arising

132

hereunder) and of any Loan Party's performance of and compliance with all agreements and conditions on its part to be performed or complied with under this Agreement and the other Loan Documents including, without limitation, with respect to confirming compliance with environmental and insurance requirements; (iii) the actual and reasonable fees, expenses and disbursements incurred by Agent (including without limitation reasonable attorneys' and consultants' fees and costs, and the actual and reasonable allocated costs of internal counsel) in connection with the negotiation, preparation, execution and administration of the Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by any Loan Party (including, without limitation, reasonable travel-related expenses incurred by Agent); (iv) all the actual and reasonable costs and expenses of creating and perfecting Liens in favor of Agent, on behalf of Lenders, pursuant to the Loan Documents, including without limitation costs of conducting record searches, examining Collateral, costs of title insurance premiums, real estate survey costs, and reasonable fees and taxes in connection with the filing of financing statements, costs of preparing and recording Loan Documents, reasonable fees and expenses of counsel for providing such opinions as Agent or Requisite Lenders may reasonably request, and reasonable fees and expenses of legal counsel to Agent; (v) all the actual costs and reasonable expenses of obtaining and reviewing any appraisals provided for under this Agreement and any environmental audits or reports provided for under this Agreement; (vi) all other actual and reasonable costs and expenses incurred by Agent in connection with the syndication of the Commitments and the negotiation, preparation and execution of the Loan Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; (vii) all reasonable costs and expenses, including reasonable attorneys' fees (including actual and reasonable allocated costs of internal counsel) and reasonable costs of settlement, incurred by Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Loan Party hereunder or under the other Loan Documents or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or pursuant to the Chapter 11 Cases or any other insolvency or bankruptcy proceedings, (viii) the actual and reasonable fees, expenses and disbursements incurred by Agent (including without limitation reasonable attorneys' and consultants' fees and costs, and the actual and reasonable allocated costs of internal counsel) in connection with the monitoring of, and participation in, the Chapter 11 Cases (including, without limitation, reasonable travel-related expenses incurred by Agent), and (ix) all other reasonable fees, expenses, disbursements and other costs or liabilities of any financial advisors, accountants, auditors or appraisers retained by Agent or its counsel in connection with this Agreement or any other Loan Document or the transactions contemplated thereby. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include reasonable: paralegal fees, costs and expenses; accountants' and experts' fees, costs and expenses; appraisers' fees, costs and expenses; management and other consultants' fees, costs and expenses; court costs and expenses; photocopying and duplicating expenses; court reporter fees, costs and expenses; long distance telephone charges; communication charges, air express charges; telegram charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other professional services.

## 10.3   Indemnity.

In addition to the payment of expenses pursuant to subsection 10.2, whether or not the transactions contemplated hereby shall be consummated, each Loan Party agrees to defend, indemnify, pay and hold harmless Agent and Lenders, and the officers, directors, employees, attorneys, agents and affiliates of Agent and Lenders (collectively called the "**Indemnitees**") from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including without limitation the reasonable fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened by any Person, whether or not any such Indemnitee shall be designated as a party or a potential party thereto), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including without limitation securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of this Agreement or the other Loan Documents or the Chapter 11 Cases or the transactions contemplated hereby or thereby (including without limitation Lenders' agreement to make the Loans hereunder or the use or intended use of the proceeds of any of the Loans or the issuance of Letters of Credit hereunder or the use or intended use of any of the Letters of Credit) or the statements contained in the commitment letter delivered by any Lender to any Loan Party with respect thereto (collectively called the "**Indemnified Liabilities**"); provided that Loan Parties shall not have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent such Indemnified Liabilities arise solely from the gross negligence or willful misconduct of that Indemnitee as determined by a final judgment of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, no Foreign Borrower shall be liable under this Section 10.3 in respect of the actions, omissions or expenses generated by other Borrowers.  To the extent that the undertaking to defend, indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, each Loan Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.

Without limiting the generality of the foregoing, each Loan Party further agrees to fully and promptly pay, perform, discharge, defend (subject to Indemnitee's selection of counsel), indemnify and hold harmless each Indemnitee from and against any Indemnified Environmental Liabilities; provided that Loan Parties shall not have any obligation to any Indemnitee hereunder with respect to any Indemnified Environmental Liabilities to the extent such Indemnified Environmental Liabilities arise solely from the gross negligence or willful misconduct of that Indemnitee as determined by a final judgment of a court of competent jurisdiction. To the extent that the undertaking to defend, indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, each Loan Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Environmental Liabilities incurred by the Indemnitees or any of them.  As used herein, "**Indemnified Environmental Liabilities**" means any liabilities, obligations, losses, damages (including, without limitation, natural resource damages), penalties, actions, judgments, suits, claims

(including Environmental Claims), costs (including, without limitation, the costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation, or other response action necessary to remove, remediate, clean up, or abate any Hazardous Materials or any activity relating to Hazardous Materials that is in violation of any Environmental Laws or that presents a material risk of giving rise to an Environmental Claim), expenses and disbursements of any kind or nature whatsoever, whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations (including without limitation securities and commercial laws, statutes, rules or regulations and Environmental Laws), on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of: (i) any Release, threatened Release or disposal of any Hazardous Materials at any of the Facilities; (ii) the Release, threatened Release, or disposal at any location of any Hazardous Materials generated at or originating from any of the Facilities by or at the direction of Company or any of its Subsidiaries; (iii) any Environmental Claim in connection with any of the Facilities; or (iv) the operation of or violation of any Environmental Law at any of the Facilities.

## 10.4    Set-Off; Security Interest in Deposit Accounts.

In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, and notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to, or order from, the Court, upon the occurrence of any Event of Default and consultation with Agent each Lender is hereby authorized by each Loan Party at any time or from time to time, without notice to any Loan Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including, but not limited to, Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by that Lender or any of its Affiliates to or for the credit or the account of such Loan Party against and on account of the obligations and liabilities of such Loan Party under this Agreement, the Letters of Credit and participations therein and the other Loan Documents, including, but not limited to, all claims of any nature or description arising out of or connected with this Agreement, the Letters of Credit and participations therein or any other Loan Document, irrespective of whether or not (i) that Lender shall have made any demand hereunder or (ii) the principal of or the interest on the Loans or any amounts in respect of the Letters of Credit or any other amounts due hereunder shall have become due and payable pursuant to Section 8 and although said obligations and liabilities, or any of them, may be contingent or unmatured. Each Loan Party hereby further grants to Agent and each Lender for the benefit of all Lenders a security interest in all deposits and accounts maintained with Agent or such Lender as security for the Obligations.

## 10.5    Ratable Sharing

Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment, by realization upon security, through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Loan Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of

principal, interest, amounts payable in respect of Letters of Credit, fees and other amounts then due and owing to that Lender from a Loan Party hereunder or under the other Loan Documents (collectively, the **"Aggregate Amounts Due"** to such Lender) which is greater than such Lender would have received if the sum received had been received by Agent and applied in accordance with subsection 2.4A(iv)(b), then the Lender receiving such sum shall (i) notify Agent and each other Lender of the receipt of such payment and (ii) apply a portion of such sum to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all Lenders in the proportion that would have resulted if the sum received had been received by Agent and applied in accordance with subsection 2.4A(iv)(b); provided that if all or part of such sum received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of such Loan Party or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Each Loan Party expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by such Loan Party to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

## 10.6    Amendments and Waivers.

No amendment, modification, termination or waiver of any provision of this Agreement or of the Notes, and no consent to any departure by any Loan Party therefrom, shall in any event be effective without the written concurrence of such Loan Party and Requisite Lenders; provided that any such amendment, modification, termination, waiver or consent which:

(a)    extends the final scheduled maturity of any Loan or Note, or extends the stated maturity of any Letter of Credit beyond the Commitment Termination Date (except in accordance with subsection 2.11), or reduces the rate or extends the time of payment of interest or fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates), or reduces the principal amount thereof (except to the extent repaid in cash); or

(b)    releases all or substantially all of (x) the Collateral (except as expressly provided in the Loan Documents) under all the Collateral Documents, or (y) the Guarantors (except as expressly provided in the Loan Documents) from their obligations under any of the Guaranties; or

(c)    amends, modifies or waives any provision of this subsection 10.6; or

(d)    reduces the percentage specified in the definition "Requisite Lenders"; or

(e)    consents to the assignment or transfer by any Loan Party of any of its rights and obligations under this Agreement or any other Loan Document;

shall be effective only if evidenced in a writing signed by or on behalf of all Lenders (with Obligations being directly affected in the case of clause (a) above); provided further that any such amendment, modification, termination, waiver or consent which reduces the percentage specified in the definition of "Supermajority" for a Type of Lenders shall be effective only if evidenced in a writing signed by or on behalf of all Lenders of such Type; provided further that any such amendment, modification, termination, waiver or consent which changes the definition of "Requisite Enforcement Decision-makers" shall be effective only if evidenced in a writing signed by or on behalf of all Senior Lenders.

