IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 01-31747 |
| | ) | 01-31751 |
| | ) | (Jointly Administered) |
| GOSS HOLDINGS, INC., et al., | ) | Chapter 11 |
| | ) | Hon. Carol A. Doyle |
| | ) | Hearing Date: N/A |
| Debtors. | ) | Hearing Time: N/A |

**AFFIDAVIT OF TIMOTHY R. COLEMAN IN SUPPORT OF
EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364 (I) AUTHORIZ-
ING POST-PETITION FINANCING; (II) GRANTING LIENS AND
SUPER-PRIORITY CLAIMS; (III) AUTHORIZING USE OF CASH
COLLATERAL; (IV) GRANTING ADEQUATE PROTEC-
TION; AND (V) SCHEDULING A FINAL HEARING**

| | | |
|---|---|---|
| STATE OF NEW YORK | ) | |
| | ) | SS |
| COUNTY OF NEW YORK | ) | |

FILED
SEP 10 2001
UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
KENNETH S. GARDNER, CLERK
BY _____ DEPUTY CLERK

I, Timothy Coleman, after having been first duly sworn under oath, do hereby depose and state as follows:

1. I have personal knowledge of each of the matters stated herein and could and would competently testify thereto if called as a witness in these proceedings.

2. I am a Senior Managing Director of the firm The Blackstone Group, L.P. ("Blackstone"), an investment banking and financial restructuring advisory firm that maintains an address located at 345 Park Avenue, New York, New York 10154.

3. Blackstone specializes in providing financial restructuring advice to distressed companies, including assisting such companies in locating sources of financing or capital; restructuring their capital structures; valuing their businesses; and in marketing and selling their assets and businesses as going concerns.

4. I have been affiliated with Blackstone for over 9 years. I personally have over 18 years of experience providing financial restructuring and investment

banking services or acting as a principal in numerous distressed companies, including large manufacturers of industrial products.

5.  Goss Holdings, Inc. ("Goss Holdings") and its wholly-owned operating subsidiary, Goss Graphic Systems, Inc. ("Goss Systems," and together with Goss Holdings, the "Debtors"), engaged Blackstone to provide the foregoing services to them commencing in June 2001. The Debtors will file with this Court an application requesting Blackstone's retention as restructuring advisors and investment bankers during the Debtors' reorganization proceedings.

6.  I and several employees of Blackstone under my supervision have been personally and extensively involved on behalf of Blackstone in providing the foregoing services to the Debtors since shortly after Blackstone's retention by the Debtors. During that time, I and my staff have become intimately familiar with the Debtors' operations, history, capital structure, cash management system and controls, anticipated receipts and disbursements, financing needs, business plan, and restructuring plan.

7.  I make this Affidavit in support of that certain Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 (I) Authorizing Postpetition Financing; (ii) Granting Liens and Superpriority Claims; (III) Authorizing Use of Cash Collateral; (IV) Granting Adequate Protection; and (V) Scheduling a Final Hearing (the "DIP Motion") filed by the Debtors concurrently herewith.

8.  Pursuant to the DIP Motion, the Debtors are requesting this Court to enter interim and final orders authorizing the Debtors to obtain postpetition secured financing and other financial accommodations (the "DIP Loan") up to an aggregate principal amount not to exceed $90 million on the terms set forth in that certain Debtor-in-Possession Multicurrency Credit Agreement With Foreign Bridge Facility (the "DIP Credit Agreement") with Bankers Trust Company, as agent ("BTCo" or the "DIP Agent"), and certain lenders party thereto (collectively, the "DIP Lenders"), a copy of which is attached to the DIP Motion as Exhibit A.

9.  Pursuant to the DIP Motion, the Debtors also seek authority to borrow money and seek other financial accommodations from the DIP Lenders on an interim basis (the "Interim Order") pursuant to the terms of a budget, a copy of which is attached to the DIP Motion as Exhibit B (the "Budget").

10.  I and other employees of Blackstone under my supervision have been personally and extensively involved in assisting the Debtors in attempting to procure

sources of financing to meet the Debtors' cash needs, including the DIP Loan, and in reviewing and negotiating the terms of the DIP Loan with the DIP Lenders.

11.     Based upon my experience in providing financial restructuring services and my efforts to date in providing such services to the Debtors, I am of the opinion that without access to financing, the Debtors will be unable to meet their working capital needs, thereby interrupting their ability to maximize the value of their estates and their ability to reorganize as going concerns.