In addition, (i) no amendment, modification, termination or waiver of any provision of this Agreement which affects only the Tranche 1A Facility or only the Tranche 1B Facility shall be effective without the written concurrence of Lenders having or holding a majority of the aggregate Loan Exposure under the Tranche 1A Facility and Tranche 1B Facility, and (ii) no amendment, modification, termination or waiver of any provision of this Agreement which affects only the Tranche 2 Facility or only the Tranche 3 Facility shall be effective without the written concurrence of Lenders having or holding a majority of the aggregate Loan Exposure under the Tranche 2 Facility and Tranche 3 Facility.

In addition, (i) no amendment, modification, termination or waiver of any provision of any Note shall be effective without the written concurrence of the Lender which is the holder of that Note, (ii) to the extent related to (a) UK Bridge Indemnifying Lenders or UK Bridge Loan Commitments, (b) French Bridge Indemnifying Lenders or French Bridge Loan Commitments, or (c) Japanese Bridge Indemnifying Lenders or Japanese Bridge Loan Commitments, no amendment, modification, termination or waiver of any provision of subsection 2.9 or of related definitions shall be effective without the written concurrence of, respectively, (x) the UK Bridge Indemnifying Lenders holding a majority of the UK Bridge Loan Exposure and of Agent, (y) the French Bridge Indemnifying Lenders holding a majority of the French Bridge Loan Exposure and of Agent, and (z) the Japanese Bridge Indemnifying Lenders holding a majority of the Japanese Bridge Loan Exposure and of Agent, and (iii) no amendment, modification, termination or waiver of any provision of Section 9 or of any other provision of this Agreement which, by its terms, expressly requires the approval or concurrence of Agent shall be effective without the written concurrence of Agent.

Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of that Lender. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Loan Party in any case shall entitle such Loan Party to any other or further notice or demand in similar or other circumstances. Any amendment, modification, termination, waiver or consent effected in accordance with this subsection 10.6 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by any Loan Party, on such Loan Party. Neither this subsection 10.6 nor any other provision of this Agreement or in any other Loan Document shall give any Lender, in its capacity as a Lender hereunder, any right, privilege or vote to amend, modify, terminate or waive any provision of the Existing Credit Agreement, any notes issued thereunder, any of the other Loan Documents (as defined therein) or any Liens granted in favor of Prepetition Lenders thereunder.

**10.7    Independence of Covenants.**

All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of an Event of Default or Potential Event of Default if such action is taken or condition exists.

**10.8    Notices.**

Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telexed or sent by telefacsimile or mail or courier service and shall be deemed to have been given when delivered in person or by courier service, upon receipt of telefacsimile or telex, or three Business Days after depositing it in the mail with postage prepaid and properly addressed; provided that notices to Agent shall not be effective until received. For the purposes hereof, the address of each party hereto shall be as set forth under such party's name on the signature pages hereof or (i) as to Loan Parties and Agent, such other address as shall be designated by such Person in a written notice delivered to the other parties hereto and (ii) as to each other party, such other address as shall be designated by such party in a written notice delivered to Agent.

**10.9    Survival of Representations, Warranties and Agreements.**

**A.**    All representations, warranties and agreements made herein shall survive the execution and delivery of this Agreement and the making of the Loans and the issuance of the Letters of Credit hereunder.

**B.**    Notwithstanding anything in this Agreement or implied by law to the contrary, the agreements of Loan Parties set forth in subsections 2.6D, 2.7, 3.5A, 3.6, 10.2, 10.3 and 10.4 and the agreements of Lenders set forth in subsections 9.2C, 9.4 and 10.5 shall survive the payment of the Loans, the cancellation or expiration of the Letters of Credit and the reimbursement of any amounts drawn thereunder, and the termination of this Agreement.

**10.10    Failure or Indulgence Not Waiver; Remedies Cumulative.**

No failure or delay on the part of Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. All rights and remedies existing under this Agreement and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

**10.11    Marshalling; Payments Set Aside.**

None of Agent or any Lender shall be under any obligation to marshal any assets in favor of any Loan Party or any other party or against or in payment of any or all of the Obligations. To the extent that any Loan Party makes a payment or payments to Agent or

Lenders (or to Agent for the benefit of Lenders), or Agent or Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**10.12  Severability.**

In case any provision in or obligation under this Agreement or the Notes shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**10.13  Obligations Several; Independent Nature of Lenders' Rights.**

The obligations of Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitments of any other Lender hereunder.  Nothing contained herein or in any other Loan Document, and no action taken by Lenders pursuant hereto or thereto, shall be deemed to constitute Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**10.14  Headings.**

Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**10.15  Applicable Law.**

**THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES EXCEPT TO THE EXTENT PREEMPTED BY FEDERAL BANKRUPTCY LAW.**

**10.16  Successors and Assigns.**

This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and

assigns of Lenders (it being understood that Lenders' rights of assignment are subject to subsection 10.1). None of Loan Parties' rights or obligations hereunder nor any interest therein may be assigned or delegated by any Loan Party without the prior written consent of all Lenders.

## 10.17  Consent to Jurisdiction and Service of Process.

ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST GOSS UK, GOSS FRANCE AND/OR GOSS JAPAN ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT OR ANY OBLIGATION MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF NEW YORK, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT EACH LOAN PARTY ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT, SUCH OTHER DIP LOAN DOCUMENT OR SUCH OBLIGATION. Each Loan Party hereby agrees that service of all process in any such proceeding in any such court may be made by registered or certified mail, return receipt requested, to such Loan Party at its address provided in subsection 10.8, such service being hereby acknowledged by such Loan Party to be sufficient for personal jurisdiction in any action against such Loan Party in any such court and to be otherwise effective and binding service in every respect. Nothing herein shall affect the right to serve process in any other manner permitted by law or shall limit the right of any Lender to bring proceedings against any Loan Party in the courts of any other jurisdiction.

## 10.18  Waiver of Jury Trial.

EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER DIP LOAN DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/LOAN PARTY RELATIONSHIP THAT IS BEING ESTABLISHED. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims. Each party hereto acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings. Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SUBSECTION 10.18 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS,

**SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR ANY OF THE OTHER DIP LOAN DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.** In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

**10.19  Confidentiality.**

Each Lender shall hold all non-public information obtained pursuant to the requirements of this Agreement which has been identified in writing as confidential by any Loan Party in accordance with such Lender's customary procedures for handling confidential information of this nature and in accordance with safe and sound banking practices, it being understood and agreed by each Loan Party that in any event a Lender may make disclosures to Affiliates of such Lender, to the legal counsel and accountants of such Lender or of such Affiliates, or disclosures reasonably required by any bona fide assignee, transferee or participant (who shall have agreed to the confidentiality of the same) in connection with the contemplated assignment or transfer by such Lender of any Loans or any participations therein or disclosures required or requested by any governmental agency or representative thereof or pursuant to legal process; provided that, unless specifically prohibited by applicable law or court order, each Lender shall notify Company of any request by any governmental agency or representative thereof (other than any such request in connection with any examination of the financial condition of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information; and provided further that in no event shall any Lender be obligated or required to return any materials furnished by Company or any of its Subsidiaries.

**10.20  Judgment Currency.**

(a)     If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in any currency (the **"Original Currency"**) into another currency (the **"Other Currency"**), the parties hereto agree, to the fullest extent permitted by law, that the rate of exchange used shall be that at which in accordance with normal banking procedures Agent or a Lender could purchase the Original Currency with such Other Currency in New York, New York on the Business Day immediately preceding the day on which any such judgment, or any relevant part thereof, is given.

(b)     The obligations of each Loan Party in respect of any sum due from it to Agent or any Lender hereunder shall, notwithstanding any judgment in such Other Currency, be discharged only to the extent that on the Business Day following receipt by Agent or Lender of any sum adjudged to be so due in such Other Currency Agent or Lender may in accordance with normal banking procedures purchase the Original Currency with such Other Currency; if the Original Currency so purchased is less than the sum originally due Agent or Lender in the Original Currency, such Loan Party agrees, as a separate obligation and notwithstanding any such judgment, to indemnify Agent or Lender against such loss, and if the Original Currency so purchased exceed the sum originally due to Agent or Lender in the Original Currency, Lender shall remit such excess to such Loan Party.

### 10.21  Counterparts; Effectiveness.

This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by each Loan Party and Agent of written or telephonic notification of such execution and authorization of delivery thereof.

### 10.22  No Immunity.

To the extent that any Loan Party has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to itself or its property, to the fullest extent permitted by law, such Loan Party hereby irrevocably waives such immunity in respect of its obligations under this Agreement and, without limiting the generality of the foregoing, agrees that the waivers set forth in this subsection 10.22 shall have the fullest scope permitted under the Foreign Sovereign Immunities Act of 1976 of the United States and are intended to be irrevocable for purposes of such Act.

### 10.23  Intention to Secure Obligations Under Currency Agreements.

Loan Parties may from time to time enter into one or more Currency Agreements with or one or more Lenders in accordance with the terms of the Credit Agreement, and it is intended that the obligations of Loan Parties under the Currency Agreements, including the obligation of Loan Parties to make payments thereunder in the event of early termination thereof be secured pursuant to the Loan Documents.