12.     I am also of the opinion that the proposal for the DIP Loan provided by the DIP Lenders is the most favorable under the circumstances and addresses the Debtors' cash needs as outlined in the Budget. Although the DIP Loan is expensive and contains many terms that are very stringent when compared to the terms of other debtor-in-possession facilities, in my opinion, the Debtors would not have been able to obtain debtor-in-possession financing on terms and conditions more favorable to the Debtors' estates than those offered by the DIP Lenders pursuant to the DIP Credit Agreement.

13.     I base this opinion primarily on three factors: (i) this is the Debtors' second bankruptcy proceeding in the last two years; (ii) the Debtors have suffered a significant loss of liquidity and drop off in orders as a result of a sharp decline in the Debtors' industry (newspaper publishing); and (iii) the terms of the DIP Loan are closely intertwined with the Debtors' restructuring plan, a plan that has been the result of very difficult and protracted negotiations with the Debtors' lenders and other creditor constituencies.

14.     First, these Chapter 11 proceedings represent the Debtors' second bankruptcy filing since 1999. In particular, on July 30, 1999, the Debtors and/or certain of their predecessors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. Though Blackstone had no role in this previous bankruptcy filing, I understand that the Debtors commenced that case because of increased competition and cyclical declines that had resulted in severe operating losses and the Debtors' use of virtually all of its liquidity.

15.     Although the Debtors' prior bankruptcy reduced their unsecured indebtedness and provided the Debtors with significant new liquidity, since then, the Debtors have exhausted almost all of such funds and liquidity provided by their operations. Based upon my experience, in my opinion, this history significantly reduced the Debtors' options for finding additional liquidity, including debtor-in-

possession financing. Indeed, in my opinion, the only viable source of such financing is the Pre-Petition Lenders.

16. The second significant factor in support of my opinion that the DIP Loan is the most favorable under the circumstances is that the Debtors' recent performance has been negatively impacted by the downturn in economic conditions that began after the Debtors' emergence from their first bankruptcy. I understand that this downturn has affected the newspaper publishing industry in general, resulting in substantial losses in advertising revenue and numerous layoffs by newspaper publishers nationwide.

17. I also understand that the Debtors have experienced operational, product quality, and installation issues with respect to certain newspaper presses and related equipment manufactured by their North American operations. These issues have resulted in delays in installations, increased production and substantial re-work costs, and the loss of customer goodwill.

18. These economic and operational factors have significantly affected the Debtors' operational performance and liquidity, especially in recent months. In particular, the number of new press orders in 2001 has been substantially lower than in 2000, and substantially lower than originally projected by the Debtors. This is due in large part to the ease with which newspaper publishers may defer their new press purchases. Newspaper presses have a long useful life, typically twenty-five years, and their cost is significant, ranging between $6 million and $100 million for large press systems and between $1 million and $8 million for small press systems. Given the costs and long life of presses, newspapers can defer press replacement, and they frequently do so during periods of economic recession.

19. In short, in my opinion, the foregoing economic and operational factors have significantly and negatively impacted the Debtors' performance, further reducing their viable options for obtaining financing and increasing the likelihood that any such financing that they obtain will be expensive and subject to a number of stringent borrowing requirements.

20. The third and most significant factor in support of my opinion that the terms of the DIP Loan are the best available to the Debtors under the circumstances is that the terms of the DIP Loan are closely intertwined with the Debtors' restructuring plan, a plan that has been the result of very difficult and protracted negotiations with the Debtors' lenders and other creditor constituencies.

4

21. In order to understand the relationship between the DIP Loan and restructuring plan, it is necessary to summarize the Debtors' current lending facility with their pre-petition lenders (the "Pre-Petition Lenders") and the terms upon which the Pre-Petition Lenders have agreed to restructure this facility.

22. The Debtors' obligations to the Pre-Petition Lenders are evidenced by that certain Second Amended Multicurrency Credit Agreement dated November 19, 1999, as amended (the "Pre-petition Credit Agreement"). Under the Pre-Petition Credit Agreement, the Debtors' obligations are comprised of various levels or "tranches" of debt.

23. First, there is the Domestic Tranche A Overline Facility, in the outstanding principal amount of $15 million, which I understand is secured by substantially all of Goss Systems' assets, including a portion of the stock in the Debtors' foreign subsidiaries. Second, the Domestic Tranche A Revolver, in the outstanding principal amount of $50 million, is secured by the same collateral.