### 10.24  Parties Including Trustees; Court Proceedings.

This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Agent and each Lender, and the assigns, transferees and endorsees of Agent and each Lender. The security interests and Liens created in this Agreement, the Collateral Documents and the other Loan Documents shall be and remain valid and perfected, and the claims of Agent and Lenders hereunder valid and enforceable in accordance with the terms hereof, notwithstanding the discharge of any Loan Party pursuant to 11 U.S.C. § 1141, the conversion of any Chapter 11 Case or any other bankruptcy case of any Loan Party to a case under Chapter 7 of the Bankruptcy Code, the dismissal of any Chapter 11 Case or any subsequent Chapter 7 case or the release of any Collateral from the property of any Loan Party. The security interests and Liens created in this Agreement, the Collateral Documents and the other Loan Documents shall be and remain valid and perfected without the necessity that Agent file financing statements or otherwise perfect its security interests or Liens under applicable law. This Agreement, the claims of Agent and Lenders hereunder, and all security interests or Liens created hereby or pursuant hereto or by or pursuant to the Collateral Documents or any other

Loan Document shall at all times be binding upon Loan Parties, the estates of Loan Parties and any trustee appointed in any Chapter 11 Case or any Chapter 7 case, or any other successor in interest to Loan Parties. This Agreement shall not be subject to Section 365 of the Bankruptcy Code.

**10.25  Consent and Waiver .** Each of the Loan Parties hereby acknowledges that it is not a beneficiary of the terms of the Consent and Waiver (regardless of whether such Loan Party executed the Consent and Waiver), and that the Consent and Waiver, or any term thereof, may be modified or waived in whole or in part without consent of, consultation with or notice to any Loan Party. The Lenders hereby agree that the vote of Requisite Lenders shall be sufficient to take action on behalf of the DIP Lenders under the Consent and Waiver, including, without limitation, for purposes of modifying or waiving the Consent and Waiver or any term thereof, in whole or in part.

**10.26  Intercreditor Terms .**

(a)  **Enforcement Decision-making**. The Agent shall, subject to the terms of Section 9, make such demands and give such notices under the Loan Documents as Requisite Enforcement Decision-makers may request, and to take such action to enforce the Loan Documents and to foreclose upon, collect and dispose of the Collateral or any portion thereof as may be directed by Requisite Enforcement Decision-makers. The Foreign Bridge Lenders understand and agree that such decisions relating to the Foreign Collateral Documents and the Foreign Collateral shall be made by Requisite Enforcement Decision-makers, notwithstanding that the Lenders constituent to such decisions may not have made Foreign Bridge Loans or issued or participated in Foreign Bridge Letters of Credit. Each Lender, Currency Exchanger and Cash Management Lender agrees that (i) the Agent may act as Requisite Enforcement Decision-makers may request (regardless of whether any such Lender or any holder represented thereby agrees, disagrees or abstains with respect to such request), (ii) the Agent shall have no liability for acting in accordance with such request and (iii) no Lender shall have any liability to any other Lender with respect to such request. The Agent shall provide reasonably prompt notice to all Lenders of actions taken pursuant to the instructions of Requisite Enforcement Decision-makers; provided, however, that the failure to give any such notice shall not impair the right of the Agent to take any such action or the validity or enforceability under this Agreement or the applicable Collateral Document or Guaranty of the action so taken.

(b)  **Negative Covenant of Lenders**. Each Lender agrees, for the benefit of Agent and each other Lender, that it shall not (i) exercise or seek to exercise any rights or exercise any remedies with respect to any Collateral, or any Guaranty, except through Agent, as contemplated by this Agreement; or (ii) institute any action or proceeding with respect to such rights or remedies with respect to any Collateral, including without limitation, any action of foreclosure or execution of any judgment or other Lien, except through Agent, as contemplated by this Agreement; or (iii) contest, protest or object to any exercise of rights or enforcement of remedies under any Collateral Document or Guaranty by Agent, including without limitation, any action of foreclosure or execution of any judgment or other Lien.

(c)  **Provisions Defining Relative Rights; Waiver Of Notice With Respect To Certain Events; Reliance.** This Agreement is intended solely for the purpose of defining the

relative rights of the Lenders as between one another, and no other Person shall have any right, benefit or other interest under this subsection 10.26. Nothing contained in this Agreement is intended to affect or limit, in any way whatsoever, the security interest that each Senior Lender and/or each Junior Lender and/or each Foreign Bridge Lender has in any Collateral insofar as the rights of any Loan Party or any third parties are involved and nothing in this Agreement is intended to affect or limit, in any way whatsoever, the security interests that the Lenders have in any Collateral. Each Senior Lender, each Junior Lender and each Foreign Bridge Lender specifically reserves any and all of their respective rights, security interests, and rights to assert security interests as against Holdings, Company, each Foreign Borrower or third party other than as set forth herein and as against any Loan Party other than Holdings, Company, each Foreign Borrower and against any third parties. No Loan Party may enforce the terms of this subsection 10.26, or assert any defense to enforcement of Loan Documents or any security interest thereunder on the basis of these terms.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

[Signatures on next page]

## Annex A

### 2.7   Increased Costs; Taxes; Capital Adequacy.

     **A.**    **Compensation for Increased Costs and Taxes.** Subject to the provisions of subsection 2.7B, in the event that any Lender shall determine (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto) that any law, treaty or governmental rule, regulation or order, or any change therein or in the interpretation, administration or application thereof (including the introduction of any new law, treaty or governmental rule, regulation or order), or any determination of a court or governmental authority, in each case that becomes effective after the date hereof, or compliance by such Lender with any guideline, request or directive issued or made after the date hereof by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law):

         (i)    subjects such Lender (or its applicable lending office) to any additional Tax (other than any Tax on the overall net income of such Lender) with respect to this Agreement or any of its obligations hereunder or any payments to such Lender (or its applicable lending office) of principal, interest, commitment fees or any other amount payable hereunder;

         (ii)    imposes, modifies or holds applicable any reserve (including without limitation any marginal, emergency, supplemental, special or other reserve), special deposit, compulsory loan, FDIC insurance or similar requirement against assets held by, or deposits or other liabilities in or for the account of, or advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of such Lender (other than any such reserve or other requirements with respect to Offshore Rate Loans that are reflected in the definition of Adjusted Offshore Rate); or

         (iii)    imposes any other condition (other than with respect to a Tax matter) on or affecting such Lender (or its applicable lending office) or its obligations hereunder or the interbank Eurodollar market for the Applicable Currency;

and the result of any of the foregoing is to increase the cost to such Lender of agreeing to make, making or maintaining Loans hereunder or to reduce any amount received or receivable by such Lender (or its applicable lending office) with respect thereto in an amount deemed by such Lender (in its sole discretion) to be material; then, in any such case, the applicable Loan Party shall promptly pay to such Lender, upon receipt of the statement referred to in the next sentence, such additional amount or amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as such Lender in its sole discretion shall determine) as may be necessary to compensate such Lender for any such increased cost or reduction in amounts received or receivable hereunder. Such Lender shall deliver to the applicable Loan Party (with a copy to Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to such Lender under this subsection 2.7A, which statement shall be conclusive and binding upon all parties hereto absent manifest error.

**B.** **Withholding of Taxes**.

(i)    Payments to Be Free and Clear.  All sums payable by Loan Parties under this Agreement and the other Loan Documents shall be paid free and clear of, and, except to the extent required by law, without any deduction or withholding on account of, any Tax (other than a Tax on the overall net income of any Lender) imposed, levied, collected, withheld or assessed by or within the United States of America, the UK, France or Japan or any political subdivision in or of the United States of America, the UK, France or Japan or any other jurisdiction from or to which a payment is made by or on behalf of any Loan Party or by any federation or organization of which the United States of America, the UK, France or Japan or any such jurisdiction is a member at the time of payment.

(ii)    Grossing-up of Payments.  If any Loan Party or any Funding Lender with respect to any payments made to an Indemnifying Lender under subsection 2.9 is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by any Loan Party to Agent or any Lender under any of the Loan Documents or by any Funding Lender with respect to any payments made to an Indemnifying Lender under subsection 2.9:

(a)    such Loan Party shall notify Agent of any such requirement or any change in any such requirement as soon as such Loan Party becomes aware of it;

(b)    such Loan Party shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on such Loan Party) for its own account or (if that liability is imposed on Agent or any such Lender, as the case may be) on behalf of and in the name of Agent or any such Lender;

(c)    the sum payable by such Loan Party or by such Funding Lender in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, Agent, such Lender or Indemnifying Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made; and

(d)    within 30 days after paying any sum from which it is required by law to make any deduction or withholding, and within 30 days after the due date of payment of any Tax which it is required by clause (b) above to pay, such Loan Party shall deliver to Agent evidence reasonably satisfactory to the other affected parties of such deduction, withholding or payment and of its making payment thereof to the relevant taxing or other authority;

provided that no such additional amount of United States Tax shall be required to be paid to any Lender under clause (c) above except to the extent that any change after the date