24. I understand that the liens securing the Domestic Tranche A Overline Facility and the Domestic Tranche A Revolver constitute first priority liens on Goss Systems' assets and are evidenced by that certain Security Agreement dated November 19, 1999, among Goss Holdings, Goss Systems, BTCo, and the lenders party thereto (collectively with BTCo, the "Tranche A Lenders").

25. Third, the Debtors also are obligated on the Domestic Tranche B Revolver and the Domestic Tranche B Term Loan in the collective outstanding principal amount of approximately $191 million, exclusive of undrawn letters of credit. I understand that these loans are secured by second priority liens on Goss Systems' assets, junior in priority to the liens securing the Tranche A facilities. The liens securing the Domestic Tranche B Revolver and the Domestic Tranche B Term Loan are evidenced by that certain Second Amended and Restated Security Agreement dated November 19, 1999, among Goss Holdings, Goss Systems, BTCo, and the lenders party thereto (collectively with BTCo, the "Tranche B Lenders").

26. The relative priorities as between the Tranche A Lenders and the Tranche B Lenders is further evidenced by that certain Intercreditor Agreement by and among the Tranche A Lenders and the Tranche B Lenders. Pursuant to the terms of the Intercreditor Agreement, the Tranche B Lenders are subordinated in right of payment to the Tranche A Lenders with respect to proceeds from any sales of the Debtors' assets.

27. In sum, the claims represented by the Tranche A Overline Facility and the Tranche A Revolver (collectively, the "Tranche A Claims") are separate and distinct from the claims represented by the Tranche B Revolver and the Domestic Tranche B Term Loan (collectively, the "Tranche B Claims"). My understanding is that the liens securing the Tranche A Claims also are separate and distinct from the liens securing the Tranche B Claims.

28. The Debtors and Pre-Petition Lenders have agreed to restructure the Tranche A Claims and the Tranche B Claims pursuant to the terms of the Joint Plan of Reorganization of Goss Holdings, Inc. and Goss Graphic Systems, Inc. (the "Plan"). Under the Plan, the Tranche A Claims will be repaid in full from the proceeds of an exit facility to be provided upon emergence from Chapter 11.

29. Of the Tranche B Claims, $153 million will be converted into equity in the reorganized enterprise, $22.4 million will remain as debt of one of the Debtors' foreign subsidiaries, and an estimated $15 million will be converted into subordinated notes of the reorganized enterprise.

30. The Pre-Petition Lenders consistently have advised the Debtors and Blackstone, throughout the parties' lengthy and protracted negotiations, that they would restructure their secured indebtedness only if the Tranche A Claims are paid in full in the foregoing fashion. The Pre-Petition Lenders have based their position in part upon their belief that the going-concern value of the Debtors' assets that secure the Tranche A Claims (the "Collateral") exceeds the face amount of such Claims.

31. Blackstone agrees with the Pre-Petition Lenders' belief that the value of the Collateral likely exceeds the face amount of the Tranche A Claims. Blackstone bases this opinion upon a preliminary, going concern valuation analysis of the Collateral that Blackstone prepared. In particular, Blackstone is of the opinion that the going-concern value of the Collateral exceeds the face amount of the Tranche A Claims ($65 million) by an amount that is greater than the new funding to be provided under the DIP Loan (up to $25 million).

32. Based upon the foregoing values and the heavily-negotiated terms of the Plan, the Pre-Petition Lenders also consistently have advised the Debtors that a condition to providing the DIP Loan is that the DIP Loan refinance the Tranche A Claims in full upon commencement of a Chapter 11 proceeding. The DIP Loan has been structured to do so.

33. In particular, there are several sub-facilities or "tranches" to the DIP Loan. The "DIP Tranche 2 Facility" is a revolving commitment in the maximum

amount of $15 million. The proceeds of the DIP Tranche 2 Facility will be used to refinance the Pre-Petition Tranche A Overline Facility in the amount of $15 million. In this fashion, the outstanding obligations with respect to the Tranche A Overline Facility will be "rolled over" from a pre-petition obligation to a post-petition obligation.