Annex A-2

hereof (in the case of each Lender listed on the signature pages hereof) or after the date of the Assignment Agreement pursuant to which such Lender became a Lender (in the case of each other Lender) in any such requirement for a deduction, withholding or payment as is mentioned therein shall result in an increase in the rate of such deduction, withholding or payment from that in effect at the date of this Agreement or at the date of such Assignment Agreement, as the case may be, in respect of payments to such Lender; provided further that any such additional amount of UK, French, or Japanese Tax, as the case may be, shall be required to be paid by Loan Party to Agent, any applicable Indemnifying Lender or to any other Lender under clause (c) above whether or not any such payment shall be required as a result of any change in applicable laws and regulations after the date hereof (i.e., Loan Party shall be required to pay such additional amount of UK, French, or Japanese Tax, as the case may be, even if the obligation to make such payment shall have arisen under applicable laws and regulations as in effect on the date hereof); and provided further that notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, to the extent that Agent is required by any applicable law or regulation, whether or not in effect on the date hereof, to make any deduction or withholding on account of any such UK, French, or Japanese Tax from any sum paid or payable by Agent to any Indemnifying Lender pursuant to subsection 2.9, (a) Loan Party shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on such Loan Party) for its own account or (if that liability is imposed on Agent or such Indemnifying Lender, as the case may be) on behalf of and in the name of Agent or such Indemnifying Lender; and (b) the sum payable by such Loan Party or by Agent in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, Agent or Indemnifying Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made.   Loan Party shall indemnify Agent and each applicable Indemnifying Lender for any Tax (other than a Tax on the overall net income of any Lender) imposed, levied, collected, withheld or assessed by or under any applicable Governmental Authority with respect to the payments to be made pursuant to subsection 2.9.

    (iii)    <u>Evidence of Exemption from Withholding Taxes</u>.

        (a)    (1)    Each Lender that is organized under the laws of any jurisdiction other than the United States or any state or other political subdivision thereof (for purposes of this subsection 2.7B(iii), a **"Non-US Lender"**) shall deliver to Agent for transmission to Company, on or prior to the Closing Date (in the case of each Lender listed on the signature pages hereof) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a Lender (in the case of each other Lender), and at such other times as may be necessary in the determination of Company or Agent (each in the reasonable exercise of its discretion), (X) two original copies of Internal Revenue Service Form 1001 or 4224 (or any successor forms), properly completed and duly executed by such Non-US Lender, together with any other certificate or statement of exemption

required under the Internal Revenue Code or the regulations issued thereunder to establish that such Non-US Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Non-US Lender of principal, interest, fees or other amounts payable under any of the Loan Documents or (Y) if such Non-US Lender is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code and cannot deliver either Internal Revenue Service Form 1001 or 4224 pursuant to clause (X) above, a Certificate re Non-Bank Status together with two original copies of Internal Revenue Service Form W-8 (or any successor form), properly completed and duly executed by such Non-US Lender, together with any other certificate or statement of exemption required under the Internal Revenue Code or the regulations issued thereunder to establish that such Non-US Lender is not subject to deduction or withholding of United States federal income tax with respect to any payments to such Non-US Lender of interest payable under any of the Loan Documents.

(2)     Each UK Bridge Lender (other than a UK Qualifying Lender; provided that this clause 2.7B(iii)(a)(2) shall apply to a UK Qualifying Lender who loses such status, other than through a change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof after the Relevant Date (as defined below) as set out in clause 2.7B(iii)(c), from the date of such loss) shall deliver to the appropriate Person such application forms, certificates, documents or other evidence as may be required from time to time, properly completed and duly executed by such UK Bridge Lender, to enable Goss UK to be able to pay interest on the UK Bridge Loans from it without withholding or deduction for or on account of any UK income tax. Each UK Bridge Lender severally warrants to Goss UK that on the Relevant Date (as defined in clause 2.7B(iii)(c)) (i) it is a UK Qualifying Lender or (ii) it is a UK Double Tax Treaty Lender that has or will timely fulfill its obligations under this subsection 2.7B(iii).

(3)     Each French Bridge Lender that is organized under the laws of any jurisdiction other than France or any political subdivision thereof (for purposes of this subsection 2.7B(iii), a **"Non-French Bridge Lender"**) agrees to deliver to Goss France and Agent upon request such certificates, documents or other evidence as may be required from time to time, properly completed and duly executed by such Non-French Bridge Lender, to establish the basis for any applicable exemption from or reduction of Taxes with respect to any payments to such Non-French Bridge Lender of principal, interest, fees, commissions or any other amount payable under this Agreement or the French Bridge Loans.

(4)     Each Japanese Bridge Lender that is organized under the laws of any jurisdiction other than Japan or any political subdivision thereof (for purposes of this subsection 2.7B(iii), a **"Non-Japanese Bridge Lender"**) agrees to deliver to Goss Japan and Agent upon request such certificates, documents or other evidence as may be required from time to time, properly completed and duly executed by such Non-Japanese Bridge Lender, to establish the basis for any

Annex A-4

L.A3:979117.9

applicable exemption from or reduction of Taxes with respect to any payments to such Non-Japanese Bridge Lender of principal, interest, fees, commissions or any other amount payable under this Agreement or the Japanese Bridge Loans.

(b)    Each Lender required to deliver any forms, certificates or other evidence with respect to United States federal income tax withholding matters or UK, French or Japanese income tax withholding matters pursuant to subsection 2.7B(iii)(a) hereby agrees, from time to time after the initial delivery by such Lender of such forms, certificates or other evidence, whenever a lapse in time or change in circumstances renders such forms, certificates or other evidence obsolete or inaccurate in any material respect, that such Lender shall (1)(W) in the case of any Non-US Lender, promptly deliver to Agent for transmission to Company two new original copies of Internal Revenue Service Form 1001 or 4224, or a Certificate re Non-Bank Status and two original copies of Internal Revenue Service Form W-8, as the case may be, (X) in the case of any Non-French Bridge Lender, promptly deliver to Agent for transmission to Goss France such certificates, documents or other evidence as may be required from time to time under the third paragraph of subsection 2.7B(iii)(a), (Y) in the case of any Non-Japanese Bridge Lender, promptly deliver to Agent for transmission to Goss Japan such certificates, documents or other evidence as may be required from time to time under the fourth paragraph of subsection 2.7B(iii)(a), or (Z) in the case of any UK Bridge Lender, promptly deliver to the appropriate Persons such application forms, certificates, documents or other evidence as may be required from time to time under the second paragraph of subsection 2.7B(iii)(a), in each case properly completed and duly executed by such Lender, together with any other certificate or statement of exemption required in order to confirm or establish that such Lender is not subject to deduction or withholding of United States, French, Japanese or UK (as applicable) Tax with respect to payments to such Lender under the Loan Documents or (2) notify Agent and Loan Party of its inability to deliver any such forms, certificates or other evidence.

(c)    The Loan Party shall not be required to pay any additional amount to or in respect of any payment to any Non-US Lender, Non-French Bridge Lender, Non-Japanese Bridge Lender or UK Bridge Lender that is not a UK Bridge Indemnifying Lender in respect of that payment, as the case may be, under clause (c) of subsection 2.7B(ii) if such Lender shall both (i) have failed to satisfy the requirements of clause (a) or (b) (provided that for the purpose of this subsection 2.7B(iii)(c) its obligations under such clause (b) shall not be considered to be duly fulfilled by its notification to Agent and Loan Party of its inability to deliver any form, certificate or other evidence) of this subsection 2.7B(iii) and (ii) is not a UK Qualifying Lender; provided further that if such Lender shall have satisfied the requirements of subsection 2.7B(iii)(a) (in the case of any payment, or part thereof, connected with any Commitment, Loan, Letter of Credit or Indemnity Participation, sold, assigned or transferred pursuant to an Assignment Agreement) after the date of such Assignment Agreement or (in any other case) after the Closing Date (hereinafter, the "**Relevant Date**"), or is a UK Qualifying

Lender on the Relevant Date, as the case may be, nothing in this subsection 2.7B(iii)(c) shall relieve the Loan Party of its obligation to pay any additional amounts pursuant to clause (c) of subsection 2.7B(ii) in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender either is no longer a UK Qualifying Lender or is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender is exempt from withholding tax or is subject to withholding tax at a rate higher than on the Relevant Date, as described in subsection 2.7B(iii)(a), as the case may be.

(d)     The Loan Party shall not be required to pay any additional amount under clause (c) of subsection 2.7B(ii) to any French Bridge Indemnifying Lender if Agent is not either a French Bridge corporation or a bank which has and acts through a permanent establishment in France and holds a valid Certificate of Exemption from withholding tax for foreign corporations or non-residents, provided, however, that nothing in this subsection 2.7B(iii) shall relieve the applicable Loan Party of its obligation to pay any additional amounts pursuant to clause (c) of subsection 2.7B(ii) to an Indemnifying Lender which becomes a French Bridge Lender, Japanese Bridge Lender or a UK Bridge Lender, as the case may be, upon the occurrence of a Triggering Event under subsection 2.9A, notwithstanding the fact that such Indemnifying Lender is not properly entitled to deliver forms, certificates or other evidence establishing that such Indemnifying Lender is exempt from Tax (other than Tax on its overall net income) with respect to payments received from such Loan Party, whether or not as a result of any change in applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof after the Closing Date.