34. Similarly, the "DIP Tranche 3 Facility" is a revolving commitment in the maximum amount of $50 million. The proceeds of the DIP Tranche 3 Facility will be used to refinance the Pre-Petition Tranche A Revolver Facility in the amount of $50 million. Similar to the Tranche A Overline Facility, the Tranche A Revolver therefore will be "rolled over" from a pre-petition obligation to a post-petition obligation of the Debtors.

35. The "roll over" of the Tranche A Overline Facility and the Tranche A Revolver Facility in the foregoing fashion anticipates the proposed treatment of the Tranche A Claims under the Plan, which requires that such Claims be repaid in full with proceeds from the exit facility. This treatment under the Plan, and hence the treatment under the DIP Loan, were discussed and negotiated at length by representatives of the Debtors and the Pre-Petition Lenders.

36. Given the Debtors' previous Chapter 11 filing, the fact that the Debtors exhausted all of the $100 million in liquidity afforded by that filing, the economic downturn that has adversely affected the Debtors' performance, and the fact that the Plan otherwise calls for the forgiveness of $153 million in Tranche B Claims, the Pre-Petition Lenders required the "roll over" of the Tranche A Claims as part of the DIP Loan and their repayment in full under the Plan. In light of these factors, including my opinion that the Pre-Petition Lenders were the only viable source of financing, I believe that the provisions of the DIP Loan, including those providing for a "roll over" of the Tranche A Overline Facility and the Tranche A Revolver Facility, were the best that the Debtors could obtain under the circumstances.

37. Given all of the foregoing, neither the Debtors nor Blackstone on behalf of the Debtors solicited debtor-in-possession financing proposals from other lenders prior to the petition date. Based upon my experience representing other corporate debtors, and given the Debtors' unique circumstances, I believe that any efforts to obtain such financing from other lenders would have been futile. In my opinion, the Debtors would not have been able to obtain debtor-in-possession financing in the form of unsecured credit allowable as an administrative expense under the Bankruptcy Code, unsecured credit allowable under the Bankruptcy Code, or junior secured credit allowable under the Bankruptcy Code. Also, in my opinion,

the only source of debtor-in-possession financing for the Debtors was the Pre-Petition Lenders.

38. Given the Debtors' scarce resources, and the need to negotiate, in a very compact time-frame, a pre-arranged restructuring plan with the Debtors' creditor constituencies in order to preserve value, I believe that the Debtors made a prudent business judgment not to expend any effort pursuing sources of financing that, in my opinion, did not exist.

39. Before determining to agree to the terms of the restructuring contemplated by the Plan, and before agreeing to enter into the DIP Loan, the Debtors, the DIP Lenders, and the DIP Agent conducted vigorous, arm's-length, and good-faith negotiations. These negotiations spanned several weeks and involved many conference calls among numerous participants, their counsel, and their financial advisors. These calls often occurred during weekends and late into the night. Certain terms of the Plan and the DIP Loan changed frequently during these discussions, and the Plan and DIP Loan were not finalized until very shortly prior to the commencement of the Debtors' Chapter 11 cases.

40. Accordingly, I believe that approval of the DIP Loan is in the best interests of the Debtors' estates, their creditors and all parties-in-interest, and that the Court should therefore grant the DIP Motion and authorize the Debtors to enter into the DIP Loan.

41. In the DIP Motion, the Debtors request interim authority to borrow funds on an interim basis pending final approval of the DIP Loan. Such funds will be used by the Debtors, among other things, to pay payroll and related taxes and to continue purchasing parts and other services necessary for the Debtors to continue manufacturing newspaper printing presses pursuant to contracts entered into with customers prior to the petition date. Such expenses are detailed in the Budget attached to the DIP Motion.

42. Absent an ability to pay these and related expenses, the Debtors' estates and prospects for reorganizing their businesses will be irreparably harmed. Failure to pay such expenses will result in employees leaving the Debtors' employ at a time when their services are needed most, and will irretrievably damage the Debtors' relationships and goodwill with their many valued customers.

43. Accordingly, I believe that approval of the requested interim borrowing is in the best interests of the Debtors' estates, their creditors, and all parties in interest and should be approved.

8

_____
Timothy R. Coleman
Senior Managing Director
The Blackstone Group L.P.

Sworn to and subscribed before me
this 7 day of September, 2001

_____
Notary Public

HOLLY B. COHEN
NOTARY PUBLIC, State of New York
No. 01CO6003607
Qualified in Bronx County
Commission Expires March 9, 20 02