(e)     The Loan Party shall not be required to pay any additional amount under clause (c) of subsection 2.7B(ii) to any Japanese Bridge Indemnifying Lender if Agent is not either a Japanese corporation or a bank which has and acts through a permanent establishment in Japan and holds a valid Certificate of Exemption from withholding tax for foreign corporations or non-residents, provided, however, that nothing in this subsection 2.7B(iii) shall relieve the applicable Loan Party of its obligation to pay any additional amounts pursuant to clause (c) of subsection 2.7B(ii) to an Indemnifying Lender which becomes a Japanese Bridge Lender, a French Bridge Lender or a UK Bridge Lender, as the case may be, upon the occurrence of a Triggering Event under subsection 2.9A, notwithstanding the fact that such Indemnifying Lender is not properly entitled to deliver forms, certificates or other evidence establishing that such Indemnifying Lender is exempt from Tax (other than Tax on its overall net income) with respect to payments received from such Loan Party, whether or not as a result of any change in applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof after the Closing Date.

Annex A-6

(e)     If:

(i)     Goss UK makes a payment under paragraph (c) of subsection 2.7B(ii) (a "**Tax Payment**") in respect of a payment to a UK Double Tax Treaty Lender (that had duly fulfilled its obligations under subsection 2.7B(iii)), such payment having been made prior to Goss UK receiving a notice from the Inland Revenue permitting it to pay gross, and

(ii)     that UK Double Tax Treaty Lender determines that it has obtained a refund of Tax or obtained and used a credit against Tax on its Overall Net Income (a "**Tax Credit**") which that UK Bridge Lender is attributable to that Tax Payment

then, if in its absolute discretion it can do so without any adverse consequences, that UK Double Tax Treaty Lender shall reimburse Goss UK such amount as that UK Double Tax Treaty Lender shall reasonably determine to be such proportion of that Tax Credit as will leave that UK Double Tax Treaty Lender (after that reimbursement) in no better or worse position in respect of its world wide Tax liabilities than it would have been in if no Tax Payment had been required.  No UK Double Tax Treaty Lender shall be obliged to disclose any information regarding its Tax affairs and computations.

C.     **Capital Adequacy Adjustment**.  If any Lender shall have determined that the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such governmental authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans, Commitments or Letters of Credit or any participations therein or any other obligations hereunder with respect to the Loans or the Letters of Credit, in the case of any Lender, to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase-in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy and in an amount deemed by such Lender (in its sole discretion) to be material), then from time to time, within five Business Days after receipt by the applicable Loan Party from such Lender of the statement referred to in the next sentence, such Loan Party shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling corporation on an after-tax basis for such reduction.  Such Lender shall deliver to the Loan Party (with a copy to Agent) a written statement, setting forth in reasonable detail the basis of the calculation of such additional amounts, which statement shall be conclusive and binding upon all parties hereto absent manifest error.  Notwithstanding any provision of this subsection 2.7 to the contrary, the applicable Loan Party shall pay, on terms and conditions consistent with this subsection 2.7, any additional amount or amounts as will compensate any

Lender or any corporation controlling such Lender on an after-tax basis for any reduction in the rate of return on the capital of such Lender or such controlling entity because of any overlap of the Commitments, whether or not as a result of any change in applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof.

[Remainder of page intentionally left blank]

Annex A-8

**Annex B**

## 2.8    Obligation of Lenders and Issuing Lenders to Mitigate; Replacement of Lenders.

A.    Each Lender and Issuing Lender agrees that, as promptly as practicable after the officer of such Lender or Issuing Lender responsible for administering the Loans or Letters of Credit of such Lender or Issuing Lender, as the case may be, becomes aware of the occurrence of an event or the existence of a condition that would cause such Lender to become an Affected Lender or that would entitle such Lender or Issuing Lender to receive payments under subsection 2.7 or subsection 3.6, it will, to the extent not inconsistent with the internal policies of such Lender or Issuing Lender and any applicable legal or regulatory restrictions, use reasonable efforts (i) to make, issue, fund or maintain the Commitments of such Lender or the affected Loans or Letters of Credit of such Lender or Issuing Lender through another lending or letter of credit office of such Lender or Issuing Lender, or (ii) take such other measures as such Lender or Issuing Lender may deem reasonable, if as a result thereof the circumstances which would cause such Lender to be an Affected Lender would cease to exist or the additional amounts which would otherwise be required to be paid to such Lender or Issuing Lender pursuant to subsection 2.7 or subsection 3.6 would be materially reduced and if, as determined by such Lender or Issuing Lender in its sole discretion, the making, issuing, funding or maintaining of such Commitments or Loans or Letters of Credit through such other lending or letter of credit office or in accordance with such other measures, as the case may be, would not otherwise materially adversely affect such Commitments or Loans or Letters of Credit or the interests of such Lender or Issuing Lender; provided that such Lender or Issuing Lender will not be obligated to utilize such other lending or letter of credit office pursuant to this subsection 2.8 unless the applicable Loan Party agrees to pay all incremental expenses incurred by such Lender or Issuing Lender as a result of utilizing such other lending or letter of credit office as described in clause (i) above or if the use of such other office is inconsistent with the internal policies of such Lender or any applicable legal or regulatory restrictions. A certificate as to the amount of any such expenses payable by a Loan Party pursuant to this subsection 2.8 (setting forth in reasonable detail the basis for requesting such amount) submitted by such Lender or Issuing Lender to such Loan Party (with a copy to Agent) shall be conclusive absent manifest error.

B.    If any Loan Party receives a notice pursuant to subsection 2.6C, Loan Parties shall have the right, if no Potential Event of Default or Event of Default then exists, to replace such Lender (a "**Replaced Lender**") with one or more Eligible Assignees (collectively, the "**Replacement Lender**") acceptable to Agent; provided that (i) at the time of any replacement pursuant to this subsection 2.8B, the Replacement Lender shall enter into one or more Assignment Agreements pursuant to subsection 10.1B (and with all fees payable pursuant to such subsection 10.1B to be paid by the Replacement Lender) pursuant to which the Replacement Lender shall acquire all of the outstanding Loans and Commitments of, and in each case participations in Letters of Credit by, the Replaced Lender and, in connection therewith, shall pay to (y) the Replaced Lender in respect thereof an amount equal to the sum of (A) an amount equal to the principal of, and all accrued interest on, all outstanding Loans of the Replaced Lender, (B) an amount equal to all unpaid drawings with respect to Letters of Credit that have been funded by (and not reimbursed to) such Replaced Lender, together with all then

Annex B-1

unpaid interest with respect thereto at such time and (C) an amount equal to all accrued, but theretofore unpaid, fees owing to the Replaced Lender with respect thereto, and (z) the appropriate Issuing Lender an amount equal to such Replaced Lender's Pro Rata Share of any unpaid drawings with respect to Letters of Credit (which at such time remains an unpaid drawing) issued by it to the extent such amount was not theretofore funded by such Replaced Lender, and (ii) all obligations (including without limitation all such amounts, if any, owing under subsection 2.6D) of Company owing to the Replaced Lender (other than those specifically described in clause (i) above in respect of which the assignment purchase price has been, or is concurrently being, paid), shall be paid in full to such Replaced Lender concurrently with such replacement. Upon the execution of the respective Assignment Agreements, recordation of such assignment in the Register by Agent pursuant to subsection 2.1D, the payment of amounts referred to in clauses (i) and (ii) above and delivery to the Replacement Lender of the appropriate Note or Notes executed by Loan Parties, the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder except with respect to indemnification provisions under this Agreement which by the terms of this Agreement survive the termination of this Agreement, which indemnification provisions shall survive as to such Replaced Lender. Notwithstanding anything to the contrary contained above, no Issuing Lender may be replaced hereunder at any time while it has Letters of Credit outstanding hereunder unless arrangements satisfactory to such Issuing Lender (including the furnishing of a Standby Letter of Credit in form and substance, and issued by an issuer, satisfactory to such Issuing Lender or the furnishing of cash collateral in amounts and pursuant to arrangements satisfactory to such Issuing Lender) have been made with respect to such outstanding Letters of Credit.

[Remainder of page intentionally left blank]

Annex B-2

Annex C

**2.9    Indemnifying Lenders.**

        **A.    Purchase of Participations by Indemnifying Lenders.**    Upon the execution of this Agreement or an Assignment Agreement, as the case may be, (1) each UK Bridge Indemnifying Lender shall be deemed to, and hereby agrees to, have irrevocably purchased an Indemnity Participation (as defined below) from Agent in the UK Bridge Loan Commitment of Agent, including without limitation the UK Bridge Loans and the participations purchased by Agent pursuant to subsection 3.1C in the Letters of Credit issued by Agent for the benefit of Goss UK and any drawings thereunder, (2) each French Bridge Indemnifying Lender shall be deemed to, and hereby agrees to, have irrevocably purchased an Indemnity Participation (as defined below) from Agent in the French Bridge Loan Commitment of Agent, including without limitation the French Bridge Loans and the participations purchased by Agent pursuant to subsection 3.1C in the Letters of Credit issued by Agent for the benefit of Goss France and any drawings thereunder, and (3) each Japanese Bridge Indemnifying Lender shall be deemed to, and hereby agrees to, have irrevocably purchased a participation (the "**Indemnity Participation**") from Agent in the Japanese Bridge Loan Commitment of Agent, including without limitation the Japanese Bridge Loans and the participations purchased by Agent pursuant to subsection 3.1C in the Letters of Credit issued by the Agent and any drawings thereunder, in each case in a proportionate amount based on such Indemnifying Lender's Indemnity Amount. Upon the occurrence of a Triggering Event, each Indemnifying Lender, upon one Business Day's notice from Agent, shall deliver to Agent by wire transfer in immediately available funds its proportionate share based on its Indemnity Amount of the aggregate unpaid principal amount of Agent's UK Bridge Loans, French Bridge Loans or Japanese Bridge Loans, as the case may be, and any accrued and unpaid interest thereon and the aggregate unreimbursed amount of any payments made by Agent pursuant to subsection 3.3C to the applicable Issuing Lender with respect to any unreimbursed drawings on Letters of Credit issued by such Issuing Lender. Each Indemnifying Lender's obligations under this subsection 2.9 shall be absolute and unconditional and shall not be affected by any circumstance, including, without limitation, (a) any set-off, counterclaim, recoupment, defense or other right which Agent or any Lender may have against Agent, Loan Party or other Person for any reason whatsoever; (b) the occurrence or continuance of an Event of Default or a Potential Event of Default; (c) any adverse change in the condition (financial or otherwise) of any Loan Party; (d) any breach of this Agreement by any Loan Party, Agent or any Lender; or (e) any other circumstance, happening, or event whatsoever, whether or not similar to any of the foregoing; provided that the obligations of each Indemnifying Lender are subject to the condition that at the time such UK Bridge Loan, French Bridge Loan or Japanese Bridge Loan, as the case may be, was made or such Letter of Credit was issued the duly authorized officer of Agent responsible for the administration of the credit relationship with Goss UK, Goss France or Goss Japan, as the case may be, believed in good faith that either (x) no Event of Default had occurred and was continuing or (y) any Event of Default that had occurred and was continuing had been waived by Requisite Lenders at the time such UK Bridge Loan, French Bridge Loan or Japanese Bridge Loan, as the case may be, was made or such Letter of Credit was issued.

Annex C-1

**B.     Payment of Indemnity Fees.** Agent shall promptly pay by wire transfer of immediately available funds to each applicable Indemnifying Lender, as an indemnity fee for the Indemnity Participation provided to Agent by such Indemnifying Lender in this subsection 2.9, the following amounts, in each case in proportion to such Indemnifying Lender's Indemnity Amount: (i) with respect to the UK Bridge Loans, French Bridge Loans or Japanese Bridge Loans, as the case may be, an amount equal to (x) the excess of the interest received by Agent pursuant to subsection 2.2C from Goss UK, from Goss France or Goss Japan, as the case may be, over the Adjusted Offshore Rate on such UK Bridge Loans, French Bridge Loans or Japanese Bridge Loans less (y) 0.125% per annum to be retained by Agent as an Indemnity Participation fee; (ii) with respect to Letters of Credit, (x) letter of credit fees received by Agent pursuant to subsections 3.2(i)(b) and 3.2(ii)(b) from the applicable Issuing Lender less (y) 0.125% per annum to be retained by Agent as an Indemnity Participation fee; and (iii) commitment fees received by Agent pursuant to subsection 2.3A from Agent; provided that if any such indemnity fee is less than $10,000, Agent shall not be required to so promptly pay such indemnity fee to an Indemnifying Lender until the aggregate unpaid amount of indemnity fees accumulates to an amount exceeding $10,000. The excess, if any, of the interest payable to Agent on the UK Bridge Loans, the French Bridge Loans or Japanese Bridge Loans, as the case may be, over the interest distributable to an Indemnifying Lender under this subsection 2.9B in respect thereof, and the excess, if any, of the letter of credit and commitment fees payable to Agent over and in addition to the letter of credit and commitment fees distributable to such Indemnifying Lender under this subsection 2.9B, shall be retained by Agent.

**C.     Other Payments.** Provided that an Indemnifying Lender shall have made any payments to Agent required by this subsection 2.9, including the payments required to be made upon the occurrence of a Triggering Event pursuant to subsection 2.9A, Agent shall promptly pay by wire transfer of immediately available funds to such Indemnifying Lender any principal or other payments thereafter recovered by Agent from Goss UK, Goss France or Goss Japan, as the case may be, to the extent allocable to such Indemnifying Lender's Indemnity Participation. If Agent shall pay any amount to an Indemnifying Lender pursuant to this subsection 2.9 in the belief or expectation that a related payment has been or will be received or collected and such related payment is not received or collected by Agent, then such Indemnifying Lender will promptly on demand by Agent return such amount to Agent, together with interest thereon at such rate as Agent shall determine to be customary between banks for correction of errors. If Agent determines at any time that any amount received or collected by Agent pursuant to this Agreement is to be returned to Goss UK, Goss France or Goss Japan, as the case may be, under this Agreement or paid to any other Person or entity pursuant to any insolvency law, any sharing clause in this Agreement, or otherwise, then, notwithstanding any other provision of this Agreement, Agent shall not be required to distribute any portion thereof to any Indemnifying Lender, and each Indemnifying Lender will promptly on demand by Agent repay any portion that Agent shall have distributed to such Indemnifying Lender, together with interest thereon at such rate, if any, as Agent shall pay to Goss UK, Goss France or Goss Japan, as the case may be, or such other Person or entity with respect thereto. If any amounts returned by Agent to Goss UK, Goss France or Goss Japan, as the case may be, pursuant to this subsection 2.9 are later recouped by Agent, Agent shall promptly pay to each Indemnifying Lender a proportionate amount based on such Indemnifying Lender's Indemnity Amount.

Annex C-2

**D.    Indemnity for Costs and Expenses.**  If Agent incurs any costs or expenses (including, without limitation, in indemnifying Agent pursuant to subsection 9.4) in connection with any effort to enforce or protect Agent's or any Indemnifying Lender's rights or interests with respect to this Agreement or the other Loan Documents, then, other than in the case of Agent's gross negligence or willful misconduct, each Indemnifying Lender will reimburse Agent on demand for each such Indemnifying Lender's proportionate share based on such Indemnifying Lender's Indemnity Amount of any portion of such costs or expenses which is not reimbursed by or on behalf of Goss UK, Goss France or Goss Japan, as the case may be.  If Agent recovers any amounts for which Agent has previously been reimbursed by an Indemnifying Lender hereunder, Agent shall promptly distribute to such Indemnifying Lender such Indemnifying Lender's proportionate share thereof based on such Indemnifying Lender's Indemnity Amount.

**E.    Certain Tax Matters.**  Each Indemnifying Lender agrees to deliver to Agent from time to time upon request such certificates, statements, documents, forms or other evidence, properly completed and executed by such Indemnifying Lender, as may be required at any time in order to comply with any applicable tax laws or regulations or to confirm or maintain in effect such Indemnifying Lender's entitlement to exemption from or reduction of any applicable withholding tax on any payments hereunder.  Each Indemnifying Lender hereby agrees to indemnify and hold harmless Agent from any applicable taxes, penalties, interest and other expenses, costs and losses incurred or payable by Agent as a result of either (i) such Indemnifying Lender's failure to submit any statement, document, form or certificate or other evidence that such Indemnifying Lender is required to provide pursuant to this subsection or (ii) Agent's reliance on any such statement, document, form or certificate or other evidence which such Indemnifying Lender has provided to Agent pursuant to this subsection.

**F.    Indemnifying Lender Consent.**  Notwithstanding any provision to the contrary contained in this Agreement or the other Loan Documents and so long as an Indemnifying Lender has not failed to make any payments required to be made by such Indemnifying Lender under this subsection 2.9 or is not otherwise in default under its obligations under this subsection 2.9, Agent hereby agrees that, to the extent of but only to the extent of such Indemnifying Lender's proportionate share based on its Indemnity Amount, Agent will not agree to any amendment, modification, termination or waiver of any provision of this Agreement or the other Loan Documents, or to any departure by Goss UK, Goss France or Goss Japan, as the case may be, therefrom, in each case related to the Indemnity Participation without the prior written consent of such Indemnifying Lender.  Nothing herein contained shall prevent Agent from consenting to any amendment, modification, termination or waiver of any provision of this Agreement or the other Loan Documents, or to any departure by Goss UK, Goss France or Goss Japan, as the case may be, therefrom, to the extent unrelated to the Indemnity Participation or to the extent that Agent's interests or Pro Rata Share is not related to the Indemnity Participation or the Indemnity Amount.

**G.    Failure to Make Required Payments.**  In the event that any Person obligated to make a payment to any other Person pursuant to this subsection 2.9 fails to make available to the Person entitled to receive such payment the amount of such payment, the Person entitled to receive such payment shall be entitled to recover such amount on demand from such

Annex C-3

other Person, together with interest at the customary rate set by Agent for the correction of errors among Lenders for three Business Days and thereafter at the sum of the Base Rate plus 1.50% per annum.

        **H.**    **Assignment Matters.**  Agent may from time to time sell or transfer to other Persons assignments or participations or other interests in Agent's UK Bridge Loans and UK Bridge Loan Commitments, French Bridge Loans and French Bridge Loan Commitments or Japanese Bridge Loans and Japanese Bridge Loan Commitments, as the case may be, but not in the portion thereof allocated to the Indemnity Participation hereunder.  An Indemnifying Lender's Indemnity Participation may not be sold, pledged, assigned, or otherwise transferred (i) without Agent's prior written consent; provided that this restriction shall not apply to any such transfer to any of such Indemnifying Lender's Affiliates; or (ii) without a pro rata assignment in accordance with subsection 10.1B of each Type of Commitment and Loan held by such Indemnifying Lender.

        **I.**    **Miscellaneous.**  In no event shall the Indemnity Participation be construed as a loan or other extension of credit by an Indemnifying Lender to Agent.  In no event shall this Agreement be construed to require an Indemnifying Lender to make any Loans or to otherwise extend any credit to Goss UK, Goss France or Goss Japan, as the case may be, or to Agent under this Agreement or under the other Loan Documents.  In no event shall this Agreement be construed to require an Indemnifying Lender to fund or pay to Agent such Indemnifying Lender's Indemnity Amount except upon the occurrence of a Triggering Event pursuant to subsection 2.9A.  Each Indemnifying Lender agrees that Agent may take legal action to enforce or protect an Indemnifying Lender's or Agent's interests in respect of this Agreement and the other Loan Documents.

[Remainder of page intentionally left blank]

**DEBTOR-IN-POSSESSION
MULTICURRENCY CREDIT AGREEMENT
(WITH FOREIGN BRIDGE FACILITY)
DATED AS OF SEPTEMBER 10, 2001**

**AMONG**

**GOSS GRAPHIC SYSTEMS, INC.,
GOSS GRAPHIC SYSTEMS LIMITED,
GOSS SYSTEMES GRAPHIQUES NANTES S.A.,**
and
**GOSS GRAPHIC SYSTEMS JAPAN CORPORATION,**
as Loan Parties,

**THE LENDERS LISTED HEREIN,**
as Lenders,

and

**BANKERS TRUST COMPANY,**
as Agent

## TABLE OF CONTENTS

**Page**

Section 1.       DEFINITIONS...................................................................................... 3
   1.1       Certain Defined Terms................................................................... 3
   1.2       Accounting Terms; Utilization of GAAP for Purposes of
              Calculations Under Agreement................................................... 37
   1.3       Other Definitional Provisions ................................................... 37

Section 2.       AMOUNTS AND TERMS OF COMMITMENTS AND LOANS......... 37
   2.1       Commitments; Making of Loans; the Register; Notes ............................ 37
   2.2       Interest on the Loans................................................................ 45
   2.3       Fees ............................................................................................ 48
   2.4       Repayments, Prepayments and Voluntary Reductions in
              Commitments; General Provisions Regarding Payments...................... 50
   2.5       Use of Proceeds........................................................................... 59
   2.6       Special Provisions Governing Offshore Rate Loans .............................. 60
   2.7       Increased Costs; Taxes; Capital Adequacy.............................................. 62
   2.8       Obligations of Lenders and Issuing Lenders to Mitigate;
              Replacement of Lenders ............................................................... 62
   2.9       Indemnifying Lenders.................................................................... 63
   2.10      Superpriority Nature of DIP Obligations; Foreign Security .................. 63
   2.11      Extension of Commitments.......................................................... 64

Section 3.       LETTERS OF CREDIT ....................................................................... 64
   3.1       Issuance of Letters of Credit and Lenders' Purchase of
              Participations Therein ................................................................. 64
   3.2       Letter of Credit Fees ................................................................... 67
   3.3       Drawings and Reimbursement of Amounts Drawn Under Letters of
              Credit............................................................................................. 68
   3.4       Obligations Absolute ................................................................... 71
   3.5       Indemnification; Nature of Issuing Lenders' Duties .............................. 72
   3.6       Increased Costs and Taxes Relating to Letters of Credit...................... 73

Section 4.       CONDITIONS TO LOANS AND LETTERS OF CREDIT .................. 74
   4.1       Conditions to Initial Effectiveness.................................................... 74

| 4.2 | Conditions to All Loans | 80 |
| 4.3 | Conditions to Letters of Credit | 81 |
| 4.4 | Conditions to Foreign Bridge Loans | 82 |
| Section 5. | BORROWERS' REPRESENTATIONS AND WARRANTIES | 83 |
| 5.1 | Organization, Powers, Qualification, Good Standing, Business and Subsidiaries | 84 |
| 5.2 | Authorization of Borrowing, etc. | 84 |
| 5.3 | Financial Condition | 86 |
| 5.4 | No Material Adverse Change; No Restricted Junior Payments | 86 |
| 5.5 | Title to Properties; Liens | 87 |
| 5.6 | Litigation; Adverse Facts | 87 |
| 5.7 | Payment of Taxes | 88 |
| 5.8 | Performance of Agreements; No Materially Adverse Agreements | 88 |
| 5.9 | Governmental Regulation | 88 |
| 5.10 | Securities Activities | 89 |
| 5.11 | Employee Benefit Plans | 89 |
| 5.12 | Certain Fees | 89 |
| 5.13 | Environmental Protection | 89 |
| 5.14 | Employee Matters | 91 |
| 5.15 | Solvency | 91 |
| 5.16 | Matters Relating to Collateral | 91 |
| 5.17 | Disclosure | 92 |
| 5.18 | Inventory and Accounts | 93 |
| 5.19 | Orders | 93 |
| 5.20 | Goss Realty | 94 |
| Section 6. | LOAN PARTIES' AFFIRMATIVE COVENANTS | 94 |
| 6.1 | Financial Statements and Other Reports | 94 |
| 6.2 | Corporate Existence, etc. | 100 |
| 6.3 | Payment of Taxes and Claims; Tax Consolidation | 100 |
| 6.4 | Maintenance of Properties; Insurance; Application of Net Insurance/Condemnation Proceeds | 100 |

| 6.5 | Inspection; Records; Audits and Appraisals | 102 |
| 6.6 | Compliance with Laws, etc. | 102 |
| 6.7 | Environmental Disclosure and Inspection | 102 |
| 6.8 | Execution of Future Guaranties and Collateral Documents | 105 |
| 6.9 | Additional Real Property Collateral | 106 |
| 6.10 | Assignability and Recording of Lease Agreements | 108 |
| 6.11 | Cash Maintenance | 109 |
| 6.12 | Inventory Reports; Accounts | 109 |
| 6.13 | Further Assurances | 110 |
| 6.14 | Waiver of Claims to Surcharge | 111 |
| 6.15 | [Intentionally Omitted]. | 111 |
| 6.16 | Delivery of Additional Documents by Foreign Borrowers | 111 |
| Section 7. | LOAN PARTIES' NEGATIVE COVENANTS | 112 |
| 7.1 | Indebtedness | 112 |
| 7.2 | Liens and Related Matters | 113 |
| 7.3 | Investments; Joint Ventures | 114 |
| 7.4 | Contingent Obligations | 114 |
| 7.5 | Payments Contrary to Budget | 115 |
| 7.6 | Goss Realty | 116 |
| 7.7 | Restrictions on Fundamental Changes; Asset Sales and Acquisitions | 116 |
| 7.8 | [Intentionally Omitted] | 116 |
| 7.9 | Sales and Lease-Backs | 116 |
| 7.10 | Transactions with Shareholders and Affiliates | 117 |
| 7.11 | Disposal of Subsidiary Stock | 117 |
| 7.12 | Conduct of Business | 117 |
| 7.13 | [Intentionally Omitted] | 118 |
| 7.14 | Fiscal Year | 118 |
| 7.15 | Foreign Unfunded Pension Plans | 118 |
| 7.16 | Chapter 11 Claims | 118 |
| 7.17 | Agreements | 118 |
| 7.18 | Remedies of Agent | 118 |

| 7.19 | Use of Proceeds | 118 |
| Section 8. | EVENTS OF DEFAULT | 118 |
| 8.1 | Failure to Make Payments When Due | 119 |
| 8.2 | Default in Other Agreements | 119 |
| 8.3 | Breach of Covenants | 119 |
| 8.4 | Breach of Warranty | 119 |
| 8.5 | Material Variance | 119 |
| 8.6 | Involuntary Bankruptcy; Appointment of Receiver, etc. | 119 |
| 8.7 | Voluntary Bankruptcy; Appointment of Receiver, etc. | 120 |
| 8.8 | Bankruptcy Proceeding Events | 120 |
| 8.9 | [Intentionally Omitted] | 121 |
| 8.10 | Judgments and Attachments | 121 |
| 8.11 | Dissolution | 122 |
| 8.12 | Employee Benefit Plans | 122 |
| 8.13 | Change in Control; Management | 122 |
| 8.14 | Invalidity of Loan Documents | 123 |
| 8.15 | Failure of Security | 123 |
| 8.16 | Amendment of Certain Documents of Holdings | 123 |
| 8.17 | Conduct of Business Relating to Holdings | 123 |
| 8.18 | Failure of Lock Up | 124 |
| 8.19 | Failure to Accomplish Certain Milestones | 124 |
| Section 9. | AGENT | 126 |
| 9.1 | Appointment | 126 |
| 9.2 | Powers and Duties; General Immunity | 126 |
| 9.3 | Representations and Warranties; No Responsibility for Appraisal of Creditworthiness | 127 |
| 9.4 | Right to Indemnity | 128 |
| 9.5 | Successor Agent | 128 |
| 9.6 | Collateral Documents and Guaranties | 129 |
| Section 10. | MISCELLANEOUS | 130 |

10.1      Assignments and Participations in Loans and Letters of Credit ............ 130

10.2      Expenses ................................................................................................ 132

10.3      Indemnity .............................................................................................. 134

10.4      Set-Off; Security Interest in Deposit Accounts ..................................... 135

10.5      Ratable Sharing ..................................................................................... 135

10.6      Amendments and Waivers ..................................................................... 136

10.7      Independence of Covenants ................................................................... 138

10.8      Notices .................................................................................................. 138

10.9      Survival of Representations, Warranties and Agreements ................... 138

10.10     Failure or Indulgence Not Waiver; Remedies Cumulative .................. 138

10.11     Marshalling; Payments Set Aside ......................................................... 138

10.12     Severability ........................................................................................... 139

10.13     Obligations Several; Independent Nature of Lenders' Rights .............. 139

10.14     Headings ................................................................................................ 139

10.15     Applicable Law ..................................................................................... 139

10.16     Successors and Assigns .......................................................................... 139

10.17     Consent to Jurisdiction and Service of Process ................................... 140

10.18     Waiver of Jury Trial .............................................................................. 140

10.19     Confidentiality ...................................................................................... 141

10.20     Judgment Currency ............................................................................... 141

10.21     Counterparts; Effectiveness ................................................................. 142

10.22     No Immunity .......................................................................................... 142

10.23     Intention to Secure Obligations Under Currency Agreements ............. 142

10.24     Parties Including Trustees; Court Proceedings .................................... 142

10.25     Consent and Waiver .............................................................................. 143

10.26     Intercreditor Terms .............................................................................. 143


          Signature pages ................................................................................... S-1

## EXHIBITS

| | |
|---|---|
| I | FORM OF NOTICE OF BORROWING |
| II | FORM OF NOTICE OF CONVERSION/CONTINUATION |
| III | FORM OF REQUEST FOR ISSUANCE OF LETTER OF CREDIT |
| IV | FORM OF NOTES |
| V | APPROVED BUDGET AND INITIAL FORECAST |
| VI | FORM OF COMPLIANCE CERTIFICATE |
| VII | RESERVED |
| VIII | FORM OF OPINION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM |
| IX | FORM OF ASSIGNMENT AGREEMENT |
| X | FORM OF COLLATERAL ACCOUNT AGREEMENT |
| XI | FORM OF GUARANTY |
| XII | FORMS OF SECURITY AGREEMENTS |
| XIII | RESERVED |
| XIV | RESERVED |
| XV | PLAN OF REORGANIZATION |
| XVI | FORM OF INTERIM BORROWING ORDER |
| XVII | RESERVED |
| XVIII | FORM OF SUBSIDIARY GUARANTY |

## SCHEDULES

1.1(a)   BANK OF ENGLAND RELATIVE RESERVE RATIO REQUIREMENT
         CALCULATION
1.1(b)   FUNDING AND PAYMENT OFFICE
2.1      LENDERS' COMMITMENTS AND PRO RATA SHARES
4.1A(v)  LOAN DOCUMENTS TO BE EXECUTED BY LOAN PARTIES AT CLOSING
4.4B     FOREIGN LOAN DOCUMENTS TO BE EXECUTED
5.1      SUBSIDIARIES OF COMPANY
5.2      AUTHORIZATION ISSUES
5.4      MATERIAL ADVERSE CHANGES
5.5      REAL PROPERTY ASSETS
5.6      LITIGATION
5.13     ENVIRONMENTAL MATTERS
7.1      CERTAIN EXISTING INDEBTEDNESS
7.2      CERTAIN EXISTING LIENS
7.3      CERTAIN EXISTING INVESTMENTS
7.4      CERTAIN EXISTING CONTINGENT OBLIGATIONS; EXISTING LETTERS
         OF CREDIT

## ANNEXES

A   2.7   INCREASED COSTS; TAXES; CAPITAL ADEQUACY
B   2.8   OBLIGATIONS OF LENDERS AND ISSUING LENDERS TO MITIGATE;
          REPLACEMENT OF LENDERS
C   2.9   INDEMNIFYING LENDERS

| CONSOLIDATED ($000) | 17-Aug Forecast | 24-Aug Forecast | 31-Aug Forecast | 7-Sep Forecast | 14-Sep Forecast | 21-Sep Forecast | 28-Sep Forecast | 5-Oct Forecast | 12-Oct Forecast | 19-Oct Forecast | 26-Oct Forecast | 2-Nov Forecast | 9-Nov Forecast | 16-Nov Forecast | 23-Nov Forecast | 30-Nov Forecast | TOTAL SEP-NOV |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Beginning Cash** | 20,613 | 16,658 | 12,926 | 811 | (28) | (6,799) | 604 | (417) | (6,035) | (9,820) | (4,789) | (760) | (2,702) | (2,689) | (4,719) | (2,335) | |
| **Receipts** | | | | | | | | | | | | | | | | | |
| **Total Receipts** | 3,743 | 5,993 | 8,814 | 4,648 | 8,591 | 14,429 | 9,517 | 5,973 | 8,700 | 14,952 | 9,739 | 10,304 | 9,938 | 5,775 | 7,790 | 12,518 | 122,875 |
| **Disbursements** | | | | | | | | | | | | | | | | | |
| Trade Notes | 579 | 426 | 4,945 | 273 | 4,771 | 313 | 273 | 5,773 | 5,248 | 295 | 273 | 4,659 | 5,248 | 273 | 273 | 5,509 | 33,176 |
| Trade Payables | 5,607 | 6,532 | 9,061 | 4,235 | 6,131 | 5,707 | 7,089 | 4,663 | 5,506 | 7,884 | 3,950 | 4,487 | 4,090 | 5,357 | 4,060 | 3,794 | 66,953 |
| Payroll/Taxes/Other | 2,408 | 2,738 | 4,072 | 942 | 1,822 | 1,489 | 2,965 | 541 | 1,620 | 1,577 | 1,189 | 2,361 | 588 | 1,813 | 1,343 | 2,741 | 20,991 |
| Debt Service | 44 | - | 35 | 0 | 0 | 0 | 0 | 0 | 0 | 106 | 0 | 374 | - | - | 0 | 0 | 480 |
| Professional Fees | - | - | - | - | 1,270 | - | - | - | - | - | - | - | - | - | - | 2,580 | 3,850 |
| Dip Financing Fees | - | - | - | - | 1,630 | - | 468 | - | - | - | 495 | - | - | - | 389 | - | 2,982 |
| **Total Disbursements** | 8,639 | 9,696 | 18,113 | 5,449 | 15,623 | 7,508 | 10,794 | 10,977 | 12,373 | 9,862 | 5,411 | 12,376 | 9,925 | 7,443 | 5,676 | 15,013 | 128,433 |
| Net Intercompany | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Cash Flow** | (4,896) | (3,704) | (9,499) | (801) | (7,032) | 6,920 | (1,278) | (5,004) | (3,674) | 5,090 | 4,328 | (2,073) | 13 | (1,668) | 2,114 | (2,495) | (5,558) |
| Revolver Draw/(Paydown) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Current Week Float | 4,395 | 4,367 | 1,751 | 1,713 | 1,974 | 2,457 | 2,714 | 2,099 | 1,988 | 1,929 | 1,630 | 1,761 | 1,761 | 1,398 | 1,669 | 1,299 | |
| Prior Week Float | (3,455) | (4,395) | (4,367) | (1,751) | (1,713) | (1,974) | (2,457) | (2,714) | (2,099) | (1,988) | (1,929) | (1,630) | (1,761) | (1,761) | (1,398) | (1,669) | |
| **Ending Cash** | 16,658 | 12,926 | 811 | (28) | (6,799) | 604 | (417) | (6,035) | (9,820) | (4,789) | (760) | (2,702) | (2,689) | (4,719) | (2,335) | (5,200) | (5,200) |
| **Revolver Allocations** | | | | | | | | | | | | | | | | | |
| Revolver Draw/(Paydown) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Letters of Credit | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Reallocations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Weekly Revolver Allocations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Availability** | 118 | 118 | 118 | 118 | 118 | 118 | 118 | 118 | 118 | 118 | 118 | 118 | 118 | 118 | 118 | 118 | 118 |
| **Cash & Availability** | 16,776 | 13,044 | 929 | 90 | (6,681) | 722 | (299) | (5,917) | (9,702) | (4,671) | (642) | (2,584) | (2,571) | (4,601) | (2,217) | (5,082) | (5,082) |